1   Rollin A. Ransom (State Bar No. 196126)
    rransom@sidley.com
2   Lauren M. De Lilly (State Bar No. 301503)
    ldelilly@sidley.com
3   Paula C. Salazar (State Bar No. 327349)
    psalazar@sidley.com
4   SIDLEY AUSTIN LLP
    555 West Fifth Street
5   Los Angeles, CA 90013
    Telephone: (213) 896-6000
6   Facsimile: (213) 896-6600

7   *Attorneys for Defendant Thrive*
    *Causemetics, Inc.*

8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10

11   THRIVE NATURAL CARE, INC.,          Case No. 2:20-cv-9091-PA-AS

12          Plaintiff,                   Hon. Percy Anderson

13      v.                              **DEFENDANT THRIVE**
                                        **CAUSEMETICS, INC.'S**
14   THRIVE CAUSEMETICS, INC.,          **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN OPPOSITION TO**
15          Defendant.                  **PLAINTIFF'S MOTION FOR**
                                        **PARTIAL SUMMARY JUDGMENT**
16
                                        Date:   September 13, 2021
17                                      Time:   1:30 p.m.
                                        Place:  Courtroom 9A
18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**PAGE**

BACKGROUND ................................................................................................. 1

I.   THE PARTIES ........................................................................................... 1

II.  PLAINTIFF'S DELAY IN INITIATING THIS LAWSUIT .................................. 2

LEGAL STANDARD ........................................................................................ 2

ARGUMENT .................................................................................................... 3

    I.   TCI's Laches Defense Raises a Genuine Dispute of Material Fact ........... 3

    II.   Genuine Disputes Exist as to Ownership. .................................................. 5

    III.   Genuine Disputes Exist as to Likelihood of Confusion. ............................ 7

        A.   Plaintiff Has Not Offered Any Evidence of Forward Confusion. ... 7

        B.   Genuine Disputes Exist As To Each *Sleekcraft* Factor. .................. 8

            1.   Plaintiff's Mark Is Conceptually and Commercially Weak. 8

            2.   The Parties' Products Share No Meaningful Overlap. ......... 10

            3.   The Parties' Marks and Commercial Impression Are Dissimilar. .................................................................................. 12

            4.   Evidence of Actual Confusion Is De Minimis. ................... 14

            5.   The Parties' Marketing Channels Are Distinct. ................. 15

            6.   Skincare Purchasers Exercise a High Degree of Care. ....... 16

            7.   TCI Selected Its Mark and Expanded Into Skincare In Good Faith. ............................................................................. 18

            8.   Neither Party Intends to Expand Its Product Line. ............. 19

    IV.   Genuine Disputes Exist as to Willfulness. ................................................. 20

    V.   Plaintiff Is Not Entitled to Recover TCI's Profits. .................................. 21

    VI.   Plaintiff Is Not Entitled To A Corrective Advertising Award. .................. 24

    VII.   There Is No Basis for a Permanent Injunction. ......................................... 25

CONCLUSION ................................................................................................. 25

-i-

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adray v. Adry-Mart, Inc.*,
  76 F.3d 984 (9th Cir. 1995) ..........................................................................24, 25

*Aeros Aeronautical Systems Corp. v. United States*,
  2016 WL 10516020 (C.D. Cal. June 20, 2016)...............................................3

*Allstate Ins. Co. v. Kia Motors Am., Inc.*,
  784 F. App'x 507 (9th Cir. 2019) ....................................................................16

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979), *abrogated in part on other grounds by
  Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003).......8, 20

*AOP Ventures, Inc. v. Steam Distrib., LLC*,
  2016 WL 7336730 (C.D. Cal. Oct. 11, 2016) ..................................................14

*Automobile Club of S. Cal. v. Auto Club, Ltd.*,
  2007 WL 704892 (C.D. Cal. Mar. 6, 2007) .....................................................18

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*,
  561 F.2d 1365 (10th Cir. 1977) .......................................................................24

*Binder v. Disability Group, Inc.*,
  2009 WL 10672976 (C.D. Cal. Feb. 3, 2009) ..................................................25

*Binder v. Disability Group, Inc.*,
  772 F. Supp. 2d 1172 (C.D. Cal. 2011) ...........................................................24

*Clinique Labs., Inc. v. Dep Corp.*,
  945 F. Supp. 547 (S.D.N.Y. 1996) ...................................................................17

*E. & J. Gallo Winery v. Consorzio del Gallo Nero*,
  782 F. Supp. 472 (N.D. Cal. 1992).................................................................21

*Echo Drain v. Newsted*,
  307 F. Supp. 2d 1116 (C.D. Cal. 2003) ...........................................................9

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
  741 F. Supp. 2d 1165 (C.D. Cal. 2010) .......................................................19, 20

*Fitbug Ltd. v. Fitbit, Inc.*,
  78 F. Supp. 3d 1180 (N.D. Cal. 2015) ......................................................4, 5, 21

*Folkens v. Wyland*,
  2002 WL 1677708 (N.D. Cal. July 22, 2002) ...................................................23

*Glow Indus., Inc. v. Lopez*,
  273 F. Supp. 2d 1095 (C.D. Cal. 2003) .........................................................6, 13

*Glow Indus. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002)................................................9, 10, 14, 17

*Golden Door, Inc. v. Odisho*,
  646 F.2d 347 (9th Cir. 1980) ..............................................................................13

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ............................................................................17

*Herbalife Int'l, Inc. v. Lumene N. Am., Inc.*,
  2007 WL 4225776 (C.D. Cal. Oct. 15, 2007) ...........................................*passim*

*Icebreaker Ltd. v. Gilmar S.P.A.*,
  911 F. Supp. 2d 1099 (D. Or. 2012)....................................................................11

*Interactive Health LLC v. King Kong USA, Inc.*,
  2008 WL 11342982 (C.D. Cal. Dec. 5, 2008)....................................................23

*interState Net Bank v. NetB@nk Inc.*,
  348 F. Supp. 2d 340 (D.N.J. 2004)........................................................................6

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) ................................................................................3

*Kamar Int'l, Inc. v. Russ Berrie and Co.*,
  752 F.2d 1326 (9th Cir. 1984)......................................................................22, 23

*Kleven v. Hereford*,
  2015 WL 4977185 (C.D. Cal. Aug. 21, 2015) .....................................................6

*Lahoti v. Vericheck, Inc.*,
  636 F.3d 501 (9th Cir. 2011) ................................................................................8

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Marketquest Group, Inc. v. BIC Corp.*,
   316 F. Supp. 3d 1234 (S.D. Cal. 2018) ...............................................................24

*Miller v. Glenn Miller Prods., Inc.*,
   454 F.3d 975 (9th Cir. 2006) ................................................................................3

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
   331 F. Supp. 2d 1214 (C.D. Cal. 2004), *aff'd,* 114 F. App'x 921 (9th
   Cir. 2004) .........................................................................................................9, 10

*Move Press, LLC v. Peloton Interactive, Inc.*,
   2019 WL 4570018 (C.D. Cal. Sept. 5, 2019) .......................................................21

*New Milani Grp., Inc. v. J.T. Bella, LLC*,
   2013 WL 12116579 (C.D. Cal. July 22, 2013) .....................................................13

*Novadaq Technologies, Inc. v. Karl Storz GmbH & Co. K.G.*,
   2015 WL 9028123 (N.D. Cal. Dec. 16, 2015) .................................................21, 22

*Oculu, LLC v. Oculus VR, Inc.*,
   2015 WL 3619204 (C.D. Cal. June 8, 2015)...............................................*passim*

*Patagonia, Inc. v. Anheuser-Busch, LLC*,
   2020 WL 8514835 (C.D. Cal. Sept. 3, 2020) .........................................................6

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014) .........................................................................14, 17

*Quia Corp. v. Mattel, Inc.*,
   2011 WL 2749576 (N.D. Cal. July 14, 2011) .......................................................24

*Razor USA LLC v. Vizio, Inc.*,
   2015 WL 12656941 (C.D. Cal. Oct. 19, 2015) .....................................................18

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ...............................................................................3

*Rodan & Fields, LLC v. Estee Lauder Co., Inc.*,
   2010 WL 3910178 (N.D. Cal. Oct. 5, 2010) .......................................................17

*S&B Filters Inc. v. R2C Performance Prods., LLC*,
   2016 WL 8928314 (C.D. Cal. Aug. 18, 2016) .....................................................12

-iv-

*Scat Enter., Inc. v. FCA US LLC,*
   2017 WL 5896182 (C.D. Cal. June 8, 2017)...................................................22, 24

*Sebastian Brown Prods. LLC v. Muzooka Inc.,*
   2016 WL 5910817 (N.D. Cal. Oct. 11, 2016) ......................................................6

*Stark v. Diageo Chateau & Estate Wines Co.,*
   907 F. Supp. 2d 1042 (N.D. Cal. 2012)..............................................................17

*Surfvivor Media, Inc. v. Survivor Prods.,*
   406 F. 3d 625 (9th Cir. 2005) ...................................................................*passim*

*Synopek, LLC v. Synaptek Corp.,*
   2018 WL 3359017 (C.D. Cal. Jun. 4, 2018)........................................................21

*Synoptek, LLC v. Synaptek Corp.,*
   309 F. Supp. 3d 825 (C.D. Cal. 2018) ................................................................14

*Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.,*
   964 F. Supp. 733 (S.D.N.Y. 1997) ...................................................................4, 5

*Winterland Concessions Co. v. Fenton,*
   835 F. Supp. 529 (N.D. Cal. 1993)..............................................................22, 23

**Statutes and Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................2

15 U.S.C. § 1060(a)(1)................................................................................................6

15 U.S.C. § 1115(b) ....................................................................................................7

15 U.S.C. § 1115(b)(2) ...............................................................................................6

15 U.S.C. § 1127.........................................................................................................6

**Other Authorities**

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2021)..........................................................................*passim*

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Thrive Causemetics, Inc. ("TCI") respectfully submits this memorandum of points and authorities in opposition to Plaintiff Thrive Natural Care Inc.'s ("Plaintiff") motion for partial summary judgment (ECF No. 40).

## BACKGROUND

### I.   THE PARTIES

TCI was established by its founder and Chief Executive Officer Karissa Bodnar in 2014.  Def.'s Statement of Genuine Disputes and Additional Material Facts ("SGD") No. 74.  Ms. Bodnar envisioned a beauty company that sells high-end luxury products and makes a difference in women's lives.  SGD No. 75.  To that end, TCI makes significant charitable donations in support of issues important to women, such as fighting breast cancer, surviving domestic abuse, emerging from homelessness, and adjusting to life outside of military service.  *Id.*  Ms. Bodnar coined the word "Causemetics" to reflect TCI's deep commitment to supporting charitable causes critical to women's well-being.  SGD No. 76.  In 2014, TCI sold its first products of false eyelashes and eyelash adhesive.  SGD No. 77.  By 2015, TCI was also selling color cosmetics, and in 2018, added skincare to its existing product line.  *Id.*  TCI achieved remarkable success almost from inception.  SGD No. 78.  It has expended substantial resources in developing its brand and gaining commercial recognition of the THRIVE CAUSEMETICS mark.  SGD No. 79.

Plaintiff was established in late 2012 by its co-founder and Chief Executive Officer Alex McIntosh.  SGD No. 80.  Under the mark THRIVE, Plaintiff sells skincare and grooming products principally targeted at men and featuring ingredients ostensibly sourced from regenerative Costa Rican "super-plants."  SGD No. 81.  Plaintiff's business model is focused on sustainability and environmentally conscious product development.  SGD No. 82.  Since its founding, Plaintiff's commercial performance has been modest, at best.  Its annual net revenue has ranged from $███ in 2014 to a high of $███ in 2020, and it has incurred significant net

1  losses every year.  SGD No. 83.  Plaintiff's "sales and marketing" expenditures have

2  also been modest, ranging from $███ in 2013 to a high of $███ in 2019.  SGD

3  No. 84.  As of mid-August 2021, Plaintiff had just 7,237 followers on Instagram and

4  2,725 followers on Facebook.  SGD No. 85.

5  **II.**  **PLAINTIFF'S DELAY IN INITIATING THIS LAWSUIT**

6          Plaintiff learned about TCI and THRIVE CAUSEMETICS in April of 2016

7  when Ms. Bodnar contacted Plaintiff by e-mail.  SGD No. 86.  During that exchange,

8  Mr. McIntosh declined Ms. Bodnar's request to use the word "thrive" as part of TCI's

9  brand name and stated that Plaintiff "already sell[s] female cosmetic products," but

10  did not demand that TCI cease use of its mark.  SGD No. 87.  Nearly a year later, on

11  March 3, 2017, Plaintiff sent TCI a cease-and-desist letter alleging trademark

12  infringement.  SGD No. 89.  TCI promptly responded on April 12, 2017, and

13  explained its position that confusion was unlikely because (1) TCI's coined phrase

14  "Causemetics," coupled with differences in the parties' overall branding and product

15  lines, differentiated the parties' marks to consumers, (2) the term "thrive" is a

16  commonly used term in personal care, health, and beauty spaces, and (3) Plaintiff had

17  not created sufficient market awareness of its brand.  SGD No. 91.  Plaintiff never

18  responded to this letter.  SGD No. 92.  Over two years later in June 2019, Ms. Bodnar

19  reached out to Mr. McIntosh by phone regarding the companies' respective marks and

20  a potential "peaceful coexistence" agreement.  SGD No. 93.  The parties did not reach

21  any agreement during that conversation and had no further communication.  SGD No.

22  94.  Nearly sixteen months later, and four and one-half years after learning of TCI's

23  mark, Plaintiff filed this action.  *See generally* ECF No. 1.

24                              **LEGAL STANDARD**

25          At summary judgment, the movant bears the burden of demonstrating "there is

26  no genuine dispute as to any material fact and the movant is entitled to judgment as a

27  matter of law."  Fed. R. Civ. P. 56(a).  Only when the movant meets its initial burden

28  of demonstrating the absence of a genuine issue of material fact does the burden shift

to the non-moving party "to set out specific material facts showing a genuine issue for trial." *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *4 (C.D. Cal. June 8, 2015).

Summary judgment is "generally disfavored" in trademark infringement cases "[b]ecause the likelihood of confusion is often a fact-intensive inquiry." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012) (reversing summary judgment). Summary judgment regarding likelihood of confusion should be granted "sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Rearden*, 683 F.3d at 1210.

## ARGUMENT

### I.   TCI'S LACHES DEFENSE RAISES A GENUINE DISPUTE OF MATERIAL FACT.

TCI asserts a laches defense to Plaintiff's claims. ECF No. 31 at 10 ¶ 2. Although the defendant bears the burden of proving an affirmative defense at trial, a plaintiff seeking summary judgment must point to a lack of evidence supporting the affirmative defenses. *Oculu*, 2015 WL 3619204, at *4 ("When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case.") (citations omitted); *accord Aeros Aeronautical Systems Corp. v. United States*, 2016 WL 10516020, at *7 (C.D. Cal. June 20, 2016). Here, Plaintiff does not even mention TCI's laches defense, let alone argue that TCI has not presented a genuine issue of material fact as to the defense. For this reason alone, Plaintiff's motion should be summarily denied.

Laches is a defense to both Plaintiff's Lanham Act claims and its related state law claims. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The defense is established where there is (1) unreasonable delay by the plaintiff in bringing suit, and (2) prejudice to the defendant. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). Ample evidence supports both of these elements (and at least raises genuine issues of material fact). First, TCI adopted

the THRIVE CAUSEMETICS mark in 2014, six years before this action, which Plaintiff has known since at least April 2016. SGD Nos. 74, 86, 88, 89, 91, 92. Notwithstanding this knowledge, Plaintiff waited four and one-half years before filing suit. ECF No. 1 (filed October 2, 2020). Courts have readily found that periods of such length constitute "unreasonable delay" for purposes of laches. *See, e.g.*, *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1190 (N.D. Cal. 2015) (four and one-half year delay held unreasonable); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 751-53 (S.D.N.Y. 1997) (three-year delay unreasonable).

While Plaintiff may claim that its delay is justified because TCI's growing business added allegedly infringing skincare products in 2018, Plaintiff's communications with TCI belie any such excuse. In his April 2016 e-mail to Ms. Bodnar, Mr. McIntosh unequivocally stated "[w]e already sell female cosmetic products" and that Plaintiff was ostensibly entitled to "protection of the thrive mark across the gamut of personal care products that fall within our owned mark." SGD No. 87. Thus, Plaintiff *already believed there was overlap in the parties' products* in 2016 and *already believed there was infringement.* SGD Nos. 87, 88, 96. Similarly, when Plaintiff's counsel contacted TCI in March 2017 to demand that TCI cease use of "thrive," Plaintiff's counsel unequivocally asserted that TCI's "use of the identical term [THRIVE] for highly related products infringes Thrive's trademark rights." SGD Nos. 89, 90. The undisputed facts are that Plaintiff knew about TCI, believed the parties' products overlapped and that TCI infringed in early 2016 and 2017, but did not act until late 2020. SGD Nos. 86-94, 96; ECF No. 1. That unreasonable delay satisfies the first element of laches (or at least creates a genuine issue of fact).[1]

Second, TCI has been prejudiced by Plaintiff's delay. Courts recognize "economic prejudice" – namely, the investment of time and resources in promoting a

---

[1] While TCI disputes Plaintiff's claim of both product similarity/overlap and infringement as discussed further below, what matters for purposes of the laches defense is *Plaintiff's* belief that TCI was infringing (and its corresponding failure to act). As set forth above, it is clear that *Plaintiff* believed that TCI was infringing from inception, but failed to take any action for years.

-4-

1  mark and corresponding brand identity – as more than sufficient to support a finding

2  of laches.  *See, e.g.*, *Fitbug*, 78 F. Supp. 3d at 1194 (finding defendant "suffered

3  'expectation' or 'economic prejudice'" because defendant built its valuable business

4  around its trademark during plaintiff's delay); *Columbia Univ.*, 964 F. Supp. at 753

5  (finding prejudice where defendant spent substantial money developing programs

6  featuring its trademark during plaintiff's delay).  In light of Plaintiff's silence and

7  inaction for years – including after the above-referenced communications – TCI

8  continued to substantially invest in its brand and business, including developing new

9  products.  *See* SGD Nos. 77-79.  This prejudice satisfies the second element of laches.

10       At a minimum, the evidence of Plaintiff's delay and resulting prejudice to TCI

11  creates a genuine dispute of material fact as to TCI's laches defense.  Because

12  Plaintiff has not even addressed the defense in its motion (as it is required to do), the

13  motion should be denied for this reason alone.

14  **II.   GENUINE DISPUTES EXIST AS TO OWNERSHIP.**

15       Plaintiff has failed to demonstrate the absence of a genuine dispute as to the

16  first element of its infringement claim – a protectable ownership interest in the mark.

17  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F. 3d 625, 630 (9th Cir. 2005).  Plaintiff

18  contends that its mark is protectable because it owns two federal registrations, one of

19  which is allegedly incontestable.  ECF No. 34-6 at 12.  Neither registration supports

20  Plaintiff's ownership claim, however, because Plaintiff never succeeded to rights in

21  the THRIVE mark, which has since been abandoned by its actual owner.

22       Ecomundi Ventures LLC ("Ecomundi") initially filed intent-to-use Application

23  Serial No. 85726058 (the "'058 Application") for the mark THRIVE.  SGD No. 97.

24  However, Ecomundi entered into an agreement with Plaintiff, effective May 23, 2013,

25  to purportedly assign all right, title, interest, and goodwill in the '058 Application to

26  Plaintiff.  SGD No. 98.  Although Ecomundi claimed to have worked on product

27  packaging and marketing materials with the THRIVE mark prior to May 2013, there is

28  no admissible evidence that these materials were even shown to consumers or

retailers, and Ecomundi never sold a product bearing the THRIVE mark.  SGD No. 99.  As a result, no goodwill was created in the THRIVE mark prior to the putative assignment.  *See, e.g.*, *Sebastian Brown Prods. LLC v. Muzooka Inc.*, 2016 WL 5910817, at *9 (N.D. Cal. Oct. 11, 2016) (holding that "no goodwill is created when a mark is seen by the consuming public only in very limited quantity," and finding assignment of an intent-to-use application invalid where the assignor's use of the mark was largely non-public and did not generate sales) (citations omitted).

Because there was no goodwill in the THRIVE mark at the time of the putative assignment from Ecomundi to Plaintiff, that assignment was invalid, such that all rights in the '058 Application remained with Ecomundi.  SGD No. 99; 15 U.S.C. § 1060(a)(1); *Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1107-08 (C.D. Cal. 2003); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy") § 18:17 (5th ed. 2021) ("[A]n 'assignment in gross' of a trademark is invalid, and operates to pass no rights to the purported assignee.").  The '058 Application, in turn, matured into U.S. Registration Nos. 4,467,942 and 6,164,303 (the "'942" and "'303" Registrations), SGD No. 100, and as the putative assignment to Plaintiff was invalid, Ecomundi possesses all rights in those registrations, *Patagonia, Inc. v. Anheuser-Busch, LLC*, 2020 WL 8514835, at *7 (C.D. Cal. Sept. 3, 2020) ("[O]nly after a valid assignment of trademarks does an assignee succeed to the rights of the assignor.").  That Ecomundi has not used the THRIVE mark is prima facie evidence of abandonment.  *See* SGD Nos. 98-99; 15 U.S.C. § 1127.

Plaintiff's cited authorities are inapposite because they assume that Plaintiff is the owner of the '942 and '303 Registrations, and none addresses the threshold issue of whether Plaintiff succeeded to Ecomundi's rights in the first instance.  Equally irrelevant is Plaintiff's claim that the '942 Registration is incontestable, as incontestability does not insulate a trademark registration from an abandonment defense.  *See* 15 U.S.C. § 1115(b)(2); *interState Net Bank v. NetB@nk Inc.*, 348 F. Supp. 2d 340, 352 (D.N.J. 2004); *Kleven v. Hereford*, 2015 WL 4977185, at *22-23

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

(C.D. Cal. Aug. 21, 2015).  In short, TCI has a raised a genuine issue of material fact that Plaintiff did *not* succeed to rights in the THRIVE mark due to an invalid assignment and that the mark was then abandoned by Ecomundi.  The '942 and '303 Registrations thus cannot serve as "conclusive evidence" of the validity of the mark or its ownership. 15 U.S.C. § 1115(b); *see also id.* §§ 1115(b)(2), 1127.  This precludes summary judgment on Plaintiff's federal statutory infringement claim, and further deprives the THRIVE mark of the evidentiary presumptions upon which Plaintiff relies in connection with all of its claims (*see, e.g.,* ECF 34-6 at 7).[2]

## III.   GENUINE DISPUTES EXIST AS TO LIKELIHOOD OF CONFUSION.

Plaintiff's motion should also be denied because of multiple genuine disputes of material fact concerning likelihood of confusion.

### A.   **Plaintiff Has Not Offered Any Evidence of Forward Confusion.**

The "likelihood of confusion" analysis underlying trademark infringement claims considers "whether a 'reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.'" *Surfvivor*, 406 F.3d at 630 (citations omitted).  Such claims can take two distinct forms – forward confusion and reverse confusion.  *Id.*; *Oculu*, 2015 WL 3619204, at *9.  "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Surfvivor*, 406 F.3d at 630.  In contrast, "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one," *id.*, because the junior user "'saturates the market with a similar trademark and overwhelms'" the senior user, *Oculu*, 2015 WL 3619204, at *9-10 (*quoting Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1047 (C.D. Cal. 2013)); *see* McCarthy § 23:10.

Here, it is apparent that Plaintiff's claim involves reverse confusion, as this is the only theory for which Plaintiff has attempted to offer (disputable) evidence;

---

[2] TCI's abandonment defense is also the subject of Plaintiff's pending motion to strike.  ECF Nos. 32, 43.

1    Plaintiff has offered *no* evidence of forward confusion.[3]  Plaintiff claims that "TCI's

2    multi-million dollar per year growth has enabled it to flood the market with

3    advertising for its own skincare products such that consumers have now come to

4    believe that Plaintiff is related to or affiliated with defendant TCI and that Thrive's

5    goods originate from TCI."  ECF No. 28 ¶ 4; *see also id.* ¶ 75.  Such allegations

6    reflect a theory of reverse, rather than forward, confusion.  *See, e.g.*, *Surfvivor*, 406

7    F.3d at 630; *Oculu*, 2015 WL 3619204, at *9; McCarthy § 23:10.[4]  Plaintiff also

8    asserts that TCI's success has crowded Plaintiff out of the market.  ECF No. 28 ¶¶ 4,

9    69-70.  Finally, the few instances of alleged actual confusion reflect (if anything)

10   reverse confusion, and Plaintiff conceded that it is not aware of any other instances of

11   confusion.  SGD No. 101.  Without evidence of forward confusion, Plaintiff cannot

12   obtain summary judgment on a forward confusion infringement claim.

**B.    Genuine Disputes Exist As To Each *Sleekcraft* Factor.**

14          Summary judgment is also inappropriate as to Plaintiff's reverse confusion

15   infringement claim.  Courts in the Ninth Circuit consider the eight factors in *AMF Inc.*

16   *v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated in part on other*

17   *grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003), to

18   analyze likelihood of confusion.  Genuine issues of fact exist as to all of the factors.

1.    Plaintiff's Mark Is Conceptually and Commercially Weak.

20          The strength of a mark is determined with a two-part test concerning the

21   mark's:  (1) conceptual strength or distinctiveness, and (2) the "commercial strength,

22   or marketplace recognition value."  *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th

23   Cir. 2011).  In a reverse confusion case, although "a strong junior mark may

24   overwhelm the senior mark . . . the strength of the senior use's mark is still relevant,

25   as the senior user must still show that its mark deserves protection."  *Oculu*, 2015 WL

---

[3] For this reason, TCI has moved for summary judgment on Plaintiff's forward confusion claim.  *See generally* ECF No. 36.
[4] Plaintiff's motion likewise relies on the theory that TCI overwhelmed the market such that consumers associate Plaintiff with TCI, *see, e.g.*, ECF No. 34-6 at 13-14, 24, while mentioning forward confusion only once, and only in passing, *see id.* at 13.

1    3619204, at *11; *see also Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F.

2    Supp. 2d 1214, 1226 (C.D. Cal. 2004) (conceptual weakness of senior user's mark and

3    commercial strength of junior user's mark weighed against confusion), *aff'd,* 114 F.

4    App'x 921 (9th Cir. 2004); *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 992 (C.D. Cal.

5    2002) (confusion unlikely where senior user's mark operated in crowded field and was

6    conceptually weak); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal.

7    2003) (plaintiff's presumptively weak mark and numerous third-party use of similar

8    mark weighed against confusion).

9        The conceptual strength of a mark is considered on a spectrum from weak to

10   strong:  descriptive (describes the associated product, and is protectable only upon a

11   showing that consumers associate the term with a single source); suggestive (some

12   imagination is required to associate the mark with the product); arbitrary (common

13   term that has no commonly-known connection with the associated product); and

14   fanciful (coined word or phrase that has no commonly-known meaning).  *Surfvivor*,

15   406 F.3d at 631.  Plaintiff incorrectly contends that its mark is arbitrary and deserving

16   of "maximum" protection.  ECF No. 34-6 at 18.  The mark THRIVE is descriptive at

17   worst, and suggestive at best.  The ordinary dictionary definition of the word "thrive"

18   is "prosper or flourish" or to "grow vigorously or luxuriantly; improve physically."

19   SGD No. 102.  Plaintiff has represented to the public that its skincare products are

20   "regenerative," "empower your skin," and "'go under the hood' to work with your

21   body to help skin be healthy and resilient from the inside out."  SGD No. 103.  The

22   mark THRIVE thus *describes* the characteristics of the Plaintiff's products – they

23   (ostensibly) help consumers' skin physically improve, or thrive.  SGD No. 104.  At

24   best, the mark THRIVE is suggestive of these benefits, and of Plaintiff's business

25   model that helps the environment and communities to thrive.  SGD No. 105.

26       Furthermore, extensive third-party use of the term "thrive" in connection with

27   personal care products indicates that consumers are regularly exposed to and associate

28   the term with improvement to body, health, and appearance.  SGD No. 106; *see*

-9-

1    *Moose Creek*, 331 F. Supp. 2d at 1224-25 ("[E]ven 'an arbitrary mark may be

2    classified as weak where there has been extensive third party use of similar marks on

3    similar goods.'").  There are currently 1074 active registrations and applications with

4    the United States Patent and Trademark Office ("PTO") that include "thrive," alone or

5    in combination with other words, and hundreds more that include variations on the

6    word.  SGD No. 106.  Several of these are for personal care products or services that

7    are the same or related to those offered by Plaintiff.  *Id.*  These similar marks for

8    related goods further shows the conceptual weakness of the THRIVE mark.

9         Plaintiff's mark is also commercially weak, and has been throughout its

10   existence.  The commercial strength of a mark refers to its degree of recognition in the

11   minds of consumers, as measured by "advertising expenditures, length of exclusive

12   use, and other indicia of actual marketplace recognition."  *Herbalife Int'l, Inc. v.*

13   *Lumene N. Am., Inc.*, 2007 WL 4225776, *5 (C.D. Cal. Oct. 15, 2007).  Plaintiff

14   argues that its mark is commercially strong due to "long and continuous" use.  ECF

15   No. 34-6 at 18.  However, prior to 2018, when Plaintiff now alleges the infringement

16   began, Plaintiff's commercial performance was modest:  its "sales and marketing"

17   expenses ranged from $▮▮▮▮ in 2013 to $▮▮▮▮ in 2017; its revenues in the same

18   period ranged from $▮▮▮ to $▮▮▮▮; and it lost hundreds of thousands of dollars

19   every year.  SGD Nos. 83, 84.  Since 2018, Plaintiff's performance has continued to

20   be mediocre, as evidenced by its relatively modest revenue, six-figure net losses, and

21   minor social media presence.  SGD Nos. 83-85.  And as noted above, extensive third-

22   party use of "thrive" reflects that Plaintiff's use is far from exclusive.  SGD No. 106.

23        As Plaintiff's mark is neither conceptually nor commercially strong, even if the

24   Court were to find that TCI's mark is commercially strong, this factor weighs against

25   confusion.  *Moose Creek*, 331 F. Supp. 2d at 1226; *Glow*, 252 F. Supp. 2d at 992.

26             2.    The Parties' Products Share No Meaningful Overlap.

27        This factor considers "whether customers are likely to associate the two product

28   lines," including "whether the buying public could reasonably conclude that the

-10-

products came from the same source." *Surfvivor*, 406 F.3d at 633 (internal quotations and citations omitted).  Plaintiff incorrectly claims that the parties' products are "identical."  ECF No. 34-6 at 10-11.  Although the parties' products may superficially fall into a similar category, a cursory examination reveals that the parties sell distinct products marketed to substantially distinct customer bases.  *See, e.g.*, *Icebreaker Ltd. v. Gilmar S.P.A.*, 911 F. Supp. 2d 1099, 1104 (D. Or. 2012) (no likelihood of confusion between apparel brands targeted to different markets:  "[c]ourts have held that the mere fact that two products or services fall within the same general field . . . does not mean that the two products or services are sufficiently similar to create a likelihood of confusion") (citation omitted).

Plaintiff's mission focuses primarily on sustainability, and conveys the impression of earthiness, manliness, and active, outdoor living.  SGD No. 109.  Consistent with that mission, Plaintiff's products are made from regenerative Costa Rican "super-plants" marketed as having natural, "unique" properties that ameliorate the effects of an active, outdoor lifestyle or facilitate shaving.  SGD No. 110.  One or more of these "super-plants" are in all of Plaintiff's products and tied to Plaintiff's sustainability mission.  SGD No. 111.  Plaintiff's target consumer is men; its first three products were for male grooming with earthy and masculine scents, its product packaging was expressly modeled after "male shoulders," Plaintiff's fictional target consumer was described by Plaintiff's branding agency as an "urban woodsman" named "Adam," and third-party articles regarding Plaintiff (and featuring Mr. McIntosh) have routinely characterized Plaintiff as a "men's skin care company."[5] SGD No. 112.  Its individual products are priced in the range of $12.95 to $24.95, with kits priced from $25.95 to $54.95.  SGD No. 113.

[5] Mr. McIntosh himself concedes that the products appear fundamentally different – with Plaintiff's directed toward men and TCI's directed toward women – stating that "consumers would be likely to believe that TCI's Infringing Skincare Products are a women's line and Thrive's Thrive Products are a men's line."  SGD No. 47.  In short, Plaintiff's own CEO has conceded that the parties' respective product packaging and target consumers fundamentally differ along gender lines, a strong fact weighing against likely confusion.

-11-

1    In contrast, TCI has a mission of charitable giving primarily focused on female

2    empowerment.  SGD No. 114.  TCI's mark THRIVE CAUSEMETICS merges the

3    company's philanthropic purpose with its products.  SGD No. 115.  TCI primarily

4    sells high-end luxury color cosmetics and some high-end skincare products, both

5    principally marketed to women.  SGD No. 116.  TCI markets its skincare as having

6    the ability to beautify or improve the appearance of skin or to cleanse the skin after a

7    makeup routine.  SGD No. 117.  TCI's individual skincare products are priced as high

8    as $68 (*i.e.*, more than Plaintiff's most expensive multi-product kit).  SGD No. 118.

9    The substantial differences between the parties and their products prove they are not

10   "identical"; to the contrary, these distinctions render any confusion unlikely.

11           3.      <u>The Parties' Marks and Commercial Impression Are Dissimilar.</u>

12    Courts assess similarity of the marks by "compar[ing] the two marks in terms

13   of sight, sound, and meaning, considering the marks 'as a whole, as [they] appear in

14   the marketplace.'"  *Oculu*, 2015 WL 3619204, at *12 (citations omitted); *Surfvivor*,

15   406 F.3d at 633 ("In considering the degree of similarity between the two marks,

16   courts should analyze each mark within the context of other identifying features.");

17   *S&B Filters Inc. v. R2C Performance Prods., LLC*, 2016 WL 8928314, *8 (C.D. Cal.

18   Aug. 18, 2016) ("[w]hen judging similarity, trademarks should be considered as they

19   are encountered in the marketplace") (citation omitted).  Here, the parties' marks are

20   not similar in sight, sound, or meaning when considered as a whole – Plaintiff's mark

21   is the word THRIVE, and TCI's mark is THRIVE CAUSEMETICS.  SGD No. 119.

22   Plaintiff does not dispute – because it cannot – that every TCI product includes the

23   coined term "Causemetics" as part of TCI's mark, which ties TCI's products to its

24   core philosophy of charitable giving.  *See* SGD No. 76, 115, 120.

25           Plaintiff's assertion that the Court should simply ignore the "Causemetics"

26   element fails for multiple reasons.  First, Plaintiff's argument violates the "anti-

27   dissection" rule, which prohibits disassociation of a single element of an allegedly

28   infringing mark from its other elements, and from the overall context in which the

mark is presented.  *See, e.g., Herbalife,* 2007 WL 4225776, at *6.  Second, Plaintiff's assertion that "Causemetics" is "merely descriptive," *see* ECF No. 34-6 at 14, and should therefore be ignored, is legally and factually incorrect (or, at a minimum, raises a factual issue that precludes summary judgment).  While Plaintiff argues that one Examining Attorney at the PTO has made a non-final statement that "Causemetics" is a homophone of the descriptive term "cosmetics" and would have to be disclaimed, another Examining Attorney reached the opposite conclusion, such that TCI owns a federal trademark registration for the standalone term CAUSE-METICS for cosmetics.  SGD No. 121.  At a minimum, therefore, there is a genuine dispute as to the alleged descriptiveness of the "Causemetics" element.  Finally, Plaintiff's citation to *Electropix v. Liberty Livewire Corp.*, is particularly inapt, as the court there observed that adding a descriptive term to an *arbitrary* mark may not avoid confusion.  178 F. Supp. 2d 1125, 1129 (C.D. Cal. 2001).  Here, *neither* aspect of this observation applies:  "Causemetics" is not descriptive and THRIVE is not arbitrary.[6]  The parties' respective marks are thus clearly distinct.

Moreover, the parties' distinct presentations of their products weighs against similarity.  The overall color scheme of Plaintiff's packaging is brown, tan, black, and red tones, with the "Thrive" mark in bold, chunky font.  SGD No. 122.  In contrast, TCI's packaging consistently uses white or teal tones, and the mark is in slim, all lower-case black, white, teal, or silver font.  SGD No. 123.  These distinctions further support a finding that confusion is unlikely.  *See Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1124 (C.D. Cal. 2003) (presentation of marks "in starkly different typefaces and styles," and differences in shape, dimensions, and color patterns of packaging gives rise to "distinctly different commercial impressions") (citation omitted); *New Milani Grp., Inc. v. J.T. Bella, LLC*, 2013 WL 12116579,*10 (C.D.

---

[6] Also inapposite is *Golden Door, Inc. v. Odisho*, 646 F.2d 347, (9th Cir. 1980), in which the "additional" element added by the defendant described *both* parties' services.  *Id.* (where both parties used "GOLDEN DOOR" for services that included hair styling, defendant's addition of "for Hair" did not meaningful distinguish marks).

Cal. July 22, 2013) (plaintiff's "bulkier, more stylized font" and defendant's "thinner, sleeker" font weighed against similarity).

Plaintiff's assertion that its (abandoned) plain text mark registrations render differences in the parties' trade dress irrelevant, or that differences in presentation should otherwise be ignored, is unsupported by the cases it cites.  In *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018), differences in display were of limited significance because, unlike the present action, the marks were "virtually indistinguishable in both sound and appearance."  *Id.* at 838.  And in *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014), the court affirmed that the parties' respective trade dress *must* be considered; it found that the overall factor weighed in favor of the plaintiff because the marks possessed "many visual similarities, perfect aural similarity, and perfect semantic similarity" – factors not present here.  *Id.* at 1128 n.7, 1129; *see also AOP Ventures, Inc. v. Steam Distrib., LLC*, 2016 WL 7336730, at *7 (C.D. Cal. Oct. 11, 2016) (considering packaging differences but concluding factor weighed in favor of confusion given near identical sight and meaning of THE MILKMAN and MILK MAN marks for identical goods).  Likewise inapt is Plaintiff's reliance on *Perfumebay.com Inc. v. eBay, Inc.*, in which the court relied heavily on the strength of the "eBay" mark in evaluating similarity – also a factor not present here.  506 F.3d 1165, 1174 (2007) ("Although differences exist between the two marks, the fact that eBay's mark is a strong one weighs against Perfumebay.").  In sum, the multiple differences between the parties' marks and overall commercial impression far outweigh the single similarity of the word "thrive."

### 4.   Evidence of Actual Confusion Is De Minimis.

This factor considers the existence and extent of evidence that the parties' marks have led to confusion.  *Oculu*, 2015 WL 3619204, at *12.  Notably, de minimis evidence of actual confusion is insufficient to demonstrate a likelihood of confusion.  *See, e.g.*, *Surfvivor*, 406 F.3d at 633 (two instances of actual confusion were insufficient to demonstrate likelihood of confusion); *Glow Indus.*, 252 F. Supp. 2d at

-14-

999 (two facsimiles from a wholesale customer and handwritten notes of employees recording comments by retail customers insufficient for likelihood of confusion).

Here, the parties have coexisted since 2014, and Plaintiff has offered at most five instances of alleged actual confusion:  three statements by online customers, an allegedly mistaken reference on Walmart.com, and a passing comment by the parent of a professional athlete.[7]  SGD Nos. 95, 124.  That only these disputable instances of alleged confusion have occurred during the parties' long coexistence demonstrate that confusion is unlikely.  Plaintiff also proffers putative survey evidence, but the survey methodology suffers from multiple fatal flaws, including as to its overall design, the use of suggestive and leading questions, and the failure to replicate actual marketplace conditions.  SGD No. 125.  TCI's expert conducted a survey based on widely accepted survey principles, and found *zero* confusion between the parties and their respective products.  SGD Nos. 95, 126.  This factor also weighs against confusion.

### 5.    The Parties' Marketing Channels Are Distinct.

"When examining the marketing channels factor, the Court considers the location of where the goods or services are sold as well as the sales and marketing methods employed."  *Oculu*, 2015 WL 3619204, at *17.  When both parties advertise online, however, this factor is less relevant because "it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  *Id.*; *see also Herbalife*, 2007 WL 4225776, at *10-11 ("If anything, a consumer will use *more* care in choosing between the two companies' [] products online.").

Plaintiff contends that because both parties sell and advertise their products online, the parties' products may "appear side-by-side" in Internet searches and consumers are therefore likely to be confused.  ECF No. 34-6 at 16.  But courts have routinely rejected such simplistic arguments, given the ubiquity of Internet-based

---

[7] Plaintiff claims that TNC's partnership with the athlete faltered because of the alleged confusion.  This claim is unsupported and false.  *See* SGD Nos. 58, 124.

marketing.  *See, e.g., Allstate Ins. Co. v. Kia Motors Am., Inc.*, 784 F. App'x 507, 510 (9th Cir. 2019) ("[I]nternet marketing is too ubiquitous to shed much light on the likelihood of consumer confusion.") (internal quotations and citations omitted); *Herbalife*, 2007 WL 4225776, at *10-*11 ("Consider the consumer who types [product name] in a search engine, presumably searching for [defendant's] or [plaintiff's] products (or else why use that search term?). That consumer will then have to exercise some care in choosing among the search results in order to find the product she specifically had in mind.").

The more critical consideration, which Plaintiff fails to meaningfully address, is that there is *no* overlap in the locations where each party actually sells its respective products.  Plaintiff's products are available at brick-and-mortar retailers like Whole Foods, on Plaintiff's website, and on Amazon.com and Walmart.com.  SGD No. 127.  TCI does not sell its products through *any* of these locations; instead, TCI sells its products *only* through its website.[8]  SGD No. 128.  The facts are thus comparable to those in *Herbalife*.  Although the plaintiff in that action – like Plaintiff here – "relie[d] heavily on the fact that both companies' products can be purchased on the Internet and on the fact that if a consumer searches for [the relevant mark] using the Google search engine, both companies' products appear on the first page of results," the court found that this factor weighed against confusion, where the parties did not sell their respective products through the same websites or the same brick-and-mortar stores.[9] *Herbalife*, 2007 WL 4225776, at *9-10.  The same is true here.

      6.    <u>Skincare Purchasers Exercise a High Degree of Care.</u>

This factor considers "'the type of good or service offered and the degree of care one would expect from "the average buyer exercising ordinary caution." *Oculu*,

---

[8] Although TCI's color cosmetics (not skincare) were once sold at certain Ulta locations through a limited-time partnership and at small beauty boutiques, Plaintiff has never sold its products at Ulta or at any of these boutiques. SGD No. 129.
[9] The facts here are also distinguishable from *Perfumebay.com Inc.*, in which the parties' respective services were exclusively web-based services.  506 F.3d at 1174-75; *see also Herbalife*, 2007 WL 4225776, at *9.

2015 WL 3619204, at *16 (citations omitted).  Plaintiff contends that skincare consumers will exercise little to no care, ostensibly because the parties' products are "fungible" and inexpensive, "can be purchased off the shelf with no prior knowledge," and because "the parties' brands are centered on the same name."  ECF No. 34-6 at 20-21.  These claims are meritless – on the contrary, several courts have recognized that consumers exercise substantial care with respect to skincare products.  *See, e.g.*, *Glow Indus.*, 252 F. Supp. 2d at 1001 (purchasers of "skin care products tend to exercise a high degree of care and brand consciousness"); *Rodan & Fields, LLC v. Estee Lauder Co., Inc.*, 2010 WL 3910178, at *4 (N.D. Cal. Oct. 5, 2010) (skincare consumers likely to exercise a high degree of care given their "sophistication" and "the prestigious, relatively expensive products being sold"); *Herbalife*, 2007 WL 4225776, at *10-11 ("purchasers of fragrances and skin care products tend to exercise a high degree of care and brand consciousness"); *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 556 (S.D.N.Y. 1996) ("[C]onsumers of skin care products are women (and the products at issue are marketed to women), who take care in deciding what products to use on their skin, particularly the skin on their faces.").[10]

Plaintiff's arguments are also divorced from the reality of how consumers encounter the parties' products.  TCI's products cannot be "purchased off the shelf with no prior knowledge" by consumers.  ECF No. 34-6 at 21.  TCI's products are not available in stores; instead, consumers need to visit TCI's website to purchase authorized TCI products.  *Supra* § III.B.5.  Purchasers of TCI's products are also sophisticated and care about the products they use; indeed, TCI's customers provide extensive and regular feedback to TCI concerning product development and naming.  SGD No. 130.  The parties' respective products also have significantly different price

---

[10] Plaintiff's authorities are inapposite because they involve goods and services unrelated to personal care products.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) (Internet search engines); *Pom Wonderful*, 775 F.3d at 1122 (pomegranate beverages); *Electropix*, 178 F. Supp. 2d at 1126 (post-production feature film and television services); *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1045 (N.D. Cal. 2012) (wine).

1   ranges and TCI's skincare products are not inexpensive.  *Supra* § III.B.2.  Finally,

2   every product sold by TCI includes the mark THRIVE CAUSEMETICS, which

3   clearly and conspicuously informs all consumers that the products originate from TCI.

4   *Supra* § III.B.3.  This factor weighs against a likelihood of confusion.

5   <u>7.   TCI Selected Its Mark and Expanded Into Skincare In Good Faith.</u>

6        "In a reverse confusion case, the intent inquiry must . . . focus on whether the

7   defendant was aware of the senior user's use of the mark in question, or whether the

8   defendant conducted an adequate name search for other companies marketing similar

9   goods or services under that mark." *Oculu*, 2015 WL 3619204, at *18 (citation

10  omitted).  Plaintiff concedes that TCI had no knowledge of Plaintiff when TCI

11  adopted its mark, but nonetheless asserts that TCI "made the knowing choice to

12  infringe" when it began offering skincare products in 2018, notwithstanding the

13  parties' communications and decisions by the PTO.[11]  ECF No. 36-4 at 21-22.  This

14  claim is baseless.  TCI did not "choose" to infringe; rather, TCI continued its existing

15  business operations after Plaintiff's silence and inaction in enforcing its purported

16  trademark rights.  *Supra* § I.  In response to Plaintiff's 2017 cease-and-desist letter and

17  to the interim decisions of the PTO, TCI explained its multiple good faith reasons to

18  believe that confusion was not likely, including TCI's use of the coined term

19  "Causemetics," differences in the parties' target consumers and channels, extensive

20  third party use of the term "thrive," and the reality that Plaintiff had not created

21  meaningful market awareness of its brand.  SGD No. 91.  After receiving TCI's

22  response, Plaintiff took no action and waited over three and one-half years to file this

23  action.  *Supra* § I.  During Plaintiff's delay, TCI continued its business operations,

24  _____

[11] Decisions of PTO examining attorneys (to the extent even admissible, as raised in
25  TCI's evidentiary objections) are far from conclusive on likelihood of confusion, and
as detailed herein, TCI had valid bases for disagreeing with the examining attorney's
26  decision concerning the THRIVE CAUSEMETICS mark.  *See, e.g.*, *Automobile Club
of S. Cal. v. Auto Club, Ltd.*, 2007 WL 704892, *3 (C.D. Cal. Mar. 6, 2007) (the
27  findings of the USPTO examining attorney are "not conclusive or binding on the
Court"); *Razor USA LLC v. Vizio, Inc.*, 2015 WL 12656941, *7 (C.D. Cal. Oct. 19,
28  2015) (PTO examining attorney conclusion "need not be given weight when the PTO
attorney did not review all the evidence available to the District Court").

including making substantial investments in developing new products.  *See id.*  TCI also knew that the parties had coexisted for years without incident and was unaware of any actual confusion, further supporting that confusion was not likely.  SGD No. 95. This factor does not support a likelihood of confusion.

## 8.   Neither Party Intends to Expand Its Product Line.

This factor evaluates whether the "existence of the allegedly infringing mark is hindering the plaintiff's expansion plans."  *Surfvivor*, 406 F.3d at 634.  A plaintiff's "complete inability to adduce any concrete evidence of expansion plans tilts this factor in favor of [the defendant]."  *Id.*; *see also Oculu*, 2015 WL 3619204, at *15 ("The likelihood of expansion factor weighs in favor of finding infringement only when there is 'a *strong* possibility of expansion into competing markets.'") (citations omitted).  Plaintiff contends this factor supports confusion because the parties already directly compete, Plaintiff has concrete plans to expand its products "in the personal grooming market," and TCI added products in 2020 and 2021.  ECF No. 34-6 at 22.

As an initial matter, Plaintiff's reliance on *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165 (C.D. Cal. 2010) is misplaced.  Here, in contrast to *Fiji*, the parties do not directly compete for the reasons explained above – their products, marketing channels, and target consumers differ significantly.  *Supra* § III.B.2, 5; *compare Fiji*, 741 F. Supp. 2d at 1182 (both parties sold mineral water bottled in Fiji side-by-side in grocery stores).  Furthermore, Plaintiff has offered no evidence of "concrete plans" to expand its products, much less that the expansion would include moving into the high-end luxury beauty market in which TCI operates. SGD No. 44.  The sole evidence Plaintiff cites is its pending trademark application filed on September 22, 2020, ten days prior to filing this lawsuit.  *Id.*  Setting aside the pretextual timing of the filing, it has been over eleven months since the application was filed and Plaintiff cites no evidence reflecting new product development, sample advertising or branding for the new products, or sample product packaging – the types of concrete steps a business would take if it were truly planning to expand its

-19-

1   products.  *Id.*; *see Oculu*, 2015 WL 3619204, *19 (no confusion where plaintiff "has

2   not offered competent evidence of release dates, timetables, or business plans, or other

3   documents or testimony that could show concretely what goods or services [the

4   parties] will be using their marks on in the future and when").  Several of the

5   categories of goods covered by Plaintiff's pending application are also unrelated to

6   (and thus unhindered by) TCI's products, for example, baby products, moustache wax,

7   beard care preparations, shaving products, and antiperspirant.  PSUF No. 44.  Finally,

8   TCI does not presently have concrete expansion plans, and certainly no plans to offer

9   products made from regenerative Costa Rican "super-plants."  SGD No. 131.  This

10  factor thus weighs against confusion.

11                     *        *        *

12        In weighing the *Sleekcraft* factors, courts consider the totality of the factors and

13  their appropriate weight in light of the context of the case.  *See Oculu*, 2015 WL

14  3619204, at *9.  Here, the factors weigh against confusion or are neutral, and at a

15  minimum, TCI has genuine disputes of material fact concerning each.  For these

16  reasons, summary judgment on likelihood of confusion should be denied.

17  ## IV.   GENUINE DISPUTES EXIST AS TO WILLFULNESS.

18        There is no legal or factual basis for summary judgment as to willfulness.

19  Plaintiff relies on *Lindy Pen Co., Inc. v. Bic Pen Corp.*, but neglects to provide the

20  Ninth Circuit's complete explanation of the willfulness standard.  *Lindy Pen* makes

21  clear that willfulness means the defendant knowingly tried to gain the value of an

22  established name or mark of another:  "Willful infringement carries a connotation of

23  deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,'

24  'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard."  982 F.2d

25  1400, 1406 (9th Cir. 1993), *abrogated on other grounds in SunEarth, Inc. v, Sun*

26  *Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).  The Ninth Circuit further

27  explained that "knowing use in the belief that there is no confusion is not bad faith . . .

28  this court has cautioned that an accounting is proper only where the defendant is

-20-

'attempting to gain the value of an established name of another.'" *Id.*; *see also Fitbug*, 78 F. Supp. 3d at 1196 (no willfulness even when defendant knew of plaintiff's mark because defendant believed the parties' marks were not confusingly similar and defendant did not intend to capitalize on the plaintiff's goodwill).

Here, neither the THRIVE mark nor its connection to Plaintiff or Plaintiff's products is "established." Plaintiff is obscure and lacks marketplace recognition, which was also true for the half decade before TCI began selling skincare. *Supra* § III.B.I. It simply does not follow that TCI deliberately intended to exploit the mark of an unknown and unprofitable business (to the contrary, TCI's decision to add skincare was the result of customer demand). SGD No. 130. TCI's knowledge of Plaintiff at the time it launched skincare also does not equate to bad faith, as TCI had multiple bases for believing no confusion was likely. *Supra* § I, III.B.7. While Plaintiff sent TCI a cease-and-desist letter in 2017, ostensibly because Plaintiff believed TCI was infringing the THRIVE mark, when TCI responded and refuted Plaintiff's claim, Plaintiff took no action and TCI simply continued its business operations. *Supra* § I, III.B.7. None of these facts indicate bad faith or willfulness. *Fitbug*, 78 F. Supp. 3d at 1196; *Move Press, LLC v. Peloton Interactive, Inc.*, 2019 WL 4570018, at *7-8 (C.D. Cal. Sept. 5, 2019).[12] Summary judgment should therefore be denied.

## V.   PLAINTIFF IS NOT ENTITLED TO RECOVER TCI'S PROFITS.

The Court should likewise deny summary judgment as to Plaintiff's request for profits. First, Plaintiff's case involves a claim of reverse confusion. *Supra* § III.A. As fully explained in TCI's motion for summary judgment, TCI's profits are thus unavailable as a matter of law. ECF No. 37-1 at 11-13; *see also Novadaq*

---

[12] Plaintiff's cases are not applicable: in *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 472, 475 (N.D. Cal. 1992), the defendant had *itself* argued there was a likelihood of confusion between the parties' marks in a proceeding in the United Kingdom; the court therefore concluded that the defendant's infringement in the United States (where the plaintiff had senior rights) was willful, and in *Synopek, LLC v. Synaptek Corp.*, 2018 WL 3359017, at *10 (C.D. Cal. Jun. 4, 2018), the defendant continued using the infringing mark *even after* the court found a likelihood of confusion and cancelled the defendant's registration. Also misguided is Plaintiff's repeated invocation of *non-final* and *non-binding* PTO statements. *See supra* n. 11.

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  *Technologies, Inc. v. Karl Storz GmbH & Co. K.G.*, 2015 WL 9028123, at *2 (N.D.

2  Cal. Dec. 16, 2015); *Scat Enter., Inc. v. FCA US LLC*, 2017 WL 5896182, at *2 (C.D.

3  Cal. June 8, 2017); McCarthy § 23:10.  Plaintiff nonetheless contends that an award of

4  profits is appropriate because otherwise TCI would "reap the benefits" of infringing

5  the THRIVE mark.  ECF No. 34-6 at 26.  But there was no benefit obtained, as

6  Plaintiff had no real market recognition before (or after) TCI began offering skincare.

7  *Supra* § III.B.I.  TCI's alleged intent or willful blindness to possible infringement is

8  also irrelevant, as there is no evidence that TCI intended to trade on Plaintiff's mark.

9  *Supra* § III.B.7, IV; *Scat Enter.*, 2017 WL 5896182, at *2; *Novadaq Technologies*,

10  2015 WL 9028123, at *3.  Recovery of TCI's profits is unavailable as a matter of law.

11       Even if profits were legally available, summary judgment should be denied

12  because genuine disputes of material fact exist as to Plaintiff's calculation.  Plaintiff

13  contends that TCI received $██████ in profits from its skincare products and that

14  TCI has failed to prove various deductions.  ECF No. 34-6 at 27-28.  Plaintiff is

15  incorrect on both fronts.  Plaintiff improperly includes revenue associated with two of

16  TCI's color cosmetics, Buildable Blur CC Cream and Filtered Effects Blurring

17  Primer, which are not within the scope of Plaintiff's claims.  SGD at No. 132.  Even

18  Plaintiff's expert acknowledges that both products could be excluded from the

19  calculation.  ECF No. 34-5 at 7, 35.  As such, a genuine dispute exists as to whether

20  Buildable Blur CC Cream and Filtered Effects Blurring Primer are color cosmetics,

21  and thus as to the profits sought pursuant to the motion.

22       Plaintiff is also incorrect that TCI has failed to meet its burden to prove

23  deductible overhead expenses associated with its products.  Courts in the Ninth Circuit

24  permit deductions of overhead expenses when they are of actual assistance in the

25  production, distribution, or sale of the infringing product.  *Winterland Concessions*

26  *Co. v. Fenton*, 835 F. Supp. 529, 533 (N.D. Cal. 1993); *accord Kamar Int'l, Inc. v.*

27  *Russ Berrie and Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) (copyright context).

28  "Where more precise methods of allocating costs are not available, defendants may

1  allocate costs based on the infringing products' share of gross revenues" so long as the

2  costs actually contributed to the infringing products.  *Winterland*, 835 F. Supp. at 533.

3  The question of whether evidence supports such a finding "is one for the trier of fact."

4  *Id.*; *Interactive Health LLC v. King Kong USA, Inc.*, 2008 WL 11342982, at *3 (C.D.

5  Cal. Dec. 5, 2008).  TCI has submitted evidence that its overhead costs consist of rent,

6  employee salaries and benefits, legal fees, charitable donations, travel, entertainment,

7  non-legal professional fees, insurance, and income tax, and that each contributes to

8  TCI's skincare products and are therefore properly allocated and deducted here.  *See*

9  SGD No. 133; *Winterland*, 835 F. Supp. at 533.[13]

10       Finally, there are genuine factual disputes as to other deductions to Plaintiff's

11  profits claim – among other things, Plaintiff is not entitled to profits attributable to

12  factors other than the alleged infringement.  *See, e.g.*, McCarthy § 30:65.  In addition

13  to evidence reflecting that TCI's sales are driven by multiple factors other than the

14  "THRIVE" element of its name, SGD No. 134, Plaintiff's own evidence demonstrates

15  that its claimed profits award fails as a matter of law.  Plaintiff has submitted a survey

16  ostensibly showing a confusion rate of 54.5% to 56.6%.  ECF No. 42 ¶ 9.  While TCI

17  vigorously disputes the survey's validity (TCI's own properly-designed survey shows

18  zero confusion), to the extent Plaintiff seeks to rely on its survey or the Court

19  otherwise credits it, summary judgment on Plaintiff's profits calculation must be

20  denied – by Plaintiff's own admission, at least 43.4% of consumers are *not* confused,

21  and an award of all of TCI's profits is legally unsupportable.  There are thus multiple

22  disputes of material fact as to Plaintiff's profits calculation, assuming profits are

23  appropriate at all.[14]

24  [13] Courts have declined to deduct overhead costs in the absence of evidence the costs
    contributed to the allegedly infringing products.  *See, e.g.*, *Kamar*, 752 F.2d at 1333
25  (directing district court to evaluate if overhead costs contributed to infringing product,
    and if so, to allow deduction); *Folkens v. Wyland*, 2002 WL 1677708, at *6 (N.D. Cal.
26  July 22, 2002) (excluding costs where defendant did not show they were attributable
    to the infringing work).  TCI has provided such evidence here.  SGD No. 133.
27  [14] Section 1117(a) of the Lanham Act empowers the Court with discretion to modify
    the amount of damages according to the circumstances of the case.  TCI has raised
28  multiple genuine disputes concerning Plaintiff's damages calculations that TCI

DEFENDANT THRIVE CAUSEMETICS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## VI.   PLAINTIFF IS NOT ENTITLED TO A CORRECTIVE ADVERTISING AWARD.

Plaintiff's request for summary judgment as to corrective advertising should also be denied because there is no evidence of damage to the value of Plaintiff's mark. As explained in TCI's motion for summary judgment, corrective advertising is unavailable where – as here – a plaintiff has failed to demonstrate that its mark lost value.  ECF No. 37-1 at 15-18; *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *5-6 (N.D. Cal. July 14, 2011); *Binder v. Disability Group, Inc.*, 772 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2011); *Scat Enter. Inc.*, 2017 WL 5896182, at *2.

Furthermore, Plaintiff's proposed methodology of applying 25% to TCI's advertising expenditures to calculate a corrective advertising award is untethered to any *actual* (alleged) harm to Plaintiff's mark.  Plaintiff suggests that the approach of an FTC guideline requiring businesses who engage in misleading advertising to spend 25% of their advertising budget on corrective advertising is an "approved" rule.  ECF No. 34-6 at 29 (*citing Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995)). But the Ninth Circuit did not determine how corrective advertising costs were to be calculated because the lower court did not reach the issue, and such an award would in any event conflict with the purpose of corrective advertising – namely, to restore the value of the infringed mark to its pre-infringement value (and no more).  *Adray*, 76 F.3d at 988-89 & n.2.  Here, there is no evidence of the value or devaluation of the THRIVE mark, SGD No. 135, and thus no basis for Plaintiff's 25% calculation.[15] Plaintiff also has not made actual corrective advertising expenditures, asserting instead that such expenditures would *not* be a "good investment."  SGD No. 136.

---

respectfully submit warrant equitable consideration as to whether the calculation is excessive, including because such amounts constitute a windfall in this case.
[15] For these same reasons, Plaintiff's other authorities do not support its position.  In *Marketquest Group, Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018), the district court allowed the issue of corrective advertising to go to the jury because there was evidence of loss of value to the mark.  In *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977), the Tenth Circuit awarded corrective advertising only in the amount necessary to place the plaintiff "in the position it was in before" the infringing advertising campaign.

1        Even if corrective advertising were available (and it is not), Plaintiff has failed

2   to demonstrate the absence of a genuine dispute of material fact as to the amount.

3   Plaintiff's proposed figure of $▮▮▮▮▮ runs headlong into the caution in *Adray*.  *See*

4   *Adray*, 76 F.3d at 988-89.  Such an award would be equal to **8.7 times** Plaintiff's total

5   sales and marketing expenditures, and **3.8 times** Plaintiff's total net revenue for the

6   same period of alleged infringement.  SGD No. 137.  While there is no evidence of

7   actual damage to Plaintiff's mark, a corrective advertising award certainly cannot

8   exceed, by several multiples, the *entire* amount of both Plaintiff's revenues *and* its

9   sales and marketing expenses.  SGD Nos. 135-137; *see* McCarthy § 30.84 (explaining

10  that when a corrective advertising award "is many times the value of the trademark

11  property, then it appears that plaintiff has received a windfall, not compensation").

12  **VII.   THERE IS NO BASIS FOR A PERMANENT INJUNCTION.**

13       TCI has identified numerous genuine disputes of material fact precluding

14  summary judgment on Plaintiff's infringement claims.  Plaintiff is therefore not

15  entitled to a permanent injunction or any of the remedies it seeks.  *See, e.g.*, *Binder v.*

16  *Disability Group, Inc.*, 2009 WL 10672976, at *3 (C.D. Cal. Feb. 3, 2009).

17  **CONCLUSION**

18       For the foregoing reasons, TCI respectfully requests that the Court deny

19  Plaintiff's motion for partial summary judgment.

20   DATED:  August 23, 2021         SIDLEY AUSTIN LLP

21

22                    By: */s/ Rollin A. Ransom*

23                         Rollin A. Ransom

24                    *Attorneys for Defendant*
                      *Thrive Causemetics, Inc.*

25

26

27

28