# EXHIBIT G

**REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

THRIVE NATURAL CARE, INC.,

                              No. 2:20-CV-9091-PA-AS

    Plaintiff,

vs.

THRIVE CAUSEMETICS, INC.,

    Defendants.

_____

C O N F I D E N T I A L
ATTORNEYS' EYES ONLY
VIDEOTAPED REMOTE EXPERT DEPOSITION OF DAVID DREWS
AUGUST 19, 2021
9:30 a.m.

San Diego, California

Diana Janniere, CSR-10034

Magna Legal Services
866-624-6221
www.MagnaLS.com



071
De Lilly Reply Decl. Ex. G

```
                                                           Page 2
 1              REMOTE APPEARANCES OF COUNSEL
 2
 3   For the Plaintiff:
 4        THE MCARTHUR LAW FIRM, P.C.
          STEPHEN MCARTHUR, ESQ.
 5        9465 WILSHIRE BOULEVARD, SUITE 300
          BEVERLY HILLS, CALIFORNIA   90212
 6        323.639.4455
          stephen@smcarthurlaw.com
 7
 8   For the Defendant:
 9        SIDLEY AUSTIN, LLP
          ROLLIN RANSOM, ESQ.
10        555 WEST 5TH STREET
          LOS ANGELES, CALIFORNIA   90013
11        rransom@sidley.com
12
     The Videographer:
13
          ROBERT WALLACE
14
15
16
17
18
19
20
21
22
23
24
25
```



1           C O N F I D E N T I A L
2             ATTORNEYS' EYES ONLY
3   VIDEOTAPED REMOTE EXPERT DEPOSITION OF DAVID DREWS
4                 AUGUST 19, 2021
5
6           THE VIDEOGRAPHER:  Good morning.  We are now
7   on the record.
8           This begins Videotape No. 1 of the
9   deposition of David Drews in the matter of "Thrive
10  Natural Care, Incorporated vs. Thrive Causemetics,
11  Incorporated," in the United States District Court,
12  Central District of California, Case
13  No. 2:20-CV-9091-PA-AS.
14          Today is Thursday, August 19, 2021, and the
15  time is 9:34 a.m.  This deposition is being taken
16  remotely at the request of Sidley Austin, LLP.
17          The videographer is Robert Wallace of Magna
18  Legal Services, and the court reporter is Diana
19  Janniere of Magna Legal Services.
20          Will counsel and all parties present state
21  their appearances and whom they represent.
22          MR. RANSOM:  Rollin Ransom for the
23  defendant, Thrive Causemetics, Inc.
24          MR. McARTHUR:  Stephen McArthur for
25  plaintiff, Thrive Natural Care, and its expert



Page 5

1 Mr. David Drews.
2         THE VIDEOGRAPHER: Will the court reporter
3 please swear in the witness.
4
5                    DAVID DREWS,
6  having been first duly sworn, testifies as follows:
7
8                    EXAMINATION
9 BY MR. RANSOM:
10      Q   Would you please state your name?
11      A   David Drews.
12      Q   Mr. Drews, are you employed?
13      A   Yes, I am.
14      Q   Where are you employed?
15      A   IPmetrics.
16      Q   What is your job at IPmetrics?
17      A   I -- I'm the President of IPmetrics, but I
18 do a lot of the actual work of the company as well;
19 valuation and damage calculations and whatnot.
20         I'm going to turn up the volume for a second
21 here.  Okay.  Go ahead.
22      Q   Among the services that you provided,
23 IPmetrics is serving as a -- as an expert witness in
24 litigation such as this; correct?
25      A   That's correct.

Page 13

```
 1        A    No.  He asked me which ones I thought were
 2   appropriate.
 3        Q    And did you then select and include in your
 4   repart -- report those measures of damages you thought
 5   were appropriate?
 6        A    Yes, that's correct.
 7        Q    Okay.  Can you identify just generally the
 8   categories of damages that you believe are appropriate
 9   in this action?
10        A    Sure.  There's a defendant's profits
11   calculation that measures unjust enrichment.  There is
12   a reasonable royalty for calculating actual damages,
13   and there is a corrective advertising calculation as
14   well.
15        Q    At any time in your retention in this
16   matter, did you undertake any effort to calculate any
17   damage to Thrive Natural Care's goodwill?
18        A    I think that a number of these different
19   approaches measured damage to -- to Thrive Natural
20   Care.  I don't know that it's specific to their
21   goodwill.
22        Q    Okay.  And in what way do your damages
23   theory measure damage to Thrive Natural Care?
24        A    Well, it -- it shows the extent of harm that
25   Thrive Natural Care has suffered.  For example, with
```



Page 14

1  the corrective advertising, the amount of expenditure
2  that would be necessary to dispel any misinformation
3  that isn't in the marketplace.
4     Q   In your work in this matter, did you attempt
5  to specifically quantify any harm to the Thrive mark
6  itself?
7     A   Well, again, I -- I -- referring, again, to
8  the corrective advertising.  I think that is a measure
9  of harm to the mark.
10        It -- it demonstrates the -- the amount of
11 resources that need to be expended by Thrive Natural
12 Care in order to be made whole.
13    Q   Anything else?
14    A   I think that a reasonable royalty is also a
15 good measure of the actual damages for Thrive Natural
16 Care in that their asset has been utilized by a -- a
17 third party without compensation.
18    Q   Do you attempt to calculate whether Thrive
19 Natural Care had lost any sales as a result of the
20 alleged infringement?
21    A   I -- I think that would be speculative in
22 this instance.  There is not a good way of isolating
23 that particular impact from other factors that may be
24 brought to bear here.
25    Q   Did you attempt to actually value the Thrive



076
De Lilly Reply Decl. Ex. G

Page 15

```
 1   trademark as part of your work in this matter?
 2        A    Not directly.
 3        Q    When you say, "not directly," is there a way
 4   you attempted to value the Thrive trademark
 5   indirectly?
 6        A    Well, indirectly, I think advertising
 7   expenditures are kind of a proxy for value of a
 8   trademark to some extent in that marketing and
 9   advertising expenditures go towards increasing
10   awareness; and explaining the attributes of the brand
11   to the various audiences, customers, and investors;
12   and what have you.
13        Q    When you say, "marketing and advertising
14   expenditures," are you referring to marketing and
15   advertising expenditures by Thrive Natural Care?
16        A    By both parties.
17        Q    In your work in this matter, did you
18   undertake any effort to value the Thrive Natural Care
19   business as a whole?
20        A    No.
21        Q    And with respect to the Thrive mark in
22   particular, I apologize if I -- if I missed this, in
23   evaluating the circumstances of this case, did you
24   come to an opinion as to the value of the Thrive
25   trademark at any point in time?
```



Page 16

```
 1      A    No, that was not one of the calculations
 2   that I performed.
 3      Q    Are your -- is it fair to say you have three
 4   categories of damages?
 5      A    Yes.
 6      Q    Okay.  Are your three categories of damages
 7   cumulative?
 8      A    Partially.
 9      Q    Can you explain that, please?
10      A    Well, the -- the defendant's profits and the
11   reasonable royalty analysis both utilize the same
12   block of -- of -- if I -- if I say, "TCI," I'm
13   referring to Thrive Causemetics.  Does everyone
14   understand that?
15           But those two, defendant's profits and
16   reasonable royalty, utilize the same block of TCI
17   sales.  So that's a -- as I understand it, you -- it's
18   a one or the other type of approach; but the
19   corrective advertising would be in addition to either
20   one of those.
21      Q    And so as I understand your testimony, you
22   wouldn't get both an award of defendant's profits and
23   an award of a reasonable royalty.  It would be one or
24   the other; is that right?
25      A    Well, that would be a legal conclusion.
```



Page 148

1      But they were talking about it being
2 necessary to have three to five impressions for every
3 misimpression when you're talking about online
4 advertising, which is the lion's share of the
5 advertising that's taken place here, which would be a
6 much, much higher figure than the $███████ that
7 I've calculated here.
8      Q   Well, you've -- again, because you broke it
9 down for the different products, you've got two
10 different numbers; right?
11           There's ████████ for skincare products,
12 excluding hybrid; right?
13      A   Yes.
14      Q   So would ████████ be sufficient to
15 correct any inaccurate impressions in the marketplace
16 in your view?
17      A   My understanding is that is what the Federal
18 Trade Commission has called for in similar situations,
19 and that is what the courts have accepted as being a
20 reasonable approach to determining what is necessary
21 for correcting those misimpressions.
22      Q   Have you attempted to price out what an
23 advertising campaign to correct the misimpressions
24 would cost?
25      A   Not in this instance.



```
 1   trademark by the defendant has stopped.
 2        Q    In reaching this conclusion regarding
 3   corrective advertising damages, did you compare the
 4   figure at all to the amount that TNC has spent on
 5   advertising itself?
 6        A    I -- I understand that it is much larger.
 7        Q    And did that factor into your consideration
 8   in reaching this opinion at all?
 9        A    No.  I -- I think you have to look at the
10   totality of advertising that has taken place in the
11   marketplace.  And the lion's share of that advertising
12   effort has been on the TCI side.  So that is the
13   advertising that needs to be corrected.
14        Q    If the court rejected application of the
15   25 percent figure that you attribute to the FTC, would
16   you have a basis for calculating the amount of
17   corrective advertising necessary in this matter to
18   correct any inaccurate impressions in the marketplace?
19        A    Yes.  There --
20        Q    What would that be?
21        A    -- are a couple of different approaches you
22   could go by.  One is you could measure the impressions
23   that have been achieved by TCI's advertising and then
24   come up with the three to five times impressions that
25   are necessary to correct those misimpressions and
```



Page 152

```
 1   determine what the cost of that type of advertising
 2   campaign is.
 3           The other thing is, is that you could do
 4   a -- a determination of the cost of TCI's advertising
 5   effort in terms of keyword advertising and social
 6   media distribution, and those types of aspects; and do
 7   a duplication of that effort.
 8       Q   Have you undertaken either of those analyses
 9   here?
10       A   No, I have not.
11       Q   Are you prepared to offer an opinion as to
12   that amount of corrective advertising damages on the
13   basis of either of those approaches, as you sit here
14   today?
15       A   Only in the instance that this particular
16   approach is thrown out by the court or not allowed to
17   proceed.
18       Q   But today you're not able to offer an
19   opinion on that front; are you?
20       A   I have not performed either of those
21   analyses.
22           MR. RANSOM:  Why don't we take a short
23   break?
24           THE WITNESS:  Sure.
25           MR. RANSOM:  Okay.
```



081
De Lilly Reply Decl. Ex. G

Page 163

REPORTER'S CERTIFICATION

1
2
3     I, Diana Janniere, a Certified Shorthand Reporter,
4  in and for the State of California, do hereby certify:
5
6     That the foregoing witness was by me remotely duly
7  sworn; that the remote deposition was then taken
8  before me at the time and place herein set forth; that
9  the remote testimony and remote proceedings were
10 reported stenographically by me and later transcribed
11 into typewriting under my direction; and that the
12 foregoing is a true record of the remote testimony and
13 remote proceedings taken at that time.
14
15    IN WITNESS WHEREOF, I subscribed my name
16 this 23rd day of August, 2021.
17
18
19
20
21    _____
22    Diana Janniere, CSR No. 10034
23
24
25