Stephen McArthur (SBN 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (SBN 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff*
*Thrive Natural Care, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:20-CV-9091-PA-AS |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| THRIVE CAUSEMETICS, INC., | Hon. Percy Anderson |
| Defendant. | **Hearing Date**: September 13, 2021<br>**Time:** 1:30 p.m.<br>**Courtroom:** 9A |

# **TABLE OF CONTENTS**

I.      Introduction ................................................................................................... 1

II.     Additional Relevant Facts .............................................................................. 4

        A.      Thrive's Business, THRIVE Marks, and Registrations ......................... 4

        TCI's Competing THRIVE-Branded Skincare Products .................................. 5

        B.      TCI Knew Its Expansion Into Skincare Would Be Infringing ............... 7

        C.      2019 Call Between the Parties' CEOs ................................................... 8

III.    Thrive Has Proffered Substantial Evidence of Forward Confusion ........................... 8

        A.      TCI Can Be Liable for Both Forward and Reverse Confusion .............. 8

        B.      Actual Confusion Evidence Exists, But Even Its Absence is
                "Unnoteworthy" and Cannot Be Dispositive ......................................... 9

        C.      Totality of *Sleekcraft* Factors Favor Finding Forward Confusion ........... 11

IV.     TCI's Attempt to Intentionally Infringe Without Any Liability for Monetary
        Damages Should Be Rejected as Inequitable and Not in Accordance With
        Precedent .................................................................................................... 16

        A.      Supreme Court's *Romag* Case Overruled All Cases Cited By TCI Relating
                to Disgorgement of Profits .................................................................. 16

        B.      Facts Fully Support Thrive's Intent to License and Request for a
                Reasonable Royalty ............................................................................ 20

        C.      Corrective Advertising Cases Cited by TCI are Inapposite .................. 22

Conclusion ............................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*A & L Labs., Inc. v. Bou-Matic, LLC*, No. CIV.02-4862(PAM/RLE), 2004 WL 1745865 (D. Minn. Aug. 2, 2004)...................................................................................................... 22

*adidas Am., Inc. v. Payless Shoesource, Inc*., No. CV 01-1655-KI, 2008 WL 4279812........... 3, 20

*Adray v. Adry-Mart, Inc*., 76 F.3d 984 (9th Cir. 1995)........................................................ 22, 25

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ................................................... 10, 14

*AOP Ventures, Inc. v. Steam Distrib., LLC*, No. ED-CV-15-1586-VAP-KKX, 2016 WL 7336730 (C.D. Cal. Oct. 11, 2016) ......................................................................................................... 13

*Bauer Bros., LLC v. Nike, Inc*., 159 F. Supp. 3d 1202 (S.D. Cal. 2016) .................................. 3, 20

*Bellagio Jewelry, Inc. v. Croton Watch Co*., No. CV-06-6672-ODW-RZx, 2008 WL 3905895 (C.D. Cal. Aug. 20, 2008).......................................................................................................... 16

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co*., 561 F.2d 1365 (10th Cir. 1977)......... 25

*Binder v. Disability Grp., Inc*., 772 F. Supp. 2d 1172 (C.D. Cal. 2011) ...................................... 23

*Brookfield Comms., Inc. v. W. Coast Ent. Corp*., 174 F.3d 1036 (9th Cir. 1999) .................. 10, 11

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc*., 156 F. Supp. 3d 1173 (E.D. Cal. 2016) .... 15

*Coryn Grp. II, LLC v. O.C. Seacrets, Inc*., No. CIV WDQ-08-2764, 2010 WL 1375301 (D. Md. Mar. 30, 2010)........................................................................................................................... 22

*E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 472 (N.D. Cal. 1992). ............. 19

*Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ........... 11, 12, 13, 15

*Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir. 1980)......................................................... 13

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000).................................... 12, 14

*Gucci Am., Inc. v. Guess?, Inc*., 858 F. Supp. 2d 250 (S.D.N.Y. 2012). ....................................... 21

*Henderson v. Lindland*, No. 11-CV-01350-DDP-DTBX, 2013 WL 1181957 (C.D. Cal. Mar. 21, 2013) ............................................................................................................................................ 12

*Int'l Oddities v. Record*, No. CV 12-3934-CAS VBKX, 2013 WL 3864050 (C.D. Cal. July 22, 2013) ............................................................................................................................................ 23

*JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098 (9th Cir. 2016).. 1, 2, 9, 12, 15, 16

*Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400 (9th Cir. 1993) ................................................... 17

*Lodestar Anstalt v. Bacardi & Co*., No. 2:16-CV-06411-CASF-FMX, 2019 WL 8105378 (C.D. Cal. July 3, 2019)........................................................................................................................ 23

*M2 Software Inc. v. Viacom Inc*., 223 F. App'x 653 (9th Cir. 2007)........................................ 2, 20

*Marketquest Grp., Inc. v. BIC Corp*., 316 F. Supp. 3d 1234 (S.D. Cal. 2018) .............................. 21

*Marketquest Grp., Inc. v. BIC Corp*., 862 F.3d 927 (9th Cir. 2017).............................................. 9

*Marketquest Grp., Inc. v. BIC Corp*., No. 11-CV-618-BAS (JLB), 2018 WL 1756117 (S.D. Cal. Apr. 12, 2018). ..................................................................................................................... 22, 25

*Monster Energy Co. v. Integrated Supply Network, LLC*, 821 F. App'x 730 (9th Cir. 2020) .. 2, 17, 18

*Monster Energy Co. v. Integrated Supply Network, LLC*, No. ED-CV-17548-CBM-RAOx, 2021 WL 1521981 (C.D. Cal. Apr. 12, 2021) ................................................................................... 18

*Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204 (C.D. Cal. June 8, 2015) ................................................................................................................................. 9

*Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005 (C.D. Cal. 2017) ................................. 24

*Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007) ................................ 10, 13, 14

*Playboy Enters., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020 n.28 (9th Cir. 2004) ...... 10, 18, 19

*QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719 (C.D. Cal. May 9, 2013) ......................................................................................................... 3, 20

*Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576 (N.D. Cal. July 14, 2011) ............................................................................................................................................. 21

*Razor USA LLC v. Vizio, Inc.*, No. 14-CV-01586S-JOJ-CGX, 2015 WL 12656941 (C.D. Cal. Oct. 19, 2015) ............................................................................................................................... 19

*Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492 (2020) ...................................... 2, 17, 18, 19

*Scat Enters., Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182 (C.D. Cal. June 8, 2017) ................................................................................................................................. 17

*Solar Sys. & Peripherals, Inc. v. Solarcom Holdings*, 44 F. App'x 186 (9th Cir. 2002) .............. 11

*Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830 (C.D. Cal. 2012) ................ 16, 17

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005). ........................................ 9

*Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018) ............................. 14, 15

*Synoptek, LLC v. Synaptek Corp.*, No. SA-CV-1601838-CJC-JCGX, 2018 WL 3359017 ("*Synoptek II*") (C.D. Cal. June 4, 2018) ..................................................................................... 19

*Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-0094 LGB MCX, 2000 WL 709149 (C.D. Cal. May 24, 2000) ................................................................................................................................. 21

*Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.*, No. 4:19-CV-01424-YGR, 2021 WL 254448 (N.D. Cal. Jan. 26, 2021) ..................................................................................... 24

*Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG, 2012 WL 6951315, at *10 (C.D. Cal. Dec. 10, 2012) ............................................................................................................ 10

**Statutes**

15 U.S.C. § 1117(a). .................................................................................................. 16, 18, 20

15 U.S.C. § 1125 ..................................................................................................................... 11

**Treatises**

6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:188 ................... 10

I.     **Introduction**

Defendant Thrive Causemetics, Inc.'s ("TCI") attacks Plaintiff Thrive Natural Care, Inc.'s ("Thrive") forward confusion infringement claim based entirely on a purported lack of evidence of actual consumer confusion. That must fail for three reasons. *First*, a lack of actual confusion evidence is "unnoteworthy" and "not dispositive" against a trademark plaintiff. *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1111-12 (9th Cir. 2016) (reversing grant of summary judgment for defendant on forward confusion claim despite no actual confusion evidence). *Second*, Plaintiff Thrive Natural Care, Inc. ("Thrive") has submitted evidence of actual forward confusion and consumer surveys demonstrating a higher than 50% rate of actual confusion between the parties' THRIVE skincare brands, which serve as a proxy for actual confusion evidence. *Third*, Thrive's evidence shows that TCI's Infringing Skincare Products appear side-by-side and intermixed with Thrive's skincare products in nearly every relevant online search—even searches tailored to Thrive's specific brand like "mens thrive natural care"—such that consumers could easily believe be confused into believing TCI's products originate from Thrive. One example is below.



**Screenshot of Google Shopping Search for "mens thrive natural care",
showing five of Thrive's product listings intermingled with two of TCI's.**

1  Moreover, a reasonable fact-finder could conclude, based on Thrive's

2  proffered evidence, that: (a) Thrive's THRIVE mark is strong, because it has no

3  commonly understood connection with skincare products; (b) the parties sell the

4  same products to the same customer base through the same channels; (c) TCI's use

5  of the THRIVE mark is virtually identical to Thrive's use; and (d) TCI knew of

6  Thrive's trademarks prior to launching its skincare product line. A reasonable juror

7  could thus find a likelihood of forward confusion. *See JL Beverage*, 828 F.3d at

8  1112 (reversing summary judgment for defendant on similar facts). The Court

9  should therefore deny TCI's motion as to Thrive's forward confusion claim.

10  If the Court rejects TCI's argument on forward confusion, then it must

11  necessarily also reject TCI's argument that disgorgement of TCI's profits is not a

12  proper form of relief, since it hinges entirely on the Court granting summary

13  judgment of no forward confusion. If the former argument fails, the latter must too.

14  Even if the Court were to find no likelihood of forward confusion could exist,

15  TCI's argument against disgorgement still must fail because it contradicts new

16  Supreme Court precedent in *Romag Fasteners, Inc v. Fossil, Inc*., 140 S. Ct. 1492,

17  1494-97 (2020). *Romag* "squarely rejected" the prior Ninth Circuit rule that

18  disgorgement of profits could only be awarded in cases where willful infringement

19  was found. *Monster Energy Co. v. Integrated Supply Network*, *LLC*, 821 F. App'x

20  730, 733 (9th Cir. 2020) (agreeing *Romag* "fatally undermined" willfulness

21  requirement). Every single opinion cited by TCI issued prior to *Romag* and relied

22  on a rule the Supreme Court has overturned. *Id*. Willfulness is *not* a precondition to

23  disgorgement of profits under 15 U.S.C. § 1117, and therefore such an award can

24  be recovered in cases involving reverse confusion.

25  TCI's argument that reasonable royalty damages are barred should also be

26  denied. To recover a reasonable royalty in the Ninth Circuit, a plaintiff must show

27  only "a legitimate proposed basis on which to calculate a royalty . . . ." *M2*

28  *Software Inc. v. Viacom Inc*., 223 F. App'x 653, 655 (9th Cir. 2007). Courts in the

Ninth Circuit have found a reasonable royalty is recoverable where the plaintiff has demonstrated an intent to license its mark, even if no license was ever completed. "Even in cases without prior licensing agreements[,] courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013) (listing cases); *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1213 (S.D. Cal. 2016) (denying defendant's motion for summary judgment seeking no reasonable royalty despite there being no history of license negotiations between the parties); *adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812, at *12 (D. Or. Sept. 12, 2008) (upholding jury award of reasonable royalty to plaintiff "even though it concedes that it would not have licensed the marks to [defendant].""). Here, in June 2019, Thrive's CEO directly engaged in negotiations with TCI concerning a license for the THRIVE mark, demonstrating an intent to license. Thrive's intent, plus its expert analysis of similar license agreements and the remaining *Georgia-Pacific* factors, all demonstrate that Thrive's request for reasonable royalty damages rests on a reliable foundation. That TCI chose to infringe the THRIVE Registrations rather than pay a license fee after negotiations with Thrive's CEO fell apart does not render a reasonable royalty unduly speculative.

Finally, Thrive's request for an award of corrective advertising damages is based on this Circuit's approved 25% rule, and the cases cited by TCI are completely inapposite—involving very short periods of infringement many years in the past that had no chance of harming the plaintiffs' marks. Because it undisputed that TCI is currently spending millions advertising its Infringing Skincare Products in the same e-commerce channels as Thrive products are advertised in, it is fair and reasonable that Thrive would need to spend a quarter of that to correct the misimpressions TCI has served to millions of consumers.

**II.    Additional Relevant Facts**

    **A.    Thrive's Business, THRIVE Marks, and Registrations**

Thrive sells lotions, cleansers, moisturizers, and sunscreens (the "Thrive Products") under the mark "THRIVE" (the "THRIVE Mark"), and it has used the THRIVE Mark on skincare products continuously since 2013. *See* SGD ¶ 22.[1] Thrive sells its products online at its website, www.thrivecare.co, and through retail partnerships with Amazon and Walmart.com, and at physical Whole Foods stores across the West Coast. SGD ¶ 23. Most Thrive Products are sold online through e-commerce outlets. *Id*. A majority of Thrive's customers are women, though Thrive targets a unisex audience. SGD ¶ 27.

Thrive is a successful Public Benefit Corporation with a loyal customer base and increased growth and revenue year-over-year. SDG ¶ 29. Thrive achieved over $1 million gross revenue in 2020, and is on pace to double that in 2021. *Id*. From 2018 to 2020, Thrive spent over $660,000 advertising its THRIVE Marks. SDG ¶ 30. Thrive has gained a reputation for being on the leading edge of healthy, natural skincare. SGD ¶ 28. Indeed, Thrive regularly receives media coverage from major national news outlets, such as a June 30, 2021, four-page article about Thrive in *USA Today* entitled "*How a small, sustainable skin care brand became a best-selling Amazon partner. Thrive Natural Care has grown by 1,300% in just four years*". *Id*. Amazon recently featured Thrive in a marketing video that was shared with Amazon's 750,000-plus employees and 100 million customers. *Id*. In December 2020, Amazon chose Thrive from among thousands of businesses as one of two recipients of the first Amazon Launchpad Innovation Grant for most innovative products and business model. *Id*. Whole Foods has featured Thrive as a "favorite" brand for its customers. *Id*. Thrive's products and business have generated over 1.5 *billion* media impressions in recent months alone, with coverage in *Vogue, Forbes, MarketWatch, Real Simple, People, Beauty News, The Zoe*

---

[1] Citations to "SGD" refer to the concurrently-filed Statement of Genuine Disputes.

1  *Report, Hollywood Reporter, Instyle, Runners World, Whole Foods Magazine*, *USA*
2  *Today,* and *Natural Solutions Magazine*. *Id*.

3      Thrive holds two registered trademarks for the mark "THRIVE" in standard
4  characters in relation to skincare products in International Class 03. Registration
5  No. 4,467,942 (the '942 Registration"), was registered January 14, 2014, and has
6  been deemed "incontestable." SDG ¶ 31. Registration No. 6,164,303 (the "'303
7  Registration") was registered on September 29, 2020. SDG ¶ 32.

8              **TCI's Competing THRIVE-Branded Skincare Products**

9      Karissa Bodnar founded TCI in 2014, after Thrive launched its skincare
10  products and two years after Thrive filed the '942 Registration. SDG ¶¶ 1, 31. TCI
11  first sold false eyelashes and later color cosmetics (makeup) under the "THRIVE
12  causemetics" brand. SGD ¶¶ 1-2. In 2018, TCI launched its first skincare products,
13  which were advertised and sold under the "THRIVE causemetics" brand. SGD ¶ 2.
14  TCI quietly sold three skincare products through 2019 and then broadly expanded
15  its skincare line in 2020, releasing more than a dozen new skincare products. SGD ¶
16  38. These include THRIVE-branded skin cleansers, lotions, creams, moisturizers,
17  sunscreen, lip balm, and face oils (collectively, "Infringing Skincare Products") all
18  of which directly overlap with the THRIVE Registrations and the actual products
19  sold by Thrive. SGD ¶ 39. Both parties' skincare products prominently feature the
20  THRIVE Mark. SDG ¶ 24.



**Left: Thrive Face Cleanser / Right: TCI Face Cleanser**

PLAINTIFF'S OPP. TO DEF.'S MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:20-CV-09091-PA-AS

TCI sells the Infringing Skincare Products at its website, www.thrivecausemetics.com. SGD ¶ 40. However, TCI advertises widely, spending approximately 50-52% of its revenue from sales of Infringing Skincare Products on advertising for those products. SGD ¶ 43. Part of TCI's advertising includes purchasing Google advertising keywords ("AdWords") for terms including "Thrive," "Thrive cleanser," and "Thrive moisturizer"—none of which contain any reference to "Causemetics"—causing ads for TCI's skincare products to appear together with Thrive's skincare products in online search results. *Id*. Indeed, in skincare-related searches on popular online search engines (Google, Bing, and Duck Duck Go), both parties' skincare products appeared together in *every single* search result, and TCI's Infringing Skincare Products often appeared in paid posts at the top of search results for the Thrive Products. SGD ¶¶ 25, 44.

TCI's products also appear with the Thrive Products on e-commerce marketplaces including Amazon, Google Shopping, Bing Shopping, eBay, and Mercari. SGD ¶ 25, 45. Even e-commerce searches specifically targeting Plaintiff Thrive as directly as possible, such as "thrive natural care," "mens thrive natural care," and "amazon thrive natural care," returned search results showing TCI's Infringing Skincare Products side-by-side with Thrive Products. SGD ¶ 25. Both parties advertise almost exclusively online and on the same social media sites. SGD ¶ 46. Like Thrive, TCI sells a majority of its products to women but also has a significant amount of sales to men. SGD ¶ 41. Both parties' skincare products are inexpensive, ranging between approximately $10 and $60. SGD ¶ 26.

Thrive's marketing expert conducted two 600-person surveys comparing skincare products by Thrive to products by TCI and control products from third parties. These surveys found that well over 50% of consumers believed Thrive's and TCI's skincare products originated from the same source or affiliated sources. SGD ¶ 48. Unsurprisingly, the survey respondents' basis for their belief was that both products are skincare lines named "Thrive". SDG ¶ 48.

**B.     TCI Knew Its Expansion Into Skincare Would Be Infringing**

TCI knew of Thrive and the THRIVE Registrations three years before expanding into skincare in direct competition with Thrive. In summer 2015, TCI obtained a trademark clearance search report identifying Thrive's '942 Registration as a conflict with TCI's THRIVE CAUSEMETICS mark. SGD  ¶ 49. In November 2015, the U.S. Patent & Trademark Office ("PTO") rejected TCI's application to register the THRIVE CAUSEMETICS mark, citing a likelihood of confusion with Thrive's senior '942 Registration. SGD ¶ 50. TCI overcame that PTO rejection by arguing in part that TCI's color cosmetics were "distinctly different types of consumer goods" than Thrive's skincare products. *Id.*

TCI's founder, Ms. Bodnar, herself asked Thrive for permission to use the THRIVE Mark for TCI's business in April 2016. SGD ¶ 51. Ms. Bodnar identified TCI as "a color cosmetics brand" (i.e., makeup) and promised never to "use the word 'Thrive' without the word 'Causemetics'. . . ." *Id.* Thrive denied Ms. Bodnar's request to use the THRIVE Mark. SGD ¶ 51. After learning Ms. Bodnar had ignored Thrive's denial and was continuing to use the THRIVE Mark, and had even started emphasizing the "THRIVE" portion of TCI's brand, Thrive sent TCI a cease-and-desist letter on March 3, 2017. SGD ¶ 52. TCI responded by arguing Thrive had no legal claim because the parties sold "different product lines"—TCI contended its women's makeup is in a different category from Thrive's skincare products *Id.* Thrive relied on this assertion by TCI, concluding that as long as TCI stayed in its own lane of makeup and was not in the skincare market, there was no dispute to litigate. *Id.*

In 2018—before TCI expanded into skincare—the PTO rejected TCI's second attempt to register the THRIVE CAUSEMETICS mark due to a likelihood of confusion with the THRIVE Registrations. SGD ¶ 53. The PTO also required a disclaimer of the "CAUSEMETICS" portion of TCI's mark, finding it is a misspelling of "cosmetics" and is thus merely descriptive of TCI's goods. *Id.* In

TCI's response to the 2018 Office Action, TCI argued again that its cosmetics products and Thrive's skincare products were so different there could be no consumer confusion. SGD ¶ 54 (stating Thrive's skincare products "are distinctly different types of consumer goods" from TCI's makeup products). The PTO maintained its refusal to register. *Id*. Despite the known liability risk, TCI chose to expand into the skincare market anyway. SGD ¶ 38.

### C.   2019 Call Between the Parties' CEOs

On June 27, 2019, Ms. Bodnar contacted Thrive's CEO, Alex McIntosh, by phone and, once again, asked for Thrive's permission to use the Thrive mark on TCI's products. SGD ¶ 10. Mr. McIntosh reminded Ms. Bodnar about Thrive's trademark registrations, and pointed out that, without a proper agreement in place, TCI's request could cause confusion. SDG ¶¶ 11-13. Mr. McIntosh and Ms. Bodnar then began negotiating a licensing agreement, with Mr. McIntosh proposing minimum terms that TCI would (1) stop emphasizing the word "Thrive" as compared to "Causemetics," and (2) agree to compensate Thrive with a licensing fee based on a percentage of TCI's gross sales. *Id*. In response, Ms. Bodnar offered a license fee in the form of a payment to a charity of Thrive's choice, which Mr. McIntosh rejected. *Id*. Mr. McIntosh requested that Ms. Bodnar meet with TCI's Board and return with a counteroffer of a license fee based on a percentage of sales. *Id*. Ms. Bodnar said that she would speak to her Board and get back to him. *Id.* However, she never did. *Id.* TCI chose to continue infringing instead.

### III.   <u>Thrive Has Proffered Substantial Evidence of Forward Confusion</u>

TCI's argument of no forward confusion hinges liability entirely on evidence of actual confusion—just one of the eight *Sleekcraft* factors. That violates *Sleekcraft* and other Ninth Circuit precedent.

### A.   TCI Can Be Liable for Both Forward and Reverse Confusion

As an initial matter, a defendant's actions can support claims for infringement based on both forward and reverse confusion. The Ninth Circuit has

PLAINTIFF'S OPP. TO DEF.'S MOT.
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:20-CV-09091-PA-AS

held "that reverse confusion is not a separate claim that must be specifically pleaded, but instead is a theory of likely confusion that may be alleged by itself or *in addition to forward confusion*." *Marketquest Grp., Inc. v. BIC Corp*., 862 F.3d 927, 932 (9th Cir. 2017) (emphasis added). As another example, in *JL Beverage*, the Ninth Circuit noted "JL Beverage has alleged both forward and reverse confusion claims," then it analyzed the facts and reversed the trial court's grant of summary judgment for defendant on both claims. 828 F.3d at 1107.

In support of its motion, TCI cites *Oculu, LLC v. Oculus VR, Inc*., No. SACV 14-0196 DOC, 2015 WL 3619204 (C.D. Cal. June 8, 2015) and *Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d 625 (9th Cir. 2005). But those cases stand only for the proposition that a plaintiff does not allege a cognizable forward confusion claim if it completely fails to plead *any* facts supporting forward confusion. *See Oculu*, 2015 WL 3619204 at *10 (granting summary judgment for defendant because the plaintiff had "not presented any evidence in support of a forward confusion theory of liability."); *Surfvivor*, 406 F.3d at 631 (finding the plaintiff had entirely failed to plead a forward confusion claim in its complaint, so the court held it did not need to review a claim that was not pled). The more recent *Marketquest* opinion explained that a plaintiff does not allege a cognizable forward confusion claim only if the plaintiff's claim "is based on a reverse confusion theory" *and* "only reverse confusion is plausible based on the allegations in the complaint . . . ." *Marketquest*, 862 F.3d at 933. Here, Thrive has pled a plausible claim of infringement based on forward confusion. [Doc. 28 ¶¶ 1, 74, 81] And, as explained below, this case is akin to *JL Beverages* in that Thrive has proffered substantial evidence supporting a finding of a likelihood of forward confusion.

## B.   Actual Confusion Evidence Exists, But Even Its Absence is "Unnoteworthy" and Cannot Be Dispositive

It would be clear error to disregard the other seven *Sleekcraft* factors and rule that a lack of actual forward confusion evidence is dispositive against Thrive. In the

Ninth Circuit, "[t]he failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield Comms., Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999). *Sleekcraft* itself noted that "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979). In *JL Beverages*, the Ninth Circuit reversed a grant of summary judgment of no infringement where there was no actual confusion evidence because other *Sleekcraft* factors weighed in plaintiff's favor. 828 F.3d at 1111-12. Likewise, in *Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007), the court upheld a finding of a likelihood of confusion between "eBay" and "Perfumebay" marks, both of which were used online in similar contexts, even though the mark owner had not proffered evidence of actual confusion. *Id.* at 1176. Thus, the lack of direct evidence is not dispositive.

That does not mean there is no supporting evidence on the "actual confusion" *Sleekcraft* factor. Thrive has proffered evidence of an Amazon review by a customer who purchased TCI products believing them to have come from Thrive. SDG ¶ 47. Further, consumer "[s]urveys are commonly introduced as probative evidence of actual confusion." *Playboy Enters., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020, 1026 n.28 (9th Cir. 2004). Thrive has submitted two 600-person consumer surveys, each separately finding over 50% of respondents gave answers favoring a finding of forward confusion. *See* SGD ¶ 48. Those confusion levels strongly support Thrive's claim. *See* 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:188 (confusion levels over 50 percent are "persuasive evidence" of likely confusion)); *Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG, 2012 WL 6951315, at *10 (C.D. Cal. Dec. 10, 2012) ("Generally, confusion levels of 25 to 50 percent provide 'solid support' for a

finding of likelihood of confusion"). Thus, even on the "actual confusion" factor, Thrive has submitted supporting evidence in its favor, which must be weighed by the Court. *See Solar Sys. & Peripherals, Inc. v. Solarcom Holdings*, 44 F. App'x 186, 188 (9th Cir. 2002) (reversing summary judgment of no likelihood of confusion where plaintiff had presented evidence that "needs to be weighed on at least four of the *Sleekcraft* factors").

### C.   Totality of *Sleekcraft* Factors Favor Finding Forward Confusion

The Court must deny TCI's motion if a reasonably prudent consumer could be likely to believe TCI's Infringing Skincare Products are affiliated, connected, or associated with Thrive. *See* 15 U.S.C. § 1125; *Brookfield*, 174 F.3d at 1046 n. 6. In the Ninth Circuit, actionable forms of confusion include initial interest confusion, point of sale confusion, and post-sale confusion. *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001). As the *Electropix* court in this District noted, "the use of another's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement." 178 F.Supp. 2d at 1130. "That is, even if potential customers would eventually learn that the two sources of goods or services are unrelated well before any actual sale was consummated, such initial confusion works a sufficient trademark injury." *Id*.; *Brookfield*, 174 F.3d at 1063 ("the diversion of consumers' initial interest is a form of confusion against which the Lanham Act protects."). If consumers are initially attracted to a defendant's mark believing it to be associated with the plaintiff, that constitutes actional forward confusion. *See Electropix*, 178 F.Supp. 2d at 1130. Thrive has proffered substantial evidence from which a reasonable juror could find TCI's use of the "THRIVE causemetics" mark on skincare products is likely to cause consumers to believe those products originate from or are associated with Thrive. This is summarized below. [*See also* Docs. 34, 40].

*Sleekcraft* Factor 1: Thrive's THRIVE Mark is conceptually strong. The

mark is arbitrary with regard to skincare products, as it does not describe any particular quality of such products. SGD ¶ 33; *Henderson v. Lindland*, No. 11-CV-01350-DDP-DTBX, 2013 WL 1181957, at *4 (C.D. Cal. Mar. 21, 2013), aff'd, 602 F. App'x 391 (9th Cir. 2015) (finding TEAM QUEST mark arbitrary for mixed martial arts gyms, despite services relating to groups of fighters). Further, Thrive has made long and continuous use of the mark, which "enhances its strength." SGD ¶ 23; *Electropix*, 178 F. Supp. 2d at 1128. Thrive has also substantially cleared the field of similar marks used on skincare products, bolstering its conceptual strength. SGD ¶ 22; *JL Beverages*, 828 F.3d at 1108.

As to commercial strength, Thrive agrees that TCI has a strong market presence, which supports Thrive's reverse confusion claim. *See JL Beverages*, 828 F.3d at 1108-09 ("JL Beverage concedes that Jim Beam has a strong market presence. JL Beverage correctly points out, however, that this finding supports its reverse confusion claim"). However, like the *JL Beverages* plaintiff, Thrive also has a strong market presence, which supports its forward confusion claim. *Id*. Thrive sells its Thrive Products nationally, has spent a considerable amount on advertising, and its THRIVE Mark has been displayed to millions of potential customers via advertising, promotions, and media coverage. SDG ¶¶ 28-30. The Ninth Circuit held in *JL Beverages* that such evidence creates a "genuine dispute of material fact as to the commercial strength of [plaintiff's mark] in the marketplace." *Id*. at 1109. "Moreover, the determination as to whether the evidence demonstrates that [plaintiff] has robust commercial strength will lend support to [plaintiff] whatever the fact-finder decides, as [plaintiff] has raised both forward and reverse confusion claims." *Id*.

*Sleekcraft* Factor 2: The parties' goods are more than related, they are identical. SGD ¶ 39. There is thus a higher likelihood such goods will "confuse the public as to the producers of the goods." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Thrive and TCI sell in the same industry and are

1  direct competitors. This factor therefore weighs heavily in favor of likelihood of

2  confusion. *AOP Ventures, Inc. v. Steam Distrib., LLC*, No. ED-CV-15-1586-VAP-

3  KKX, 2016 WL 7336730, at *6 (C.D. Cal. Oct. 11, 2016) (Where goods "are

4  identical in kind and directly compete with one another," "[t]his factor . . . weighs

5  heavily in favor of" plaintiff.); *Perfumebay.com*, 506 F.3d at 1174 (parties "sell

6  similar products on the internet—perfume," which weighed in favor of confusion).

7       *Sleekcraft* Factor 3: The parties' marks are virtually identical. TCI's

8  "THRIVE causemetics" brand incorporates the entire THRIVE Mark and, as the

9  PTO found, merely adds a descriptive element. SGD ¶¶ 24, 53. TCI's domain

10 name, thrivecausemetics.com, also incorporates the entire THRIVE Mark. These

11 facts strongly support finding a likelihood of confusion. *See Electropix,* 178 F.

12 Supp. 2d at 1129 ("When a junior user incorporates the entire arbitrary mark of

13 another, addition of a suggestive or descriptive element is generally not sufficient to

14 avoid confusion."); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir. 1980).

15      The virtual identicality of the parties' marks causes e-commerce shopping

16 searches for the Thrive Products to display both parties' products together, where

17 TCI's Infringing Skincare Products are often identified by the name "Thrive"

18 without "Causemetics". SGD ¶ 25. A representative example is below.



**Screenshot of Google Shopping Search for "thrive mens skin"**

28 Consumers shopping online for Thrive's products are presented with links to TCI's

Infringing Skincare Products, also called "Thrive Cleanser" or "Thrive Skincare Set". *See id*. That clearly demonstrates that consumers searching for Thrive Products are likely to be confused by TCI's infringing products and diverted to TCI's product pages, supporting Thrive's forward confusion claim. *See Perfumebay.com*, 506 F.3d at 1174 (finding factor strongly favored mark owner where infringer's domain name incorporated entire mark and search engine results displayed links to both parties' sites). Further, both THRIVE Registrations "are registered as word marks without any design elements, *so any differences in how the marks are displayed is of limited significance.*" *Synoptek, LLC v. Synaptek Corp*., 309 F. Supp. 3d 825, 837 (C.D. Cal. 2018) (emphasis added).

*Sleekcraft* Factor 4: Actual confusion has been addressed above.

*Sleekcraft* Factor 5: The parties' marketing channels directly overlap, which "increase[s] the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Consumers are highly likely to encounter both parties' products and marks together on the same screen, a strong indicator of forward confusion. SGD ¶¶ 25, 43-46. *Perfumebay.com*, 506 F.3d at 1174 ("[T]he Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen."). Both parties' products are sold primarily on the internet, appearing side-by-side on search engine results and on e-commerce sites such as Amazon and Google Shopping. *Id.* (showing Thrive and TCI's skincare products side-by-side on Amazon.com for the word "Thrive", which is exactly how consumers shop for Thrive's products). This support finding convergent marketing channels and weighs heavily in favor of Thrive's claim. *See Perfumebay.com*, 506 F.3d at 1174; *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014).

*Sleekcraft* Factor 6: With regard to consumer care, the standard is "equal to that of the least sophisticated consumer." *Goto.com*, 202 F.3d at 1209. The parties' skincare products are fungible and relatively inexpensive, ranging between $10 and

$60, which supports a lower degree of consumer care. *See Pom*, 775 F.3d at 1127. But more critically, the parties' brands are centered on the same name—THRIVE—meaning "[i]t is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination" to discern the difference. *Electropix*, 178 F. Supp. 2d at 1131. "[V]irtually no amount of consumer care can prevent confusion where two entities have the same name." *Id.*

*Sleekcraft* Factor 7: The "defendant's intent" factor favors finding a likelihood of confusion, as TCI does not dispute that it knew of Thrive and the THRIVE Registration before beginning to sell the Infringing Skincare Products. *See Synoptek*, 309 F. Supp. 3d at 841 (finding this factor weighed in favor of likelihood of confusion where defendant's founders continued to use accused mark after having "constructive or actual knowledge of the [plaintiff's] mark" from PTO office actions); *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1184 (E.D. Cal. 2016) (factor favors plaintiff where "[e]ven though the injunctive record supports Defendant's assertion that it selected its mark in good faith, Defendant continued using its mark after it became aware of Plaintiff's registered mark."). By the time TCI launched its THRIVE-branded skincare products in 2018, it: (a) had obtained a trademark clearance report in 2015 identifying the THRIVE Registrations as a conflict; (b) had Thrive reject TCI's 2016 request to use the THRIVE Mark; (c) received a cease-and-desist letter from Thrive in 2017; and (d) received two PTO Office Actions finding a likelihood of confusion existed between the THRIVE Mark and the THRIVE CAUSEMETICS mark. SDG ¶¶ 49-54. TCI had to have known that the argument it made repeatedly when it only sold color cosmetics—that its and Thrive's products were different—was no longer viable once TCI started selling skincare products. Because TCI knew of Thrive and its registrations when TCI expanded into the relevant skincare market, this factor weighs in favor of finding a likelihood of confusion. *See JL Beverage* Co, 828 F.3d at 1112; *Bellagio Jewelry, Inc. v. Croton Watch Co.*, No.

CV-06-6672-ODW-RZx, 2008 WL 3905895, at *10 (C.D. Cal. Aug. 20, 2008) ("[A]fter Plaintiffs' cease and desist letter . . . Croton continued to use the Bellagio mark to market its watches. While there is no evidence that Croton maliciously intended to deceive consumers, this factor still tips in favor of Plaintiffs.").

*Sleekcraft* Factor 8: Because the parties are *already* direct competitors, the "expansion of product lines" factor weighs in Thrive's favor.

Totality of Factors: In balancing the factors, the Court should find that, *at a minimum*, there is a genuine dispute of material fact as to the likelihood of forward confusion. Accordingly, the Court should deny TCI's motion for summary judgment on Thrive's forward confusion-based infringement claim. *See JL Beverage*, 828 F.3d at 1112.

## IV. TCI's Attempt to Intentionally Infringe Without Any Liability for Monetary Damages Should Be Rejected as Inequitable and Not in Accordance With Precedent

According to TCI, it can knowingly infringe Thrive's registered trademarks and, because Thrive is the smaller company, Thrive is powerless to obtain *any* monetary recovery. TCI's bid to avoid all forms of monetary damages overlooks the language of the Lanham Act, recent Supreme Court case law directly on point, and precedential Ninth Circuit cases.

### A. Supreme Court's *Romag* Case Overruled All Cases Cited By TCI Relating to Disgorgement of Profits

There is no basis to deny the remedy of disgorgement on Thrive's reverse confusion claim. A plaintiff who proves trademark infringement "shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits . . . ." 15 U.S.C. § 1117(a). For many years, the Ninth Circuit maintained a rule that disgorgement was only available where willful infringement was proven. *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 846 (C.D. Cal. 2012) ("In the Ninth Circuit, willfulness is required to disgorge an infringer of its ill-gotten profits."). Courts used this rule to deny disgorgement in reverse confusion

1   cases because willfulness is usually absent in reverse confusion allegations. *See id.*

2   But in April 2020, the Supreme Court issued *Romag*, which "squarely rejected" that

3   rule. *Monster*, 821 F. App'x at 733. In *Romag*, the Court found neither the language

4   of § 1117 nor principles of equity required willfulness to obtain an award of

5   defendant's profits. 140 S.Ct. at 1495-96 ("The phrase 'principles of equity' doesn't

6   readily bring to mind a substantive rule about *mens rea* from a discrete domain like

7   trademark law."). Thus, while "a trademark defendant's mental state is a highly

8   important consideration in determining whether an award of profits is appropriate,"

9   that "is a far cry from insisting on the inflexible precondition to recovery [of

10   requiring willfulness]." *Id.* at 1496. *Romag* "fatally undermined" the prior Ninth

11   Circuit rule. *Monster*, 821 F. App'x at 733.

12          Every single case cited by TCI in support of its argument relied on the pre-

13   *Romag* rule that disgorgement was not available without a finding of willful

14   infringement. *See e.g., Zobmondo*, 944 F.Supp. 2d at 846; *Scat Enters., Inc. v. FCA*

15   *US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *1-2 (C.D. Cal. June 8, 2017)

16   ("To obtain disgorgement of profits under an unjust enrichment theory, Plaintiff

17   must prove that infringement was committed willfully."). Those holdings are all in

18   turn based on *Lindy Pen*, where the Ninth Circuit held that disgorgement was only

19   available "in those cases where the infringement is willfully calculated to exploit

20   the advantage of an established mark." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

21   1400, 1405 (9th Cir. 1993). For example, the court in *Zobmondo* analyzed facts

22   showing the defendant had intentionally disregarded the plaintiff's trademark rights

23   and found "considerable appeal" in the plaintiffs' argument that disgorgement

24   permitted on a reverse confusion claim. *Zobmondo*, 944 F.Supp. 2d at 848. But in

25   the end, the *Zobmondo* court held it was required to follow *Lindy Pen* and its rule

26   that willful intent to trade on an established mark was required to grant a

27   disgorgement remedy. *Id.* at 848-49.

28          Under *Romag*, the rule from *Lindy Pen* and its progeny is no longer good

law. *See Monster*, 821 F. App'x at 733. Nothing in the Lanham Act's language limits the award of profits to only cases involving forward confusion. Stated differently, there is no statutory language that precludes the award of profits in a reverse confusion case. Like Fossil's argument in *Romag*, TCI's argument requires this Court to "read into statutes words that aren't there," which the Supreme Court refused to do. 140 S.Ct. at 1495. Because TCI's argument runs counter to recent Supreme Court precedent, its argument should be rejected and Thrive's request for disgorgement should be allowed to proceed.

Moreover, there are strong equitable reasons why TCI should be forced to disgorge profits from infringing sales under § 1117(a). "Fairness also supports disgorgement of profits so that Defendant does not profit from its unlawful infringement." *Monster Energy Co. v. Integrated Supply Network, LLC*, No. ED-CV-17548-CBM-RAOx, 2021 WL 1521981, at *2 (C.D. Cal. Apr. 12, 2021) (citing *Playboy Enters., Inc. v. Baccarat Clothing Co*., 692 F.2d 1272, 1275 (9th Cir. 1982) ("Any other remedy" besides disgorgement of profits earned from the infringing activity "results in the defendants being unjustly enriched.")). In *Playboy*, the Ninth Circuit stated:

> The practical reality of this decision may be summarized in one question: Would a profit seeking businessperson, not unwilling to violating federal law, pay ten cents to make one dollar? If the answer is "yes" then the trial court's decision did not follow this court's clear mandate . . . to make willful trademark infringement unprofitable.

*Playboy*, 692 F.2d at 1275. Here, the undisputed facts show that TCI expanded into the skincare market in direct competition with Thrive with knowledge that such expansion would infringe Thrive's registered trademarks. SDG ¶¶ 49-54. TCI knew its prior argument—that the parties sold different types of products—was no longer valid. But TCI clearly made a cost-benefit analysis and decided to keep infringing rather than change its product name or pay a license fee. Without an award of disgorgement, TCI would reap the benefits of knowingly infringing Thrive's trademark rights for years—a profit-seeking, calculated violation of the Lanham

1   Act that should be deterred. *See Playboy*, 692 F.2d at 1275.

2       Further, the evidence proffered by Thrive fully supports that TCI had *mens*

3   *rea* to infringe, which remains "a highly important consideration in determining

4   whether an award of profits is appropriate." *Romag*, 140 S. Ct. at 1497. "Use of an

5   infringing mark, in the face of warnings about potential infringement, is strong

6   evidence of willful infringement." *Razor USA LLC v. Vizio, Inc.*, No. 14-CV-

7   01586S-JOJ-CGX, 2015 WL 12656941, at *6 (C.D. Cal. Oct. 19, 2015); *see also*

8   *Synoptek, LLC v. Synaptek Corp.*, No. SA-CV-1601838-CJC-JCGX, 2018 WL

9   3359017 ("*Synoptek II*"), at *9 (C.D. Cal. June 4, 2018) ("Synaptek's blatant use of

10  the 'Synaptek' mark in spite of [multiple] PTO denials provides strong evidence of

11  willful infringement."). While TCI could have had reason to believe it did not

12  infringe when selling color cosmetics, that belief could not have been reasonable

13  when applied to its later sale of skincare products. *Compare with Synoptek II*, 2018

14  WL 3359017, at *10 (finding willful infringement where "Synaptek's continued

15  use of 'Synaptek' demonstrates an indifference to Synoptek's trademark rights and

16  a willingness to determine unilaterally, in spite of the PTO's denials, that

17  Synoptek's rights in its marks should be ignored."). TCI also began to sell the

18  Infringing Skincare Products after receiving a cease-and-desist letter from Thrive,

19  which is "strong evidence of willful infringement." *E. & J. Gallo Winery v.*

20  *Consorzio del Gallo Nero*, 782 F. Supp. 472, 475 (N.D. Cal. 1992).

21      TCI undisputedly acted with knowledge of Thrive's trademark registrations

22  and rights when TCI began selling skincare products. TCI ignored a trademark

23  clearance report, two PTO findings of likelihood of confusion, Thrive's refusal to

24  grant permission to use its THRIVE Mark, and Thrive's cease-and-desist letter, and

25  proceeded to sell skincare products in direct competition with Thrive. SDG ¶¶ 49-

26  54. Those facts are undisputed. Thrive should thus be entitled to summary judgment

27  on the issue of willfulness as it has requested in is separate motion. While not a

28  precondition to an award of profits, these facts remain important and support

1    denying TCI's motion on disgorgement.

2    **B.    Facts Fully Support Thrive's Intent to License and Request for a
         Reasonable Royalty**

3

4    In its bid to avoid all monetary damages for intentional infringement, TCI

5    ignores the facts that Thrive attempted to license to TCI and the parties actually

6    began to negotiate that license. A reasonable royalty can be recoverable as part of

7    plaintiff's actual damages in a trademark case. *See* 15 U.S.C. § 1117(a); *QS*

8    *Wholesale*, 2013 WL 1953719, at *4.

9    In the Ninth Circuit, demonstrating that the parties have a history of licensing

10   is not a prerequisite to recovering a reasonable royalty; rather, a plaintiff must show

11   "a legitimate proposed basis on which to calculate a royalty . . . ." *M2 Software*, 223

12   F. App'x at 655. For example, in *Bauer Bros*., the court denied defendant's motion

13   for summary judgment of no reasonable royalty where there was no history of

14   licensing discussions between the parties, but a review of case law showed courts

15   "have awarded 'reasonable royalty damages' absent prior licensing agreements 'if

16   the evidence provides a sufficiently reliable basis from which to calculate them."

17   159 F. Supp. 3d at 1213-14 (quoting *QS Wholesale*, 2013 WL 1953719, at *4). The

18   *QS Wholesale* court in this District found a reasonable royalty was recoverable

19   where the parties had no prior licensing history but had negotiated the purchase of

20   the mark at issue and expert testimony assessing relevant factors, including other

21   similar license agreements, rendered the proposed royalty non-speculative. 2013

22   WL 1953719, at *4-5. In *adidas v. Payless*, where no previous licensing agreement

23   existed between the parties, there was no evidence of monetary loss to adidas in the

24   form of lost sales, and adidas "concede[d] that it would not have licensed the marks

25   to Payless," the court upheld a jury's reasonable royalties award that was

26   "consistent with royalties between adidas or Payless with third parties and also with

27   royalties between third parties." *adidas*, 2008 WL 4279812, at *12. And in *Gucci v.*

28   *Guess?*, the court held a reasonable royalty was proper if it was "calculated based

on reliable evidence," even though there were no prior licensing negotiations between the parties and "Gucci admits that it would not have licensed the designs at issue if Guess approached it." *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 255 (S.D.N.Y. 2012). TCI disregards these cases, which show a reasonable royalty is available even if the parties have not consummated a license agreement.

TCI then cites cases supporting that a reasonable royalty *is* appropriate here—where Thrive has demonstrated an intent to license and even attempted to actually negotiate a license with TCI in 2019 before the bulk of TCI's infringement began. *See Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300-01 (S.D. Cal. 2018) (finding plaintiff's request for a reasonable royalty was speculative because it "failed to present evidence of an intent to license its trademark"); *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-0094 LGB MCX, 2000 WL 709149, at *18 (C.D. Cal. May 24, 2000) ("Lacking any evidence that plaintiffs in this case would have licensed the rights to the mark, the award of reasonable royalties has no basis in reality"); *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011) ("Where a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculation."). Unlike any of those cases, here in the 2019 call between the parties' CEOs, Thrive *did* expressly state an intent to license the THRIVE Mark to TCI, and the parties began negotiations. SDG ¶¶ 11-13. Specifically, Thrive's CEO proposed a license agreement in a 2019 phone call, to which TCI's CEO responded with a license fee offer comprising a donation to charity that Thrive rejected. *Id*. Thrive's CEO told TCI's CEO to meet with her Board and respond with a proper license fee offer. *Id*. Thrive therefore *has* demonstrated it had the necessary intent to license to TCI. Thrive has also submitted undisputed evidence of its intent to license the THRIVE Mark to three separate third parties. SDG ¶ 18.

In addition, Thrive has supported its request for a reasonable royalty with expert analysis of the *Georgia-Pacific* factors, which provides a non-speculative

basis to calculate the royalty amount. *See Coryn Grp. II, LLC v. O.C. Seacrets, Inc*., No. CIV WDQ-08-2764, 2010 WL 1375301, at *8 (D. Md. Mar. 30, 2010) ("The *Georgia–Pacific* factors are not required for royalty calculation, but courts have recognized them as useful in trademark cases."); *A & L Labs., Inc. v. Bou-Matic, LLC*, No. CIV.02-4862(PAM/RLE), 2004 WL 1745865, at *2 (D. Minn. Aug. 2, 2004) (applying *Georgia-Pacific* factors in trademark analysis). Thrive's expert based his findings on a detailed assessment of similar third-party license agreements and every other *Georgia-Pacific* factor. SDG ¶ 57. That, in addition to the crucial fact that Thrive has demonstrated an attempt to license the THRIVE Mark to TCI, is sufficient, at minimum, to raise a genuine dispute as to material fact relating to Thrive's entitlement to a reasonable royalty award. *See Bauer Bros*., 159 F. Supp. 3d at 1213-14 (denying summary judgment for defendant where plaintiff had proffered considerably less supporting evidence). That TCI made the calculated choice to keep infringing rather than continue license negotiations cannot negate Thrive's right to a royalty.

## C.   Corrective Advertising Cases Cited by TCI are Inapposite

TCI—after spending millions advertising its Infringing Skincare Products and saturating the web with ads tying the "THRIVE" brand to TCI—seeks to avoid monetary damages for the cost of advertising needed to correct the misimpressions it has caused. That would be unfair and inequitable. Where a defendant "knowingly used [plaintiff's] marks in a manner that saturated the market with a false impression of association, . . . compensatory corrective advertising damages would be conceivably appropriate to counteract [defendant's] infringing advertising campaigns . . . ." *Marketquest Grp., Inc. v. BIC Corp*., No. 11-CV-618-BAS (JLB), 2018 WL 1756117, at *5 (S.D. Cal. Apr. 12, 2018). "An award of the cost of corrective advertising . . . allow[s] the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement." *Adray v. Adry-Mart, Inc*., 76 F.3d 984, 988 (9th Cir. 1995).

The cases cited by TCI denying corrective advertising damages involved markedly different facts than here. In *Binder v. Disability Grp., Inc*., 772 F. Supp. 2d 1172 (C.D. Cal. 2011), on which TCI relies heavily, the defendant infringed for merely four months more than four years before the decision. *Id*. at 1180-81. The court thus denied an award of corrective advertising damages because "there is no reasonable way to ascertain the[] existence [of consumers who received defendant's ads] and to target or include them in a corrective advertising campaign . . . [and] due to the limited period of infringement and the passage of substantial time, it is unlikely that any such residual misimpressions would, or now could, be remedied." *Id*.; *see also Int'l Oddities v. Record*, No. CV 12-3934-CAS VBKX, 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013) (infringement occurred over a three-month period and "defendant did not obtain even the slightest measure of commercial success"). In *Lodestar Anstalt v. Bacardi & Co*., No. 2:16-CV-06411-CASF-FMX, 2019 WL 8105378 (C.D. Cal. July 3, 2019), when the defendant's alleged infringing advertising occurred the plaintiff had only sold 18 sample bottles of its rum and had not sold *any* bottles of rum bearing its mark in the U.S. *Id*. at *15. Thus, at the time of infringement there was no value in the plaintiff's mark that could have been diminished by defendant's advertising. *Id*. Rather, the plaintiff in *Lodestar* manufactured an infringement claim by producing a new product using a previously registered mark *after* the defendant had begun its advertising campaign that included a similar mark. *Id*. at *3-4. None of the cases cited by TCI involved infringement of any more than a few months' duration and none involved placement of the parties' products side-by-side in online shopping scenarios.

This case is starkly different. Over several years, TCI has spent millions to advertise its Infringing Skincare Products online. SDG ¶ 43. Those ads and placements cause TCI's products to appear together in *every* search for Thrive and the Thrive Products on popular search engines and e-commerce platforms. SDG ¶¶ 25, 43-45. Thrive's CEO has testified to the extensive damage caused by TCI's

advertising and how TCI's AdWord bidding strategy drives up the cost of purchasing "Thrive" AdWords, increasing the expense to Thrive to advertise using its own brand name. SDG ¶ 59. And TCI's huge advertising budget has enabled it to saturate marketing channels with ads likely to cause consumers to equate "THRIVE" with "THRIVE causemetics". SDG ¶¶ 25, 43-45. That is demonstrated in part by Thrive's evidence of actual reverse consumer confusion. SDG ¶ 47. TCI's actions have caused substantial harm to Thrive's THRIVE Mark and its brand. SDG ¶¶ 25, 44, 59-60; *see Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc*., No. 4:19-CV-01424-YGR, 2021 WL 254448, at *14 (N.D. Cal. Jan. 26, 2021) ("The loss of control over one's trademarks, reputation, and goodwill is 'a quintessentially irreparable injury."); *Ossur hf v. Manamed Inc*., 331 F. Supp. 3d 1005, 1017 (C.D. Cal. 2017) ("By borrowing [plaintiff]'s mark, Defendants impair [plaintiff]'s control over its reputation" causing harm to plaintiff); *Fiji Water*, 741 F. Supp. 2d at 1183 ("If VITI continues to introduce its infringing product into the marketplace, FIJI will undoubtedly have great difficulty maintaining and restoring its reputation and goodwill with the public, many of whom are already confused.").

Spending money on corrective advertising *would* be effective when TCI is enjoined from flooding the market with its own ads linking "THRIVE" to TCI. At the present time, Thrive's advertising budget is much smaller than TCI's. Any proactive corrective advertising that Thrive could afford would be a mere drop in the bucket compared to TCI's multi-million-dollar ad spend. SDG ¶ 60. That is why Mr. McIntosh testified proactive corrective advertising would not be a "good investment" *at this time*. *Id*. However, when TCI's infringement is enjoined, it would be appropriate and necessary for Thrive to advertise to correct the millions of misimpressions caused by TCI. *Id*. And, in accordance with case law and reason, an award in the amount of 25% of TCI's advertising budget for the Infringing Skincare Products would be appropriate to provide Thrive with the resources to combat TCI's false advertising. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber*

*Co.*, 561 F.2d 1365, 1375-76 (10th Cir. 1977). The 25% amount was not pulled from thin air as TCI makes it seem; it has been court-approved and is consistent with the Federal Trade Commission's "rule requiring businesses engaged in misleading advertising to spend 25% of their budget on corrective advertising . . . ." *Id*. And Thrive is seeking only 25% of TCI's *skincare* ad budget, not its overall ad budget, which is far higher. SDG ¶ 58. Though TCI argues an award of prospective costs presents a danger of overcompensation, "the burden of any uncertainty in the amount of damages should be borne by the wrongdoer . . . ." *Marketquest*, 2018 WL 1756117, at *5; *Adray*, 76 F.3d at 989. Because Thrive has demonstrated harm to its mark caused by TCI's infringement, and its requested award is reasonable, the Court should deny TCI's motion for summary judgment on corrective advertising damages.

<u>**Conclusion**</u>

TCI knowingly infringed Thrive's trademark registrations, releasing a directly competitive THRIVE-branded skincare line and causing a likelihood of both forward and reverse confusion. TCI's motion must be denied.

DATED:  August 23, 2021                    Respectfully submitted,

THE MCARTHUR LAW FIRM, PC
By: */s/ Stephen McArthur*
Stephen McArthur
Thomas Dietrich
*Attorneys for Plaintiff Thrive
Natural Care*