Stephen McArthur (SBN 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (SBN 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff Thrive*
*Natural Care, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:20-CV-9091-PA-AS |
| Plaintiff, | **PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THRIVE CAUSEMETICS, INC., | |
| Defendant. | Hon. Percy Anderson |
| | **Hearing Date**: September 13, 2021 **Time:** 1:30 p.m. **Courtroom:** 9A |

<u>**Index of Exhibits**</u>

**Declaration of Alex McIntosh in Support of Opposition to Defendant's Motion for Summary Judgment ("McIntosh Opp. Decl.")**

Ex. A p.1[1] – June 30, 2021, *USA Today* Article

Ex. B p.5 – Certificates for Trademark Reg. Nos. 4,467,942 and 6,164,303

Ex. C p.10 – Thrive Licensing-Related Communications

Ex. D p.19 – 2017 Cease-and-Desist Letter from Thrive to TCI

Ex. E p.22 – TCI's Response to Thrive's Cease-and-Desist Letter

Ex. F p.25 – June 30, 2021, Amazon Review for Thrive Sunscreen

Ex. G p.29 – Amazon Reviews Showing Actual Confusion

Ex. H p.34 – Google Searches Showing Products Side-by-Side

Ex. I p.62 – Bing Searches Showing Products Side-by-Side

Ex. J p.71 – Online Marketplace Images Showing Products Side-by-Side

**Declaration of Stephen McArthur in Support of Opposition to Defendant's Motion for Summary Judgment ("McArthur Opp. Decl.")**

Ex. A p.1 – Excerpts of TCI 30(b)(6) Deposition of Karissa Bodnar and Deposition Exhibits ("Depo. Ex.") 11, 16, 20, 27, 30

Ex. B p.59 – Excerpts of Deposition of Brendan Gardner-Young and Depo. Ex. 45

Ex. C p.82 – Excerpts of Deposition of Ned Menninger and Depo. Ex. 38

Ex. D p.96 – November 30, 2015, Office Action on THRIVE CAUSEMETICS trademark application

Ex. E p.108 – TCI's Response to 2015 PTO Office Action

Ex. F p.131 – June 22, 2016, Reply from PTO on Office Action

---

[1] Pagination in index refers to bold page numbers in footer of exhibits to each declaration.

1      Ex. G p.138 – August 28, 2018, Office Action on second THRIVE

2            CAUSEMETICS trademark application

3      Ex. H p.154 – TCI's Response to 2018 PTO Office Action

4      Ex. I p.175 – November 23, 2018, PTO Suspension Letter

5      Ex. J p.179 – July 28, 2021, Office Action on second THRIVE

6            CAUSEMETICS trademark application

7      Ex. K p.188 – Dictionary Definitions of "thrive"

8    **Declaration of Rob Wallace in Support of Opposition to Defendant's Motion**

9    **for Summary Judgment ("Wallace Opp. Decl.")**

10      Ex. A p.1 – Screenshots of Parties' Products Appearing in Online Searches

11      Ex. B p.33 – Expert Report of Rob Wallace and Attachments

12    **Declaration of David Drews in Support of Opposition to Defendant's Motion**

13    **for Summary Judgment ("Drews Opp. Decl.")**

14      Ex. A p.1 – Supplemental Schedules of Damages

15      Ex. B p.7 – Expert Report of David Drews and Attachments

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to FRCP 56 and L.R. 56-2, Plaintiff Thrive Natural Care, Inc. ("Thrive") submits the following Separate Statement of Genuine Disputes in response to Defendant Thrive Natural Care, Inc.'s ("TCI") Separate Statement of Fact in support of TCI's motion for summary judgment. While Thrive identifies genuine disputes here in relation to TCI's motion, Thrive believes there is no genuine dispute regarding issues Thrive raised in its own motion for partial summary judgment and that Thrive's motion should be granted.

## I.    **Genuine Disputes**

| No. | Defendant's Stated Fact | Thrive's Response and Supporting Evidence |
|-----|------------------------|-------------------------------------------|
| 1. | Thrive Causemetics was established and sold its first products in 2014. | Undisputed. |
| 2. | TCI's first product offerings were false eyelashes and eyelash adhesives, but it thereafter expanded its product offerings to include color cosmetics and, in October 2018, skincare products. | Undisputed. |
| 3. | TCI's success has been covered in numerous major media outlets including Forbes, Cosmopolitan, Allure, Good Morning America, TODAY Show and People Magazine, and the company's robust social media presence includes 529,000 followers on Instagram and over 615,000 followers on Facebook. | It is undisputed that TCI's company has been covered by the referenced major media outlets, though the referenced coverage occurred well before TCI released the Infringing Skincare Products and did not relate to such products. |
| 4. | TCI commercial success is also reflected in its financial performance: TCI has achieved a total of $422,764,692 in revenues since 2018, including $27,436,054 attributable to the sale of skincare products, driven in part by substantial investments in advertising. | Undisputed. |
| 5. | Plaintiff sells products featuring | Undisputed. |

| | | |
|---|---|---|
| | ingredients sourced from regenerative plants grown in Costa Rica. | |
| 6. | As of August of 2021, Plaintiff had 7,242 followers on Instagram and 2,693 followers on Facebook. | Undisputed. |
| 7. | Plaintiff contends that TCI has flooded the market with advertising for TCI and its products. | Undisputed. |
| 8. | The instances of alleged actual confusion of which Plaintiff is aware all involve the purported belief that Plaintiff or its products came from or were affiliated with TCI, rather than the other way around. | Disputed. Thrive's marketing expert conducted two consumer surveys in which more than 50% of respondents believed the parties' products originated from the same or affiliate sources. These surveys demonstrate actual forward confusion and are accepted by courts as a proxy for forward confusion. Wallace Opp. Decl. ¶ 15, Ex. B. Thrive has also proffered an Amazon review from a customer indicating she purchased TCI products believing them to have originated from Thrive. McIntosh Opp. Decl. ¶ 37, Ex. F. |
| 9. | TCI has not received information indicating that any person or entity believed that TCI products originate from or that TCI or its products are otherwise affiliated with Plaintiff. | Disputed. Thrive's consumer surveys found that more than 50% of 1,200 respondents believed the parties' products originated from the same or affiliate sources. These surveys demonstrate actual forward confusion. Wallace Opp. Decl. ¶ 15, Ex. B. |
| 10. | In June 2019, Ms. Bodnar reached out to Plaintiff's co-founder Alex McIntosh regarding the companies' respective marks and a potential "peaceful coexistence" agreement between the parties. | Disputed. Ms. Bodnar reached out to Thrive because she knew that TCI was infringing on Thrive's registered trademarks, and she was seeking a way to avoid liability for infringement. By the time of this call, TCI's attempt to register its |

| | | | THRIVE CAUSEMETICS mark had been rejected twice by the U.S. Patent & Trademark Office ("PTO") because of a likelihood of confusion with the THRIVE Registrations. Ms. Bodnar also knew the parties had not been peacefully coexisting since 2017, when she received Thrive's cease-and-desist letter. Given TCI's prior reliance on arguments that the parties sold different products (cosmetics vs. skincare), it is not possible that Ms. Bodnar could have believed the parties would be peacefully coexisting when Thrive found out that TCI had moved into the skincare products market. McIntosh Opp. Decl. ¶¶ 23-25; McArthur Opp. Decl., Exs. D-I. |
| 11. | In the conversation, Mr. McIntosh made a generic reference to licensing, but did not propose a royalty amount. | Disputed. Mr. McIntosh specifically discussed the parties entering into an agreement whereby TCI would pay an ongoing license fee based on gross sales of products to Thrive in exchange for use of the THRIVE mark, which is the definition of a royalty. McIntosh Opp. Decl. ¶¶ 27-28. |
| 12. | To the contrary, Mr. McIntosh did not have a suggestion as to what an appropriate royalty would be. | Disputed. As is common in negotiations, Mr. McIntosh first gave TCI the opportunity to propose a licensing fee, rather than negotiating against himself by being the first party to propose an amount. Mr. McIntosh made a clear request to Ms. Bodnar to discuss the issue with her team and propose a licensing fee for the rights to use the THRIVE mark. McIntosh Opp. Decl. ¶¶ 27-28. |

| 13. | In response to Mr. McIntosh's comment, Ms. Bodnar suggested that TCI might consider a donation to Plaintiff's preferred charity to resolve any dispute between the parties, but proposed no specific terms. | Disputed. During the call, Ms. Bodnar attempted to negotiate a licensing fee in the form of a donation to charity in Thrive's name. Mr. McIntosh rejected that proposal and continued to negotiate, telling Ms. Bodnar to discuss the matter with TCI's Board and return with a licensing fee offer based on gross sales of TCI's Thrive products. McIntosh Opp. Decl. ¶¶ 27-28. |
|---|---|---|
| 14. | The conversation concluded without the parties reaching any agreement, and there was never any further discussion between the parties with respect to anything having to do with licensing. | It is undisputed that the call concluded without the parties reaching an agreement. The parties had begun licensing negotiations on the call, and it ended by Thrive requesting that TCI respond with an offer of a reasonable licensing fee. Alternatively, Thrive requested that TCI stop using the THRIVE Mark. TCI never responded and chose to continue infringing instead. McIntosh Opp. Decl. ¶ 28. |
| 15. | After the June 2019 conversation, nearly sixteen more months elapsed without any further communication between the parties. | Undisputed. |
| 16. | Plaintiff and TCI have never negotiated or entered into a license with each other concerning the THRIVE mark. | Disputed. As identified above, the parties began the process of negotiating a license during the June 2019 call. Thrive demonstrated its intent to license, TCI countered with an offer of a payment to a charity, which Thrive rejected, and Thrive requested that TCI respond with a more substantial licensee fee proposal. Rather than continue negotiations after that, TCI made the choice to |

| | | |
|---|---|---|
| | | continue infringing. McIntosh Opp. Decl. ¶¶ 27-28. |
| 17. | Plaintiff has never licensed the THRIVE mark to any third party. | Undisputed. |
| 18. | Plaintiff's counsel made one offer to license Plaintiff's mark to a third party after the commencement of this lawsuit, but the offer never actually resulted in a licensing agreement. | Disputed. Thrive made offers to license the THRIVE mark to third parties. These include offers to TCI, Thrive Market, Inc., Thriva LLC, and Elis Cosmetics. McIntosh Opp. Decl. ¶ 22, Ex. C. |
| 19. | TCI has never licensed the THRIVE CAUSEMETICS to any third parties, nor has it obtained a license for any other party's mark. | Undisputed. |
| 20. | Plaintiff has not undertaken any analysis or quantification of the value of its mark or of the alleged harm to the value of its mark. | Disputed. Thrive's THRIVE mark is particularly valuable because it is the only registered mark beginning with "thrive" or for "thrive" alone for skincare products. While numerous third parties and TCI have attempted to use the mark THRIVE in relation to skincare products—demonstrating high demand for the mark—Thrive has taken steps to clear the field of other similar marks. Further, the harm caused by TCI—and, in particular, by TCI's products showing up together with Thrive's products in nearly every online search for Thrive's products—is acute. Finally, Thrive's brand has been valued at $10 million by outside investors, as testified to by Mr. McIntosh at his deposition. McIntosh Opp. Decl. ¶¶ 44-45. |
| 21. | Plaintiff has not made any actual corrective advertising expenditures | Disputed. Mr. McIntosh testified that, under the current |

| | |
|---|---|
| and has indicated that doing so would not be a "good investment" for Plaintiff. | circumstances where TCI's skincare products appear together with Thrive's skincare products in nearly any and every online search, it would be difficult to conduct a corrective advertising campaign with Thrive's limited budget directly bidding against TCI's millions of dollars in advertising spend per quarter. Further, TCI bidding on advertising keywords containing the word "thrive" drives up the price for those keywords, such that Thrive would have to pay far more to secure them over TCI's bids. Those high costs would be significant to Thrive, which is a small business without hundreds of millions of dollars in revenue. Spending money on corrective advertising would be effective after TCI is enjoined from flooding the market with its own ads linking "THRIVE" to TCI, as that would enable Thrive to advertise to correct the millions of misimpressions caused by TCI. McIntosh Opp. Decl. ¶¶ 46-48. |

## II.    Plaintiff's Additional Material Facts

| No. | Additional Material Fact | Evidence |
|---|---|---|
| 22. | Thrive sells lotions, creams, cleansers, moisturizers, and sunscreens (the "Thrive Products") under the THRIVE Mark, and it has used the THRIVE Mark on skincare products continuously since 2013. | McIntosh Opp. Decl. ¶ 3 |
| 23. | Thrive sells its products online at its website, www.thrivecare.co, and through retail partnerships with | McIntosh Opp. Decl. ¶ 5 |

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | | Amazon and Walmart.com, and at physical Whole Foods stores. Thrive sells and advertises its Thrive Products nationally and has done so for many years. Most Thrive Products are sold online through e-commerce sites. | |
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14 | 24. | Plaintiff Thrive's skincare products and Defendant TCI's skincare products both prominently feature the THRIVE Mark on the packaging. One example is below.<br> | McIntosh Opp. Decl. ¶¶ 7, 33 |
| 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 25. | Both parties' skincare products are shown together in online search results extremely frequently. This includes not only searches on the most popular search engines and searches, but also searches on e-commerce sites for shopping specifically tailored to seek information on Thrive and the Thrive Products, such as "thrive natural care," "mens thrive natural care," and "amazon thrive natural care". An example is below.<br> | McIntosh Opp. Decl. ¶¶ 39-42, Ex. H-J; Wallace Opp. Decl. ¶¶ 8-11, Ex. A |

In the search results, as seen above, TCI's products are described as "Thrive [product name]" just like Thrive's products. The primary product names of TCI's products often do not include the word "Causemetics" and often, as shown, do not even spell out the word "Causemetics" entirely in the link and image.



The above search results for "Thrive" on Amazon.com duplicates exactly how a consumer would search for Thrive's skincare product on the website that constitutes the majority of Thrive's sales: Amazon.com. TCI's THRIVE-branded skincare "Buildable Blur CC Cream" is shown side-by-side for sale with Plaintiff Thrive's THRIVE-branded skincare products.

| 26. | Both Thrive's and TCI's skincare products are inexpensive, ranging between approximately $10 and $60. | McIntosh Opp. Decl. ¶ 9; McArthur Opp. Decl., Ex. A at 87:13-23, Depo. Ex. 16 |
|---|---|---|
| 27. | Thrive targets both men and women for its Thrive Products. Thrive targets female customers for items like sunscreen, cleansers, lotions, and moisturizers, and male customers for | McIntosh Opp. Decl. ¶ 10 |

| | | |
|---|---|---|
| | items like beard oil. Women proved to be the earliest adopters of Thrive Products and have always formed a sizable part, and in recent years the majority, of Thrive's customer base. More than 60 percent of Thrive's purchasers on Amazon are women. That ratio is similar in brick-and-mortar stores such as Whole Foods. | |
| 28. | Thrive has gained a reputation for being on the leading edge of healthy, natural skincare, and the media and Thrive's partners have recognized and promoted Thrive's skincare products. Amazon recently featured Thrive in a marketing video that was shared with Amazon's 700,000-plus employees and 100 million customers. In December 2020, Amazon chose Thrive from among thousands of businesses as one of two recipients of the first Amazon Launchpad Innovation Grant for most innovative products and business model. Several times, Whole Foods has featured Thrive as a "favorite" brand for its customers. Thrive's products and business have generated over 1.5 billion media impressions in recent months alone, with coverage in publications such as *USA Today, Vogue, Forbes, MarketWatch, Real Simple, People, Beauty News, The Zoe Report, Hollywood Reporter, Instyle, Runners World, Whole Foods Magazine,* and *Natural Solutions Magazine*. | McIntosh Opp. Decl. ¶¶ 11-15 |
| 29. | Thrive is a successful Public Benefit Corporation with a loyal customer base and significantly increased growth, revenue, and social and environmental impact each year. Thrive achieved over $1 million sales in 2020. As of August 22, 2021, Thrive's sales had equaled all of 2020, and are on track to double 2020 revenue by the end of this year. In addition, per the company's Public Benefit charter, Thrive's regenerative business model is successfully restoring hundreds of acres of degraded lands and boosting the livelihoods of hundreds of farmers and community members in rural areas. | McIntosh Opp. Decl. ¶ 6 |
| 30. | Over the past three years, Thrive has spent over $660,000 advertising its Thrive Products. | McIntosh Opp. Decl. ¶ 11 |
| 31. | Thrive owns all right, title, and interest in and to U.S. Trademark Registration No. 4,467,942 (the '942 Registration"), which was registered January 14, 2014, for | McIntosh Opp. Decl. ¶ 17, Ex. B |

| | | |
|---|---|---|
| | the word mark "THRIVE" in relation to the following goods in International Class 003: "Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams." The application which matured into the '942 Registration was filed September 11, 2012. On March 7, 2020, the PTO deemed the '942 Registration to be incontestable. | |
| 32. | Thrive owns all right, title, and interest in and to U.S. Trademark Registration 6,164,303 (the "'303 Registration," and, together with the '942 Registration, the "THRIVE Registrations"), which was registered September 29, 2020, for the word mark "THRIVE" in relation to the following goods in International Class 003: "Body and non-medicated soaps and skin cleansing gels; non-medicated skin care preparations, namely, facial lotions, cleansers and creams, oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams." The application which matured into the '303 Registration was filed May 2, 2016. | McIntosh Opp. Decl. ¶ 18, Ex. B |
| 33. | The Merriam Webster dictionary definition of "thrive" is "to grow vigorously; to gain in wealth or possessions; to progress toward or realize a goal despite or because of circumstances." Other dictionary definitions are similar, and none use "thrive" in a way that would define a particular quality about skincare products. Thrive did not choose its name because it described any quality directly relating to skincare products. | McArthur Opp. Decl., Ex. K; McIntosh Opp. Decl. ¶ 16 |
| 34. | Thrive has enforced its rights to the THRIVE Mark in relation to skincare products by sending numerous cease-and-desist letters and pursuing litigation for trademark infringement. These efforts have been successful. Thrive is the only entity that owns a registration for the mark "THRIVE", either standing alone or as the first word in the trademark, in relation to skincare and grooming products. Other registrations or applications that were similar have been refused by the PTO, canceled, or abandoned. | McIntosh Opp. Decl. ¶¶ 20-22 |
| 35. | On June 30, 2021, an Amazon customer left a review of Thrive's sunscreen on Thrive's Amazon.com page, which | McIntosh Opp. Decl. ¶ |

| | | |
|---|---|---|
| | stated: "I like Thrive products and have bought eye liner and mascara from them as well as moisteurizer [sic]." Because Thrive does not sell eyeliner or mascara, this indicates the consumer purchased those items from TCI and believed them to originate from Thrive. | 37, Ex. F |
| 36. | Karissa Bodnar founded TCI in 2014, after Thrive launched its skincare products. TCI first sold false eyelashes and later color cosmetics (makeup) under the "THRIVE causemetics" brand. TCI did not begin selling skincare products until 2018, four years later. | McArthur Opp. Decl., Ex. A at 15:9-16:5 |
| 37. | TCI emphasizes the "THRIVE" portion of its brand name, which is presented in much larger font in TCI's logo than "causemetics," which is presented in small, non-bold font. | McArthur Opp. Decl., Ex. A at 27:15-28:16, Depo. Ex. 11 |
| 38. | In 2018, TCI launched its first skincare products, which were advertised and sold under the "THRIVE causemetics" brand. TCI quietly sold three skincare products through 2019 and then dramatically expanded its skincare line in 2020, releasing more than a dozen new skincare products. | McArthur Opp. Decl., Ex. A at 45:10-47:11, 91:10-16, Depo. Ex. 16 |
| 39. | TCI now sells many skincare products under the "THRIVE causemetics" brand. These include face and body cleansers, lotions, creams, moisturizers, sunscreen, lip balm, hand sanitizer, and face oils, all of which are within the scope of Thrive's THRIVE Registrations (collectively, "Infringing Skincare Products"). The Infringing Skincare Products consists of  TCI's entire skincare line, including the following products: Overnight Sensation Brightening Sleep Mask; Liquid Balm Lip Treatment; Gravity Defying Transforming Moisturizer; Bright Balance 3-in-1 Cleanser; Defying Gravity Eye Lifting Cream; Liquid Light Therapy All-in-One Face Serum; Moisture Flash Active Nutrient Toner; Deluxe Travel Defying Gravity Transforming Moisturizer; Defying Gravity Transforming Moisturizer; Deluxe Travel Bright Balance 3-in-1 Cleanser; Moisture-Enriched Hand Sanitizer; Overnight Sensation Gentle Resurfacing Peel; Pumpkin Spice Latte Liquid Lip Balm Treatment; Smart Microdermabrasion 2-in-1 Instant Facial; Defying Gravity Nourishing Hand + Nail Cream; Smart | McIntosh Opp. Decl. ¶¶ 31-32; McArthur Opp. Decl., Ex. A at 94:1-97:23, Depo. Ex. 16; Ex. C, Depo. Ex. 38 |

| | | | |
|---|---|---|---|
| | | Microdermabrasion 2-in-1 Instant Facial; Buildable Blur CC Cream; Filtered Effects Blurring Primer; all travel sized versions of these products; and all "sets" that include any of these products as part of the set. These products include at least the following SKU numbers: TCC001-TCC019; TP001; TSC002; TSC003; TSC004; TSC005; TSC006; TSC007; TSC008; TSS002; TSS003; TSS004; TVG007; TVG070; TVG133; TVG134; TVG136; TVG137; TVG138; TVG141; TVG142. | |
| | 40. | TCI offers for sale, displays, and sells all of the Infringing Skincare Products online through its website, www.thrivecausemetics.com. | McArthur Opp. Decl., Ex. A at 77:21-24, 81:3-10, 87:13-17, Depo. Ex. 16; Ex. B at 16:17-17:9, 39:20-24 |
| | 41. | Like Thrive, the majority of TCI's customers are female, but TCI also sells a significant amount of its products to men. | McArthur Opp. Decl. Ex. A at 142:1-145:24, Depo. Ex. 20 |
| | 42. | Plaintiff Thrive's marketing and advertising often uses the term "Thrive skincare" to refer to Thrive Products, as well as terms that include the word "thrive" and words describing the product, such as "Thrive moisturizer," "Thrive cleanser," and "Thrive sunscreen." | McIntosh Opp. Decl. ¶ 8 |
| | 43. | TCI advertises heavily online, spending approximately 50-52% of its revenue from sales of its Infringing Skincare Products on advertising for those products. Part of TCI's advertising includes purchasing Google advertising keywords ("AdWords") for terms including "Thrive," "Thrive cleanser," and "Thrive moisturizer"—none of which contain any reference to "causemetics"—causing ads for TCI's skincare products to appear together with Thrive's skincare products in online search results. TCI has purchased many Google AdWords for terms that included the word "thrive" but did not include the word | McArthur Opp. Decl., Ex. B at 56:14-20, 68:5-7, 97:8-113:23, Depo. Ex. 45; Ex. C at 41:3-42:13, Depo. Ex. 38 |

| | | |
|---|---|---|
| | "causemetics," including "thrive" (used repeatedly by TCI), "thrive cleanser," "thrive moisturizer," "+thrive +lip +balm," "thrive liquid balm," "thrive promo code," "+thrive +holiday +set," and "thrive lip treatment," among others. | |
| 44. | A consumer searching online for Thrive or the Thrive Products is highly likely to be presented with images of and links to TCI's Infringing Skincare Products together with Thrive Products. Consumers are likely to seek out Plaintiff's products via an online search for terms such as "Thrive skincare" and "Thrive Natural Care". When TCI's products, also referred to as "Thrive" products in search results are shown together with the Thrive Products, it is highly likely a consumer would be confused and click on links to TCI's products believing them to originate from or be affiliated with Thrive. | McIntosh Opp. Decl. ¶¶ 39-41, Exs. H, I; Wallace Opp. Decl. ¶¶ 8-13, Ex. A |
| 45. | Thrive's Thrive Products and TCI's Infringing Skincare Products also appear together in searches on online marketplaces, including Amazon, Walmart.com, eBay, and Mercari. | McIntosh Opp. Decl. ¶ 42, Ex. J |
| 46. | Both Thrive and TCI advertise their skincare products on social media, including Facebook and Instagram. | McIntosh Opp. Decl. ¶ 11; McArthur Opp. Decl., Ex. A at 42:1-11, 137:6-9; Ex. B at 55:17-58:1, 68:5-20 |
| 47. | There is evidence of actual confusion between Thrive and TCI. Consumers have been confused and believed that the parties' products originated from the same source or connected or affiliated sources. That includes an Amazon review on Thrive's sunscreen product page from a customer who erroneously believed that TCI's eyeliner, mascara, and moisturizer products originated from Thrive. | McIntosh Opp. Decl. ¶¶ 37-38, Exs. F, G |
| 48. | Thrive's marketing expert conducted two 600-person surveys comparing skincare products by Thrive to products by TCI and control products from third parties. The survey that tested Thrive's newest packaging design found a net | Wallace Decl. Opp. ¶ 15, Ex. B |

| | | |
|---|---|---|
| | 54.5% rate of confusion between Thrive's product and TCI's skincare product. The survey that tested Thrive's older packaging design found a net 56.6% rate of confusion between Thrive's product and TCI's skincare product. Survey respondents indicated confusion because both skincare lines were named "Thrive". | |
| 49. | In August 2015, TCI became aware of Thrive and Thrive's '942 Registration, when TCI received a trademark search report identifying Thrive's '942 Registration as a potential conflict with TCI's THRIVE CAUSEMETICS mark. | McArthur Opp. Decl., Ex. A at 183:16-187:13, Depo. Ex. 27 |
| 50. | In November 2015, the PTO rejected TCI's application to register the THRIVE CAUSEMETICS mark, citing a likelihood of confusion with Thrive's senior '942 Registration. TCI overcame that PTO rejection by arguing in part that TCI's color cosmetics were "distinctly different types of consumer goods" than Thrive's skincare products. | McArthur Opp. Decl., Ex. D at 4, Ex. Ex. E at 12, Ex. Ex. F at 2 |
| 51. | Before TCI responded to the PTO's 2015 Office Action, on April 22, 2016, Ms. Bodnar of TCI contacted Thrive via email and asked for permission to use the THRIVE Mark as part of TCI's brand name. Ms. Bodnar identified TCI as "a color cosmetics brand with a mission to help women going through cancer treatment look and feel better during their time of need." She promised "[w]e will never use the word 'Thrive' without the word 'Causemetics'. . . ." Thrive's co-founder, Alex McIntosh, denied Ms. Bodnar's request. | McArthur Opp. Decl., Ex. A at 196:7-202:2, Depo. Ex. 30; McIntosh Opp. Decl. ¶ 23 |
| 52. | Thrive sent a cease-and-desist letter to TCI on March 3, 2017, in response to TCI beginning to de-emphasize the term "Causemetics" in TCI's branding. TCI rejected the demand to stop using the name THRIVE on its color cosmetics products and argued again that there would be no consumer confusion between the parties' products because they sold "different product lines" (color cosmetics and skincare products). Thrive relied on the statement by TCI that its makeup products were entirely different "product lines" from Thrive's skincare products, with no overlap, and chose not to pursue the matter further. | McIntosh Opp. Decl. ¶ 24, Exs. D, E |
| 53. | In April 2018, TCI made a second attempt to register its THRIVE CAUSEMETICS mark. On August 28, 2018, the | McArthur Opp. Decl., |

| | | |
|---|---|---|
| | PTO issued an Office Action rejecting TCI's application, citing a likelihood of confusion with Thrive's '942 Registration and Thrive's then-pending second application for the THRIVE Mark, which matured as the '303 Registration. The PTO also stated "CAUSEMETICS" is a misspelling of "cosmetics" and as such, is merely descriptive and must be disclaimed. | Ex. G at 2-4 |
| 54. | In TCI's response to the PTO's 2018 Office Action, TCI argued again that its cosmetics products and Thrive's skincare products were "found in different aisles or departments than standard make-up cosmetics, such as eyeliner, and are distinctly different types of consumer goods." TCI further argued that TCI's "Goods and Services are marketed toward and used to help women, whereas [Thrive's] Cited Goods are marketed toward men." The PTO disagreed with TCI's arguments and suspended TCI's second application, maintaining the refusal to register the THRIVE CAUSEMETICS mark due to a likelihood of confusion with Thrive's '942 Registration and then-pending application that matured as the '303 Registration. | McArthur Opp. Decl., Ex. H at 7-8, Ex. I |
| 55. | Recently, on July 28, 2021, the PTO un-suspended TCI's second application for THRIVE CAUSEMETICS and issued an Office Action maintaining the refusal to register due to a likelihood of confusion with both THRIVE Registrations. | McArthur Opp. Decl., Ex. J |
| 56. | TCI's total profits from sales of all Infringing Skincare Products from 2018 through May 2021 are $21,524,380. Total profits are calculated by subtracting TCI's cost of goods sold and direct expenses from gross revenue. | Drews Opp. Decl. ¶ 5, Ex. A at 1; Ex. B at 29 |
| 57. | Reasonable royalty damages, as calculated by Thrive's damages expert, total $4,840,162. Thrive's expert considered the facts of the case, other similar license agreements, and the other *Georgia-Pacific* factors in drawing his conclusions regarding a reasonable royalty. | Drews Opp. Decl. ¶ 5, Ex. A at 1, 4; Ex. B at 11-21 |
| 58. | Corrective advertising damages, as calculated by Thrive's damages expert, total $5,796,527. That amount was determined by taking 25% of TCI's stated advertising budget for the Infringing Skincare Products. It does not include any calculation of TCI's ad spend that is not related to its skincare products. | Drews Opp. Decl. ¶ 6, Ex. A at 1, 3 |

| 59. | TCI's bidding on advertising keywords containing the word "thrive" drives up the price of those keywords for anyone else attempting to bid on them. That would cause Thrive would have to pay far more to secure advertising keywords for its own registered trademark. Those high costs would be significant to Thrive, which is a small business without hundreds of millions of dollars in revenue. In addition, Thrive is also harmed by loss of cross-selling opportunities when TCI siphons away customers who became interested in Thrive via Amazon or through social media or media articles. | McIntosh Opp. Decl. ¶¶ 47, 47 |
| 60. | Spending money on corrective advertising would be effective when TCI is enjoined from flooding the market with its own ads linking "THRIVE" to TCI. At the present time, TCI's far larger advertising budget and advertising practices have dramatically increased the cost to Thrive to attempt to undertake advertising to correct the misimpressions created by TCI. | McIntosh Decl. ¶¶ 46-48 |

## III.   Conclusions of Law

| No. | Defendant's Conclusions of Law | Thrive's Responses |
|-----|-------------------------------|---------------------|
| 1. | As to Issue 1, TCI is entitled to summary judgment as to Plaintiff's forward confusion trademark infringement claim because there is no evidence raising a genuine issue of material fact in support of such a claim. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005); *Oculu, LLC v. Oculus VR, Inc.*, No. 8:14-SACV-196-DOC (JPRx), 2015 WL 3619204, at *9-10 (C.D. Cal. June 8, 2015). | Thrive has, at minimum, established a genuine dispute of material fact regarding whether TCI's use of the THRIVE mark on competing skincare products is likely to cause forward confusion for at least the following reasons:<br>• A plaintiff can properly allege both forward and reverse confusion. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1112 (9th Cir. 2016) (reversing grant of summary judgment for defendant where genuine issues of material |

fact existed as to both forward and reverse confusion).

- A reasonable fact-finder could conclude that: (a) Thrive's THRIVE mark is conceptually strong, because it has no commonly understood connection with skincare products; (b) the THRIVE mark is commercially strong because Thrive sells its Thrive Products nationally, has spent a considerable amount on advertising, has received nationwide media coverage, and Thrive's THRIVE Mark has been displayed to millions of potential customers via advertising, promotions, and media coverage; (c) the parties sell identical products to the same customers; (d) TCI's use of the THRIVE mark is virtually identical to Thrive's use of the THRIVE mark; (e) consumers purchasing skincare products are not likely to exercise a high degree of care; and (f) TCI was aware of Thrive's trademarks prior to launching TCI's skincare product line. *See id*. (finding same facts supported denying summary judgment for defendant).

- Thrive is not required to show instances of actual forward confusion in order to succeed on that claim. "[T]he failure to *prove* instances of actual confusion is *not* dispositive

against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007); *see also JL Beverage*, 828 F.3d at 1111 (reversing grant of summary judgment where actual confusion did not weigh in plaintiff's favor but "as we have previously held, '[b]ecause of the difficulty in garnering' evidence of actual confusion, 'the failure to prove instances of actual confusion is not dispositive.'" *Id.* at 1111 (quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979).

- In addition to point-of-sale confusion, initial interest and post-sale confusion are also actionable. *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001); *ACI Int'l. Inc. v. Adidas-Salomon AG*, 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005). Thrive has provided substantial evidence that the parties' competing products appear together in online searches for Thrive's company and product names, including even a search for "mens thrive natural care". That strongly supports that consumers searching for Thrive's products and seeing TCI's products in the search are

| | | | |
|---|---|---|---|
| | | | likely to believe TCI's products are related to or originate from Thrive. *See Perfumebay.com*, 506 F.3d at 1176 ("consumers might be confused by search results for 'perfume' and 'eBay' that provided links to Perfumebay."). |
| 2. | | As to Issue 2, TCI is entitled to summary judgment as a matter of law as to Plaintiff's monetary recovery theories on the following grounds:<br>• Disgorgement of profits is unavailable in reverse confusion cases, *see, e.g., Scat Enter., Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *2 (C.D. Cal. June 8, 2017); *Novadaq Technologies, Inc. v. Karl Storz GmbH & Co. K.G.*, No. 14-cv-04853-PSG, 2015 WL 9028123, at *2-3 (N.D. Cal. Dec. 16, 2015); *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, at 848-49 (C.D. Cal. 2012);<br>• A reasonable royalty is unavailable because the parties have no prior licensing history with each other or with third parties, *see, e.g., Marketquest Group, Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018), *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL), 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011); *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094 LGB MCX., | Thrive has, at minimum, established a genuine dispute of material fact regarding whether Thrive is entitled to disgorgement of TCI's profits on infringing sales and corrective advertising damages for at least the following reasons:<br>• Thrive has demonstrated that a reasonable fact-finder could find a likelihood of forward confusion. Thrive's infringement claims are therefore not limited to reverse confusion.<br>• A plaintiff who proves trademark infringement is entitled "to recover (1) defendant's profits . . . ." 15 U.S.C. § 1117(a). The prior rule that disgorgement of defendant's profits was not an available remedy in reverse confusion cases was overruled in 2020 by the Supreme Court. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1494-97 (2020). The Supreme Court held that a finding of willful infringement is *not* a precondition to an award of defendant's profits. *Id*. Romag "squarely rejected" the prior Ninth Circuit rule that disgorgement of profits could |

2000 WL 709149, at *17-18 (C.D. Cal. May 24, 2000); and

- A prospective corrective advertising award is unavailable because there is no evidence of the value or devaluation of Plaintiff's mark, *see, e.g., Binder v. Disability Group, Inc.*, 772 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2011); *Quia Corp.*, 2011 WL 2749576, at *5-6; *Lodestar Ansalt v. Bacardi & Co. Ltd.*, No. 2:16-cv-06411-CAS(FFMx), 2019 WL 8105378, at *15 (C.D. Cal. July 3, 2019); Scat Enterprises, Inc.*, 2017 WL 5896182, at *2.

only be awarded for willful infringement. *Monster Energy Co. v. Integrated Supply Network, LLC*, 821 F. App'x 730, 733 (9th Cir. 2020); *see Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 846 (C.D. Cal. 2012) (describing prior rule that "[i]n the Ninth Circuit, willfulness is required to disgorge an infringer of its ill-gotten profits.") (citing cases). The only reason the courts in *Zobmondo* and other cases cited by TCI found disgorgement was not an available remedy in reverse confusion cases was because they all followed the now-overruled Ninth Circuit rule that willfulness was a precondition to disgorgement. *See Zobmondo*, 944 F.Supp. 2d at 846-48; *Scat Enters., Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *1-2 (C.D. Cal. June 8, 2017). That rule was reversed by *Romag*, meaning that Thrive can obtain an award of disgorgement of profits under § 1117(a) without first proving TCI infringed willfully.

- Requiring TCI to disgorge profits from infringing sales would serve the equitable purpose of deterrence, particularly in light of strong evidence of TCI's knowing and intentional infringement. *See Monster Energy Co. v. Integrated Supply Network,*

LLC, No. ED-CV-17548-CBM-RAOx, 2021 WL 1521981, at *2 (C.D. Cal. Apr. 12, 2021) ("Fairness also supports disgorgement of profits so that Defendant does not profit from its unlawful infringement.") (citing *Playboy Enters., Inc. v. Baccarat Clothing Co*., 692 F.2d 1272, 1275 (9th Cir. 1982) ("Any other remedy" besides disgorgement of profits earned from the infringing activity "results in the defendants being unjustly enriched."))

- The undisputed evidence also supports that TCI had *mens rea* to infringe, which remains "a highly important consideration in determining whether an award of profits is appropriate." *Romag*, 140 S. Ct. at 1497; Razor USA LLC v. Vizio, Inc., No. 14-CV-01586S-JOJ-CGX, 2015 WL 12656941, at *6 (C.D. Cal. Oct. 19, 2015) ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement.") (quoting *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 472, 475 (N.D. Cal. 1992) (holding defendant "was on notice that there could be a likelihood of confusion" when Canadian trademark officials cited plaintiff's mark as a reason for denying defendant's trademark application)); *see also Synoptek, LLC v. Synaptek Corp*., No. SA-

CV-1601838-CJC-JCGX, 2018 WL 3359017, at *9 (C.D. Cal. June 4, 2018) ("Synaptek's blatant use of the 'Synaptek' mark in spite of [multiple] PTO denials provides strong evidence of willful infringement."); *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576, at *8 (N.D. Cal. July 14, 2011) ("because Plaintiff has proffered at least some evidence contesting the good faith of Defendants' application, the Court cannot conclude as a matter of law that Defendant did not willfully infringe").

- Thrive has properly supported its claim for a reasonable royalty by demonstrating its intent to license the THRIVE Mark to TCI, proffering evidence that the parties began licensing negotiations, and submitting expert analysis, all of which provides a legitimate basis on which to calculate a royalty. *M2 Software Inc. v. Viacom Inc.*, 223 F. App'x 653, 655 (9th Cir. 2007); *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013); *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1213 (S.D. Cal. 2016) (denying defendant's motion for summary judgment seeking no reasonable royalty despite there being no history of license negotiations between the parties); *adidas Am.,*

|   |   |   | *Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812, at *12 (D. Or. Sept. 12, 2008). |
|---|---|---|---|

- Thrive has demonstrated it is entitled to a corrective damages award. *See Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995*)* ("An award of the cost of corrective advertising . . . allow[s] the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement."). *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618-BAS (JLB), 2018 WL 1756117, at *5 (S.D. Cal. Apr. 12, 2018) (explaining that where a defendant "knowingly used [plaintiff's] marks in a manner that saturated the market with a false impression of association, . . . compensatory corrective advertising damages would be conceivably appropriate to counteract [defendant's] infringing advertising campaigns . . . ."). Thrive has submitted sufficient evidence from which a reasonable fact-finder could determine that the value of the THRIVE Mark was harmed by TCI's infringement and Thrive's loss of control over its trademarks, reputation, and goodwill. Thrive's requested amount of corrective advertising damages—25% of TCI's

| | | skincare advertising budget—is proper, as it complies with Ninth Circuit law on such damages. *See Adray*, 76 F.3d at 988-89; *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375-76 (10th Cir. 1977). To the extent this may create a danger of overcompensation, "the burden of any uncertainty in the amount of damages should be borne by" the infringer, TCI. *Marketquest*, 2018 WL 1756117, at \*5; *Adray*, 76 F.3d at 989. |
|---|---|---|

DATED:  August 23, 2021

Respectfully submitted,

THE MCARTHUR LAW FIRM, PC

By: */s/ Stephen McArthur*
    Stephen McArthur
    Thomas Dietrich
    *Attorneys for Plaintiff Thrive Natural Care, Inc.*