Stephen McArthur (SBN 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (SBN 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff Thrive*
*Natural Care, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC., | Case No. 2:20-CV-9091-PA-AS |
| Plaintiff, | **DECLARATION OF DAVID DREWS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THRIVE CAUSEMETICS, INC., | |
| Defendant. | Hon. Percy Anderson |
| | **Hearing Date**: September 13, 2021<br>**Time:** 1:30 p.m.<br>**Courtroom:** 9A |
| | **PUBLIC REDACTED VERSION OF DOCUMENT FILED UNDER SEAL** |

I, DAVID DREWS, declare as follows:

1.      I make this Declaration in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. The matters set forth herein are of my own personal knowledge if called upon to testify as to such matters, I could and would do so.

2.      I am the founder and president of IPmetrics, an intellectual property consulting firm based in San Diego, California, which specializes in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intellectual property and intangible assets. My relevant experience is described in detail in the attached expert report and CV, but I will briefly summarize it here.

3.      I am an intellectual property consultant and have over 30 years' experience as a financial analyst, primarily concentrated in valuing intellectual property, including trademarks, trade dress, copyrights, patents, rights of publicity, know-how, trade secrets, and domain names, among others. I have been called upon to calculate values and damages related to infringement of intellectual property in numerous litigation and arbitration proceedings.

4.      In addition to publishing articles for numerous journals, industry publications and websites, I am a frequent lecturer on IP valuation issues, including CLE-accredited presentations that focus on trademark infringement damages. I have taught several courses for intellectual property valuation and related topics, including the Intellectual Property Damages course for the National Association of Certified Valuation Analysts and a Monetary Remedies in Trademark Cases seminar for the University of San Diego School of Law. I have served on the Valuation and Taxation Committee and the Trademarks Committee of the Licensing Executives Society (USA & Canada) and as Chair on the IP Valuation Committee of Licensing Executives Society International. I have also served on the Famous and Well-known Marks Committee of the International Trademark Association (INTA). I currently serve as Editor for *les Nouvelles*, a peer-reviewed

journal dealing with intellectual property and licensing matters.

5.    Below is a summary of Defendant Thrive Causemetics, Inc.'s ("TCI") total revenues from sales of accused Infringing Skincare Products and total profit on such sales. Total profit, consisting of revenues minus cost of goods sold, is **$21,524,380**. Total profits are separated into TCI's skincare products and hybrid makeup-skincare products, which I understand TCI advertises and sells as skincare products.

6.    Below is a summary of corrective advertising damages to which I have determined Thrive is entitled, based on the approved Ninth Circuit rule of 25% of TCI's budget for advertising its Infringing Skincare Products. Corrective

DECLARATION OF DAVID DREWS
Case No. 2:20-CV-09091-PA-AS

advertising damages total **$5,796,527**. Note this amount is limited to 25% of TCI's advertising spend specifically for Infringing Skincare Products, not TCI's overall advertising budget. As with total profits, I have divided corrective advertising damages between TCI's skincare products and hybrid makeup-skincare products, all of which are considered to be Infringing Skincare Products in this action.

| Relevant Advertising and Marketing Expenditures - Thrive Causemetics Skincare Products | | | | |
|---|---|---|---|---|
| | | | | [1] |
| | 2018 | 2019 | 2020 | 2021 |
| Relevant Advertising Spend | $210,505 | $649,834 | $9,012,493 | $4,361,765 |

| | | |
|---|---|---|
| Total Relevant Marketing Spend: | $14,234,597 | [2] |
| FTC Corrective Advertising Rule: | 25% | |
| **Corrective Advertising:** | **$3,558,649** | |

| Relevant Advertising and Marketing Expenditures - Thrive Causemetics Hybrid Skincare Products | | | | |
|---|---|---|---|---|
| | | | | [1] |
| | 2018 | 2019 | 2020 | 2021 |
| Relevant Advertising Spend | $1,048,467 | $2,626,416 | $3,671,454 | $1,605,175 |

| | | |
|---|---|---|
| Total Relevant Marketing Spend: | $8,951,512 | [2] |
| FTC Corrective Advertising Rule: | 25% | |
| **Corrective Advertising:** | **$2,237,878** | |

7.     My calculations and analysis are described in much more detail in my attached expert report.

8.     Attached to this declaration as <u>Exhibit A</u> is a true and correct copy of revised schedules containing my updated damages calculations as of the date of this Declaration, following TCI's production of sales data for its Filtered Effects Blurring Primer product.

9.     Attached to this declaration as <u>Exhibit B</u> is a true and correct copy of my expert report that I prepared for this case. The calculations in this report did not include the Filtered Effects Blurring Primer product, for which sales data was not available at the time of drafting.

10.     The information contained in my expert report is true and correct, and

/ / /

/ / /

DECLARATION OF DAVID DREWS
Case No. 2:20-CV-09091-PA-AS

1    if called to testify under oath on such matters I could and would testify consistent

2    with my opinions and conclusions contained therein.

3        I declare under penalty of perjury that the foregoing is true and correct.

4        Executed on August 20, 2021, at San Diego, California.

5

6                             David Drews

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

DREWS OPP. 1

**Schedule 1**

# Thrive Natural Care v. Thrive Causemetics
## Damages Summary
### Through May 31, 2021
#### Figures in US Dollars

## DAMAGES ANALYSES

| Defendant's Profits | |
|---|---|
| Defendant's Profits - Skincare Products | $11,698,497 |
| Defendant's Profits - Hybrid Skincare Products | $9,825,883 |
| Total Defendant's Profits | $21,524,380 |

| Reasoable Royalty | |
|---|---|
| Reasonable Royalty - Skincare Products | $2,866,637 |
| Reasonable Royalty - Hybrid Skincare Products | $1,973,525 |
| Total Reasonable Royalty | $4,840,162 |

| Corrective Advertising | |
|---|---|
| Corrective Advertising - Skincare Products | $3,558,649 |
| Corrective Advertising - Hybrid Skincare Products | $2,237,878 |
| Total Corrective Advertising | $5,796,527 |

Schedule 3



TNC v. TCI
Supplemental Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

DREWS OPP 3
Hybrid Products
August 5, 2021

**Schedule 6**

## Thrive Natural Care v. Thrive Causemetics
### Damages Analysis - Reasonable Royalty
#### Through May 31, 2021

| | Year | Revenue | Royalty Rate | Reasonable Royalty |
|---|---|---|---|---|
| | | **TCI Skincare Products** | | |
| | 2018 | $1,023,597 | 8.00% | $81,888 |
| | 2019 | 2,196,505 | 8.00% | 175,720 |
| | 2020 | 20,786,308 | 8.00% | 1,662,905 |
| [1] | 2021 | 11,826,553 | 8.00% | 946,124 |
| | Totals | $35,832,963 | | $2,866,637 |

| Skincare Products Royalty |
|---|
| **$2,866,637** |

| | Year | Revenue | Royalty Rate | Reasonable Royalty |
|---|---|---|---|---|
| | | **TCI Hybrid Skincare Products** | | |
| | 2018 | $3,644,428 | 8.00% | $291,554 |
| | 2019 | 5,937,668 | 8.00% | 475,013 |
| | 2020 | 10,341,816 | 8.00% | 827,345 |
| [1] | 2021 | 4,745,148 | 8.00% | 379,612 |
| | Totals | $24,669,060 | | $1,973,525 |

| Hybrid Skincare Products Royalty |
|---|
| **$1,973,525** |

*Sources/Note(s):*

TCI_00030182 - 30184; TCI_00031365.

[1] Partial year revenue through May 31, 2021.

TNC v. TCI
Supplemental Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

Reasonable Royalty
August 4, 2021

**DREWS QRP. 4**

# Thrive Natural Care v. Thrive Causemetics

## Damages Analysis - Corrective Advertising

### Through May 31, 2021

**Relevant Advertising and Marketing Expenditures - Thrive Causemetics Skincare Products**

| | 2018 | 2019 | 2020 | 2021 [1] |
|---|---|---|---|---|
| Relevant Advertising Spend | $210,505 | $649,834 | $9,012,493 | $4,361,765 |

| | |
|---|---|
| Total Relevant Marketing Spend: | $14,234,597 |
| [2] FTC Corrective Advertising Rule: | 25% |
| **Corrective Advertising:** | **$3,558,649** |

**Relevant Advertising and Marketing Expenditures - Thrive Causemetics Hybrid Skincare Products**

| | 2018 | 2019 | 2020 | 2021 [1] |
|---|---|---|---|---|
| Relevant Advertising Spend | $1,048,467 | $2,626,416 | $3,671,454 | $1,605,175 |

| | |
|---|---|
| Total Relevant Marketing Spend: | $8,951,512 |
| [2] FTC Corrective Advertising Rule: | 25% |
| **Corrective Advertising:** | **$2,237,878** |

Sources/Note(s):

TCI_00030182 - 30184; TCI_00031365.

[1] Partial year through May 31, 2021.

[2] *Big Tire Dealers Inc. v. Goodyear Tire and Rubber Company*, 561 F.2d 1365, 1374-76 (10th Cir. 1977).

TNC v. TCI

Supplemental Damages Analysis

CONFIDENTIAL

Expert Report of David Drews, CLP

Corrective Advertising

August 9, 2021

DREWS OPP. 5

# Exhibit B



**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# Thrive Natural Care, Inc.
# v.
# Thrive Causemetics, Inc.

## EXPERT REPORT OF DAVID DREWS, CLP

Submitted to

Stephen McArthur
The McArthur Law Firm, P.C.
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA  90212
323.639.4455

Submitted by

**IPmetrics LLC**
9320 Chesapeake Drive, Suite 110
San Diego, CA  92123
858.538.1533

July 5, 2021

© 2021 IPmetrics, LLC - Dissemination is subject to the Stipulated Protective Order.

DREWS OPP. 7



TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page i

## TABLE OF CONTENTS

I.   ASSIGNMENT ................................................................................................................... 1

II.  QUALIFICATIONS ........................................................................................................... 2

III. SUMMARY OF OPINIONS ............................................................................................. 3

IV.  BACKGROUND ................................................................................................................ 3

    A.   COMPANY BACKGROUND – THRIVE NATURAL CARE, INC. ................................. 4

    B.   COMPANY BACKGROUND – THRIVE CAUSEMETICS, INC. .................................... 4

    C.   DESCRIPTION AND HISTORY OF THE THRIVE MARKS .......................................... 5

    D.   HISTORY OF DEFENDANT'S USE OF THE THRIVE MARKS ..................................... 5

V.   TRADEMARK INFRINGEMENT REMEDIES ............................................................ 9

    A.   DEFENDANT'S PROFITS ANALYSIS ...................................................................... 10

    B.   REASONABLE ROYALTY ANALYSIS .................................................................... 11

    C.   CORRECTIVE ADVERTISING ANALYSIS ............................................................... 22

    D.   HYBRID SKINCARE PRODUCTS ........................................................................... 23

VI.  CONCLUSIONS .............................................................................................................. 23

SCHEDULES .............................................................................................................................. 25

APPENDICES .............................................................................................................................. 34

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 8**



# I.   ASSIGNMENT

The McArthur Law Firm, P.C. has retained IPmetrics® LLC ("**IPmetrics**") on behalf of Thrive Natural Care, Inc. ("**Thrive**" or "**Plaintiff**") to provide expert and litigation support services in Civil Action No. 2:20-cv-9091 brought by Plaintiff in the United States District Court for the Central District of California.   The subject of the litigation is Thrive Causemetics, Inc.'s ("**TCI**" or "**Defendant**") unauthorized use of Plaintiff's THRIVE trademarks (the "**THRIVE Marks**") in the advertising, marketing, offering, sale and distribution of various skincare products in violation of the Lanham Act and other related claims (the "**Infringing Use**").[1]

David Drews, the author of this report, has been named the testifying expert representing IPmetrics in this matter.  I have been asked to render opinions on the appropriate level of damages and other monetary recoveries to be awarded to Plaintiff for the unauthorized use of the THRIVE Marks by the Defendant.  For the purposes of this report, it is assumed that liability will be established at trial.[2]  Therefore, this report serves as guidance to the finder of fact regarding the damages claims and other monetary recoveries under this assumption.

The analysis and damages opinions detailed in this report cover the period from 2018, the year that the THRIVE Marks were first used in commerce on skincare products by Defendant, through the present (the "**Damages Period**").   There are also prospective damages contemplated due to the potential ongoing negative impact on Plaintiff's business.

To date, I have reviewed the Complaint and related legal documents, applicable portions of the document production from both parties, relevant websites, deposition transcripts and their associated exhibits, and financial information for both parties.  I have also performed independent research on the skincare industry, as well as licensing and other royalty-based agreements related to similar products.  This information provides the basis for the analysis and conclusions in this report.  All documents reviewed and relied upon are listed in Appendix B to this report.

The analysis detailed in this report is presented as of July 5, 2021 and reflects my analysis of the information produced in this case thus far, as well as independent research.  I reserve the right to amend, expand, and/or supplement this report as additional information and/or documents are made available to me during the course of the litigation.  At a minimum, I anticipate receiving updated sales information related to accused products at a date closer to trial.

As a result of my experience with intellectual property and my review of the information and documents produced thus far in this case, I have reached the conclusions described herein and have prepared this expert report.  Subsequent sections of this report highlight the

---

[1] First Amended Complaint for Federal Trademark Infringement, Federal Unfair Competition, Common Law Trademark Infringement, Common Law Unfair Competition and Violation of Cal. Bus. & Prof. Code § 17200 dated July 1, 2021 and Exhibits ("**Complaint**") [Document 28].

[2] This assumption precludes the need to describe any claim or aspect that falls within its bounds as "alleged" for the remainder of this report.

DREWS OPP. 9

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 2



methodologies, data, research and case documents utilized in the associated analyses. The footnotes are an integral part of this report.

This report includes multiple appendices containing information required by Federal Rule of Civil Procedure 26(a)(2)(B). These consist of the qualifications of the testifying expert with a list of publications over the last ten years, testimony experience during the previous four years, a list of documents reviewed in this matter, and disclosure of compensation arrangements. IPmetrics' compensation in this matter is not, in any way, dependent upon the conclusions reached during the performance of the analysis or on the result of the litigation.

## II.   QUALIFICATIONS

I am the founder and president of IPmetrics, an intellectual property consulting firm that specializes in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intellectual property and intangible assets. I am an intellectual property consultant and have accumulated over 30 years' experience as a financial analyst, primarily concentrated in valuing intellectual property of all types, including trademarks, trade dress, copyrights, patents, rights of publicity, know-how, trade secrets and domain names, among others. My valuation experience includes projects involving use of the assets as collateral, transaction due diligence, joint venture negotiations, licensing, transfer pricing and bankruptcy / reorganization. I have also been called upon to calculate values and damages related to infringement of intellectual property in numerous litigation and arbitration proceedings.

In addition to publishing articles for numerous journals, industry publications and websites, I am a frequent lecturer on IP valuation issues, including CLE-accredited presentations that feature information on trademark infringement damages. I have taught several courses for intellectual property valuation and related topics, including the *Intellectual Property Damages* course for the National Association of Certified Valuation Analysts and a *Monetary Remedies in Trademark Cases* seminar for the University of San Diego School of Law. I have served on the Valuation and Taxation Committee and the Trademarks Committee of the Licensing Executives Society (USA & Canada) and as Chair on the IP Valuation Committee of Licensing Executives Society International. I have also served on the Famous and Well-known Marks Committee of the International Trademark Association. I currently serve as Editor for *les Nouvelles*, a peer-reviewed journal dealing with intellectual property and licensing matters.

I have testified on many occasions in litigation and arbitration involving damage calculations and valuation of trademarks, patents, copyrights, trade secrets, trade dress and rights of publicity, and have been accepted by numerous courts as an expert witness in this regard. A more detailed listing of my experience and credentials, as well as cases in which I have testified in the past four years and my publications and presentations for the past ten years, is set forth in my *curriculum vitae*, an abbreviated version of which is attached hereto as Appendix A.

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 3



### III.    SUMMARY OF OPINIONS

Upon reviewing the documentation and evidence listed in Appendix B, and informed by my extensive experience in valuing intellectual property and calculating intellectual property-related damages, I have arrived at the following opinions in this matter, the bases for which are explained in the subsequent sections of this report:

1.    The amount of historical damages suffered by Plaintiff due to the actions of the Defendant is calculated using an analysis of the Defendant's profits as well as a reasonable royalty derived from a hypothetical negotiation between Plaintiff and Defendant. The damages measured using the Defendant's Profits analysis are determined to be **$20,401,507**.  Please see Schedules 1, 2 and 3 for additional information.

2.    Based on an analysis of relevant licensing information and the application of a modified *Georgia-Pacific* analysis, a reasonable royalty rate for the right to use the THRIVE Marks in association with various skincare products and hybrid skincare products is determined to be **8.0% of Defendant's Net Sales**.  Please see Schedules 4 and 5 for additional information.

3.    Applying the concluded royalty rate to the Defendant's applicable royalty base leads to a conclusion of **$4,607,130** in Reasonable Royalty damages.  Please see Schedules 4, 5 and 6 for additional information.

4.    The prospective advertising expenditures necessary to correct inaccurate impressions in the marketplace regarding the ownership, authorization and relationships surrounding the THRIVE Marks are calculated to be **$5,515,537**.  Please see Schedule 7 for additional information.

The foregoing conclusions are based upon the documents and information reviewed as of the date of this report, as well as my educational background and experience in valuing intellectual property and intangible assets.  They do not include any enhanced damages or pre- or post-judgment interest.  I hold these opinions with a reasonable degree of professional certainty.

### IV.    BACKGROUND[3]

In order to understand the proper context for the analysis, a brief overview of the parties, subject marks and important events relevant to this case is presented in this background section.

---

[3] Unless claimed otherwise, the source of this background information is the Complaint.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 11**



### A. Company Background – Thrive Natural Care, Inc.[4]

Plaintiff Thrive Natural Care, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Plaintiff has been providing THRIVE Marks-branded skincare products since 2013.

Thrive sells a range of skincare and grooming products, including face washes and scrubs, lotions, moisturizers, sunscreens, face balms, shaving lotions, and grooming oils. These products are made especially for people with sensitive or active-lifestyle skin. The plant oils found in Plaintiff's products contain skin-protecting antioxidants and raw ingredients that reduce inflammation and irritation better than conventional synthetic ingredients.

The key to Thrive's appeal with customers is an understanding of and affinity for the company's mission and positive impact. Plaintiff sources natural ingredients for its line of skincare products from native plants grown by communities on the coasts of Costa Rica. Since 2014, Thrive has conducted extensive research and development in Costa Rican ecosystems to regeneratively cultivate and source premium botanical ingredients to provide its unique skincare benefits.

Importantly, the company partners with women-led co-ops and smallholder farmers to cultivate native plants that improve soil and biodiversity on degraded lands, boost farmers' incomes, and provide a high-quality supply of plant oils. Ultimately, Plaintiff hopes to serve as a commercially viable inspiration for regenerative practices in the agriculture, fisheries, and forestry sectors. This unique regenerative business model has positioned Thrive as a leader in the production of healthy, natural, and sustainable products.

Plaintiff's skincare products are sold online at www.thrivecare.co and through retail partnerships with Amazon and Walmart.com, as well as at Whole Foods Markets on the West Coast.

### B. Company Background – Thrive Causemetics, Inc.[5]

Defendant Thrive Causemetics, Inc. is a Delaware corporation based in Bellevue, Washington with its principal base of operations in Los Angeles, California. I understand that TCI was founded in 2015 by Karissa Bodnar. TCI produces, markets, sells and distributes a mix of cosmetics, makeup tools and skincare products, including cleansers, toner, face serum, eye cream, moisturizers, masks, peels, lip treatments, hand cream and nail cream. Defendant also offers "value sets," which are combinations of various products, some of which contain cosmetics in addition to skincare products.

---

[4] The source of the background information is the Complaint and thrivecare.co, unless otherwise indicated.
[5] The source of the background information is the Complaint and thrivecausemetics.com, unless otherwise indicated.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

DREWS OPP. 12

TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 5



TCI designs and tests its products in its "Thrive Causemetics Lab" located in Los Angeles.  In addition, Defendant operates the website, www.thrivecausemetics.com, which sells products directly to consumers.

**C.   Description and History of the THRIVE Marks**

Plaintiff has continuously used and promoted the THRIVE Marks since at least September 5, 2013.[6]  On September 11, 2012, Thrive applied for a United States federal trademark registration for the word THRIVE in standard characters.  In January 2014, Plaintiff was awarded U.S. Trademark Reg. No. 4,467,942 for THRIVE in International Class 003 for "Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams" (the "**'942 Mark**").  On March 7, 2020, the United States Patent and Trademark Office issued a notice that the '942 Mark is "incontestable."

In May 2016, Thrive filed for a second trademark application, U.S. Serial No. 87/021,374 (the "**'374 Application**"), which issued in September 2020 as U.S. Trademark Reg. No. 6,164,303 for THRIVE in International Class 003 for the additional products of "Body and non-medicated soaps and skin cleansing gels; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre- shaving preparations; after shave lotions and creams" (the "**'303 Mark**").

**D.   History of Defendant's Use of the THRIVE Marks**

I understand that Defendant started using the THRIVE Marks to market skincare products in 2018.  Defendant's skincare products are all covered by or within the natural zone of expansion of the list of goods identified in Plaintiff's trademark registrations or protected by Plaintiff's senior common law rights.

In November 2015, the U.S. Patent & Trademark Office ("**PTO**") issued an office action against TCI's application to register THRIVE CAUSEMETICS, citing a likelihood of confusion with Thrive's registered '942 Mark for THRIVE on skincare products.[7]

I understand that TCI eventually overcame the PTO's objection by arguing that (1) THRIVE CAUSEMETICS was a unitary mark as the words were always used together, and (2) that the claimed goods—false eyelashes and eyeliner—were not related to Thrive's claimed skincare products. I understand that TCI eventually abandoned this trademark application.[8]

In April 2016, Ms. Bodnar contacted Thrive to ask for permission to use the word "Thrive" as part of TCI's brand name.  In this email, Ms. Bodnar promised that TCI

---

[6] US Trademark Registration No. 4467942.
[7] US Trademark Application No. 86721790 – November 30, 2015 Office Action.
[8] https://tsdr.uspto.gov/#caseNumber=86721790&caseType=SERIAL_NO&searchType=statusSearch.

DREWS OPP. 13



"will never use the word 'Thrive' without the word 'Causemetics'" and that the company's product lines did not overlap since TCI sold only women's color cosmetics.[9]

In 2017, TCI began sometimes removing the word "Causemetics" from its branding. For example, there is a pitch deck named "Thrive™ Causemetics – Beauty with a Purpose™" in which TCI repeatedly refers to itself as "Thrive."[10]   A separate pitch deck that promotes numerous products also has TCI referring to itself as "Thrive" numerous times.[11]

Thrive sent a cease-and-desist letter to TCI on or about March 3, 2017, demanding that TCI stop using the THRIVE Marks on its products.[12]  On or about April 12, 2017, TCI responded to Thrive's request, once again insisting that there would be no confusion because the two companies sold "different product lines" and TCI went on to define Thrive's product line as "men's skincare" and TCI's different, non-overlapping product line as "women's makeup."[13]  While Thrive disagreed as to the gendered description of the two product lines, it chose not to pursue the issue further based on TCI's assurances that its Thrive product line was limited solely to makeup and not skincare.[14]

In 2018, TCI, without any notice or warning to Thrive, began producing, marketing, selling and distributing a skincare product that directly overlapped with the goods listed in Thrive's registered trademark.  In late 2019 and 2020, TCI released several more skincare products.

This happened despite TCI having prior knowledge of Thrive and its preexisting skincare product line, prior knowledge of Thrive's registered trademark for THRIVE in relation to skincare products, and TCI's insistence to Thrive that its use of the term "thrive" was solely for women's color cosmetics.

In June 2019, before TCI released the large majority of its skincare products, Ms. Bodnar again attempted to obtain Thrive's permission to use the THRIVE Marks.  On June 27, 2019, Ms. Bodnar spoke to Alex McIntosh, Thrive's Co-founder and CEO, by phone and repeatedly asked Mr. McIntosh to allow TCI to use the THRIVE Marks.[15]  Mr. McIntosh refused her request.  Mr. McIntosh reminded Ms. Bodnar about Thrive's existing trademark registration and trademark application. Mr. McIntosh also stated that, at minimum, TCI would have to agree to (1) alter its logo to deemphasize the word "THRIVE" so it is once again equal and consistent with the word "CAUSEMETICS," and (2) agree to compensate Thrive with a significant licensing fee based on a percentage of TCI's sales.  I understand that TCI decided to ignore Thrive's contentions

[9] TCI_00019117.
[10] TCI_00019099, TCI_00019105 and TCI_00019106.
[11] TCI_19125, TCI_00019133, TCI_00019134 and TCI_00019156.
[12] TNC00902 – 903.
[13] TCI_00028581 – 28582; Interview of Alex McIntosh.
[14] Interview of Alex McIntosh.
[15] TCI_00028612 – 28614.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 7



and requests and released many more skincare products in the months following that call.[16]

In online advertising, TCI adopted the tagline "Try Thrive," as shown in the screenshot of a 2020 advertisement below. This tagline was used without the word "Causemetics" appearing anywhere on the advertisement.

**Figure 1**
**TCI Advertisement**



In media coverage of TCI, which I understand increased significantly throughout 2018 and 2019, the company was frequently referred to by authors and by Ms. Bodnar herself as "Thrive" alone, without the "Causemetics" portion of the name. For example, in a 2019 article by Beauty Independent featuring an interview with Ms. Bodnar, she is referred to as the "29-year-old founder of Thrive." During the interview, Ms. Bodnar repeatedly calls her company "Thrive" and refers to TCI's followers as the "Thrive Tribe" several times.[17]

Similarly, in January 2020 coverage of TCI by *InStyle* magazine, the author and Ms. Bodnar use the term "Thrive" by itself to describe TCI. The article contains content such as: "Thrive's loyal customers, called the Thrive Tribe, are completely involved in all aspects of the brand." Ms. Bodnar is quoted referring to her company as "Thrive" and referring repeatedly to the "Thrive Tribe."[18]

Importantly, a significant portion of the coverage of TCI that referred to it as "Thrive" was negative. For example, a 2018 article on the news and beauty website MirahMirah discussed the class action lawsuit filed against TCI for allegedly misleading customers about its charitable donations.[19] The author refers to TCI as "Thrive" numerous times and questions the company's motives and honesty.

Online consumer reviews of TCI are also often negative and frequently refer to TCI as "Thrive" without the "Causemetics" descriptor. For example, TCI received a consumer

---

[16] TCI_00028612 – 14; Interview of Alex McIntosh.
[17] https://www.beautyindependent.com/thrive-causemetics-major-dtc-beauty-business/; TNC01129 – 42.
[18] https://www.instyle.com/beauty/makeup/thrive-causemetics-karissa-bodnar; TNC01143 – 48.
[19] TNC01100 – 14.

DREWS OPP. 15

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 8



rating of 2.7 out of five stars on bestcompany.com, with dozens of one-star reviews, including many from consumers who stated the products from "Thrive" were "terrible," "horrible," and caused allergic reactions and eye infections.[20]

In 2018, TCI again tried to register THRIVE CAUSEMETICS in relation to cosmetics and makeup, makeup brushes, and an online retail store featuring those products.[21] This time, the PTO found TCI's mark created a likelihood of confusion with both Thrive's registered '942 Mark and with Thrive's previously-filed '374 Application for THRIVE in relation to skincare and sun care products.[22]

The PTO rejected TCI's argument that its products were not related to those claimed in Thrive's application. The trademark examiner supported the rejection with evidence showing "the goods and/or services listed [in Thrive's '942 Mark], namely [Thrive's] lotions, creams and after shave lotions, and [TCI's] cosmetics, brushes and retail store services featuring these goods, are of a kind that may emanate from a single source under a single mark."[23]

TCI now sells numerous products that are directly covered by Thrive's registered trademarks, Thrive's common law trademark rights, and their natural zone of expansion—including skincare products, face and body cleansers, lotions and moisturizers, sunscreen, hand sanitizer, and face oils. In fact, in 2020 TCI added a separate "skincare" section to its website displaying various skincare products for sale.[24] Examples of some of TCI's skincare products are below.

**Figure 2**
**TCI Product Examples**




---

[20] https://bestcompany.com/makeup-stores/company/thrive-causemetics.
[21] US Trademark Application No. 87895130.
[22] US Trademark Application No. 87895130 – August 28, 2018 Office Action.
[23] *Ibid.*
[24] https://thrivecausemetics.com/collections/all-skincare.

DREWS OPP. 16



**IPmetrics**
Intellectual Property Consulting

In other usage of the THRIVE Marks, TCI purchases Google AdWords and Amazon keywords to intentionally place ads for TCI's skincare products at the top of search results seeking Thrive's skincare products.[25]

To date, there have been numerous instances of actual confusion in the marketplace regarding Thrive and TCI and their respective products. For example, consumers have posted comments on Amazon and social media indicating that they believed Thrive was part of or affiliated with TCI or confused the source of the products.[26] This includes a 2019 customer comment on an Amazon page for Thrive's moisturizer stating that "Thrive is an up and comer in the cosmetics field. Their mascara is phenomenal."[27]

There is evidence that TCI's actions have also created confusion among Thrive's retail partners. For example, Walmart listed Thrive's products on its online sales portal under the "Thrive Causemetics" label, in such a way that all of Thrive's products appeared together with Thrive Causemetics' name.[28]

The following analyses are based on the aforementioned premises and, as stated above, assume that liability associated with the assertions in the Complaint will be established at trial.

## V.   TRADEMARK INFRINGEMENT REMEDIES

In quantifying the monetary relief available to Plaintiff in connection with the alleged Infringing Use in this case, I first considered the general concepts of recovery provided for in the Lanham Act, Title 15 of the United States Code. When tasked with calculating monetary relief related to trademark infringement, the Lanham Act provides that an infringer may be liable for the following:

> *"...the plaintiff shall be entitled [...], subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."* [29]

Lanham Act recoveries associated with historical activity are typically measured in at least one of three ways: (1) defendant's profits, (2) the plaintiff's lost profits on lost sales, or (3) lost profits in the form of a reasonable royalty owed to the plaintiff for the use of the assets by the defendant.

I understand that, in the Ninth Circuit, the disgorgement of defendant's profits may be awarded when there is a theory of unjust enrichment,[30] and is recognized as "a traditional trademark remedy."[31] I also understand that it is not necessary to prove willfulness on the

---

[25] For example, see TNC00908, TNC00909 and TNC00929.
[26] For example, see TNC00916 – 923, TNC00924 and TNC01559.
[27] TNC00928. Importantly, Thrive does not sell mascara, but TCI does.
[28] TNC00930 – 931.
[29] 15 U.S.C. § 1117(a).
[30] *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).
[31] *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004-05 (9th Cir. 2004).

**DREWS OPP. 17**

TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 10



part of the defendant when claiming disgorgement of a defendant's profits as a damages theory.[32]

An additional form of monetary recovery in trademark infringement matters is corrective advertising. The purpose of corrective advertising is to repair damage to the mark resulting from a defendant's wrongful conduct. Corrective advertising typically consists of measuring the cost of an advertising campaign that is extensive enough to correct marketplace confusion and educate customers. Even in cases where an injunction has been granted and/or sales of the infringing products have ceased, corrective advertising is oftentimes needed to rectify any lingering misperceptions the target audience may have about the actual source of the relevant products, especially if there have been negative interactions with the infringing brand.

The monetary relief analyses I believe to be most appropriate in this matter are the following: (1) Defendant's Profits, which measures the unjust enrichment enjoyed by Defendant as a result of its use of the THRIVE Marks, and to some extent is a proxy for Plaintiff's lost sales, profits and expansion opportunities. It also provides an effective deterrent against infringement by the Defendant and others; (2) a Reasonable Royalty, which provides an estimate of fair market compensation owed to Plaintiff for the Infringing Use of a confusingly similar trademark by the Defendant; and (3) Corrective Advertising, which measures the estimated expenditures necessary to inform and educate actual and potential customers that are misinformed about the true source of the products bearing the THRIVE Marks. The following sections describe the analyses performed in assessing and determining damages and appropriate monetary recovery in this case.

## A.  Defendant's Profits Analysis

A Defendant's Profits analysis measures the alleged damages resulting from infringement or misappropriation of the subject intellectual property by calculating the associated benefits received by the infringer. When measuring the revenue in a defendant's profits analysis, it includes those sales where a nexus between the infringing activity and the revenue received can be proved. This analysis uses the actual/estimated revenue generated by Defendant from sales of accused products featuring the use of the THRIVE Marks during the Damages Period. It is important to note that any estimates of revenue utilized in this analysis were provided by Defendant based on their internal operating procedures, so they have been accepted as accurate for these purposes.[33]

Defendant has produced a purportedly complete summary of its net revenue achieved in conjunction with the use of the THRIVE Marks on skincare products.[34] The relevant net sales total $4,668,025 in 2018; $8,134,173 in 2019; $29,454,640 in 2020 and $15,332,281 in the first five months of 2021. Total net sales associated with the accused products reported through May 31, 2021 were $57,589,119. I understand that the vast majority of these sales were to customers in the United States,[35] and that for the very

---

[32] *Romag Fasteners, Inc. v. Fossil Group, Inc.*, No. 18-1233, Slip Op. (S. Ct. April 23, 2020).
[33] Deposition of Ned A. Menninger dated May 27, 2021 ("**Menninger Depo**"), 69:09 – 70:17.
[34] TCI_0030182 – 30184.
[35] Menninger Depo, 48:19 – 22.



small percentage of sales that were to customers outside of the United States, those product sales were fulfilled and shipped from the United States.[36]

Since the THRIVE Marks skincare product sales are a relatively small percentage of Defendant's overall operation,[37] the proper measurement of Defendant's profits is incremental profits. This is because relatively few additional general or administrative expenses need be incurred to generate these incremental sales.

TCI_00030182 – 30184 provide information on the purported cost of goods sold for the accused products, along with cost information for related advertising, merchant fees and Shopify commissions. These relevant deductions total $37,187,612 for the period reported.[38] Total incremental profits during the Damages Period thus far are therefore **$20,401,507**. Please see Schedules 1, 2 and 3 for additional information.

## B. Reasonable Royalty Analysis

A reasonable royalty analysis calculates the damages by measuring the fair market royalties that should have been paid to Plaintiff for the unauthorized use of the THRIVE Marks by the Defendant. The underlying basis for the measurement is that a license to use the THRIVE Marks had hypothetically been negotiated prior to the infringement taking place.

Some courts only allow for damages based on a reasonable royalty in trademark infringement matters if the plaintiff has demonstrated a willingness to license the mark. I note that there has been a conversation about TCI licensing the THRIVE Marks from Thrive between Ms. Bodnar and Mr. McIntosh.[39] I understand that these discussions were never successfully concluded. However, they do demonstrate a willingness on the part of Thrive to consider licensing the THRIVE Marks.

In this instance, a hypothetical negotiation between the two parties is analyzed to determine the correct level of royalty-based compensation due Plaintiff. Thus, a critical element of this damages approach is the selection of an appropriate royalty rate to apply to the relevant royalty base in order to project the royalty income that Plaintiff should have received.

### 1. *Georgia-Pacific* Analysis

The determination of an appropriate royalty rate is based on a hypothetical negotiation between the parties, commonly referred to as a *Georgia-Pacific*

---

[36] Menninger Depo, 45:21 – 46:2.
[37] According to TCI_00014424 and TCI_00022753 – 22767, the skincare products represented 5.83% of total sales in 2018, 7.44% of total sales in 2019, 16.51% of total sales in 2020, and 11.23% of total sales in the first two months of 2021. Also, these percentages are overstated since the total sales figures do not contain any revenue from sales of tools and brushes (Menninger Depo, 78:17-25).
[38] TCI_00030182 – 30184.
[39] For example, see TCI_00028613.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

DREWS OPP. 19



TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 12

analysis.[40]  The goal is to duplicate the results of an arm's-length agreement between a willing licensor and a willing licensee on the eve of the infringement.  A major component of the hypothetical license is that its scope and parameters must mirror the actual use of the asset by the defendant.

While this technique was initially used to determine reasonable royalty rates associated with patent infringement, there are numerous elements that can be brought to bear on copyright and trademark infringement matters as well.

The key to an accurate analysis when employing the 15 *Georgia-Pacific* factors is to acknowledge and utilize all of the factors that are relevant and assess them properly.  I have conducted this analysis as of July 2018, the month and year in which the Defendant began using the THRIVE Marks in commerce on the accused skincare products.[41]  Given the stature of the Defendant at the time of the negotiation, the analysis assumes an understanding among the parties that significant sales would be forthcoming over the next few years.

The factors are assessed as to whether they favor the position of the licensor or the licensee in the hypothetical negotiation, and therefore support the conclusion of a higher or lower royalty rate, respectively, all other factors being equal.

> *Georgia-Pacific* Factor 1 – Royalties Received by the Licensor (Plaintiff)

I understand that Plaintiff has not entered into any trademark license agreements, including any associated with its THRIVE Marks.  I also understand that Plaintiff has entertained potential licenses in the past and was specifically open to licensing the THRIVE Marks to TCI,[42] so a license for the THRIVE Marks is not out of the question.  Without any relevant information to analyze, this factor does not provide any guidance on the negotiated royalty rate and is therefore scored as neutral in terms of whether it favors the licensor or licensee in the negotiation.

> *Georgia-Pacific* Factor 2 – Royalties Paid by the Licensee (Defendants)

I understand that Defendant has not produced any license agreements in this litigation, including any in which they are the licensee.  Based on the evidence, Defendant has not been involved in any trademark licenses.  However, it did request that Thrive license the marks to it, so TCI was admittedly open to licensing the THRIVE Marks. Without additional information from the Defendant regarding any licensing activities and negotiated results, this factor is also scored as neutral.

[40] *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 170, 170 U.S.P.Q. 369 (2d Cir. 1971).
[41] TCI_00026950 – 26955; TCI_00014424; TCI_00022753 – 22767.
[42] TCI_00028612 – 28614.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

DREWS OPP. 20

TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 13



*Georgia-Pacific* Factor 3 – Nature and Scope of the License

The nature and scope of the hypothetical license is for the broad right to use the THRIVE Marks in North America in conjunction with Defendant's skincare products in a wide variety of distribution channels including e-commerce, direct to consumer, wholesale and retail. It covers the timeframe encompassed within the Damages Period and, since the Defendant unilaterally determined how to use the THRIVE Marks, allows for maximum flexibility regarding how the licensee uses the mark and the products that are covered. Moreover, the Defendant did not have to pay any guaranteed minimum or up-front license fee. All of these factors will result in a higher royalty rate.

The only factor trending towards a lower licensing fee is that the license would be non-exclusive. All other aspects being the same, a non-exclusive license will generally feature a lower level of compensation than an exclusive license since an exclusive license limits the licensor's ability to exploit the asset. However, the enhanced flexibility afforded the licensee in this situation would tend to entail additional compensation and offset any discount associated with the hypothetical license being non-exclusive. In addition, while a hypothetical license would be non-exclusive, Thrive never actually licensed its marks to any other third party during the relevant time period. Overall, this factor favors the licensor in terms of its impact on a negotiated royalty rate for the THRIVE Marks.

*Georgia-Pacific* Factor 4 – Licensor's Established Policy

While there is no established licensing policy in place for Plaintiff, I understand that Plaintiff summarily rejected Defendant's initial licensing offer in 2019,[43] and made high opening offers of licensing the THRIVE Marks at a 20.0% royalty rate when discussing licensing with third parties.[44] These actions demonstrate that Plaintiff knows the value of licensing its trademark and, though the standard in a *Georgia-Pacific* analysis is for a willing licensor, would be unlikely to take an offer on the low end of the spectrum.

Defendant similarly has no established policy or experience with negotiating license agreements, so the impact of Plaintiff's lack of experience or policy is correspondingly offset by Defendants' equal lack of experience or policy. Overall, the impact of this factor in the analysis is neutral and its relevance is relatively low.

---

[43] TCI apparently offered to Thrive a licensing fee consisting solely of donating several thousand dollars to Thrive's charity of choice. Interview of Alex McIntosh.
[44] See, *e.g.*, TNC01595 – 1597.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 21**



_Georgia-Pacific_ Factor 5 – Commercial Relationship between Licensor and Licensee

Plaintiff and Defendant are direct competitors in the skincare products industry, including an overlapping presence throughout the United States.  Being direct competitors indicates that Plaintiff would have had the stronger negotiating position.

An important aspect of their being direct competitors is that, had Plaintiff entered into a license with Defendant allowing Defendant to sell its competing skincare products, Plaintiff would have known that it would lead to the cannibalization of Plaintiff's own products, a situation that supports a higher royalty rate to compensate for those losses.

Further, it is clear from the timeline of events, particularly the 2016 email from Ms. Bodnar to Thrive in which Ms. Bodnar repeatedly requested permission to use the THRIVE Marks, that TCI would have known at the time of the hypothetical negotiation that obtaining a license to use Thrive's trademarks was critical to TCI's business and expansion into skincare.

As the holder of the THRIVE Marks, Thrive was the _only_ entity from whom TCI could have obtained this license, which would be necessary for TCI to transition its "Thrive" brand name from makeup into skincare.  Thrive knew this because of TCI's outreach and prior contact in 2016, in addition to the USPTO's rejections of TCI's trademark applications.  This additional aspect underscores the strength of Thrive's negotiating position and supports a higher royalty rate in the hypothetical negotiation, as TCI could not sell its skincare products under its established "Thrive Causemetics" brand without getting the license from Thrive.

While Defendant was larger than Plaintiff at the time of the hypothetical negotiation, the size differential was not nearly as large as it is at the time of this writing and thus would not have been as significant in determining a royalty rate. The most important aspect of the commercial relationship between the parties is that the THRIVE Marks are the key to the Defendant's brand name, website, marketing activities and ecommerce platforms and therefore Defendant would be extremely motivated to procure this license.  This factor is important and argues for a significantly higher royalty rate with a high rate of relevance.

_Georgia-Pacific_ Factor 6 – Convoyed Sales

Convoyed sales in this instance include sales of additional products and services beyond those associated with the Infringing Use.  While TCI does sell other products under the "Thrive Causemetics" brand name, I understand that these products are either outside the scope of products covered by Plaintiff's trademark registrations or are not being accused in this matter.

However, I note that at the time of the hypothetical negotiation in 2018, Thrive had recently sent TCI a cease-and-desist letter in 2017 requesting that TCI cease use of the "Thrive" name on its cosmetics products and, in 2016, Mr. McIntosh had refused

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 15



to grant Ms. Bodnar's request for explicit permission to use the THRIVE Marks on color cosmetics. Therefore, in light of these facts, Defendant would likely have been even more motivated to enter into a license to protect its entire series of product lines and to be able to use its company brand in any fashion relating to cosmetics and skincare products. Therefore, this factor favors the licensor, although the level of relevance is lower than for other factors.

     *Georgia-Pacific* Factor 7 – Duration of IP / License

Because there are no expiration dates for trademarks that are continuously used in commerce and that have all registration fees kept current, the duration of the hypothetical license could last for several years. However, I understand that the Infringing Use so far is approximately three years, which is compatible with the initial term of many of the comparable agreements I have reviewed. Also, many of the comparable agreements I have reviewed provide for a renewal of the existing compensation terms for several more years beyond any initial term.

Oftentimes, relatively long license agreements will feature higher compensation than otherwise since the terms are in place for a longer period of time and therefore the licensor has less flexibility in terms of negotiating its rights. In any event, this factor is neutral regarding its effect on the hypothetical royalty rate.

     *Georgia-Pacific* Factor 8 – Commercial Success / Profitability of the Product

The commercial success of Defendant's skincare products that feature the THRIVE Marks is substantial. During a relatively short period of time, the products have generated over $57 million of net sales. The profitability of the products is also significant, with a demonstrated incremental profit margin of 35.4%.[45]

Plaintiff has also demonstrated success using the THRIVE Marks, showing significant sales growth every year since its founding.[46] Due to the commercial success of both operations and the demonstrated profitability of Defendant in regard to these products, Factor 8 is highly relevant and clearly argues for a relatively high royalty rate.

     *Georgia-Pacific* Factors 9 & 10 – Asset Utility / Nature of the IP

When assessing the *Georgia-Pacific* factors for trademarks, Factors 9 and 10 are often assessed together. The utility/nature of a trademark is to denote the source of products and to convey information regarding the reputation and characteristics of the associated brand. The THRIVE Marks are no different in that they carry the goodwill associated with Plaintiff's positive reputation and good standing in the industry. In addition, they are used to brand the sustainable farming and regenerative

---

[45] TCI_00030182 – 30184.
[46] TNC01282 – 01299.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 23**

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 16



formulas that are the primary differentiators of Plaintiff's THRIVE-branded products.[47]

In this situation, Plaintiff's goodwill has been drowned out by the much larger Defendant and its ability to secure important keyword search terms and command attention in the skincare industry. The trademark should indicate the source and consistency of characteristics and quality control of the goods. In this scenario, the ability of the THRIVE Marks to perform this vital function in regard to Thrive has been curtailed. Thus, these factors indicate that a higher royalty rate would be negotiated. This would compensate Plaintiff for the reduced or eliminated efficacy of its trademarks regarding their ability to indicate the source of the products featuring their use. This factor is also highly relevant.

*Georgia-Pacific* Factor 11 – Extent of Use by Infringer

The Infringing Use by the Defendant is extensive. The THRIVE Marks have been included as the primary aspect of its branding (see Figures 1 and 2 above) and Defendant often refers to itself as "Thrive" and is referred to as "Thrive" by others. As mentioned above, it is the key aspect of the Defendant's brand name, website, marketing activities and ecommerce platforms.

In addition, Defendant has been prolific in its social media and keyword advertising. TCI has advertised across virtually every significant platform, including Google, Facebook, Instagram, Snapchat, Twitter, and TikTok. According to Defendant's data, it has spent over $22 million advertising its skincare products from 2018 to May 2021.[48]

In addition, the broad extent of Defendant's use of the THRIVE Marks is anecdotally evidenced by the fact that, since I have been researching this project, virtually every banner ad on websites and every bumper ad on YouTube videos I have received has been for TCI's THRIVE Marks-branded merchandise, even for topics or websites that have nothing to do with skincare or cosmetics. In light of the extensive use, a higher royalty rate is appropriate, and this factor is highly relevant.

*Georgia-Pacific* Factor 12 – Portion of Profit that is Customary / Marketplace Royalty Rates

This factor is not scored as favoring one party or the other. Rather, it informs the negotiation by providing relevant royalty rate data.

As was discussed for Factors 1 and 2 above, there have been no trademark license agreements produced by either party in this matter. Through independent research on trademark license agreements in the skincare products industry, I uncovered 12 license agreements that are relevant.[49] In my analysis, I endeavored to include

[47] Thrivecare.co.
[48] TCI_00030182 – 30184.
[49] Please see Schedule 5 for a summary of the terms for these agreements.

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 17



agreements that cover similar products, similar geographies and a similar timeframe to the facts of this hypothetical license. I also excluded license agreements that licensed other intellectual property in addition to any trademarks, such as patents, trade secrets or know-how. Agreements with multiple categories of licensed assets tend to have higher royalty rates than those focused on only one asset class, all other aspects being the same.

It is important to note that comparable license agreements that feature terms that are different from the circumstances associated with the hypothetical negotiation may still be instructive for this analysis as long as appropriate adjustments to the royalty rate that account for the differences are considered and applied. Indeed, it is virtually impossible to find a comparable license agreement that perfectly mirrors every single term and circumstance as those found in the hypothetical negotiation. Therefore, the terms found in similar agreements are utilized to help determine the royalty rate applicable to the hypothetically negotiated agreement. Examples of differences that may require an adjustment to the royalty rate include timeframe, geography, duration, scope of covered products and distribution channels.

A few of the licenses are included simply because they provide additional guidance on the level of trademark royalty rates associated with skincare products. Since certain aspects of these licenses do not directly mirror the fact set in this case, such as celebrity endorser licensors or relatively well-known consumer brands, those agreements are given less weight in the analysis, although they do provide information regarding the full spectrum of royalty rates applicable to trademarks associated with these kinds of products.

With two exceptions, the royalty rates in these agreements are all based on a percentage of net sales, ranging from 3.00% to 10.00%. The agreements with a royalty base of gross sales are within the overall range of relevant royalty rates, so no adjustment is necessary for that aspect. The mean royalty rate for all of the agreements is 5.63% and the median is 5.00%. Indeed, most of the agreements feature royalty rates at the 5.00% level. Several of the agreements also include significant guaranteed minimum royalty payments, a form of compensation that would be difficult to incorporate into the terms of this hypothetical license, but which also tends to reduce the level of the ongoing royalty rate, an aspect that should also be taken into account.

The dates when the comparable agreements were first established range from 1996 to 2020. The agreements from the 1990s have similar royalty rates to those negotiated more recently, indicating that royalty rates in this industry have remained relatively stable over the years. As a result, there is no need to adjust any of the agreement terms simply because their date of negotiation is further away from the July 2018 hypothetical negotiation date in this situation.

In terms of geographies, all of the agreements cover the United States, with nine of them having expanded territories beyond the US. There is no indication that expanded geographies lead to different relative royalty rates, so again no adjustment is necessary.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 18



It is interesting to note that many of the agreements have limitations on the channels of distribution that may be pursued, which would be consistent with TCI's expectation of significant revenue flow from higher end stores such as Sephora and luxury retail outlets, which apparently were a key focus for TCI early on.[50]  There is no discernible pattern that restricted distribution channels or a lack thereof are associated with higher or lower royalty rates so no adjustment for this aspect is necessary.

With one exception, most of the comparable agreements are exclusive in nature.  The one exception is the TOMMY BAHAMA agreement, which is the highest royalty rate among the comparable agreements, even though it is non-exclusive.[51]  As stated above in *GP* Factor 3, the non-exclusive aspect of the hypothetical agreement is taken into account in the analysis.

Many of the agreements have royalty rates in the 5.00% to 6.00% range.  These licenses are for the use of trademarks such as LIFEGUARD, INTERLUDE, MEMBERS ONLY, BABYGUND, I'M1 and TIKUN PHARMA, among others.  These agreements exhibit the full range of dates, geographies and distribution channel restrictions (or lack thereof) found in the comparable agreements, with none of them being significantly more relevant than the others.

The highest rates in the comparable agreements are 7.00%, 8.00% and 10.00%.  I have already touched on the 10.00% agreement, which is the TOMMY BAHAMA agreement.  Tommy Bahama is a medium-sized casual lifestyle brand that is not known for its association with skincare or personal beauty products.[52]  Tommy Bahama does not appear to be recognized as a particularly famous clothing brand as it does not appear on any top lists.[53]  The TOMMY BAHAMA agreement was not exclusive, the licensor is not a top 100 leading clothing brand, had no association with skincare and beauty products, and the license would not have cannibalized any of Tommy Bahama's own sales, all factors that would lead to a lower royalty rate.  Despite those facts, Tommy Bahama was still able to obtain a 10.00% net royalty license.

An agreement that obligates the licensee to pay 7.00% of net sales for the use of marks is associated with Mario Lopez, a television actor and celebrity.[54]  While this agreement helps illustrate the full range of royalty rates associated with skincare

[50] TCI_00019116.
[51] Royalty Range agreement no. RR20201006T04302.
[52] https://en.wikipedia.org/wiki/Tommy_Bahama; https://www.tommybahama.com/.
[53] See, e.g., https://fashionunited.com/i/most-valuable-fashion-brands/ (listing top 100 clothing brands, without Tommy Bahama appearing anywhere on the list); https://today.yougov.com/ratings/consumer/popularity/clothing-footwear-brands/all (listing top 179 clothing brands, without Tommy Bahama appearing anywhere on the list); https://businessnes.com/top-100-luxury-fashion-brands-list/ (listing top 100 luxury fashion brands, without Tommy Bahama appearing anywhere on the list).
[54] Royalty Range agreement no. RR20180416T00901; https://www.epollresearch.com/marketing/E-Score_Celebrity_Special_Report_Q3-2009-12-08-02-sl.pdf; https://today.yougov.com/topics/entertainment/explore/tv_personality/Mario_Lopez.



products, I give it somewhat less weight in the analysis due to its association with a celebrity persona.

The third agreement, with an 8.00% rate, grants a license to the KATHY HILTON mark for skincare products, Kathy Hilton being a socialite and philanthropist.[55]  As stated above, this license sets 3.00% and 4.00% royalty rates for sales made through infomercials (the 4.00% rate takes effect when certain performance metrics are met).[56]  The 3.00% royalty rate is the lowest among any of the comparable agreements.

More importantly, however, this agreement set an 8.00% royalty rate that was applicable to *all other* channels of distribution, including retail, wholesale, website, multi-level marketing, television shopping networks and "any other channel of distribution."[57]  It is clear that the infomercial channel of distribution is not applicable to this hypothetical negotiation.  Therefore, the relevant royalty rate in this agreement for the purposes of this analysis is 8.00%. While Ms. Hilton's minor celebrity status may warrant a slight reduction in the weight given to this agreement as to the marks being licensed, this agreement appears to be among the most comparable in terms of products and sales channels.

In my view, any enhancement to the royalty rates in the three licenses discussed above that was due to the fame or celebrity of those brands would be equivalent to, or exceeded by, the importance to TCI of obtaining the license from Thrive for the THRIVE Marks, as discussed above in *GP* Factor 5. While Tommy Bahama as a brand and Mario Lopez and Kathy Hilton as individuals may command a slightly higher rate due to their public recognition, none of their licenses were to competitors that *needed* to obtain the license in order to continue using their primary brand name on skincare products.  Nonetheless, those licensors were still able to negotiate royalty rates ranging from 7.00 to 10.00%.

In general, the comparable agreements show that trademark royalty rates in this industry range from 3.00% to 10.00% and the agreements that are most comparable to the hypothetical negotiation indicate that royalty rates in the 5.00% to 8.00% range are applicable.

*Georgia-Pacific* Factor 13 – Relative Contribution

The hypothetical THRIVE Marks license broadly covers the standard character marks, meaning use of the word "THRIVE" in any font, format, or logo.[58]  While Defendant's products use a logo and trade dress that are different from Plaintiff's

---

[55] https://en.wikipedia.org/wiki/Kathy_Hilton.
[56] KtMine Agreement no. 13423.
[57] KtMine Agreement #13423, page 1.
[58] *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) ("Therefore, Pom Wonderful's exclusive right to use its 'POM' standard character mark is extremely broad, covering the word in all types of depictions.").

DREWS OPP. 27



TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 20

logo and trade dress, that is of less importance here since the trademark covers the word "THRIVE" in all types of depictions for skincare products.

The THRIVE Marks are a significant part of Defendant's brand name and are vitally important aspects of its website, marketing activities and ecommerce platforms. Without the THRIVE Marks, TCI would have had to create an entirely new brand identity, website, and marketing strategy divorced from its makeup line.[59] The relative contribution of the THRIVE Marks to Defendant's operation is paramount. Therefore, this factor should be scored as highly relevant and as significantly favoring the licensor under these circumstances.

> *Georgia-Pacific* Factor 14 – Qualified Expert Opinions

To my knowledge, no other expert opinions have yet been offered in this matter. I am also not aware of any relevant expert opinions outside of this case that may have any bearing on the royalty rate conclusion. This factor is therefore neutral in the instant analysis and has a low level of relevance.

> *Georgia-Pacific* Factor 15 – Hypothetical Negotiation

The outcome of a hypothetical negotiation concluding in July 2018 is fundamental to the reasonable royalty analysis and calculations presented herein. A larger number of the *GP* factors in the hypothetical negotiation were deemed to favor the licensor over the licensee.

Of those factors favoring the licensor, the strongest arguments reside in the fact that the Infringing Use is very extensive (Factor 11), the benefits encompassed within Plaintiff's THRIVE Marks were a key component of Defendant's operation at the time of the hypothetical negotiation (Factor 13), the fact of direct competition between the Plaintiff and Defendant (Factor 5) and that operations related to the use of the THRIVE Marks have been very successful (Factor 8).

Other factors that weighed in the licensor's favor include the fact that the licensor should be compensated for any loss of control over the THRIVE Marks (Factor 10) and the significant degree of flexibility regarding Defendant's use of the THRIVE Marks necessarily encompassed within the hypothetical license (Factor 3 – the license must encompass the Infringing Use).

Finally, the nature and utility of the asset is central to the trademark license (Factors 9 and 10) which, given the foundational assumption that liability will be established at trial, is a necessity in this situation. All of these arguments would be front and center during the hypothetical negotiation, and difficult for the licensee to dismiss.

On the other hand, there is one aspect that favors the licensee: its larger size in comparison to the Plaintiff (Factor 5).

---

[59] For example, TCI_00019105, TCI_00019106 and TCI_00019125 – 19134.



Of the six factors (other than this Factor 15) that were considered highly relevant in terms of their impact on whether the hypothetical negotiation results in a higher or lower relative royalty rate, including several given significant weight in this analysis, all six favor the licensor and none favor the licensee.

Under the facts of this case—where TCI knew of the THRIVE Marks, TCI knew it needed to obtain a license as shown by Ms. Bodnar's repeated contacts, and Thrive knew it had the upper hand in negotiations because of its registered trademarks, as it demonstrated with its 2017 cease and desist letter to TCI—a relatively high royalty rate would be appropriate here. What the THRIVE Marks may lack in fame would have been more than made up for by the critical nature of this license to TCI's business. The sum total of the *Georgia-Pacific* analysis is that a reasonable royalty rate for the Infringing Use would likely be at the upper end of the range of royalty rates found in the comparable agreements for trademarks licensed for use with similar products. In keeping with the results of the *Georgia-Pacific* analysis, the comparable agreements and the facts of this case, the appropriate royalty rate is determined to be **8.0% of Net Sales**. Please see Schedules 4 and 5 of this report for additional information.

2. **Royalty Base**

The next step is to isolate the royalty base that the royalty rate is applied against, which necessarily must be associated with Defendants' use of the THRIVE Marks. A key factor to consider is that the available evidence indicates that the royalty rates in this industry are typically applied against *net* sales.

Defendant's THRIVE Marks-related skincare product net sales are $57,589,119 through May 31, 2021.[60] Again, the instant presentation of damages is based upon the best information available and may be amended as additional information is provided.

3. **Reasonable Royalty Conclusion**

Applying the concluded royalty rate to the relevant royalty base identified above leads to a conclusion of **$4,607,130** in reasonable royalty damages. Please see Schedules 4, 5 and 6 for additional information.

It is important to note that the *Georgia-Pacific* factor analysis is simply a tool used to fine-tune the results of a hypothetical negotiation between the parties, including structure, timeframe, relevant products and similar items. The most relevant and important data in this exercise are the royalty rates found in the comparable agreements. Even if the *Georgia-Pacific* Factor construct had not been utilized in this analysis, the royalty rate conclusions would have remained the same based strictly on the comparable agreement data.

---

[60] TCI_00030182 – 30184.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.



## C.   Corrective Advertising Analysis

The prospective advertising expenditures necessary to correct any inaccurate impressions in the marketplace regarding ownership, authorization and relationships surrounding specific intellectual property are oftentimes used as a method to measure potential future or incremental damages associated with intellectual property infringement and unfair competition.  Prospective corrective advertising damages have been defined as the amount the Plaintiff would be required to spend in the future to dispel the confusion caused by the Defendant's infringement.[61]

The Defendant's advertising and marketing efforts as summarized and quantified in TCI_00030182 – 30184 are directly associated with the THRIVE Marks.  The following factors provide the context within which the need for corrective advertising should be analyzed:

- The Defendant has attempted to build substantial awareness through aggressive marketing campaigns focused on introducing and enhancing its presentation of the THRIVE Marks brand.  These efforts have included significant search engine optimization, keyword search campaigns and social media posting, in addition to significant efforts at lining up interviews and mentions through traditional media like *The Today Show*, *Good Morning America* and *Marie Claire*.[62]

- To counteract the impact of the Defendant's marketing efforts, the corrective advertising should ideally encompass the same kind of advertising and marketing efforts employed by the Defendant.  Therefore, the corrective advertising should include the cost associated with pursuing all of the elements listed above in similar quantities and qualities.

- On a pro-rated basis, Defendant spent $1,258,972 in 2018, $3,276,250 in 2019, $12,006,858 in 2020 and $5,520,068 through May 31 in 2021 on advertising and marketing activities.   Total advertising and marketing expenditures assigned to skincare products and hybrid skincare products have been $22,062,148 through May 31, 2021.[63]

An important consideration in the calculation of appropriate prospective corrective advertising damages is the geographic scope of sales and advertising of the plaintiff in relation to that of the defendant.   In this case, I understand that both parties market and sell their skincare products across the United States, so no adjustment is necessary based on geographical differences.

It is my understanding that courts typically award only a percentage of the advertising expenditures associated with the infringement of the plaintiff's mark.  This is because

---

[61] *American Farm Bureau Federation v. Alabama Farmers Federation, et al.*, 935 F. Supp. 1533 – USDC, M.D. Alabama, 11th Circuit (1996).
[62] For example, TCI_00019125.
[63] TCI_00030182 – 30184.

DREWS OPP. 30

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 23



past marketing activities are believed to not have a continuing impact on consumers after a considerable passage of time.  Even though some studies suggest that correcting misinformation may require an increase in advertising over the amount of advertising that led to the misinformation, I understand that many courts have acknowledged the Federal Trade Commission's rule requiring businesses who engage in misleading advertising to spend 25% of their accused advertising budget on corrective advertising, which is consistent with accepted Ninth Circuit methodology for corrective advertising.[64]

Based on the adjusted advertising expenditures, the amount of prospective corrective advertising damages is **$5,515,537**, after applying the FTC's 25% corrective advertising rule discussed above.  Please see Schedule 7 for additional information.

### D.   Hybrid Skincare Products

The damages analysis and calculations above include two of Defendant's products, Buildable Blur CC Cream and Filtered Effects Blurring Primer, that can be described as hybrids between makeup and skincare products.  According to the material I have read from TCI's advertising and website, TCI often describes its Buildable Blur CC Cream and Filtered Effects Blurring Primer products as skincare products that provide skincare benefits, and other times as hybrid makeup-and-skincare products. For the purposes of this analysis, it does not matter whether these two products are solely skincare products or if they are hybrid makeup-and-skincare products that provide some makeup-related benefit; either way the damages analysis for Reasonable Royalty, Defendant's Profits, and Corrective Advertising applies the same.

However, if Buildable Blur CC Cream and Filtered Effects Blurring Primer were to be excluded from my calculations, the total applicable damages would be as follows: (1) Defendant's Profits in the amount of $11,698,497; (2) Reasonable Royalty in the amount of $2,866,637 and (3) Corrective Advertising damages in the amount of $3,558,649.[65] I provide these calculations to establish the correct amount of damages in the event the finder of fact were to determine these hybrid products are not included in the set of infringing products.  I have also broken these products out separately in the attached schedules.

## VI.   CONCLUSIONS

Upon reviewing the documentation listed in Appendix B, and informed by my experience in valuing intellectual property and calculating intellectual property related damages, I have arrived at the following opinions in this matter, the bases for which are explained in the previous sections of this report:

---

[64] For example, *Adray CBS v. Adry-Mart, Inc.*, 68 F.3d 362 (9th Cir. 1995), footnote 3.

[65] As of the date of this Report, TCI has not yet provided its sales data for Filtered Effects Blurring Primer. Therefore, that information has not been included in any of my damages calculations.  I will include it in a supplemental report after it is provided.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.



TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 24

1. The amount of historical damages suffered by Plaintiff due to the actions of the Defendant is calculated using an analysis of the Defendant's profits as well as a reasonable royalty derived from a hypothetical negotiation between Plaintiff and Defendant. The damages measured using the Defendant's Profits analysis are determined to be **$20,401,507**.  Please see Schedules 1, 2 and 3 for additional information.

2. Based on an analysis of relevant licensing information and the application of a modified *Georgia-Pacific* analysis, a reasonable royalty rate for the right to use the THRIVE Marks in association with various skincare products and hybrid skincare products is determined to be **8.0% of Defendant's Net Sales**.  Please see Schedules 4 and 5 for additional information.

3. Applying the concluded royalty rate to the Defendant's applicable royalty base leads to a conclusion of **$4,607,130** in Reasonable Royalty damages.  Please see Schedules 4, 5 and 6 for additional information.

4. The prospective advertising expenditures necessary to correct inaccurate impressions in the marketplace regarding the ownership, authorization and relationships surrounding the THRIVE Marks are calculated to be **$5,515,537**.  Please see Schedule 7 for additional information.

The foregoing conclusions are based upon the documents and information reviewed as of the date of this report, as well as my educational background and experience in valuing intellectual property and intangible assets.  As stated above, any damages conclusions proffered do not include calculations of pre- or post-judgment interest or enhanced damages. I am available to perform these calculations should the Finder of Fact deem them appropriate.

I hold these opinions with a reasonable degree of professional certainty. I hereby reserve the right to amend these conclusions should additional information and/or documents become available for review and consideration.

Sincerely,

David Drews
President, IPmetrics LLC

DREWS OPP. 32

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 25



# SCHEDULES

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 33**

**Schedule 1**

# Thrive Natural Care v. Thrive Causemetics
## Damages Summary
### Through May 31, 2021
#### Figures in US Dollars

**DAMAGES ANALYSES**

| Defendant's Profits | |
| --- | --- |
| Defendant's Profits - Skincare Products | $11,698,497 |
| Defendant's Profits - Hybrid Skincare Products | $8,703,010 |
| Total Defendant's Profits | $20,401,507 |

| Reasoable Royalty | |
| --- | --- |
| Reasonable Royalty - Skincare Products | $2,866,637 |
| Reasonable Royalty - Hybrid Skincare Products | $1,740,492 |
| Total Reasonable Royalty | $4,607,130 |

| Corrective Advertising | |
| --- | --- |
| Corrective Advertising - Skincare Products | $3,558,649 |
| Corrective Advertising - Hybrid Skincare Products | $1,956,888 |
| Total Corrective Advertising | $5,515,537 |

Schedule 2



Thrive Natural Care v. Thrive Causemetics
Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

DREWS OPP. 35

Defendant's Profits
July 5, 2021

Schedule 3



CONFIDENTIAL
Expert Report of David Drews, CLP

DREWS OPP. 36

Schedule 4

# Thrive Natural Care v. Thrive Causemetics
## *Georgia-Pacific* Factor Analysis Summary
### As of July 2018

| | Factor Summary | Relevance of Factor | Impact on Rate | Reason for Scoring |
|---|---|---|---|---|
| Factor 1 | Licensor's Royalties | Low | Neutral | No TM Licensing Terms |
| Factor 2 | Licensee's Payments | Low | Neutral | No TM Licensing Terms, Value of TM Recognized |
| Factor 3 | Nature / Scope of License | High | Higher | Broad Use, Flexibility for Licensee |
| Factor 4 | Licensor's Policy | Low | Neutral | No Advantage to Either Party |
| Factor 5 | Commercial Relationship | High | Higher | Direct Competitors, Overlapping Products and Markets |
| Factor 6 | Convoyed Sales | Even | Higher | Licensee Has An Incentive to Protect Other Product Lines |
| Factor 7 | Duration of License | Low | Neutral | Informs the Structure of the Agreement |
| Factor 8 | Profitability / Success | High | Higher | All Relevant Factors are Positive |
| Factor 9 | Utility of Asset Licensed | High | Higher | Demonstrated Utility of Plaintiff's Mark |
| Factor 10 | Nature of the Asset Licensed | High | Higher | Reverse Confusion Impacts Plaintiff's Goodwill |
| Factor 11 | Extent of Use / Value of Use | High | Higher | Extensive Use Across Various Media / Platforms |
| Factor 12 | Comparable Agreements | High | Neutral | Informs Range of Royalty Rates |
| Factor 13 | Relative Contribution | High | Higher | Primary Brand, Extensive Advertising, Word Mark Only |
| Factor 14 | Qualified Expert Opinions | Low | Neutral | No Other Expert Opinions Available |
| Factor 15 | Reasonable Negotiation | High | Higher | Preponderance of Factors |

Thrive Natural Care v. Thrive Causemetics
Damages Analysis
CONFIDENTIAL
Expert Report of David Drews, CLP
GP Factor Summary
July 27, 2021
**DREWS OPP. 37**

Schedule 5

## Thrive Natural Care v. Thrive Causemetics
### License Agreements - Skincare Products
#### As of July 5, 2021

| | Licensor | Licensee | Exclusive | Effective Date | Territory | Royalty Rates | | Royalty Base | Product or Service | Additional Notes | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Kathy Ireland Worldwide, Inc. | NuGene, Inc. | Yes | 2014 | Worldwide excluding Russia, Certain Stores | 5.00% | - 5.00% | Net Sales | Stem Cell Derived or Biologically Active Lotions, among other things | The licensed marks are "Kathy Ireland" and "Kathy Ireland" logos. Also requires "Brand Participation Fees." The term of this agreement is eight years, with renewal options. | KtMine Agmt. 107425 |
| 2 | KRH Licensing Company, LLC | OmniReliant Corp. | Yes | 2006 | Certain Stores, Worldwide | 3.00% | - 8.00% | Net Sales | Men's and Women's Skincare Products, among other things | The licensed mark is "Kathy Hilton." The term is five years with renewal options. | KtMine Agmt. 13423 |
| 3 | The Stephan Co. | Color Me Beautiful, Inc. | Yes | 1996 | Certain Stores in the US | 5.00% | - 6.00% | Net Sales | Body Lotion, among other things | The licensed marks are "Frances Denney," "Interlude," "Fade Away" and "Hope." Term is perpetual. | KtMine Agmt. 47363 |
| 4 | Gund, Inc. | Parlux Fragrances, Inc. | Yes | 2005 | Certain Stores, Worldwide | 5.00% | - 5.00% | Net Sales | Hypoallergenic Body Lotion, among other things | The licensed mark is "babyGUND." Term is five years with option for renewal. | KtMine Agmt. 4965 |
| 5 | Parlux Fragrances, Inc. | Genesis International Marketing Corp. | Yes | 1998 | Worldwide | 5.00% | - 5.00% | Net Sales | Skincare Products, among other things in IC 003 | The licensed marks are "Bal A Versailles," "Jean Desprez," "Sheherazade," "Jardanel" and "Revolution A Versailles." The term of this agreement is ten years, with automatic five-year renewals indefinitely. | KtMine Agmt. 60021 |
| 6 | Europe Craft Imports, Inc. | Azurel, Ltd. | Yes | 1996 | Worldwide ex China | 5.00% | - 5.00% | Net Sales | Skincare Products, among other things in IC 003 | The licensed mark is "Members Only." Term is five years with option for renewal. | KtMine Agmt. 68786 |
| 7 | I\|M1, LLC | Nugene International, Inc. | Yes | 2017 | Certain Stores in the US | 5.00% | - 5.00% | Gross Sales | Men's Grooming Products | The licensed marks are "IM1" and "I\|M1." Term is five years. | Royalty Range RR20180122T00104 |
| 8 | Pez-Mar, Via Mar Productions, Inc. | BOLDFACE Licensing + Branding | Yes | 2012 | US, Canada, Mexico | 7.00% | - 7.00% | Net Sales | Toiletries and Grooming Products, including lotions and creams | The licensed marks are "Mario Lopez," "Mario Lopez rated M" and "Mario Lopez Malo." Initial term is three years. There are guaranteed minimums. | Royalty Range RR20180416T00901 |
| 9 | Tikun Olam LLC | Jay Pharma, Inc. | Yes | 2020 | US | 5.00% | - 5.00% | Net Sales | Beauty Products | The licensed mark is "Tikun Olam," "Tikun Pharma" and variations thereof. Term is twenty years. There are significant guaranteed minimum royalties. | Royalty Range RR20210528T04301 |

CONFIDENTIAL
Expert Report of David Drews, CLP
Comparable Royalty Rates
July 5, 2021

**DREWS OPP. 38**

Schedule 5 (cont.)

## Thrive Natural Care v. Thrive Causemetics
### License Agreements - Skincare Products
#### As of July 5, 2021

| | Licensor | Licensee | Exclusive | Effective Date | Territory | Royalty Rates | | Royalty Base | Product or Service | Additional Notes | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | Tommy Bahama Group, Inc. | Boomer Holdings Inc. | No | 2019 | Certain Stores in the US | 7.00% | - 10.00% | Net Sales | Massage Oils, among other things | The licensed mark is "Tommy Bahama." Term is four years. There are significant guaranteed minimum royalties and a 2% of net sales advertising requirement. | Royalty Range RR20201006T04302 |
| 11 | 8012415 Canada Inc. | GMS Capital Corp. | Yes | 2012 | Worldwide excluding Sweden, Russia and Finland | 5.00% | - 5.00% | Gross Sales | Cosmetics and Cosmetics-related Products, including moisturizing creams | License is for "Nacara" trademarks, logos, etc., and similar marks owned by Licensor. The term is five years with automatic renewals if sales milestones are met. | Royalty Range RR20140327T06001 |
| 12 | Lifeguard Licensing Corp. | Canbiola, Inc. | Yes | 2020 | US, Canada, Mexico | 6.00% | - 6.00% | Net Sales | Balms and Moisturizers, among other things | The licensed mark is "Lifeguard." There are significant guaranteed minimum royalties. Term is five years with renewal provisions. | Royalty Range RR20201103T00902 |

| | |
|---|---|
| 1st Quartile | 6.00% - 10.00% |
| 2nd Quartile | 5.00% - 6.00% |
| 3rd Quartile | 5.00% - 5.00% |
| 4th Quartile | 3.00% - 5.00% |
| Minimum | 3.00% |
| Maximum | 10.00% |
| Mean | 5.63% |
| Median | 5.00% |

*Sources:  KtMine, Royalty Range.*

Thrive Natural Care v. Thrive Causemetics
Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

Comparable Royalty Rates
July 5, 2021

**DREWS OPP. 39**

**Schedule 6**

<div style="background-color:red; color:white; text-align:center;">

**Thrive Natural Care v. Thrive Causemetics**

**Damages Analysis - Reasonable Royalty**

**Through May 31, 2021**

</div>

### TCI Skincare Products

| Year | Revenue | Royalty Rate | Reasonable Royalty |
|------|---------|--------------|--------------------|
| 2018 | $1,023,597 | 8.00% | $81,888 |
| 2019 | 2,196,505 | 8.00% | 175,720 |
| 2020 | 20,786,308 | 8.00% | 1,662,905 |
| [1] 2021 | 11,826,553 | 8.00% | 946,124 |
| Totals | $35,832,963 | | $2,866,637 |

**Skincare Products Royalty**

**$2,866,637**

### TCI Hybrid Skincare Products

| Year | Revenue | Royalty Rate | Reasonable Royalty |
|------|---------|--------------|--------------------|
| 2018 | $3,644,428 | 8.00% | $291,554 |
| 2019 | 5,937,668 | 8.00% | 475,013 |
| 2020 | 8,668,332 | 8.00% | 693,467 |
| [1] 2021 | 3,505,728 | 8.00% | 280,458 |
| Totals | $21,756,156 | | $1,740,492 |

**Hybrid Skincare Products Royalty**

**$1,740,492**

*Sources/Note(s):*

TCI_00030182 - 30184.

[1] Partial year revenue through May 31, 2021.

TNC v. TCI
Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

Reasonable Royalty
July 2021

**DREWS OPP 40**

# Thrive Natural Care v. Thrive Causemetics

## Damages Analysis - Corrective Advertising

Through May 31, 2021

### Relevant Advertising and Marketing Expenditures - Thrive Causemetics Skincare Products

|  |  |  |  | [1] |
| --- | --- | --- | --- | --- |
|  | **2018** | **2019** | **2020** | **2021** |
| Relevant Advertising Spend | $210,505 | $649,834 | $9,012,493 | $4,361,765 |

|  |  |
| --- | --- |
| Total Relevant Marketing Spend: | $14,234,597 |
| [2] FTC Corrective Advertising Rule: | 25% |
| **Corrective Advertising:** | **$3,558,649** |

### Relevant Advertising and Marketing Expenditures - Thrive Causemetics Hybrid Skincare Products

|  |  |  |  | [1] |
| --- | --- | --- | --- | --- |
|  | **2018** | **2019** | **2020** | **2021** |
| Relevant Advertising Spend | $1,048,467 | $2,626,416 | $2,994,365 | $1,158,303 |

|  |  |
| --- | --- |
| Total Relevant Marketing Spend: | $7,827,551 |
| [2] FTC Corrective Advertising Rule: | 25% |
| **Corrective Advertising:** | **$1,956,888** |

Sources/Note(s):

TCI_00030182 - 30184

[1] Partial year through May 31, 2021.

[2] *Big Tire Dealers Inc. v. Goodyear Tire and Rubber Company*, 561 F.2d 1365, 1374-76 (10th Cir. 1977).

Thrive Natural Care v. Thrive Causemetics
Damages Analysis

CONFIDENTIAL
Expert Report of David Drews, CLP

Corrective Advertising
DREWS OPP. 41
July 1, 2021



TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 34

# APPENDICES

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 42**

TNC v. TCI
Damages Analysis
July 5, 2021

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 35



# APPENDIX A
## QUALIFICATIONS OF DAVID DREWS, CLP

I am currently a Principal with IPmetrics LLC, an intellectual property consulting firm. Prior to that, I was Director of Valuation at CONSOR Intellectual Asset Management. I have over thirty years' experience as a financial analyst, primarily concentrated in valuing intellectual property of all types, including trademarks, copyrights, patents, know-how, trade secrets and domain names. My valuation experience includes projects involving use of the assets as collateral, transaction due diligence, joint venture negotiations, licensing, transfer pricing and bankruptcy / reorganization.

I have performed valuations on assets as diverse as apparel, financial services, retail, automotive, processed food, non-profit organization, sports and consumer brand trademarks; mechanical, chemical and electrical patents, processes and trade secrets; customer lists; non-compete agreements; and entertainment industry characters, trademarks and copyrights. I have also been called upon to calculate damages related to infringement of intellectual property in numerous litigation and arbitration proceedings.

Prior to concentrating on intellectual property, I was responsible for the analysis and valuation of a broad range of credit applicants and investment vehicles for California Commerce Bank. Before joining California Commerce Bank, he performed investment research at William O'Neil & Co. My responsibilities at O'Neil included in-depth analyses of companies in many different industries, including pharmaceuticals, retail, processed foods, apparel, biotechnology, computer software, financial services and scientific instruments, among others. I hold a Bachelor of Science degree in business administration / economics from the University of Nebraska. In addition, I hold the Certified Licensing Professional (CLP) designation, which indicates a demonstrated level of experience, proficiency and knowledge surrounding intellectual property licensing, commercialization and valuation.

In addition to regularly publishing articles for numerous journals, industry publications and websites, I am a frequent lecturer on IP valuation issues. I have taught several courses for intellectual property valuation and related topics, including the Intellectual Property Valuation Workshop for the Licensing Executives Society, the Intellectual Property Damages course for the National Association of Certified Valuation Analysts and the Valuation of Intellectual Property course offered by the National Technology Transfer Center.

I currently serve as Editor of *les Nouvelles* and previously served on the Famous and Well-Known Marks Committee of the International Trademark Association. In the past, I have served on the Valuation and Taxation Committee and the Trademarks Committee of the Licensing Executives Society USA/Canada and was Co-Chair on the Intellectual Property Valuation Committee of Licensing Executives Society International.

IPmetrics was founded in 2000 to help clients establish and build the value of their intellectual property. The firm is headquartered in San Diego, California and serves clients throughout the global economy.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 36



## PROFESSIONAL INSTRUCTION

- Continuing Legal Education – Instructor
    - *Courses:  Intellectual Property Valuation Techniques*
      *Monetary Remedies in Patent Litigation*
      *Monetary Remedies in Trademark Cases*
      *10 Common Mistakes in IP Valuation / Damages Reports*
      *Brand Valuation*

- Licensing Executives Society – Instructor
    - *Course:    IP Valuation Workshop*

- University of San Diego School of Law – Guest Instructor
    - *Course:    Monetary Remedies in Trademark Cases*

- NASA Langley Research Center – Guest Instructor
    - *Course:    Valuation of Intellectual Property*

- National Association of Certified Valuation Analysts (NACVA) – Past Instructor
    - *Course:    Intellectual Property: Calculating Damages and Lost Profits*

- National Technology Transfer Center – Past Instructor
    - *Course:    Valuation of Intellectual Property*

## PRESENTATIONS

- *YMC "Ultimate Champion" Discussion*; LESI Virtual Annual Meeting; May 2021 – Global Video Feed

- *les Nouvelles Live! (March 2021 Issue Edition)*; LESI Webinar; March 2021 – Global Video Feed

- *les Nouvelles Live! (December 2020 Issue Edition)*; LESI Webinar; January 2021 – Global Video Feed

- *les Nouvelles Live! (September 2020 Issue Edition)*; LESI Webinar; September 2020 – Global Video Feed

- *Monetary Remedies in Trademark Cases*; University of San Diego School of Law; March 2019 – San Diego, CA

- *10 Common Mistakes in IP Valuation/Damages Reports*; Kilpatrick Townsend & Stockton In-house CLE; September 2018 – San Francisco, CA

- *10 Common Mistakes in IP Valuation/Damages Reports*; Wilson Elser Moskowitz Edelman & Dicker In-house CLE; July 2018 – Nationwide Video Feed

- *Select IP Damages Issues:  Patents, Trademarks, Counterfeits*; BakerHostetler In-house CLE; July 2018 – New York, NY

- *Enter the Experts: Tips and Tools for Identifying Effective Expert Witnesses;* American Bar Association Regional CLE Workshop; September 2017 – Los Angeles, CA

- *Monetary Remedies in Trademark Cases;* University of San Diego School of Law; April 2017 – San Diego, CA

**DREWS OPP. 44**

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 37



- *Brand Valuation;* 12:30 Club; May 2016 – La Jolla, CA

- *Gain a Competitive Advantage and Maximize the Value of your Deals: Investigating Current Trends in Licensing;* LES USA & Canada Webinar; April 2016 – Abila.com

- *Current Issues in Valuing Intellectual Property;* VALCON 2016; March 2016 – Las Vegas, NV

- *Monetary Remedies in Trademark Cases*; University of San Diego School of Law; March 2015 – San Diego, CA,

- *IP Valuation Committee Study on Royalty Rates and Deal Structures*; Licensing Executives Society (LES) USA & Canada Annual Meeting; October 2014 – San Francisco, CA

- *IP Valuation Techniques*; Kirkland & Ellis In-house CLE; September 2014 – New York, NY

- *How to Determine Brand Value: A Rational Basis for Showing What a Brand Name is Worth for Licensing and Litigation*; New Jersey Trademark Counsel Luncheon Club; September 2014 – Basking Ridge, NJ

- *Monetary Remedies in Trademark Cases*; Fish & Richardson In-house CLE; September 2014 – Nationwide Video Feed

- *IP Valuation Workshop*; Tiger BDO Conference; July 2014 – Westlake Village, CA

- *10 Common Mistakes in IP Valuation/Damages Reports*; Jeffer Mangels Butler & Mitchell In-house CLE; July 2014 – Los Angeles, CA

- *10 Common Mistakes in IP Valuation/Damages Reports*; Winston & Strawn In-house CLE; July 2014 – San Francisco, CA

- *IP Valuation Techniques 2-Day Workshop*; Red OTT 2nd Annual Conference; November 2013 – Monterrey, Mexico

- *10 Common Mistakes in IP Valuation/Damages Reports*; LES USA & Canada Webinar; November 2013 – Peachnewmedia.com

- *How to Use IP to Secure Funding*; IP Money Talk Webinar; September 2013 – Blogtalkradio.com

- *IP Valuation Techniques*; IPmetrics Ballpark Invitational CLE; April 2013 – San Diego, CA

- *10 Common Mistakes in IP Valuation/Damages Reports*; Licensing Executives Society International (LESI) Annual Meeting; April 2013 – Rio de Janeiro, Brazil

- *10 Common Mistakes in IP Valuation/Damages Reports*; LES USA & Canada Annual Meeting; October 2012 – Toronto, Canada

- *IP Valuation Workshop*; LES USA & Canada Annual Meeting; October 2012 – Toronto, Canada

- *IP Valuation Techniques*; Indiana Soybean Alliance IP Valuation Seminar; July 2012 – San Diego, CA

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 38



- *LESI IP Valuation Committee LES Society Survey Results*; Global Technology Impact Forum; January 2012 – Geneva, Switzerland

- *LESI Committee on IP Valuation Standards Survey Results*; LES USA & Canada Annual Meeting; October 2011 – San Diego, CA

- *IP Valuation Techniques*; Bank of America Special Assets Group Meeting, June 2009 – Charlotte, NC (telephonic participation)

- *IP Valuation Techniques*; LES USA & Canada Annual Meeting; October 2008 – Orlando, FL

- *Damages, Valuation and Expert Witness*; Gibson, Dunn & Crutcher In-house CLE; June 2008 – Irvine, CA

- *Intellectual Property: Calculating Damages and Lost Profits*; National Association of Certified Valuation Analysts (NACVA) Annual Meeting; December 2007 – Ft. Lauderdale, FL

- *Intellectual Property: Calculating Damages and Lost Profits*; NACVA Conference; October 2007 – Philadelphia, PA

- *Intellectual Property Valuation Techniques*; IP Portfolio Management Conference; May 2007 – New York, NY

- *Key Issues in IP Due Diligence*; Due Diligence Symposium; April 2007 – Iselin, NJ

- *IP Valuation Techniques*; BIO IPCC Spring Meeting; January 2007 – San Diego, CA

- *Life Sciences IP Due Diligence*; American Conference Institute; January 2007 – San Francisco, CA

- *Intellectual Property: Calculating Damages and Lost Profits*; NACVA Annual Meeting; December 2006 – Coronado, CA

- *Fundamentals of Intellectual Property Valuation*; IP Licensing Summit; August 2006 – New York, NY

- *Monetization of Intellectual Property*; SRI Monetization Conference; June 2006 – Boston, MA

- *NTP vs. RIM: Valuation Perspectives*; American Intellectual Property Law Association (AIPLA) Spring Meeting; May 2006 – Chicago, IL

- *Perfecting Security Interests in Intellectual Property*; PhillipsLytle / HSBC IP Securitization Conference; March 2006 – New York, NY

- *Opening the Black Box: IP Valuation, Securitization and Disposition Unveiled*; Commercial Finance Association Annual Conference; November 2005 – San Diego, CA

- *Brand Valuation*; LINK New York; October 2005 – New York, NY

- *Intellectual Property Valuation Techniques*; FindLaw IP Strategies in Deals; October 2004 – Palo Alto, CA

- *Intellectual Property Valuation Techniques*; Sterling Intellectual Property Issues Seminar; July 2004 – San Diego, CA

DREWS OPP. 46

CONFIDENTIAL – Attorneys' Eyes Only
Expert Report of David Drews, CLP
Page 39



- *Leveraging IP via the Capital Markets*; Sterling Intellectual Property Issues Seminar; July 2004 – San Diego, CA

- *Innovative Deal Structures – Licensing Intellectual Property*; American Conference Institute; October 2000 – Beverly Hills, CA

- *Licensing on the Internet*; LES USA & Canada Annual Meeting; September 2000 – Toronto, Canada

- *Valuation of Electronic Assets*; Glasser Legalworks 11th Annual Institute; March 2000 – San Francisco, CA

- *Valuation of Domain Names*; Glasser Legalworks 10th Annual Institute; November 1999 – Los Angeles, CA

- *Valuation of Domain Names*; LES USA & Canada Annual Meeting; October 1999 – San Antonio, TX

- *Licensing Executives: Guardians of Corporate Technology*; LES USA & Canada Annual Meeting; October 1999 – San Antonio, TX

- *Intellectual Property & Reorganizations*; Second Annual Conference on Corporate Reorganizations; September 1999 – Chicago, IL

- *Valuation of Intellectual Properties*; Pillsbury, Madison & Sutro In-house CLE; August 1999 – San Diego, CA

- *Helping Clients Understand and Build the Value of their Intangible Assets*; Dow Chemical Company; August 1998 – Midland, MI

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 40



## PROFESSIONAL ASSOCIATIONS

- Certified Licensing Professional (CLP)
- International Trademark Association (INTA)
- Licensing Executives Society (LES)
- San Diego Intellectual Property Law Association (SDIPLA)

## PUBLICATIONS – PREVIOUS TEN YEARS

- **Current Issues in Valuing Intellectual Property - Bankruptcy**
  (VALCON 2016 Course Materials, March 2016)
- **Ten Common Mistakes in IP Valuation/Damages Reports**
  (les Nouvelles, September 2015)
- **Determining an Appropriate Royalty Rate for Reasonable Royalty Trademark Damages – A Modified *Georgia-Pacific* Framework**
  (les Nouvelles, September 2014)
- **Reasonable Royalty Damages in Trademark Cases**
  (Intellectual Property Today, August 2013)
- **LESI IP Valuation and Standards Committee Report on IP Valuation Survey of LES National Societies**
  (les Nouvelles, June 2012)
- **Intellectual Property Valuation** (Updated)
  (Chapter 23 – *Drafting License Agreements, Fourth Edition*, 2012 Supplement, March 2012)
- **Rules of the Road: Valuing Commercialized Software-Based Technology**
  (les Nouvelles, June 2011)
- **Properly Evaluating a Target with Intellectual Property Rights**
  (Chapter 2 – *Intellectual Property Strategies for the 21st Century Corporation*, May 2011)
- **Countering the Impact of Private Label on Brand Value**
  (Total Licensing, Winter 2009)

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 48**

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 41



## EXPERT WITNESS AND TESTIMONY EXPERIENCE
## OF DAVID DREWS

### Deposition and/or Trial Testimony
### January 2017 through July 5, 2021
(Clients in **Bold**)

**Trial Testimony**

| | Year | Case | Case No. | Issue | Jurisdiction |
|---|---|---|---|---|---|
| 1 | 2019 | ILC Trademark Corp. v. **Aviator Nation, Inc., et al.** | 2:17-cv-07975 | Trademarks - Apparel | USDC – Central District of California |
| 2 | 2017 | Brighton Collectibles, LLC v. **AIF Corporation d/b/a Time World** | BC526920 | Copyrights – Apportionment | California Superior Court, Los Angeles County |
| 3 | 2017 | **OSRAM Sylvania, Inc.** v. Photographic Illustrators Corp. | 01-16-0000-2652 | Copyrights – Commercial Images | American Arbitration Association, Boston |
| 4 | 2016 | **Aurora World Corporation** v. Toonzone Studios, Inc., et al. | 1220048995 | Breach of Contract – Animation | JAMS, Los Angeles |
| 5 | 2016 | Thomas Sköld v. **Galderma Laboratories, L.P., et al.** | 2:14-cv-05280-WB | Trademarks – Skincare Products | USDC, Eastern District of Pennsylvania |
| 6 | 2015 | DefensTech Int'l. Inc. v. **Edward Robert Fyfe, et al.** | 30-2014-00697473 CU-BT-CJC | Patents – Blast Mitigation | California Superior Court, Orange County |
| 7 | 2015 | **BTM, LLC** v. William P. Thomas, III, et al. | SAC CV14-00414 JVS (RNBx) | Trademarks – Custom Automobiles | USDC, Central District of California |

**Deposition Testimony**

| | Year | Case | Case No. | Issue | Jurisdiction |
|---|---|---|---|---|---|
| 1 | 2021 | **Midwest Athletic Sports Alliance LLC** v. Ricoh USA, Inc. | 2:19-cv-03423 | Patents – Multi-function Printers | USDC, Eastern District of Pennsylvania |
| 2 | 2020 | **Lontex Corporation** v. Nike, Inc. | 2:18-cv-05623 | Trademark – Apparel | USDC, Eastern District of Pennsylvania |
| 3 | 2020 | **Evolusion Concepts, Inc.** v. Juggernaut Tactical, Inc. | 8:18-cv-1378 JLS | Patent – Firearms | USDC, Central District of California |
| 4 | 2019 | **Waiter.com, Inc.** v. Waitr, Inc. | 2:17-cv-01041 | Trademarks – Delivery Services | USDC, Western District of Louisiana |
| 5 | 2019 | **Lin's Waha International Corp.** v. Tingyi (Cayman Islands) Holding Corp. | 1:17-cv-00773 | Trademarks – Processed Foods | USDC, Eastern District of New York, Brooklyn |
| 6 | 2019 | **Robert Gaudio** v. Spotify USA, Inc. | 3:17-cv-01052 | Copyrights – Music Compositions | USDC, Middle District of Tennessee |
| 7 | 2018 | **Confectionery Arts International, LLC** v. CK Products LLC | 3:16-cv-02015 JBA | Trademarks – Cake Decorating | USDC, District of Connecticut |
| 8 | 2017 | Brighton Collectibles, LLC v. **AIF Corporation d/b/a Time World** | BC526920 | Copyrights – Apportionment | California Superior Court, Los Angeles County |
| 9 | 2017 | **OSRAM Sylvania, Inc.** v. Photographic Illustrators Corp. | 01-16-0000-2652 | Copyrights – Commercial Images | American Arbitration Association, Boston |

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.



## APPENDIX B
## DOCUMENTS AND SOURCES REVIEWED AND/OR RELIED UPON

In the course of conducting my analysis and preparing this report, I reviewed and/or relied upon the following principal documents and sources, as well as the documents and sources cited in the body of the report, including the footnote references.

1.  Complaint for Federal Trademark Infringement, Federal Unfair Competition, Common Law Trademark Infringement, Common Law Unfair Competition and Violation of Cal. Bus. & Prof. Code § 17200 dated October 2, 2020 and Exhibits [Document 1]

2.  First Amended Complaint for Federal Trademark Infringement, Federal Unfair Competition, Common Law Trademark Infringement, Common Law Unfair Competition and Violation of Cal. Bus. & Prof. Code § 17200 dated July 1, 2021 and Exhibits [Document 28]

3.  Stipulated Protective Order [Document 17]

4.  Deposition of Ned A. Menninger dated May 27, 2021, and Exhibits

5.  Videoconference 30 (b)(6) Deposition of Karissa Bodnar dated June 3, 2021, and Exhibits

6.  Plaintiff Thrive Natural Care, Inc.'s Initial Disclosures

7.  Plaintiff Thrive Natural Care, Inc.'s Responses to Defendant Thrive Causemetics, Inc.'s First Set of Interrogatories

8.  Defendant Thrive Causemetics, Inc.'s Supplemental Responses and Objections to Plaintiff Thrive Natural Care, Inc.'s First Set of Interrogatories

9.  TCI_00014424

10. TCI_00019097 – 19118

11. TCI_00019120 – 19159

12. TCI_00019235

13. TCI_00019247 – 19255

14. TCI_00022753 – 22767

15. TCI_00024084

16. TCI_00024093 – 24408

17. TCI_00026950 – 26955

18. TCI_00027717 – 27719

19. TCI_00027864 – 27865

20. TCI_00027881 – 27900

21. TCI_00028581 – 28582

22. TCI_00028612 – 28614

23. TCI_00030182 – 30184

24. TNC Ad Sales Documents (Attorney's Eyes Only) [Excel Files]

25. TNC00001 – 00004

26. TNC00895-U

27. TNC00896-U

28. TNC00897-U

29. TNC00898-U

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 43



30. TNC00902 – 906
31. TNC00908 – 924
32. TNC00926 – 931
33. TNC01007 – 1009
34. TNC01100 – 1114
35. TNC01129 – 1148
36. TNC01239-U
37. TNC01282 – 1299
38. TNC01344 – 1364
39. TNC01554 – 1559
40. TNC01593 – 1597
41. Thrive Natural Care_Unit+$Sales_1Q17-1Q21_v6-30-21
42. Facebook AdsManager
43. Google Ads Keyword Planner
44. KtMine 107425
45. KtMine 11814
46. KtMine 13423
47. KtMine 47363
48. KtMine 4965
49. KtMine 60021
50. KtMine 68786
51. Royalty Range RR20180122T00104
52. Royalty Range RR20180416T00901
53. Royalty Range RR20210528T04301
54. Royalty Range RR20201006T04302
55. Royalty Range RR20140327T06001
56. Royalty Range RR20201103T00902
57. Thrivecare.co
58. Thrivecausemetics.com
59. uspto.gov
60. royaltysource.com
61. royaltystat.com
62. ktmine.com
63. royaltyrange.com
64. epollresearch.com
65. 15 U.S.C. § 1117(a)
66. *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 170, 170 U.S.P.Q. 369 (2d Cir. 1971)

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 51**

TNC v. TCI
Damages Analysis
July 5, 2021

**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 44



67. *American Farm Bureau Federation v. Alabama Farmers Federation, et al.*, 935 F. Supp. 1533 – USDC, M.D. Alabama, 11th Circuit (1996)

68. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993)

69. *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004-05 (9th Cir. 2004)

70. *Romag Fasteners, Inc. v. Fossil Group, Inc.*, No. 18-1233, Slip Op. (S. Ct. April 23, 2020)

71. *Adray CBS v. Adry-Mart, Inc.*, 68 F.3d 362 (9th Cir. 1995)

72. *Big Tire Dealers Inc. v. Goodyear Tire and Rubber Company*, 561 F.2d 1365, 1374-76 (10th Cir. 1977).

73. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014)

74. US Trademark Registration No. 4467942

75. US Trademark Application No. 86721790

76. US Trademark Application No. 87895130

77. https://www.beautyindependent.com/thrive-causemetics-major-dtc-beauty-business/

78. https://bestcompany.com/makeup-stores/company/thrive-causemetics

79. https://en.wikipedia.org/wiki/Kathy_Hilton

80. https://today.yougov.com/topics/entertainment/explore/tv_personality/Mario_Lopez

81. https://www.instyle.com/beauty/makeup/thrive-causemetics-karissa-bodnar; TNC01143 – 48

82. https://en.wikipedia.org/wiki/Tommy_Bahama

83. https://www.tommybahama.com/

84. https://fashionunited.com/i/most-valuable-fashion-brands/

85. https://today.yougov.com/ratings/consumer/popularity/clothing-footwear-brands/all

86. https://businessnes.com/top-100-luxury-fashion-brands-list/

87. https://en.wikipedia.org/wiki/Kathy_Hilton

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 52**



**CONFIDENTIAL – Attorneys' Eyes Only**
Expert Report of David Drews, CLP
Page 45

## APPENDIX C
## COMPENSATION

IPmetrics is being compensated on this project at a rate of $450 per hour for all services related to the presentation of this report.  Expenses are not included in the above fee and are billed separately.  Time involved in the preparation for deposition and/or trial, as well as expert testimony given in deposition and/or trial, will also be compensated at $450 per hour.  IPmetrics' compensation is not dependent, in any way, upon the conclusions reached during the performance of the analysis.

© 2021 IPmetrics LLC - Dissemination is subject to the Stipulated Protective Order.

**DREWS OPP. 53**