Rollin Ransom (State Bar No. 196126)
rransom@sidley.com
Lauren M. De Lilly (State Bar No. 301503)
ldelilly@sidley.com
Paula Salazar (State Bar No. 327349)
psalazar@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

*Attorneys for Defendant Thrive
Causemetics, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THRIVE CAUSEMETICS, INC.,<br><br>Defendant. | Case No. 2:20-cv-9091-PA-AS<br><br>**DECLARATION OF KARL J. SCHULZE IN SUPPORT OF DEFENDANT THRIVE CAUSEMETICS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

Declaration of Karl Schulze ............................................................................. 2

Exhibit A ........................................................................................................... 7

DECLARATION OF KARL SCHULZE  IN SUPPORT OF DEFENDANT THRIVE CAUSEMETRICS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>DECLARATION OF KARL J. SCHULZE</u>

I, Karl J. Schulze, declare and state as follows:

1.     I have been retained as an expert by counsel for Thrive Causemetics, Inc. ("TCI"), the Defendant in the above-captioned.  I make this declaration in support of TCI's Opposition to Plaintiff Thrive Natural Care, Inc.'s ("Plaintiff") Motion for Partial Summary Judgment ("Motion") (ECF No. 40).  I have personal knowledge of the facts stated in this declaration, and I would and could testify as to them if called as a witness in this action.

2.     I am a Certified Public Accountant (CPA), holding active licensee status in both California and Florida, a Certified Fraud Examiner (CFE), Certified Valuation Analyst (CVA) and hold the Certified in Financial Forensics credential (CFF) from the American Institute of CPAs.  I have over 45 years of financial, executive management, entrepreneurial and advisory experience across a broad base of industries, including serving as a financial executive for both public and privately owned companies.  I am experienced and certified in corporate governance and directorship.  I hold a Certificate in Corporate Governance from Tulane University School of Law, as well as a Certificate in Corporate Directorship from UCLA.  I am certified in corporate directorship by Institutional Shareholder Services (ISS).  I have consulted and testified on many matters in complex business disputes, economic damages and lost profits claims, and intellectual property infringement, among others, and have served as an expert on matters related to a variety of businesses and industries.  I have been designated as an expert in over 600 matters, and have testified over 200 times at trials, depositions and arbitration proceedings.  I have qualified in numerous Courts.  A true and correct copy of my CV is included as Exhibit 1 to the Rebuttal Report of Karl J. Schulze, which is attached hereto as **<u>Exhibit A</u>**.

3.     I was asked by counsel for TCI to provide an opinion regarding damages claimed in this matter by Plaintiff, as quantified and opined on by David Drews, CLP in his Expert Report dated July 5, 2021 ("Drews Report").  In particular, I was asked

1  to consider whether the damage calculations and opinions regarding same offered by

2  Mr. Drews: (a) utilize appropriate methodologies and assumptions; (b) are adequately

3  supported by the facts and circumstances, as well as materials relied on by Mr. Drews

4  in performing his analysis; and (c) arrive at monetary damage conclusions that are

5  reasonable and supportable in light of available data, historical information, and other

6  facts and circumstances relative to the parties and their businesses.

7      4.     I understand that the Drews Report has been submitted in support of

8  Plaintiff's Motion as an exhibit to Mr. Drews' declaration (ECF No. 34-5).  I also

9  reviewed Mr. Drews' declaration, which updates the calculations set forth in the

10  Drews Report.

11      5.     I reviewed the Drews Report and set forth the results of my evaluation as

12  well as my own analysis in a rebuttal report.  My opinions were based on my analysis

13  and review as described herein, calculations and preparation of analyses as needed,

14  independent research as deemed appropriate, as well as my over 45 years' experience

15  as a Certified Public Accountant, financial forensics expert, business and financial

16  executive, entrepreneur, consultant and analyst.  A true and correct copy of the

17  rebuttal report that I prepared on behalf of TCI is attached hereto as **Exhibit A**.

18      6.     The Drews Report purports to analyze various legal documents related to

19  the above-captioned action, relevant websites, deposition transcripts, financial

20  information for the parties, and, generally, the skincare industry and licensing and

21  other royalty-based agreements related to similar products in order to provide an

22  opinion as to the measure and amount of damages in this action, in the form of

23  disgorgement of TCI's profits, a reasonable royalty, and corrective advertising.  Mr.

24  Drews' declaration follows the same methodology as the Drews Report.

25      7.     In order to assess damages suffered by Plaintiff, Mr. Drews, using sales

26  and cost data provided by TCI regarding the allegedly infringing products, calculated

27  the net profits on these items realized by TCI over the relevant period.

28      8.     Mr. Drews calculates TCI's profits related to sale of the allegedly

1  infringing products to be $21,524,380 ($11,698,497 if Buildable Blur CC Cream and

2  Filtered Effects Blurring Primer are excluded).  Even if TCI's profits is an

3  inappropriate measure of damage in this case as a legal matter (an issue as to which I

4  offer no opinion), I disagree with Mr. Drews' calculations.

5       9.    I understand that Mr. Drews eliminated the category called "Other

6  Overhead" from his analysis of the TCI-produced revenue and expense sheets.

7  Eliminating this category from his calculations of deductible costs was improper.  The

8  "Other Overhead" category includes allocated costs such as supervisory personnel,

9  managerial oversight, office and facility costs, among others, without which the

10 product sales process could not take place.  I understand that Ned Menninger has

11 testified on behalf of TCI that this category of cost consists of employee salaries and

12 benefits, rent, charitable donations, legal fees, non-legal professional fees, income tax,

13 travel, entertainment, and public relations, which are outside of direct cost of goods

14 sold, but which nonetheless contributed to the sales of the allegedly infringing

15 products.  I understand that Mr. Menninger further explained that these expenses are

16 allocated to specific products based on the proportion of units sold of each product

17 during a given period.  Thus, the allocation of such costs is reasonably tied to the sale

18 of the allegedly infringing products; it is my opinion that such costs must be included

19 in the determination of net profit on the allegedly infringing product sales.

20      10.   In addition, while Mr. Drews suggests that a defendant's profits "to some

21 extent is a proxy for Plaintiff's lost sales, profits and expansion opportunities," it does

22 not appear that Mr. Drews performed an analysis or damages calculation based on any

23 alleged "lost sales, profits and expansion opportunities."  Nor has Mr. Drews

24 performed an analysis or damages calculation based on alleged harm to Plaintiff's

25 goodwill or reputation, if any exists.  Moreover, given that Plaintiff's net revenue was

26 $302,591, $487,223 and $700,910 for 2018, 2019 and 2020, respectively, and the fact

27 that it incurred a net loss for each period from 2013 through 2020, the value of

28 goodwill impairment, if any, would be minimal at best.

-4-

11.     I further understand that an award of a defendant's profits is limited to profits "attributable to" the alleged infringement.  In that regard, I have seen no clear indication or evidence that any sales made by TCI represented a misappropriation of any "goodwill" Plaintiff may have built, or were at any time based on or related to Plaintiff's reputation or goodwill.  Nor have I seen evidence that the "Thrive Causemetics" brand name is itself a particular driver of sales.

12.     Instead, as discussed in my report and incorporated herein by reference, I understand that TCI's sales and profits appear to be attributable principally to (a) a highly loyal, largely-female customer base; (b) a clearly-defined mission that includes a philosophy of supporting women's causes; (c) specific cosmetics-related products that established the company; and (d) high quality products.  While such factors do not lend themselves to precise calculation in considering what portion, if any, of profits is attributable to alleged trademark infringement, to the extent any portion of TCI's profits is attributable to the alleged infringement at all (which for reasons stated above, I do not believe to be the case), my opinion is that the attributable portion is minimal, at best.

13.     I also note that Plaintiff's other putative expert, Rob Wallace, conducted a consumer survey that he contends shows net confusion of 54.5% to 56.6%.  While I understand that TCI has challenged the validity of Mr. Wallace's survey and opinion, to the extent it is credited, it suggests that any profits allegedly "attributable" to infringement should not exceed 56.6% of TCI's profits, after applying all of the other reductions set forth above (as – based on Mr. Wallace's work – at least 43.4% of consumers are not confused, and profits from sales to those consumers are thus not even arguably attributable to any infringement).

14.     I also understand that, in some infringement cases, the plaintiff may be entitled to a corrective advertising award as damages.  I understand that the purpose of any award of corrective advertising damages is to allow the plaintiff to reestablish its mark's reputation and standing, and to correct any harm done by the defendant's

infringement, not to create a windfall for the plaintiff; accordingly, I understand that such an award must not exceed the damage (if any) to the value of the mark .  I have not seen evidence reflecting what Plaintiff believes to be the pre-infringement value of its mark or the damage (if any) to the value of the mark, and understand that Mr. Drews did not undertake that analysis here.  I note that, based on Plaintiff's financial performance since 2013 and the fact that Plaintiff has incurred significant net losses throughout its history, applying traditional methods of valuing a trademark, which are based on the mark's ability to generate a continuing stream of profits to its owner, the overall value of Plaintiff's mark is minimal at best (and any damages to that value an even smaller figure).

15.    I further note that Plaintiff's advertising expenses, stated as a percentage of net revenue, have been on a generally downward trajectory throughout the relevant period, with 2020 coming in at 38% of net revenue.  This downward trend provides no indication that Plaintiff has taken any action, measured in monetary terms, to boost its profile or to engage in enhanced, corrective advertising.  Plaintiff's total selling and marketing expense figures, none of which Plaintiff asserted were "corrective" in nature, were $142,289, $258,493, and $265,305 for the years 2018, 2019 and 2020, respectively.  This means that the $5,796,527 that Mr. Drews asserted would be an appropriate amount for corrective advertising, would in fact be equal to *8.7 times Plaintiff's total sales & marketing expenditures* for the 2018 through 2020 period, and *3.8 times Plaintiff's total net revenue* for the same period.  In my opinion, there is simply no basis for any such award.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct.

Executed this 23rd day of August, 2021, at Los Angeles, California.

_____

Karl J. Schulze

-6-

1  Rollin Ransom (State Bar No. 196126)
   rransom@sidley.com
2  Lauren M. De Lilly (State Bar No. 301503)
   ldelilly@sidley.com
3  Ryan Stasell (State Bar No. 307431)
   rstasell@sidley.com
4  Paula Salazar (State Bar No. 327349)
   psalazar@sidley.com
5  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite-4000
6  Los Angeles, CA 90013
   Telephone: (213) 896-6000
7  Facsimile: (213) 896-6600

8  *Attorneys for Defendant Thrive*
   *Causemetics, Inc.*
9

10

11                  UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13

14  THRIVE NATURAL CARE, INC.          Case No. 2.20-cv-9091-PA-AS

15              Plaintiff,             **REBUTTAL EXPERT REPORT OF**
                                       **KARL J. SCHULZE**
16       v.

17  THRIVE CAUSEMETICS, INC.,

18              Defendant.

19

20

21

22            **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

23

24

25

26

27

28

**THRIVE NATURAL CARE, INC.**
v.
**THRIVE CAUSEMETICS, INC.**
Case No. 2:20-cv-9091-PA-AS

**EXPERT REPORT OF KARL J. SCHULZE, CPA, CVA, CFE, CFF**

I.      **_ASSIGNMENT_**

I was asked to provide an opinion regarding damages claimed in this matter by Plaintiff Thrive Natural Care, Inc. ("TNC" or "Plaintiff"), as quantified and opined on by David Drews, CLP in his Expert Report dated July 5, 2021. In particular, I was asked to consider whether the damage calculations and opinions regarding same offered by Mr. Drews:

- Utilize appropriate methodologies and assumptions;
- Are adequately supported by the facts and circumstances, as well as materials relied on by Mr. Drews in performing his analysis;
- Arrive at monetary damage conclusions that are reasonable and supportable in light of available data, historical information, and other facts and circumstances relative to the parties and their businesses.

My opinions are based on my analysis and review as described herein, calculations and preparation of analyses as needed, independent research as deemed appropriate, as well as my over 45 years' experience as a Certified Public Accountant, financial forensics expert, business and financial executive, entrepreneur, consultant and analyst. My report is prepared and submitted in accordance with Federal Rule of Civil Procedure 26.

II.      **_QUALIFICATIONS_**

I am a Certified Public Accountant (CPA), holding active licensee status in both California and Florida, a Certified Fraud Examiner (CFE), Certified Valuation Analyst (CVA) and hold the Certified in Financial Forensics credential (CFF) from the American Institute of CPAs. I have over 45 years of financial, executive management, entrepreneurial and advisory experience across a broad base of industries, including serving as a financial executive for both public and privately-owned companies. I am experienced and certified in corporate governance and directorship. I hold a Certificate in Corporate Governance from Tulane University School of Law, as well as a Certificate in Corporate Directorship from UCLA. I am certified in corporate directorship by Institutional Shareholder Services (ISS). I have had extensive forensic and litigation consulting and

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 2 of 16

expert witness experience, as well as expertise in crisis and insolvency management, strategic planning, fraud investigation and prevention, mergers and acquisitions, and business valuation. I have consulted and testified on many matters in complex business disputes, economic damages and lost profits claims, intellectual property infringement, lender and professional liability, employment, personal injury, merger and acquisition matters, governance, alter ego, fraud and forensic reconstruction, real estate and construction disputes, among others, and have served as an expert on matters related to a variety of businesses and industries. I have been designated as an expert in over 600 matters, and have testified over 200 times at trials, depositions and arbitration proceedings. I have qualified in numerous Courts. Attached as Exhibit 1 to this report is my Curriculum Vitae, and attached as Exhibit 2 is a summary of my testimony, publishing and speaking history.

## III.   *BACKGROUND*

TNC, per information derived from the First Amended Complaint in this matter, along with that available at TNC's website, is a Delaware corporation headquartered in San Francisco, California founded in 2013. Its stated mission at founding was "making the best natural skincare products on the market using regenerative agricultural methods to produce unique botanical oil 'hero ingredients' for its products, while also restoring degraded landscapes and improving livelihoods of rural farming communities." TNC sells its products via its website, as well as through retail arrangements with Amazon, Walmart.com, as well as at Whole Foods on the West Coast.[1]

TNC, on its website, currently lists seventeen products or product combinations as available, including, listed in order of "best-selling", the following:[2]

- Daily Defense Sunscreen Balm
- Face Wash
- Energy Scrub
- Face Balm
- Shave Oil
- Shave and Shower Soap Bar
- Sensitive Skin face Balm – Stress Defense
- Sensitive Skin Face Wash – Stress Defense
- Grooming Oil

---

[1] First Amended Complaint filed July 1, 2021, ¶¶ 2, 7, 15
[2] https://thrivecare.co/

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 3 of 16

- BodyShield 50
- Several kits that incorporate various of the above-listed items, including:
  - VIP Kit: Look better and Live Healthier
  - Deep Clean Kit
  - Sensitive Skin Kit
  - Shave & Restore Kit
  - Own the Day Kit
  - Daily Defense Kit
  - Shave, Shower & Restore Kit

Thus, excluding the combination "Kits", TNC currently lists ten unique products on its site.

Thrive Causemetics, Inc. ("TCI") is a Delaware corporation and maintains headquarters in Bellevue, Washington with offices located in Los Angeles, California.[3] TCI, founded in 2015, sells a variety of beauty-related products, primarily through its website, including products for eyes (mascara, eyeliner, eye primer, eyeshadow, lashes), eyebrows (eyebrow liner, eyebrow gel), face (face primer, CC cream, concealer, contour, highlighter), cheek (blush, bronzer), lips (lip liner, lip gloss, lipstick), accessories (brushes, tools, bags), and sets including assortments of these items.[4] More recently, TCI has added several products that are currently at issue in this action, including cleansers, moisturizers, peel and sleep masks, as well as a color-correcting product called "Buildable Blur CC Cream."

TCI has historically distributed its products primarily through its website, as well as a number of smaller boutiques, along with a limited-product, limited-time offering at Ulta Beauty. It has not authorized its products to be sold on Amazon or through any other online retailer.[5]

The First Amended Complaint in this matter, filed as of July 1, 2021, asserts that TCI has used confusingly similar imitations of TNC's "Thrive" marks on the allegedly infringing skincare-related products that is likely to cause confusion, deception, and mistake by creating the false impression that TCI's allegedly infringing skincare products are manufactured or distributed by TNC, are associated or connected with TNC, or have the sponsorship, endorsement, or approval of TNC.[6]

---

[3] Defendant Thrive Causemetics, Inc.'s Answer to First Amended Complaint and Affirmative Defenses, filed July 15, 2021, ¶ 8
[4] https://thrivecausemetics.com/products
[5] Deposition of Karissa Bodnar, June 3, 2021, at 79:10-14, 81:20-25, 82:18-85:5.
[6] First Amended Complaint filed July 1, 2021, ¶ 74

*Schulze Haynes Loevenguth & Co.*

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 4 of 16

TNC's claims, as enumerated in the First Amended Complaint, include:

- Federal Trademark Infringement under the Lanham Act, including a request for injunctive relief and damages, costs and fees under 15 U.S.C. §§ 1114, 1116 and 1117[7]
- Federal Unfair Competition, based on allegedly false representations, designations and designations of origin, referencing 15 U.S.C. § 1125(a)[8]
- Common Law Trademark Infringement[9]
- Common Law Unfair Competition[10]
- Violation of California Business and Professions Code § 17200[11]

## IV.   *DOCUMENTS CONSIDERED*

Attached as Exhibit 3 to this report is a list of the documents I have reviewed and considered in performing my analysis in this matter.

## V.   *ANALYSIS AND OPINIONS*

My analysis included the following steps, discussed in more detail below:

- Review of all documents and data listed above;
- Analysis and calculations as deemed appropriate;
- Consideration of TNC's damage claims and potential support and quantification of same, assuming liability is found to exist;
- Development of opinions and findings as discussed below.

I understand that the parties hold differing positions with regard to the facts, actions and responsibilities of each as related to the events at issue in this matter. My analysis below makes the assumption that liability is ultimately found to exist, and evaluates the quantification of TNC's alleged damages, if any.

---

[7] First Amended Complaint filed July 1, 2021, ¶¶ 73-79
[8] First Amended Complaint filed July 1, 2021, ¶¶ 80-87
[9] First Amended Complaint filed July 1, 2021, ¶¶ 88-94
[10] First Amended Complaint filed July 1, 2021, ¶¶ 95-99
[11] First Amended Complaint filed July 1, 2021, ¶¶ 100-105

*Schulze Haynes Loevenguth & Co.*

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 5 of 16

## TNC's Alleged Damages as Calculated and Opined Upon by David Drews, CLP

Mr. Drews calculates damages in three categories:

- Defendant TCI's profits on sales of the allegedly infringing products
- A hypothetical reasonable royalty, determined under a *Georgia-Pacific* analysis
- Corrective advertising

Below I examine and respond to TNC's, and Mr. Drews, damage methodologies, assumptions, source data reliability and usage, and conclusions, in each of these categories.

### *TCI's Profits on Allegedly Infringing Sales*

Mr. Drews calculates TCI's profits on the allegedly infringing products to be $20,401,507 ($11,698,497 if Buildable Blur CC Cream is excluded, as I believe it should be – see further discussion below). However, there are a number of reasons why this is an inappropriate measure of damage, if any, in this case.

In order to assess damages suffered by TNC in this category, Mr. Drews, using sales and cost data provided by TCI regarding the alleged infringing products, calculated the net profits on these items realized by TCI over the relevant period.

Mr. Drews, in his base calculations in this category, includes the entirety of the product listing as relevant to his calculations, including the TCI product known as Buildable Blur CC Cream. The "CC" in this product name refers to "Color Correcting", and, per the description of the product on TCI's website, its Blur Effect Technology "diffuses and blurs the look of skin imperfections like a photo filter for your face, blurring the look of pores, fine lines and texture to reveal naturally flawless coverage with a skin-like finish," and further it is infused with Smart Pigment Technology "to brighten and revive dull complexions while visibly correcting and concealing redness, rosacea, discoloration, sun spots and dark spots." Buildable Blur CC Cream is also "available in 18 inclusive shades." Based on this description, and the range of shades offered, the product appears to be more in line with concealers or foundation products, which would generally be considered as makeup products rather than skin care items. This characterization was confirmed by TCI founder Karissa Bodnar in her deposition taken June 3, 2021.[12] Moreover, and notably, I do not see any comparable

---

[12] Deposition of Karissa Bodnar, June 3, 2021, at 92:4 – 93:21

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 6 of 16

"color correcting" product in TNC's product line, nor does such a product with "color correcting" benefits appear to be the type of products offered by TNC. Mr. Drews, recognizing this fact, referred to the product as "hybrid" in his analysis, and provided an alternative set of damage figures that eliminate this item from his calculations. I agree with Mr. Drews' alternative approach, and that that this item should be eliminated from the calculations.

I also note that, while Mr. Drews utilized the cost data as provided in the TCI-produced revenue and expense sheets, he eliminated the category called "Other Overhead" from the costs considered. This category would include allocated costs such as supervisory personnel, managerial oversight, office and facility costs, among others, without which the product sales process could not take place. As testified to by Ned A. Menninger, on behalf of TCI, this category of cost includes items such as salary, rents, office expenses and other administrative costs that are outside of direct cost of goods sold, but that nonetheless contributed to the sales of the allegedly infringing products.[13] Mr. Menninger noted in his deposition testimony that these expenses, as other categories, are allocated to specific products based on the proportion of units sold of each product during a given period.[14] Thus, the allocation of such costs is reasonably tied to the sale of the allegedly infringing products; it is my opinion that such costs must be included in the determination of net profit on the allegedly infringing product sales.

### Defendant's Profits as a Measure of Damages

In trademark cases such as this one, confusion, if any, may occur in either forward or reverse fashion. "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder. . . . reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one."[15] In other words, reverse confusion occurs "when [the junior mark holder] saturates the market with a similar trademark and overwhelms [the senior mark holder]."[16] TNC, in its First Amended Complaint, asserts infringement in the form of forward and reverse confusion, as well as unfair competition.[17]

---

[13] Deposition of Ned A. Menninger, testifying as a Rule 30(b)(6) witness on behalf of TCI, May 27, 2021, at 55:24-58:2; 76:12-18; 82:18-25

[14] Menninger Deposition, May 27, 2021, at 57:15-21

[15] *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

[16] *Id.*

[17] First Amended Complaint filed July 1, 2021, ¶ 1

Thrive  Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 7 of 16

TNC's net revenue for each of the past three full years was as follows (a summary of TNC's historical profit and loss data is at Exhibit 4 to this report):[18]

| Year | Net Revenue |
|------|-------------|
| 2018 | $302,591 |
| 2019 | $487,223 |
| 2020 | $700,910 |

TCI, in response to TNC's Original Complaint in this matter, produced net revenue and net income data on a larger set of products (excluding items such as bags and accessories); TNC has since filed its First Amended Complaint, alleging infringement only as to TCI's products it has identified as falling into the skincare category. Nonetheless, the data included in that earlier net revenue listing is useful for comparative purposes, as follows:[19]

| Year | Net Revenue |
|------|-------------|
| 2018 | $ 75,467,607 |
| 2019 | $101,197,369 |
| 2020 | $148,967,035 |

Thus, TCI being the much larger company, it is far more likely that reverse, rather that forward, confusion would occur, if in fact any such confusion among consumers can be shown.

In performing background research for my analysis in this matter, I referred, among other sources, to McCarthy on Trademarks and Unfair Competition, in particular, to § 23:10, covering reverse confusion. In that section, it is noted that profits of the infringer are not generally a proper basis for recovery in reverse confusion cases, since the alleged infringer is not, in such instances, seeking to take away the plaintiff's customers through confusion. The text of § 23:10 cites to a number of cases on the topic in support of this, including *Koninkijke Philips Electronics N.V v. Hunt Control Systems, Inc.*, *Fabick, Inc. v. JFTCO, Inc.*, and *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*[20] Applying this standard, and assuming TNC's claim is for reverse confusion (as seems likely to be the case), there would be no basis for any award of profits.

---

[18] TNC01282-TNC01299
[19] TCI_00022753-TCI_00022767
[20] McCarthy on Trademarks and Unfair Competition, § 23:10; *Koninkijke Philips Electronics N.V v. Hunt Control Systems, Inc.*, No. 11-3684 (SRC)(CLW), 2016 WL 3545529, at *27 (D.N.J. 2016); *Fabick, Inc. v. JFTCO, Inc.*, 944

*Schulze Haynes Loevenguth & Co.*

Thrive  Natural Care, Inc.
v. Thrive  Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 8 of 16

The McCarthy treatise suggests that a plaintiff in a reverse confusion case may be able to recover damages for devaluation of the mark in the form of harm to plaintiff's goodwill and reputation. Mr. Drews, based on my review of his report and supporting calculations, did not perform an analysis or damage calculation based on alleged harm to TNC's goodwill or reputation, if any exists. Even if he had, given that TNC's net revenue was $302,591, $487,223 and $700,910 for 2018, 2019 and 2020, respectively, and the fact that it incurred a net loss for each period from 2013 through 2020, the value of goodwill impairment, if any, would be minimal at best.

Even if TNC were legally entitled to pursue an award of TCI's profits, I understand that such an award is limited to profits "attributable to" the alleged infringement. In that regard, I have seen, as noted above, no clear indication or evidence that any sales made by TCI represented a misappropriation in any fashion of TNC's "goodwill", or were at any time based on or related to TNC's reputation or goodwill. Nor have I seen evidence that the "Thrive Causemetics" brand name is itself a particular driver of sales. Instead, I understand that TCI's sales and profits appear to be attributable principally to (a) a highly loyal, largely-female customer base; (b) a clearly-defined mission that includes a philosophy of supporting women's causes; (c) specific cosmetics-related products that established the company; and (d) high quality products. Indeed, these factors were identified to TNC by Phil Segal, a person identified as a "Chief Optimizer of Digital Media" that I understand was consulted by TNC, as well as by Ms. Bodnar.[21] While such factors do not lend themselves to precise calculation in considering what portion, if any, of profits is attributable to alleged trademark infringement, to the extent TCI's profits are attributable to the alleged infringement at all (which for reasons stated above, I do not believe to be the case), my opinion is that the portion of the profits attributable to the alleged infringement is minimal, at best.

### *Reasonable Royalty*

In appropriate cases, a plaintiff may recover its identifiable, direct losses in addition to any improper gains realized by the defendant, as long as it can be demonstrated that those two measures are not cumulative or overlapping. TNC, to my knowledge and based on the analysis and opinions

---

F.3d 649, 658-69 (7th Cir. 2019); *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436, 51 U.S. P.Q.2d 1920 (7th Cir. 1999).
[21] See article as cited by Mr. Segal in TCN00835, at https://www.beautyindependent.com/thrive-causemetics-major-dtc-beauty-business/

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 9 of 16

expressed in Mr. Drews' July 5, 2021 report, has not asserted, nor has it demonstrated in any way, that it has experienced actual direct losses of business as a result of any alleged acts by TCI.

A reasonable royalty calculation, done in the absence of any direct, measurable losses by the plaintiff, would represent an alternative, rather than additive, measure of damages. I understand that courts in trademark cases may not permit an award of a reasonable royalty in the absence of a prior history of licensing by the plaintiff or defendant, or other legitimate basis on which to calculate a royalty.[22] Based upon my review of the materials provided to me, I do not see any evidence of a prior history of licensing by either TNC or TCI, or any evidence of serious negotiations of such a licensing arrangement between the parties, in which case an award of a reasonable royalty would be inappropriate here.

In the event the court concludes that a reasonable royalty is available, I nonetheless believe that Mr. Drews' analysis is fatally flawed. Mr. Drews asserts that a reasonable royalty in this case would amount to $4,607,130 ($2,866,637 if Buildable Blur CC Cream is excluded). He arrives at this conclusion by applying a royalty rate of 8% to TCI's allegedly infringing net sales, ostensibly through application of a *Georgia-Pacific* analysis. A number of the *Georgia-Pacific* factors work against this measure of damages as being appropriate, and Mr. Drews' conclusion as to an applicable rate.

*Applicability of Georgia-Pacific Factors*

The 15 "*Georgia-Pacific*" factors to be considered in arriving at a reasonable royalty arise from the *Georgia-Pacific Corp. v. United States Plywood Corp.* case in 1970.[23] It is important to note that these factors were intended for application in *patent* licensing situations, and their applicability to trademark licensing determinations is less certain. Below I respond to Mr. Drews use of certain of those factors, and his conclusions regarding each.

First, the application of the *Georgia-Pacific* factors is based on a hypothetical negotiation between the parties. There of course has been none here, although Mr. Drews cites to a set of notes from a telephone call that, among other topics, references a "mechanism of licensing or royalty that acknowledges [TNC's] mark." The same set of notes indicates "he [Alex McIntosh] does not have

---

[22] *M2 Software Inc. v. Viacom Inc.*, 223 F. App's 653, 655 (9th Cir. 2007); *Marketquest Group, Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018).
[23] *Georgia-Pacific Corporation v. U. S. Plywood-Champion Papers Inc.*, 446 F.2d 295 (2d Cir. 1971).

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 10 of 16

a suggestion" as to the royalty amount and "he's [Alex McIntosh] not saying we [TCI] would pay $250K per year to them."[24] This of course would not rise to the level of a negotiation, but would, if anything, appear to set a potential cap of $250,000 per year as to any royalty amount. Mr. Drews inexplicably ignores this statement by Mr. McIntosh, and instead calculates a proposed royalty that is *multiples* of this figure. This fact alone seriously undermines the legitimacy of Mr. Drews' putative analysis.

As to the specific *Georgia-Pacific* factors:

- Factors 1 and 2 relate to royalties historically received by the licensor (TNC) or paid by the licensee (TCI). Neither company appears to have any history of licensing, thus these factors are not applicable (and may, as discussed above, render a reasonable royalty an inappropriate measure of damages in this action).

- Factor 3 refers to the nature and scope of the hypothetical license. As mentioned, there is no history of licensing or negotiations between the parties concerning licensing, and as such, this would be purely speculative. Mr. Drews notes the lack of any prior licensing history and that such any license would be non-exclusive, but he inexplicably ignores that a complete lack of a prior licensing history militates against any royalty whatsoever.

- Factor 4 covers the licensor's established policy. While Mr. Drews refers to a past opening offer of 20% by TNC to one other alleged infringer, I have seen no indication that any negotiations or a final licensing arrangement resulted from these "offers." Thus, there appears to be no "established policy" in place.

- In evaluating factor 5, which considers the relationship between the hypothetical licensor and licensee, Mr. Drews describes TNC and TCI as "direct competitors", and alludes to a "cannibalization of TNC's own products", although I have seen no evidence put forth to indicate that has occurred, or would occur.

- Mr. Drews' evaluation of factor 6, relating to convoyed sales, correctly notes that there is no such accusation or claim in this matter, but nonetheless considers this factor as relevant in his analysis.

---

[24] TCI_00028612

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 11 of 16

- *Georgia-Pacific* factor 8 is worded "The established profitability of the product made under the patent, its commercial success; and its current popularity." Aside from the question of whether the *Georgia-Pacific* factors, which clearly are patent-focused, are relevant at all in this case, Mr. Drews concludes that factor 8 is "highly relevant" to his analysis, and reaches the conclusion, without further elaboration or support, that the profit margin realized by TCI on sales of its products "clearly argues for a relatively high royalty rate."

- Factors 9 and 10 relate to asset utility and advantages, and the nature of the patented invention. While this of course relates specifically to patented inventions, Mr. Drews refers here to the goodwill and positive reputation of TNC, which appears to concede that he is proceeding on a reverse confusion theory in conducting his analysis, and which, combined with *Georgia-Pacific* factors 11 and 12, discussed below, covering use by the alleged infringer and customary/marketplace royalty rates, lends itself to a discussion of the mark itself.

*Strength of Mark*

This action does not involve a claim that TCI is infringing on TNC's branding in the form of its logo, since the two company's logos are not similar (see below). Rather, as stated in the First Amended Complaint, and reinforced in Mr. Drews' report, the claim relates to the use of the word "Thrive" in connection with the products at issue. While TCI has asserted that it does not intentionally use the word "Thrive" absent the "Causemetics" portion of their mark[25], TNC has pointed to instances of that having occurred.

Generally-Used Logos of the Two Companies:

 

In evaluating trademark damages, in particular when one is attempting to assert a reasonable royalty, strength of the mark must be considered in addition to the various other factors that may be in play. The word "Thrive", unlike other well-known and perhaps unique brand names, is commonplace and ubiquitous, used by many retailers and others. In its June 2,

---

[25] Deposition of Karissa Bodnar, taken June 3, 2021, 61:14-21

Thrive  Natural Care, Inc.
v. Thrive  Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 12 of 16

2021 supplemental  response  to TNC's Interrogatory  No. 28 (incorrectly  numbered  as
Interrogatory  No. 19), TCI notes that there are "over 900 active  trademark  registrations  and
applications  in the USPTO  that include  the exact  word 'THRIVE'  alone or in combination
with other words", and further  lists a sampling  of such marks that have been either registered
or approved  by the USPTO.[26]  This fact would  argue  for a royalty  rate, if any is deemed
appropriate  or practicable,  at the lower end of any indicative  range.

In discussing  *Georgia-Pacific*  factor 11, Mr. Drews indicates  that the use of the "Thrive"
mark by TCI is "anecdotally  evidenced"  by the fact that, in conducting  his research  in this
matter, he has noted numerous  banner  ads on websites  and bumper  ads on YouTube  videos
for TCI's products,  and concludes  that this factor is highly  relevant  "in light of the extensive
use." However, it is significant  to note that much of this advertising  relates  to TCI's color
cosmetics,  and TNC removed  this category  of products  from the operative  First Amended
Complaint.

In his evaluation  of *Georgia-Pacific*  factor 12, Mr. Drews importantly  notes that there is no
history  of trademark  license  agreements  by either party in this matter.  However, he then
goes on to discuss  twelve  trademark  license  agreements  that he deems relevant,  listed in
Schedule  5 to his report.  It should  be noted that, even though  Mr. Drews notes that any
license  between  TNC and TCI would  be non-exclusive,  most of the allegedly  comparable
license  agreements  he considers  are in fact exclusive.  The exclusive  licenses  (which are
discussed  further  with respect to factor 15) are of limited,  if any, utility  in this analysis:  both
the driver  of such licenses  (which  are often  intended  to facilitate  product  offerings  or
expansions  that the licensor  would  not or cannot  manufacture  directly)  and the economics
associated  with such arrangements  differ  from the sort of non-exclusive  license  that would
be at issue here.

One, the Tommy  Bahama-Boomer  Holdings  agreement,  is non-exclusive.  Mr. Drews refers
to Tommy  Bahama  as not being  recognized  as a famous  clothing  brand, thus the fact that it
was still able to obtain  a 10% net royalty  license  positively  informs  his analysis  related to
the hypothetical  TNC-TCI negotiation.  In fact, the Tommy  Bahama  brand of clothing,  along
with a variety  of other licensed  products,  is sold through  its own retail stores, recently
numbering  over 150 worldwide,  and through  major retailers  and resorts.  The Tommy

---

[26] Defendant Thrive Causemetics, Inc.'s Supplemental Responses to Plaintiff Thrive Natural Care, Inc.'s First Set of
Interrogatories, June 2, 2021

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 13 of 16

Bahama name is also attached to a chain of restaurants and bars and the Tommy Bahama Home brand of casual furniture and accessories; it would be difficult to define the Tommy Bahama mark as weak in any fashion.[27]

- *Georgia-Pacific* factor 15 calls for an estimate of the amount that the licensor and the licensee would have agreed on in a hypothetical negotiation. In evaluating this factor, Mr. Drews evaluates a number of other license agreements, including a number of well-known names such as Kathy Ireland, Tommy Bahama and KRH Licensing (Kathy Hilton). A table at Schedule 5 to Mr. Drews' report arrives at a mean of 5.63% and a median of 5.00%.[28] Mr. Drews, however, concludes that an 8% royalty rate is appropriate, based on his review of a 2006 agreement between OmniReliant Corp (licensee) and KRH Licensing Company (licensor) for the rights to the "Kathy Hilton" brand name. First, in that agreement, the licensee was a newly-formed entity specifically formed to manufacture and sell products branded with the "Kathy Hilton" name. The "Hilton" name is iconic and unique; it is difficult to imagine how this can be deemed comparable to "Thrive", as I discuss in detail above. Also of note is the fact that the Hilton agreement calls for royalty rates of 3% and 4% on infomercial-based sales, but 8% on other sales channels, which would include retail store sales. It is unclear as to just how much, if any, of OmniReliant's proposed sales were expected to be outside the infomercial mode. Thus, Mr. Drews' conclusion that the 8% rate is appropriate is unsupported and unsupportable, assuming, of course, that any royalty is even deemed appropriate at all.

In light of the foregoing, there is no basis under the law as I understand it or the facts in this case to support a reasonable royalty. In all events, if a reasonable royalty were deemed to be appropriate here, such an award must be substantially less than $250,000 per year, as this was Mr. McIntosh's opening figure and he stated that any royalty would not be this amount.[29]

### Corrective Advertising

In order to arrive at his corrective advertising figure of $5,515,537 ($3,558,649 excluding Buildable Blur CC Cream), Mr. Drews simply takes the total advertising expenditures by TCI as allocated to the products at issue in this case, during the periods 2018, 2019, 2020 and 2021 through May, and

---

[27] https://www.tommybahama.com
[28] Expert report of David Drews, CLP, July 1, 2021
[29] TCI_00028612.

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 14 of 16

applies 25% to this total, based on a guideline ostensibly employed by the Federal Trade Commission in government enforcement actions.

However, in calculating any amount claimed as damages for "corrective advertising" an expert should first ascertain whether the plaintiff has, to date, spent any funds on what could be reasonably deemed to be advertising that is intended to overcome the alleged harm from defendant's acts. Also, quite importantly, the amount claimed as corrective damages must be proportional and reasonable.

In *Binder v. Disability Group*, for example, the court found that "Plaintiffs have presented no evidence of any expenditures actually made to restore the value of their marks", and instead sought 25% of the defendant's advertising budget as a measure of corrective advertising. The court noted that it was "concerned with the lack of any reasonably accurate measure with which to assess an appropriate award of corrective advertising." It declined to award a specific amount for corrective advertising, noting that "[a]ny award based on an arbitrary percentage of Defendant's advertising budget is not sufficiently tethered to correcting the nature of the harm suffered in this case."[30]

While Mr. Drews cites to the *Adray v. Adry-Mart* case as acknowledgement of a 25%-of-defendant's-advertising factor, it should be noted that the appellate court, in that case, did not authorize such an award (and instead referenced "the amount [the plaintiff] would be required to spend in the future to dispel the confusion caused by defendant's infringement" – an amount which Mr. Drews does not purport to calculate), and in any event explicitly noted the danger of overcompensation if such award exceeds the value of the mark at issue, and called for a limiting instruction in order to avoid such overcompensation.[31]

Also of significance is the fact that the *Adray v. Adry-Mart* appellate decision notes that Plaintiff Lou Adray was relying on *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, a case which Mr. Drews also lists among his documents relied upon. In that case, while the court did refer to the cited FTC 25% rule, that 25% was applied to a figure that was already calculated at 28% of Defendant Goodyear's advertising budget. In other words, this 25% times 28% application results in a figure that is just 7% of Goodyear's advertising budget, not a full 25%.[32]

TNC's advertising expenditures since 2013, along with TNC's summarized revenue and expenses by year, are shown at Exhibit 4 to this report. As demonstrated by that Exhibit, TNC's advertising

---

[30] *Harry J. Binder, et al. v. Disability Group, Inc., et al.*, 772 F. Supp. 2d 1172 (2011)
[31] *Adray's CBS v. Adry-Mart, Inc.*, 76 F.3d 984 (1995)
[32] *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Company*, 561 F.2d 1365 (1977)

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 15 of 16

expense, stated as a percentage of net revenue, has been on a generally decreasing trend throughout the period, with 2020 coming in at 38% of net revenue. While such trend is to be expected during early-stage growth years, the trend in more recent years provides no indication that TNC has taken any action, measured in monetary terms, to boost its profile or to engage in enhanced, corrective advertising.

In monetary terms, TNC's total selling and marketing expense, none of which is asserted to have been "corrective" in nature, has been $142,289, $258,493, and $265,305 for the years 2018, 2019 and 2020, respectively. This means that Mr. Drews assertion that a proper amount for corrective advertising is $5,515,537 would be equal to *8.3 times TNC's total sales & marketing expenditures* for the 2018-2020 period, and *3.7 times TNC's total net revenue* for the same period. In my opinion, there is simply no basis for any such award.

The purpose of any award of corrective advertising damages is to allow the plaintiff to reestablish its mark's reputation and standing, and to correct any harm done by the defendant's infringement, not to create a windfall for the plaintiff. Thus, an award of corrective advertising damages, if appropriate at all, is capped at an amount sufficient to restore the value of the mark to its pre-infringement position. I have not seen evidence reflecting what TNC believes to be the pre-infringement value of its mark. However, based on TNC's financial performance since 2013 and the fact that TNC has incurred significant net losses throughout its history, applying traditional methods of valuing a trademark, which are based on the mark's ability to generate a continuing stream of profits to its owner, the value of TNC's mark is minimal at best, and any corrective advertising award should be limited accordingly.

If any amount of corrective advertising is awarded here, it certainly should not exceed the *entire* amount TNC has spent on sales and marketing during the alleged period of infringement (which was, as noted at Exhibit 4 to this report, $666,087 for the period 2018 through 2020 combined). Of course, this amount spent by TNC on its *total* sales and marketing would be greatly overstated as a potential measure of corrective advertising damages, since, while TNC has not provided detail as to just how its "sales and marketing" dollars were spent, it is highly likely that the majority of these expenditures were made to promote TNC's specific products, rather than for brand development or awareness. Further, such amount as a potential measure of corrective advertising damages would also be significantly overstated based on the premise that any such award should not exceed the value of the mark; as noted, TNC has not provided a measure of the mark's value, but any such

Thrive Natural Care, Inc.
v. Thrive Causemetics, Inc.
Expert Report of Karl J. Schulze
Page 16 of 16

amount is minimal at best. [33] Finally, this of course assumes that an award of corrective advertising damages is ultimately found to be appropriate in this case at all.

My hourly rate for performing my work in this matter is $525 per hour. Members of my staff who have assisted me in my analysis range from $225 to $400 per hour.

### *Supplementation*

In the event additional information is made available that would impact the results of any prospective damage analysis, or I am asked to respond to amended or updated damage figures put forth by TNC or its retained expert(s), upon receipt and analysis of same, I will supplement my report as deemed appropriate.

## VI.   *EXHIBITS*

Attached are the following Exhibits:

1.   Curriculum Vitae of Karl J. Schulze
2.   Testimony, Speaking and Publishing History of Karl J. Schulze
3.   Documents and Information Reviewed and Considered in Course of Analysis
4.   TNC's Historical Financial Data and Analysis Based Thereon

_____
       Karl J. Schulze
       July 26, 2021

---

[33] While it may or may not be indicative of the current value of TNC's mark, in an agreement dated May 23, 2013, in which Alex McIntosh and Ecomundi Ventures, LLC assigned the rights to the Thrive trademark, along with the domain names Thrivenaturalcare.com and Thrive-natural.com and a variety of other noted technology, to Thrive Natural Care, Inc., a value of $25.00 was assigned to this intellectual property in total, as of that date (a point in time at which I understand TNC claims that the mark had already acquired goodwill). *See* TNC01408.

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Exhibit 1

# Karl J. Schulze, CPA, CVA, CFE, CFF

## *Summary*



Over 45 years of financial, executive management, entrepreneurial and advisory experience across a broad base of industries. Experienced and certified in corporate governance and directorship. Extensive forensic, litigation consulting and expert witness experience, as well as expertise in crisis and insolvency management, strategic planning, fraud investigation and prevention, mergers and acquisitions, and business valuation. Mr. Schulze has consulted and testified on matters involving complex business disputes, economic damages and lost profits claims, intellectual property infringement, lending custom and practice, professional standards, merger and acquisition matters, corporate governance, board responsibilities, alter ego/integrated enterprise, fraud and forensic reconstruction, real estate, development and construction disputes, personal injury, employment and wrongful death matters, among others, and has served as expert on matters related to a variety of businesses and industries. Included in his current consulting practice areas:

- *Forensic*: Mr. Schulze has served as a consultant or expert in over 500 litigated matters, with testimony provided as expert in well over 250 instances, including trial testimony in Federal Court as well as a number of State Courts, deposition, arbitration and mediation. He has also conducted and led numerous valuation engagements and fraud investigations.

- *Turnaround / Business Recovery / Crisis Management*: Mr. Schulze has served as advisor to owners, creditors and management in business crisis and recovery situations.

- *Advisory*: Mr. Schulze has acted as advisor to companies and individuals in evaluating and structuring acquisitions or sales of businesses, as well as on issues related to succession planning, executive duties and board responsibilities.

## *Business and Professional History*

**Current Position:  Founding Shareholder and President of the Firm of Schulze Haynes Loevenguth & Co., Los Angeles and Orange County, CA; South Florida**

Schulze Haynes Loevenguth & Co. provides services in three distinct areas:

- *Forensic Services*, including litigation consulting, expert testimony, fraud investigation and business valuation.
- *Turnaround* and reorganization management.
- *Transaction Advisory* services in business and real estate buy/sell transactions, succession planning and board governance matters.

Schulze Haynes Loevenguth & Co. has also invested, through affiliated entities, in real properties, as

## Karl J. Schulze, CPA, CVA, CFE, CFF
(Page 2 of 6)

well as in distressed companies. As President of the Firm, Mr. Schulze oversees and is actively involved in providing services in each of these areas, along with his specialized practice area providing corporate governance education and advisory services to management, boards and professional groups, as well as testimony on the topic of governance. In this arena, Mr. Schulze has testified numerous times on governance issues, alter ego and related topics.

### Previous Positions:

**Hankin & Co., Los Angeles, California; 1990-2000**
**Managing Director, 1996-2000, Principal 1990-1996.** Provided client service in the areas of:

- Expert Services – consulting and expert testimony in complex business disputes; economic modeling and analysis; fraud investigation and fraud prevention consulting.
- Asset Recovery – assisted lenders, receivers and government agencies in identifying and pursuing potential sources of recovery on behalf of failed financial institutions.
- Management Consulting – strategic advisory, growth planning, turnaround and insolvency, bridge management services to companies undergoing transition.
- Investment Banking – engaged in assisting buyers and sellers in company sales and acquisitions, business valuation services, and strategic financial advisory services to middle market companies.

**Gulfstream Land & Development Corp., Plantation, Florida; 1981-1990**

One of the largest developers/builders in the Southeastern U.S. Operations included community development, construction (hotel, office, high-rise condominiums, municipal projects); homebuilding (approximately 500 - 1,000 single-family homes per year); utility, country club and restaurant operations, and building products companies.

**Vice President - Finance / Treasurer** (1986-1990). Responsible for:

- Strategic planning and budgeting.
- Cash and debt management.
- Negotiation of major transactions (joint ventures, significant land sales, acquisitions).
- New project/acquisition search.
- Project feasibility analyses.
- Supervision of accounting for all joint ventures.
- Accounting and reporting compliance reviews.
- Oversight of Internal Audit Department.

**Controller** (1984-1986). Responsibilities included: Internal/external financial and management reporting, accounting for real estate joint ventures, financial planning and analysis. Played a key role in taking the Company through a leveraged buyout in 1986.

**Internal Audit Manager** (1981-1983). Responsible for financial and operational audits of all company divisions and subsidiaries, as well as in-depth investigation of suspected

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

# Karl J. Schulze, CPA, CVA, CFE, CFF
### (Page 3 of 6)

misappropriations or other improprieties.

**American Savings and Loan Association, Miami, Florida; 1978-1981**
**Internal Auditor (1978); Controller, Mortgage Operations (1979-1981).**

Financial and operational auditing; supervision of all accounting and reporting functions for two mortgage banking companies; develop of tracking and reporting systems and policies.

**Arthur Young & Company, CPA's, Miami, Florida; 1976-1978**

**Senior Auditor.** Planned, performed and supervised audits in banking, real estate, manufacturing, service, wholesale and retail. Also involved in management advisory engagements.

**Alexander Grant & Company, CPA's, Miami, Florida; 1974 – 1976**

**Staff Auditor.** Performed audits in manufacturing, financial services, retail/wholesale industries. Tax planning and preparation for corporations, partnerships and individuals. Served as controller for a number of client companies.

## _Entrepreneurial_

**Citivest, Inc.**

Previously among the ownership group of Citivest, a real estate investment, development and management company, with holdings in residential income property, industrial and commercial properties, as well as shopping centers in the Southwestern U.S.  Mr. Schulze later served in an advisory capacity to the Company, and is currently an investor in a number of LLCs under Citivest management.

**Figueroa Partners / SHL Equities**

These entities were created in order to take advantage of investment opportunities that arise from SHL's consulting and advisory activities.  Mr. Schulze provided oversight and evaluation of proposed investments, as well as arranging for equity funds as required.

**TKS Events**

Co-owner of this full-service event planning and production company.  Areas of service included corporate events, charitable and civic organizations, weddings and private parties. Mr. Schulze's role included providing business guidance and strategic planning and financing involvement.

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

## Karl J. Schulze, CPA, CVA, CFE, CFF

(Page 4 of 6)

**The Solutions Group:**

Formed and operated a consulting firm focused on assisting family-owned businesses in achieving growth objectives, as well as working with troubled companies in developing and implementing out-of-court restructuring plans.

**Gallery 2000, Inc.**

Co-Founder of a chain of art galleries and wholesale/retail framing operations. Took business through an acquisition and expansion period, then successfully sold operations.

**Real Estate Investment LLCs**

Member of seven separate real estate investment LLCs, holding and managing commercial and residential properties, as well as property for future development, in Southern California, Phoenix and Las Vegas.

## *Education, Licenses and Professional Designations*

- Bachelor of Business Administration - Accounting - University of Miami, Coral Gables, Florida
- Certificate in Corporate Directorship, UCLA - passed certification examination, accredited by Institutional Shareholder Services (ISS)
- Certificate in Corporate Governance – Tulane University School of Law
- Master of Science – Information Technology Management - Colorado Tech University
- Tulane University Freeman School of Business MBA Certificate Program
- Certified Public Accountant - California (Certificate Number 65764)
- Certified Public Accountant - Florida (Certificate Number 5507)
- Certified in Financial Forensics by the American Institute of Certified Public Accountants
- Certified Fraud Examiner (Certification Number 26296)
- Certified Valuation Analyst (Certification Number 00160)
- Certificate Program in Investment Analysis - Wharton School, University of Pennsylvania
- Leadership Los Angeles Graduate (9-month program) and current Leadership LA Fellow
- National Association of Certified Valuation Analysts – CVA Training Institute
- Mediation Training – Basic and Advanced Courses
- Real Estate Sales License (inactive)
- Average over 60 hours annually in continuing education courses related to accounting and auditing, business valuation, fraud, litigation issues, technology and business reorganization (detailed list of recent courses available on request)

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

## Karl J. Schulze, CPA, CVA, CFE, CFF
(Page 5 of 6)

### *Memberships, Boards and Honors*

- Member, American Institute of Certified Public Accountants.
- Member, California Society of Certified Public Accountants (Charter Member, Litigation Consulting and Dispute Resolution Section, Member, Economic Damages and Business Valuation Committees)
- Member, National Association of Certified Valuation Analysts
- Member, Association of Certified Fraud Examiners
- Board of Overseers, University of Miami School of Business, 2017-Present
- Member, Society of University Founders, University of Miami
- Member, University of Miami President's Council
- Board of Directors, Alzheimer's Association of Los Angeles, Riverside and San Bernardino Counties, Treasurer and member of Executive Committee, 2004 to 2012.
- Board of Directors, Alzheimer's Greater Los Angeles (2016-Present); Co-Chair of Development and Governance Committee; Chair of Audit Committee
- Chairman, Los Angeles Business Council, 1997/1998 and 1998/1999. Board of Directors, 1991 to 1999.  Executive Committee, Business and Finance Task Force.
- Member, Board of Directors, Paralysis Project of America 1992 to 2007, Executive Committee Member and Treasurer 1997-2003.
- Los Angeles County Public Library System, Past Member of Board of Strategic Advisors
- Past Member of Board of Directors, Los Angeles Economic Development Corporation
- Past Board Member and Treasurer, Los Angeles Regional Food Bank

### *Publishing and Speaking*

- Seminar Presentation: "Effective Use of Experts in Business and Real Estate Litigation"
- Seminar Presentation: "Turnaround: Identifying and Fixing a Business Crisis"
- "Solving the Mysteries of the Pyramids" – The CPA Expert, American Institute of American Institute of Certified Public Accountants
- Author of a number of firm "briefs", case studies intended for distribution to clients and other interested parties.
- "Capitalization of Interest on Real Estate Development Projects" - "CPA Today" Magazine.
- "Small Business: How to Survive Tough Times" - "Los Angeles Now"
- "Strategies for Small Businesses" - San Diego Business Journal, Sacramento Business Journal
- "Using Damages Experts Effectively":  Michigan Lawyers Weekly, Los Angeles Daily Journal, Los Angeles Business Journal
- Presentation: Business Ethics Case Studies, first presented May 2005 and continuing
- Speech: "Fraud Schemes – One Step Over the Line" – first presented April 2008, continuing

# Karl J. Schulze, CPA, CVA, CFE, CFF
### (Page 6 of 6)

*Business Ethics Initiative:*

Beginning in December 2003, and continuing through the present, Mr. Schulze has been associated with the Business Ethics Program at the University of Miami, and the primary sponsor of the Ethics Debate Program and Ethics Society.  In conjunction with this effort, Mr. Schulze has been instrumental in the design and development of programs, has spoken on the topic of Business Ethics, and has annually sponsored the Business Ethics Debate Contest at the University of Miami.  Mr. Schulze also lectures and speaks on the topic of ethics in business.

In June, 2015, Mr. Schulze was honored by the University of Miami with the Henry King Stanford Alumnus of the Year Award.

*Testimony and Consulting History:*

- (See separate list – available on request)

References and client testimonials are available on request

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Exhibit 2

# Karl J. Schulze, CPA, CVA, CFE, CFF

## Testimony, Publishing and Speaking History

### Trial Testimony (Last Four Years):

- The Palace at Washington Square LLC v. Mechanics Bank (2021) (State of California Superior Court, County of San Francisco)
- GreatCollections.com v. Vadim Polyak and Michael Johnson (2021) (State of California Superior Court, County of Orange)
- AAPM, Inc. dba ABM v. Patricia White; Parks White Properties, LLC, et al. (2020) (State of California Superior Court, County of Los Angeles)
- Maxtrade, LLC v. Wing Lee; Li Fan Li; Yee Hung Lee (2020) (State of California Superior Court, County of Los Angeles)
- HayDX, Inc. v. HayDay Farms, Inc.; Lyndon Ichida (2020) (State of California Superior Court, County of Los Angeles)
- Tabletop Media, LLC v. Citizen Systems of America Corporation (2019) (State of California Superior Court, County of Los Angeles)
- Michael Pucci v. Glovebrush Corporation, Debra Underwood, et al. (2019) (State of California Superior Court, County of Los Angeles)
- Vanessa Scott-Allen v. KRM, Inc.; Thomas Keller; French Laundry Restaurant Corporation, et al. (2019) (State of California Superior Court, County of Napa)
- Tempic Five, LLC v. Kings Co., LLC (2019) (State of California Superior Court, County of Orange)
- Republic of Korea v. John Ahn, et al. (2019) (State of California Superior Court, County of Los Angeles)
- Aviation Facilities Inc. v. Air Combat USA, Inc. (2019) (State of California Superior Court, County of Orange)
- Orange County Neurological Medical Group., Inc. v. John W. Chen, M.D. (2019) (State of California Superior Court, County of Orange)
- Susanna Contreras Smith v. Montebello Unified School District. (2018) (State of California Superior Court, County of Los Angeles)
- ULRS, Inc. dba United Legal Group v. Badax, LLC, David Weisman, et al. (2018) (State of California Superior Court, County of Los Angeles)
- Peter Hui v. Petra Pacific Insurance Services, Inc., et al. (2018) (State of California Superior Court, County of Los Angeles)
- G.P.P., Inc. d/b/a Guardian Innovative Solutions v. Guardian Protection Products, Inc. (2017) (United States District Court, Eastern District of California, Fresno Division)
- Metamorfyx, LLC v. Vanek Vickers & Masini (2017) (State of California Superior Court, County of Los Angeles)
- William Gray v. Patricia and Richard Rathburn (2017) (State of California Superior Court, County of Los Angeles)

Karl J. Schulze
Testimony History Last Four Years (Continued)
Page 2 of 4

- Strength Farm, LLC v. The Heron Family Trust (2017) (State of California Superior Court, County of Los Angeles)
- Thomas Sargent v. The Trustees of California State University (2017) (State of California Superior Court, County of Sonoma)
- Paul B. Marcus v. Wedbush Securities, Inc. (2017) (Financial Industry Regulatory Authority)

**Deposition Testimony (Last Four Years):**

- The Palace at Washington Square LLC v. Mechanics Bank (2021) (State of California Superior Court, County of San Francisco)
- Peter Stark v. Bond Creative, LLC (2021) ADR Services Arbitration
- G.P.P., Inc. dba Guardian Innovative Solutions v. Guardian Protection Products, Inc., et al. (2021) (United States District Court, Eastern District of California)
- Centerpointe TIC #1, LLC, et al. v. Vereit, Inc., et al. (2020) JAMS Arbitration
- Richard B. Somers and Terrie Somers, Trustees of the Richard & Terrie Somers Family Trust of 2000 v. The Rector, Wardens and Vestrymen of St. Mary of the Angels Parish in Hollywood, Los Angeles, California (2020) (State of California Superior Court, County of Los Angeles)
- Stanley Jacobs Productions, Ltd. v. Thane Direct, Inc., et al. (2020) (United States District Court, Central District of California)
- Preservation, Finance, Rehabilitation & Development, LP v. Associated Financial Corporation; Management Assistance Group, Inc., et al. (2020) (State of California Superior Court, County of Los Angeles)
- Windsor Capital Group, Inc. v. John Moller; Dansk Investment Group, Inc., et al. (2020) (State of California Superior Court, County of Santa Barbara)
- Maxtrade, LLC v. Wing Lee; Li Fan Li; Yee Hung Lee (2020) (State of California Superior Court, County of Los Angeles)
- Southern California Regional Rail Authority dba Metrolink v. Hyundai Rotem Company, et al. (2019) (United States District Court, Central District of California)
- Sansi North America, LLC v. LG Electronics USA, Inc. (2019) (United States District Court, Central District of California)
- Sean Harris, Michelle Harris v. Mid-Century Insurance Company, Farmers Insurance Company, et al. (2019) (State of California Superior Court, County of Sonoma)
- Sylvia Williams v. Lucas Health Partners, LLC (2019) (State of California Superior Court, County of Los Angeles)
- Vanessa Scott-Allen v. KRM, Inc.; Thomas Keller; French Laundry Restaurant Corporation, et al. (2019) (State of California Superior Court, County of Napa)
- Michael Pucci v. Glovebrush Corporation, Debra Underwood, et al. (2019) (State of California Superior Court, County of Los Angeles)
- Republic of Korea v. John Ahn, et al. (2019) (State of California Superior Court, County of Los Angeles)

Karl J. Schulze
Testimony History Last Four Years (Continued)
Page 3 of 4

- Tempic Five, LLC v. Kings Co., LLC (2019) (State of California Superior Court, County of Orange)
- Tabletop Media, LLC v. Citizen Systems of America Corporation (2018) (United States District Court, Central District of California, Western Division)
- Gradillas Court Reporters, Inc. v. Cherry Bekaert, LLP, et al (2018) (United States District Court, Eastern District of Virginia)
- Bridgepoint Construction Services, Inc. v. Vista Oceano La Mesa Venture, LLC (State of California Superior Court, County of Santa Barbara)
- Mish Hsu v. Mitsuru Garzuzi, et al. (2018) (State of California Superior Court, County of Los Angeles)
- Frances I. Coyle v. Coldwell Banker Residential Brokerage Company (2018) (State of California Superior Court, County of Los Angeles)
- Susanna Contreras Smith v. Montebello Unified School District. (2018) (State of California Superior Court, County of Los Angeles)
- Alan W. Hammond v. Thermo Fisher Scientific, Inc., Invitrogen Corporation, Life Technologies, Inc. and Life Technologies Corporation (In Arbitration)
- Gregory J. Lorber v. Jeffer Mangels Butler & Mitchell, LLP (2018) (State of California Superior Court, County of Los Angeles)
- Forever 21, Inc. v. Gucci America, Inc. and Guccio Gucci S.P.A. (2018) (United States District Court, Central District of California, Western Division)
- ULRS, Inc. dba United Legal Group v. Badax, LLC, David Weisman, et al. (2018) (State of California Superior Court, County of Los Angeles)
- Academy of Country Music v. Robert E. Romeo (2017) (JAMS Arbitration)
- Peter Hui v. Petra Pacific Insurance Services, Inc., et al. (2017) (State of California Superior Court, County of Los Angeles)
- R2R Capital – Del Mar Lender, LLC v. 13594 Mar Scenic Drive, LLC, et al. (2017) (State of California Superior Court, County of San Diego)
- Metamorfyx, LLC v. Vanek Vickers & Masini (2017) (State of California Superior Court, County of Los Angeles)
- UM Corporation v. Tsuburaya Productions, Ltd. (2017) (United States District Court, Central District of California, Western Division)
- Strength Farm, LLC v. The Heron Family Trust (2017) (State of California Superior Court, County of Los Angeles)
- Capital One Financial Corp., et al. v. Intellectual Ventures Management, LLC, et al. (2017) (United States District Court, District of Maryland)
- Bubble Pony, Inc. v. Facepunch Studios, Ltd. (2017) (United States District Court, District of Minnesota)
- Jason Kussman and Leslie Kussman v. Hammer and Steel, Inc.; ABI, et al. (2017) (State of California Superior Court, County of Orange)
- Hana Financial, Inc. v. Tri-Star Dyeing & Finishing, Inc. (2017) (State of California Superior Court, County of Los Angeles)

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Karl J. Schulze
Testimony History Last Four Years (Continued)
Page 4 of 4

## Arbitration Testimony and Mediation Participation

- SFO Technologies Private, Ltd. v. Brian Shane, et al. (JAMS)
- Centerpointe TIC #1, LLC, et al. v. Vereit, Inc., et al. (2020) (JAMS)
- Hayday Farms, Inc. v. FeeDx Holding, Inc.: Damages Phase (2020) (AAA)
- Hayday Farms, Inc. v. FeeDx Holding, Inc.: Liability Phase (2019) (AAA)
- Gregory J. Lorber v. Jeffer Mangels Butler & Mitchell, LLP (2018) (ADR Services)
- Alan Hammond. V. Thermo Fisher Scientific, Inc., et al. (2018) (AAA)
- Academy of Country Music v. Robert E. Romeo (2018) (JAMS)

In addition, Mr. Schulze has participated in numerous mediations and settlement negotiations.

## Publishing, Seminars and Speaking/Teaching:

- Accounting and Auditing Overview for Attorneys / Interpretation of Financial Statements, 2003 to the present
- Talking the Talk, Business Ethics Initiative.  Business Miami Magazine, Spring 2005.
- Case Study Analysis in Fraud, First Presentation 2006, Continuing
- Presentation: "Recognizing and Fixing a Business Crises," LAAC Business Task Force, October 24, 2002, and subsequent presentations to the present
- Case Studies in Business Ethics, presented at the University of Miami as Visiting Lecturer, 2003 to the present
- "Effective Use of Experts in Business and Real Estate Litigation" (Seminar) – presented to various law firms and attorney groups 1998-Present
- "Using Damages Experts Effectively":  Michigan Lawyers Weekly, October, 2002; Los Angeles Daily Journal October, 2002; Los Angeles Business Journal, November, 2002
- "Solving the Mystery of the Pyramids" The CPA Expert, Spring/Summer 1998
- Tips for Small Business on Weathering Recession, Sacramento Business Journal 1994
- Business Survival Strategies, San Diego Business Journal 1994
- Small Business Dilemma:  How to Survive Until the Good Times Come, Los Angeles NOW, 1993
- Effective Use of Damages Experts in Business and Real Estate Litigation, Michigan Lawyers Weekly, October, 2002
- Using Damages Experts More Effectively, Daily Journal, October, 2002
- University of Miami, Executive in Residence Lecturer, 2013-Present

*Schulze Haynes Loevenguth & Co.*

Schulze Decl. Ex. A

Exhibit 3

Schulze Decl. Ex. A

**Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.**
**Expert Report of Karl J. Schulze, CPA, CVA, CFE, CFF**
**List of Documents Reviewed and Considered**

- First Amended Complaint filed July 1, 2021
- Amended Protective Order dated March 1, 2021
- Markup transition of TNC's Complaint to Proposed First Amended Complaint
- Expert report of David Drews, CLP, dated July 5, 2021
- TNC Summary Financial Statements (TNC01282-1299)
- TCI Revenue and Cost Data – Various Products (TCI_00030182)
- TCI Revenue and Cost Data – Buildable Blur CC Cream (TCI_00030183-30184)
- Deposition of Ned A. Menninger, taken May 27, 2021, with Exhibits
- Deposition of Karissa Bodnar under 30(b)(6), taken June 3, 2021, with Exhibits
- Plaintiff TNC's Initial Disclosures, dated January 26, 2021
- TNC's Responses to TCI's First Set of Interrogatories, dated March 15, 2021
- Defendant TCI's Supplemental Responses to TNC's First Set of Interrogatories, dated June 2, 2021
- 15 U.S.C. 1117(a)
- *Adray v Adry-Mart Inc*., 68 F.3d 362 (9th Cir. 1995)
- Big O Tire Dealers Inc. v Goodyear Tire and Rubber Co., 561 F.2d 1365 (10th Cir. 1977)
- *Georgia-Pacific Corporation v. U. S. Plywood-Champion Papers Inc*., 446 F.2d 295 (2d Cir. 1971)
- TCI Schedule of Net Revenue and Costs (TCI_00014424)
- TCI Presentation Slides (TCI_00019097-19116)
- E-Mail from Karissa Bodnar to Jennifer Cohen (Sephora) dated July 7, 2016, with accompanying slide package (TCI_00019120-19159)
- TCI net revenue and cost production in response to earlier TNC claims (TCI_00022753-22767)
- TCI product listing (TCI_00026950-26955)
- Various correspondence with others regarding use of name (TCI_00028581-28582, TNC01007-1009, TNC01593-1594)
- TNC sales data by product (TNC02042)
- US Trademark Application No. 86721790
- US Trademark Application No. 87895130
- US Trademark Registration No. 4467942
- McCarthy on Trademarks and Unfair Competition § 30:84 Corrective advertising award
- *Binder v Disability Group Inc*. 772 F.Supp.2d 1172
- McCarthy on Trademarks and Unfair Competition §23:10 Reverse confusion
- *M2 Software Inc. v Viacom Inc*. 223 Fed.Appx 653 (9th Cir. 2007)
- *Marketquest Group Inc. v BIC Corporation* 316 F.Supp.3d 1234
- *Quia Corporation v Mattel Inc*. (2011)
- License and Distribution Agreement between GMS Capital Corp. and Canada Inc., dated March 16, 2012

- License Agreement between I-M1, LLC and NuGene International, Inc. dated March 31, 2017
- License Agreement between Pez-Mar, Via Mar Productions, Inc. and Boldface Licensing and Branding, dated July 11, 2012
- Trademark License Agreement between Tommy Bahama Group, Inc. and Boomer Holdings, Inc., 2019
- License Agreement between Lifeguard Licensing Corp. and Canbiola, Inc., dated January 2020
- License Agreement between Tikun Olam, LLC and Jay Pharma, Inc., dated January 10, 2020
- Notes from Telephone Call with Alex McIntosh June 27, 2019 (TCI_00028612-28614)
- License Agreement between KRH Licensing Company, LLC and OmniReliant Corp. dated October 13, 2006, related to the Kathy Hilton trademark (TNC02071-2091)
- License Agreement between Parlux Fragrances, Inc., and Genesis International Marketing Corporation, dated June 9, 1998 (TNC02092-2115)
- Trademark License and Technical Assistance Agreement between Europe Craft Imports, Inc. and Azurel, Ltd., dated May 15, 1996
- License Agreement between Parlux Fragrances, Inc. and Gund, Inc., dated April 6, 2005, related to the mark babyGUND (TNC02145-2174)
- License Agreement between Kathy Ireland Worldwide, Inc. and NuGene, Inc., dated November 2014 (TNC02175-2220)
- Trademark License and Supply Agreement between Color Me Beautiful, Inc. and The StephanCo., dated March 7, 1996
- Article from Beauty Independent including interview with K. Bodnar, April 2, 2019, at https://www.beautyindependent.com/thrive-causemetics-major-dtc-beauty-business/
- E-mail from Phil Segal dated August 12, 2019 at TNC00835-837
- Restricted Stock Purchase Agreement at TNC01408-1422
- Defendant Thrive Causemetics, Inc.'s Answer to First Amended Complaint and Affirmative Defenses, filed July 15, 2021

Exhibit 4

Schulze Decl. Ex. A

**Thrive Natural Care, Inc.**
**Statements of Income and Expense**

| Description | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| | | | | Fiscal year..................... | | | | |
| Gross Retail Sales | $ - | $ 39,590 | $ 66,936 | $ 76,614 | $ 205,421 | $ 396,106 | $ 679,521 | $1,003,379 |
| Net Revenue | - | 16,255 | 30,009 | 41,766 | 140,766 | 302,551 | 487,223 | 700,910 |
| Cost of Sales | - | 16,062 | 29,652 | 28,983 | 93,970 | 202,175 | 301,684 | 434,862 |
| Gross Margin | - | 193 | 357 | 12,783 | 46,796 | 100,416 | 185,539 | 266,048 |
| Operating Expenses | | | | | | | | |
| Sales & Marketing | 15,477 | 103,832 | 94,702 | 77,416 | 159,464 | 142,289 | 258,493 | 265,305 |
| Product Development | 65,865 | 46,150 | 57,983 | 45,812 | 68,233 | 50,221 | 29,998 | 36,269 |
| General & Administrative | 60,976 | 121,190 | 109,931 | 116,470 | 176,247 | 258,997 | 164,437 | 253,572 |
| Total Operating Expenses | 142,318 | 271,172 | 262,616 | 238,698 | 403,944 | 451,507 | 452,928 | 555,146 |
| Operating Margin | (142,318) | (270,979) | (262,259) | (225,915) | (357,148) | (351,091) | (267,389) | (289,098) |
| Other Income (Expense) | (1,022) | 6,022 | (20,452) | (41,765) | (61,020) | (146,714) | (121,311) | (116,326) |
| Taxes | | 2,352 | 647 | 1,915 | 1,700 | 1,847 | 1,792 | 1,405 |
| Net Income (Loss) | $(143,340) | $(267,309) | $(283,358) | $(269,595) | $(419,868) | $(499,652) | $(390,492) | $ (406,829) |
| Loss as percentage of net revenue | N/A | -1644.5% | -944.2% | -645.5% | -298.3% | -165.1% | -80.1% | -58.0% |
| Sales & marketing as % of net revenue | | 639% | 316% | 185% | 113% | 47% | 53% | 38% |
| Sales & Marketing total 2016-2020 | | | | | | | | $ 666,087 |

Source:  TNC01282 - TNC01299