1   Rollin Ransom (State Bar No. 196126)
    rransom@sidley.com
2   Lauren M. De Lilly (State Bar No. 301503)
    ldelilly@sidley.com
3   Paula Salazar (State Bar No. 327349)
    psalazar@sidley.com
4   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite-4000
5   Los Angeles, CA 90013
    Telephone:  (213) 896-6000
6   Facsimile:  (213) 896-6600

7   *Attorneys for Defendant Thrive
    Causemetics, Inc.*

8

9

10                  UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12

13  THRIVE NATURAL CARE, INC.          Case No. 2:20-cv-9091-PA-AS

14          Plaintiff,                 **DEFENDANT THRIVE
                                        CAUSEMETICS, INC.'S RESPONSE
15     v.                              TO PLAINTIFF'S PROPOSED
                                        FINDINGS OF FACT AND
16  THRIVE CAUSEMETICS, INC.,          CONCLUSIONS OF LAW**

17          Defendant.                 Trial Date:   November 9, 2021
                                        Time:         9:00 a.m.
18                                      Place:        Courtroom 9A

19

20

21

22

23

24

25

26

27

28

1    Pursuant to the Court's Civil Trial Scheduling Order (ECF No. 19) (the

2 "Order"), attached hereto as Exhibit A is Defendant Thrive Causemetics, Inc.'s

3 response to Plaintiff Thrive Natural Care, Inc.'s Proposed Findings of Fact and

4 Conclusions of Law (ECF No. 122), highlighted in accordance with paragraph III.B.1

5 of the Order.

6

7    DATED:  October 21, 2021          SIDLEY AUSTIN LLP

8                                       By: */s/ Rollin A. Ransom*
                                        Rollin A. Ransom (State Bar No. 196126)
9                                       rransom@sidley.com
                                        Lauren M. De Lilly (State Bar No. 301503)
10                                      ldelilly@sidley.com
                                        Paula C. Salazar (State Bar No. 327349)
11                                      psalazar@sidley.com
                                        SIDLEY AUSTIN LLP
12                                      555 West Fifth Street
                                        Los Angeles, CA 90013
13                                      Telephone:  (213) 896-6000
                                        Facsimile: (213) 896-6600
14

15

16                                      *Attorneys for Defendant Thrive*
                                        *Causemetics, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT THRIVE CAUSEMETICS, INC.'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# EXHIBIT A

Stephen McArthur (SBN 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (SBN 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM, P.C.
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff*
*Thrive Natural Care, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THRIVE CAUSEMETICS, INC.,<br><br>Defendant. | Case No. 2:20-CV-9091-PA-AS<br><br>**PLAINTIFF THRIVE NATURAL CARE, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Judge:** Hon. Percy Anderson<br>**Trial Date**: November 9, 2021<br>**Final Pretrial Conf.:** October 22, 2021<br>**Courtroom:** 9A |

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

# TABLE OF CONTENTS

I.    PROPOSED FINDINGS OF FACT ................................................................ 1

    A.    Thrive Natural Care's Registered Trademarks ..................................... 1

    B.    Assignment of '058 Application to Thrive Natural Care ..................... 2

    C.    Thrive Natural Care's Use of the THRIVE Mark................................. 3

    D.    Thrive Natural Care's Recognition and Publicity................................ 6

    E.    Thrive Natural Care's Trademark Enforcement .................................. 7

    F.    Thrive Causemetics' Origin and Knowledge of Thrive Natural Care by August 2015.................................................................... 7

    G.    Thrive Causemetics' Skincare Expansion Plans and Request to Use the THRIVE Mark ......................................................... 9

    H.    USPTO's Rejection of Second Thrive Causemetics Application ...... 10

    I.    Thrive Causemetics' Expansion Into Skincare Market ..................... 11

    J.    Ms. Bodnar's 2019 Call to Ask Permission to Use THRIVE Mark ............................................................................ 16

    K.    Appearance of Parties' Products Together Online ............................ 16

    L.    Actual Confusion Between Parties' and Their Products ................... 19

    M.    The Lawsuit.......................................................................... 20

II.   PROPOSED CONCLUSIONS OF LAW................................................... 21

    A.    Federal Trademark Infringement (15 U.S.C. § 1114) ...................... 21

    B.    False Designation of Origin (15 U.S.C. § 1125(a)).......................... 31

    C.    Common Law Trademark Infringement ............................................ 32

    D.    Common Law Unfair Competition .................................................... 32

    E.    Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*)........... 32

    F.    Willful Infringement ........................................................................ 33

    G.    Abandonment Affirmative Defense................................................... 35

    H.    Laches Affirmative Defense .............................................................. 38

    I.    Disgorgement of Thrive Causemetics' Profits................................... 41

    J.    Enhanced Damages .......................................................................... 43

K.     Permanent Injunction ............................................................... 43

L.     Attorneys' Fees and Costs ........................................................ 45

M.    Pre- and Post-Judgment Interest ............................................. 46

**III.    CONCLUSION ................................................................................ 46**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

273631750v.2

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

*A & M Recs., Inc. v. Abdallah*, 948 F. Supp. 1449 (C.D. Cal. 1996) ................ 48, 49

*ACI Int'l Inc. v. Adidas-Salomon AG*, 359 F. Supp. 2d 918 (C.D. Cal. 2005) ......... 24

*Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324 (S.D.N.Y. 2013) ...... 30

*All Cities Realty, Inc. v. Brunet*, No. B241999, 2013 WL 4017121 (Cal. Ct. App. Aug. 6, 2013) .................................................................................................... 35

*Am. Tire Distributors, Inc. v. Am. Tire Corp.*, No. CV-08-02971-MMM-JTLX, 2009 WL 10672268 (C.D. Cal. June 10, 2009) ...................................................... 23

*AOP Ventures, Inc. v. Steam Distribution, LLC*, No. 15-CV-1586-VAP-KKX, 2016 WL 7336730 (C.D. Cal. Oct. 11, 2016) ................................................................ 25

*BDO Remit (USA), Inc. v. Stichting BDO*, No. 11-CV-04054-MMM-CWX, 2012 WL 12895658 (C.D. Cal. Sept. 19, 2012) ............................................................. 24

*Bellagio Jewelry, Inc. v. Croton Watch Co.*, No. CV-06-6672-ODW-RZx, 2008 WL 3905895 (C.D. Cal. Aug. 20, 2008) ................................................................ 34

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173 (E.D. Cal. 2016) ............................................................................................................ 33

*Capbran Holdings, LLC v. Firemall LLC*, No. CV-16-02980-DSFA-FMX, 2017 WL 4769434 (C.D. Cal. Aug. 23, 2017) ................................................................ 37

*Cash Processing Servs. v. Ambient Entm't, Inc.*, 418 F.Supp.2d 1227 (D. Nev. 2006) .................................................................................................................... 40

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988) .............. 50

*Cf. Joules Ltd. v. Macy's Merch. Grp. Inc*, No. 15-CV-3645 KMW, 2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016) ..................................................................... 31

*Coach, Inc. v. Celco Customs Servs. Co.*, No. CV-1110787-MMM-FMOX, 2012 WL 12883972 (C.D. Cal. Oct. 31, 2012) .............................................................. 37

*Cyclone USA, Inc. v. LL&C Dealer Servs., LLC*, No. 03-0992 AJW, 2007 WL 9662337 (C.D. Cal. Nov. 8, 2007) .................................................................... 42

*Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038 (N.D. Cal. 2010) .......... 37

*Drain v. Newsted*, 307 F. Supp. 2d 1116 (C.D. Cal. 2003 ..................................... 27

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ...... 27

*Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210 (9th Cir. 2003) ..... 22, 36

*Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) . 24, 27

*eMachines, Inc. v. Ready Access Memory, Inc.*, No. EDCV00-00374-VAP-EEX, 2001 WL 456404 (C.D. Cal. Mar. 5, 2001 ........................................................ 40

*Exel Oyj v. D'Ascoli*, Opposition No. 91160397, 2008 WL 4354180 (T.T.A.B. Sept. 19, 2008)) .......................................................................................................... 43

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015). 52

*Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165 (C.D. Cal. 2010) .................................................................................................................... 29

*Fin. Exp. LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160 (C.D. Cal. 2008) .............. 23

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Folkens v. Wyland*, No. C-01-1241 EDL, 2002 WL 1677708 (N.D. Cal. July 22, 2002)..................................................................................................49

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir. 1991)......21

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010)............................................................................................30

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985).49

*Fuentes v. Lynch*, 788 F.3d 1177 (9th Cir. 2015)..................................................42

*Game Network, Inc. v. Goh*, No. C-09-05297-SBA (DMR), 2011 WL 13376996 (N.D. Cal. Feb. 14, 2011)...............................................................................52

*Glow Ind., Inc. v. Lopez*, 252 F. Supp. 2d 962 (C.D. Cal. 2002) ...........................27

*Henderson v. Lindland*, No. 11-CV-01350-DDP-DTBX, 2013 WL 1181957 (C.D. Cal. Mar. 21, 2013).................................................................................26, 27

*Hydramedia Corp. v. Hydra Media Grp., Inc.*, No. CV-06-05293-DDP-JTLX, 2008 WL 11336118 (C.D. Cal. Dec. 29, 2008) ........................................................37

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002) ..........24

*Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150 (9th Cir. 2021)....................28

*Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866 (9th Cir. 2002) ..................................................................................................................22

*Juan Pollo Fran., Inc. v. B & K Pollo Enterprises, Inc.*, ED-CV-13-2010J-GBSPX, 2015 WL 10695881 (C.D. Cal. Aug. 6, 2015).................................................35

*Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326 (9th Cir. 1984) .................48

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042 n.8 (9th Cir. 1988)............................................................................................................22

*Left Coast Wrestling, LLC v. Dearborn Int'l LLC*, No. 3:17-CV-00466-LAB-NLS, 2018 WL 2328471 n.4 (S.D. Cal. May 23, 2018)............................................35

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993) ............................38

*Luna Distrib. LLC v. Stoli Grp. (USA), LLC*, No. SA-CV-171552DOC-JDEX, 2018 WL 5099277 (C.D. Cal. July 10, 2018)............................................................45

*Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)................24

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 n.11 (9th Cir. 2006).............44, 46

*Monster Energy Co. v. Integrated Supply Network, LLC*, No. ED-CV-17548-CBM-RAOx, 2021 WL 1521981 (C.D. Cal. Apr. 12, 2021)........................................47

*Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157 (C.D. Cal. 2017)..........36

*Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011)............................................................................................................21

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)...........52

*Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F. 3d 948 (9th Cir. 2018) .................53

*Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005 (C.D. Cal. 2017) ......................51

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ........................42

*Partners for Health & Home, L.P. v. Seung Wee Yang*, No. CV-09-07849-CBM-

RZX, 2010 WL 11549564 (C.D. Cal. Sept. 13, 2010) .........................................41

*Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007).........................24

*Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir. 1982).....47

*Playboy Enters., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020 n.28 (9th Cir. 2004) ............................................................................................................................28

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) ..........................25

*Prudential Ins. Co. of America v. Gibraltar Fin. Corp. of Calif.*, 694 F.2d 1150 (9th Cir.1982) ............................................................................................................40

*Razor USA LLC v. Vizio, Inc.*, No. 14-CV-01586S-JOJ-CGX, 2015 WL 12656941 (C.D. Cal. Oct. 19, 2015) ....................................................................................38

*Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ...............21

*Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492 (2020) ................................47

*S. California Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014) ........................36

*Starbucks Corp. v. Heller*, No. CV-14-01383-MMM-MRWx, 2014 WL 6685662 (C.D. Cal. Nov. 26, 2014) ....................................................................................51

*Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042 (N.D. Cal. 2012)......................................................................................................................32

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063 (N.D. Cal. 2012)......................................................................................................................33

*Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018).........25, 28

*Synoptek, LLC v. Synaptek Corp.*, No. SA-CV-1601838-CJC-JCGX, 2018 WL 3359017 ("*Synoptek II*") (C.D. Cal. June 4, 2018) ................................................39

*Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002)............................28

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102 (9th Cir. 2006) ..........................................................................................44, 45, 46

*Vacation Rental Partners, LLC v. VacayStay Connect, LLC*, No. 15 CV 10656, 2017 WL 1150806 (N.D. Ill. Mar. 28, 2017)........................................................43

*Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.*, No. 4:19-CV-01424-YGR, 2021 WL 254448 (N.D. Cal. Jan. 26, 2021)...............................................50

*Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012).....................................................................................29

*Wood v. Apodaca*, 375 F. Supp. 2d 942 (N.D. Cal. 2005) .....................................35

*Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108 (9th Cir. 2010).........22

**Statutes**

15 U.S.C. § 1060(a)(1) ......................................................................................41, 44

15 U.S.C. § 1115(b)....................................................................................21, 42, 43

15 U.S.C. § 1116(a) .................................................................................................50

15 U.S.C. § 1117(a).......................................................................................47, 49, 52

28 U.S.C. § 1961.....................................................................................................53

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v2

Pursuant to L.R. 52 and the Court's Scheduling Order, Plaintiff Thrive Natural Care, Inc. ("Thrive Natural Care") respectfully submits the following Proposed Findings of Fact and Conclusions of Law.[1]

## I. PROPOSED FINDINGS OF FACT

### A. Thrive Natural Care's Registered Trademarks

1. Thrive Natural Care owns U.S. Trademark Registration No. 4,467,942 (the '942 Registration"), which was registered January 14, 2014, for the word mark "THRIVE" in relation to the following goods in International Class 003: "Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams."

2. The '942 Registration is "incontestable." On March 7, 2020, the U.S. Patent & Trademark Office ("USPTO") accepted the Combined Declaration of Use and Incontestability under Sections 8 & 15 filed by Thrive Natural Care.

3. The application which matured as the '942 Registration was created as the result of Thrive Natural Care's request to the USPTO on October 4, 2013, to divide a previously-filed application, Serial No. 85/726,058 (the "'058 Application"). On November 5, 2013, the USPTO divided the '058 Application, creating a child application, U.S. Serial No. 85/980,517 (the "'517 Application"), which matured into the '942 Registration. The '942 Registration was originally registered to Thrive Natural Care, and Thrive Natural Care has always been the registrant of that registration. Neither the '517 Application nor the resulting '942 Registration were ever owned by or assigned from another entity.

4. Thrive Natural Care also owns U.S. Trademark Registration No. 6,164,303 (the "'303 Registration," and, together with the '942 Registration, the "THRIVE Registrations"), which was registered September 29, 2020, for the word

---

[1] This filing is made as promptly as possible following Defendant's application to strike the jury demand in this case (Dkt. 116) and the parties' status conference (Dkt. 120).

mark "THRIVE" in relation to the following goods in International Class 003: "Body and non-medicated soaps and skin cleansing gels; non-medicated skin care preparations, namely, facial lotions, cleansers and creams, oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams." Thrive Natural Care filed the application that matured into the '303 Registration on May 2, 2016.

**B.  Assignment of '058 Application to Thrive Natural Care**

5.  The '058 Application was filed on September 11, 2012, by Ecomundi Ventures, LLC ("Ecomundi"), a predecessor to Thrive Natural Care. The '058 Application was signed on behalf of Ecomundi by its CEO, Alex McIntosh, who subsequently co-founded and became the CEO of Thrive Natural Care.

6.  On September 27, 2013, Ecomundi entered into an agreement with Thrive Natural Care, effective May 23, 2013, to assign all right, title, interest, and goodwill in the '058 Application to Thrive Natural Care.

7.  Prior to May 23, 2013, Ecomundi undertook substantial planning and preparation regarding a line of THRIVE-branded skincare products, and Ecomundi used the mark THRIVE in the course of those activities. Those activities included: (a) entering into agreements with contractors to formulate skincare products and provided related strategy, research, and recommendation services; (b) conducting presentations, pitches, and strategy sessions regarding development of THRIVE-branded skincare products; (c) releasing a request for proposal regarding branding and advertising for THRIVE-branded skincare products and conducting related meetings and discussions; (d) brainstorming, research, and building relationships regarding a line of THRIVE-branded skincare products; (e) traveling to Costa Rica to research product ingredients, meet potential suppliers, and build relationships relating to a THRIVE-branded line of skincare products; (f) hiring ecological consultants to help develop and define the THRIVE brand's unique regenerative farming model; (g) hiring skincare formulation professionals; (h) developing the

273631750v.2

THRIVE product formulas; (i) beginning development of THRIVE packaging and product design; (j) interviewing and evaluating manufacturers for THRIVE skincare products; (k) planning and executing a national competition to hire a Research & Development lead for the THRIVE brand; (l) interviewing sales representatives; and (m) registering the www.thrivenaturalcare.com website and email domains.

8.     All of the goodwill associated with the THRIVE mark was transferred from Ecomundi to Thrive Natural Care  Ecomundi made no use of the THRIVE mark following the transfer to Thrive Natural Care.

**C.     Thrive Natural Care's Use of the THRIVE Mark**

9.     Thrive Natural Care, Inc. was formed in 2012.  Its co-founder and CEO is Alex McIntosh, the former CEO of Ecomundi.

10.     Mr. McIntosh chose the name "Thrive" in 2012 because he believed it encapsulated the regenerative business model of creating consumer products in a way that restored degraded lands and boosted livelihoods of small-holder farmers and rural communities. The company was intended to help those communities thrive. Mr. McIntosh did not choose the name because it had any relation to a particular quality of skincare products.

11.     Thrive Natural Care's first products consisted of Thrive Face Balm (a skin lotion/cream/moisturizer product), Thrive Face Wash (a cleanser), and Thrive Shave Oil (a skin moisturizing oil).

12.     Thrive Natural Care made its first sales of Thrive Products in September 2013, and subsequently began distributing products to retail stores and preparing to make sales online.

13.     At least as early as March 2014, Thrive Natural Care began selling skincare products under the THRIVE mark, and it has continuously sold THRIVE-branded skincare products since then.

14.     Today, Thrive Natural Care sells a range of skincare and grooming products, including face washes and scrubs, lotions, moisturizers, sunscreens, face

1   balms, shaving lotions, and grooming oils—all of which use the THRIVE Mark

2   (collectively, "Thrive Products").

3        15.    Thrive Natural Care has never used the term "thrive" to describe its

4   skincare products or any quality of those products. Nor is there any evidence that

5   Thrive's competitors or Thrive's customers has ever used the term "thrive" to

6   describe skincare products or any quality of those products.

7        16.    Thrive Natural Care seeks to sell environmentally sustainable skincare

8   products, which do not use any ingredients that are synthetic or detrimental to the

9   natural environment.

10        17.    Thrive Natural Care sells its Thrive Products through its website,

11   www.thrivecare.co, as well as through online retail partners, including

12   Amazon.com and Walmart.com, and at certain brick-and-mortar Whole Foods

13   stores. Approximately 95% of Thrive Products are sold through online sites. Thrive

14   Natural Care is primarily an e-commerce company and online sales are by far the

15   most significant focus of its marketing and advertising.

16        18.    Thrive Natural Care includes its THRIVE mark and branding on every

17   product it sells. Each Thrive Product bears THRIVE branding, including the word

18   THRIVE in block or bold letters on the package front as well as additional

19   references to THRIVE on the bottle or package. The images below are correct and

20   accurate representative examples of Thrive Products.






FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

19.     In addition to product packaging, Thrive Natural Care's marketing and advertising often uses the term "Thrive skincare" to refer to Thrive Products, as well as terms that include the mark "Thrive" combined with a word describing the product at issue, such as "Thrive moisturizer," "Thrive cleanser," and "Thrive sunscreen." Seventy percent of Thrive Natural Care's website traffic to www.thrivecare.co, that results directly in a product sale, comes from a Google search. An appreciable number of those searches come from search terms such as "thrive skincare", "thrive natural care", "thrive natural skincare", "thrive face wash", "thrive skincare natural", and "healthy thrive skincare".

20.     Prices for Thrive Products range between $12.95 for a soap bar to $54.95 for a VIP Kit containing several products.

21.     Since 2015, Thrive Natural Care has consistently advertised and marketed its products to women.

22.     Thrive Natural Care targets both men and women for its Thrive Products. While it sells items such as beard oil to men, Thrive Natural Care targets female customers for items like sunscreen, cleansers, lotions, and moisturizers.

23.     The majority of Thrive Natural Care's customers are women. Due to demand from female customers, by the end of 2014, Thrive Natural Care's products were displayed on both men's and women's shelves in Whole Foods stores in Northern California. In 2015, Thrive Natural Care began advertising directly to women and developed and began selling a female-specific product, its Bodyshave Oil. However, other Thrive Products continued to be popular with women, and where Thrive Natural Care receives demographic data on purchasers, such as through Amazon.com, it indicates that about 60% of customers are female.

24.     Thrive Natural Care has used the term "Thrive Tribe" as part of its brand messaging from December 2013 to 2020. During that time, Thrive Natural Care consistently referred to its followers and customers as the "Thrive Tribe," including sending new customers an email welcoming them to the "Thrive Tribe"

upon purchasing Thrive Products or signing up to receive Thrive messages. Thrive Natural Care also used the term "Thrive Tribe" throughout its website, including prominently on its homepage, and in marketing campaigns. For example, in 2018 Thrive Natural Care ran an Instagram-based photograph contest and directed followers to use the hash tag #THRIVETRIBE on their photographs to identify that they were related to Thrive Natural Care.

**D.      Thrive Natural Care's Recognition and Publicity**

25.      Thrive Natural Care has devoted substantial money, time, and resources to developing the THRIVE brand. Thrive Natural Care advertises its skincare products extensively on the Amazon and Walmart online marketplaces. The company has promotional partnerships with Amazon and Whole Foods and advertises through marketing agencies, public relations firms, social media such as Instagram and Facebook, the Thrive website blog, and online articles published on sites such as Medium.

26.      Thrive Natural Care was recently featured in a marketing video produced by Amazon, which the retailer shared with Amazon's 600,000-plus employees and over 100 million customers. In December 2020, Thrive Natural Care was one of just two small businesses selected by Amazon from among thousands of sellers to receive the first Amazon Launchpad Innovation Grant for most innovative products and business model. Lastly, Whole Foods Market has several times featured Thrive Natural Care as a "favorite" brand for its customers.

27.      Thrive Natural Care's products, mission, and business model have generated over 1.1 billion media impressions in recent months alone, with coverage in publications such as *USA Today, Vogue, Forbes, MarketWatch, Real Simple, People, Beauty News, The Zoe Report, Hollywood Reporter, Instyle, Runners World, Whole Foods Magazine,* and *Natural Solutions Magazine*. Thrive Natural Care's CEO, Mr. McIntosh, has also spoken on numerous podcasts and other speaking engagements about the business.

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

28. Thrive Natural Care was selected by Conservation International Ventures, the investment arm of one of the world's leading environmental organizations, for a five-year partnership and investment.

29. Thrive Natural Care is a successful Public Benefit Corporation with a loyal customer base and significantly increased growth, revenue, and social and environmental impact each year. Thrive Natural Care achieved over $1 million sales in 2020 and is on track to double 2020 revenue by the end of 2021. In addition, per the company's Public Benefit charter, Thrive Natural Care's regenerative business model is successfully restoring hundreds of acres of degraded lands and boosting the livelihoods of hundreds of farmers and community members in rural areas.

**E.     Thrive Natural Care's Trademark Enforcement**

30. Thrive Natural Care has expended extensive resources enforcing and defending its family of THRIVE marks against such infringers, through cease-and-desist letters and litigation. Its enforcement efforts have resulted in numerous third parties abandoning the use and/or registration of similar marks.

31. Through its efforts, Thrive Natural Care has substantially cleared the field in the skincare market of other entities' use of the term "thrive" as a skincare product brand. Thrive Natural Care is currently the only entity with a live registered trademark for the mark "THRIVE" in relation to skincare lotions and creams.

**F.     Thrive Causemetics' Origin and Knowledge of Thrive Natural Care by August 2015**

32. Karissa Bodnar founded Defendant Thrive Causemetics, Inc. ("Thrive Causemetics") in 2014. Thrive Causemetics' first products on the market, beginning in September 2014, were false eyelashes for women undergoing cancer treatments and adhesive for false eyelashes. Thrive Causemetics sold those products under the "Thrive Causemetics" brand.

33. Thrive Causemetics expanded into color cosmetics in 2015-16, when it

273631750v.2

began to sell eyeliner followed by browliner and a color stick. "Color cosmetics" products are more commonly known as "makeup".

34.     In August 2015, Thrive Causemetics became aware of Thrive Natural Care and the '942 Registration for the THRIVE mark, when Thrive Causemetics received a trademark search report identifying the '942 Registration as a potential conflict with Thrive Causemetics' THRIVE CAUSEMETICS mark.

35.     On August 11, 2015, Thrive Causemetics filed Application Serial No. 86/721,790 with the USPTO to register the mark THRIVE CAUSEMETICS in connection with "False eyelashes; adhesives for affixing false eyelashes; eyeliner; and eyebrow cosmetics."

36.     On November 30, 2015, the USPTO issued a non-final office action (the "2015 Office Action") refusing registration of the THRIVE CAUSEMETICS mark, on the grounds of likelihood of confusion with Thrive Natural Care's '942 Registration and U.S. Registration No. 2,938,220 for the mark Cause-Metics (the "Cause-Metics Registration"), which had been registered to a third party since April 2005.

37.     On May 26, 2016, Thrive Causemetics filed a response to the 2015 Office Action, arguing as follows:

> The specific goods in Applicant [Thrive Causemetics'] application are not identical to those in the THRIVE registration, and the examining attorney does not attempt to argue that they are. Nor are Applicant's goods even in the same category as those in the THRIVE registration. The common category of Applicant's goods is cosmetics, while the common category of the goods in the THRIVE registration is skincare and shaving products. Such products are found in different aisles or departments than standard make-up cosmetics, such as eyeliner, and are distinctly different types of consumer goods. Given the dissimilarity in the marks, a higher nexus in the relatedness of the parties' goods is required to support a finding of likelihood of confusion.

38.     On June 22, 2016, the USPTO agreed with Thrive Causemetics' arguments and issued a final office action withdrawing its refusal to register the THRIVE CAUSEMETICS mark on the grounds of likelihood of confusion with

1  Thrive Natural Care's '942 Registration. However, the USPTO maintained its

2  refusal to register due to likelihood of confusion with the Cause-Metics

3  Registration.

4        **G.**     **Thrive Causemetics' Skincare Expansion Plans and Request to**

5                    **Use the THRIVE Mark**

6      39.    By at least as early as January 8, 2016, Thrive Causemetics' CEO, Ms.

7  Bodnar, had privately developed plans for Thrive Causemetics to release at least

8  three different skincare products in 2017.

9      40.    On April 22, 2016, Ms. Bodnar contacted Thrive Natural Care via

10  email and asked for permission to use the THRIVE mark as part of Thrive

11  Causemetics' brand name. Ms. Bodnar identified Thrive Causemetics as "a color

12  cosmetics brand with a mission to help women going through cancer treatment look

13  and feel better during their time of need." She further stated "[w]e will never use

14  the word 'Thrive' without the word 'Causemetics'. . . ."

15      41.    Thrive Natural Care's CEO, Alex McIntosh, denied Ms. Bodnar's

16  request for permission to use the THRIVE Mark, expressing his belief that Thrive

17  Natural Care was entitled to "protection of the thrive mark across the gamut of

18  personal care products that fall within our owned mark." However, Thrive Natural

19  Care chose not to pursue the issue further at that time because it thought Thrive

20  Causemetics would abide by the decision not to allow use of the mark, Ms. Bodnar

21  had stated that Thrive Causemetics would "never use the word 'Thrive' without the

22  word 'Causemetics'", and Ms. Bodnar's email implied that Thrive Causemetics

23  would stay in its lane of women's color cosmetics.

24      42.    In her email to Thrive Natural Care in 2016, Ms. Bodnar never

25  disclosed that she had already developed plans for Thrive Causemetics to

26  eventually release skincare products.

27      43.    In July 2016—shortly after Ms. Bodnar represented that Thrive

28  Causemetics would only sell color cosmetics—Ms. Bodnar sent a pitch presentation

to Sephora, a large beauty product retailer. In that presentation, Ms. Bodnar stated Thrive Causemetics had plans to expand from color cosmetics into skincare products in 2017 by launching one skincare product in the third quarter of 2017 and five more skincare products in the fourth quarter of 2017.

44.     In 2017, Thrive Natural Care learned that Ms. Bodnar had ignored its response refusing her request to use the THRIVE name and also learned that Thrive Causemetics had begun to de-emphasize the term "Causemetics" in its advertising and branding, and to refer to itself as "Thrive" from time to time, without "Causemetics". Thrive Natural Care therefore sent a cease-and-desist letter to Thrive Causemetics on March 3, 2017, requesting that Thrive Causemetics cease use of the THRIVE mark.

45.     Thrive Causemetics rejected the demand and responded that there could be no consumer confusion between the parties' products because they sold "different product lines," i.e., color cosmetics versus skincare products. Thrive Natural Care relied on that statement to mean that Thrive Causemetics would not sell skincare products using the THRIVE brand. Thrive Natural Care did not take further action because Thrive Causemetics was not using the name on skincare products. Thrive Causemetics explicitly stated in its response letter that Thrive Natural Care would not have a valid legal claim unless the parties were selling the same type of goods, which they were not since Thrive Causemetics sold makeup and Thrive Natural Care sold skincare lotions and creams.

**H.     USPTO's Rejection of Second Thrive Causemetics Application**

46.     In April 2018, Thrive Causemetics made a second attempt to register its THRIVE CAUSEMETICS mark. On August 28, 2018, the USPTO issued a non-final office action ("2018 Office Action") rejecting the application, citing a likelihood of confusion with Thrive Natural Care's '942 Registration and then-pending second application for the THRIVE mark, which matured as the '303 Registration. In the 2018 Office Action, the USPTO also stated that stated

"CAUSEMETICS" is merely a misspelling of "COSMETICS" and as such, is merely descriptive and must be disclaimed.

47.     Thrive Causemetics responded to the 2018 Office Action by arguing again that its cosmetics products and Thrive Natural Care's skincare products were "found in different aisles or departments than standard make-up cosmetics, such as eyeliner, and are distinctly different types of consumer goods." Thrive Causemetics further argued that its "Goods and Services are marketed toward and used to help women, whereas [Thrive Natural Care's] Cited Goods are marketed toward men."

48.     Thrive Causemetics' CEO testified that Thrive Causemetics had no knowledge of the demographics of Thrive Natural Care's customers.

49.     The USPTO disagreed with Thrive Causemetics' arguments in response to the 2018 Office Action and maintained the refusal to register the THRIVE CAUSEMETICS mark due to a likelihood of confusion with Thrive Natural Care's THRIVE Registrations.

**I.      Thrive Causemetics' Expansion Into Skincare Market**

50.     In October 2018—after the USPTO's rejection of its second trademark application—Thrive Causemetics expanded from makeup into the skincare product market and started selling skincare products under the "Thrive Causemetics" brand.

51.     Expansion from color cosmetics to skincare products would not simply be growth of the same product line. Rather, it would be expansion into a different market with a new product line. Skincare products and makeup products (like eyeliner, lipstick, mascara, blush, etc.) do not generally use the same materials so there is no synergy in production of both types of products together. Both types of products are generally packaged differently and are made using different ingredients and formulas. There are generally different corporate buyers for color cosmetics versus skincare products, and industry research and market reports view color cosmetics and skincare products as different product categories. Further, as Thrive Causemetics itself stated to the USPTO and to Thrive Natural Care, skincare

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

products and color cosmetics do not appear together on the same shelves or sections of retail stores and generally are not sold in close proximity to each other.

52.     Thrive Causemetics quietly sold three skincare products through 2019. In 2020, Thrive Causemetics significantly expanded its skincare line, releasing more than a dozen new skincare products. Thrive Causemetics has continued to periodically release new skincare products throughout 2021, including two new skincare products it calls "Thrive Causemetics Timeless Ambition" that it released in August 2021.

53.     Thrive Causemetics now sells many skincare products under the "Thrive Causemetics" brand, including the following: Overnight Sensation Brightening Sleep Mask; Liquid Balm Lip Treatment; Gravity Defying Transforming Moisturizer; Bright Balance 3-in-1 Cleanser; Defying Gravity Eye Lifting Cream; Liquid Light Therapy All-in-One Face Serum; Moisture Flash Active Nutrient Toner; Deluxe Travel Defying Gravity Transforming Moisturizer; Defying Gravity Transforming Moisturizer; Deluxe Travel Bright Balance 3-in-1 Cleanser; Moisture-Enriched Hand Sanitizer; Overnight Sensation Gentle Resurfacing Peel; Pumpkin Spice Latte Liquid Lip Balm Treatment; Smart Microdermabrasion 2-in-1 Instant Facial; Defying Gravity Nourishing Hand + Nail Cream; Smart Microdermabrasion 2-in-1 Instant Facial; Buildable Blur CC Cream; Filtered Effects Blurring Primer; Timeless Ambition Power 10-Peptide Sculpting Serum; Timeless Ambition Power 7-Peptide Firming Moisturizer; all travel sized versions of these products; and all "sets" that include any of these products as part of the set. These products are collectively referred to as "TCI Skincare Products" herein.

54.     Thrive Causemetics considers certain products to be hybrids that are both skincare products and color cosmetics. These hybrid products include Buildable Blur CC Cream and Filtered Effects Blurring Primer, both which Thrive Causemetics advertises and describes on its own website as skincare products that

1   provide skin benefits, including acting as a moisturizer and a sunscreen.

2     55. The TCI Skincare Products include face and body cleansers, lotions,

3   creams, moisturizers, sunscreen, lip balm, hand sanitizer, and face oils, all of which

4   are within the scope of Thrive Natural Care's THRIVE Registrations.

5     56. Thrive Causemetics has offered for sale, displayed, and sold all of the

6   TCI Skincare Products online through its website, www.thrivecausemetics.com.

7   Thrive Causemetics is an e-commerce company that sells its products almost

8   entirely through the internet.

9     57. Thrive Causemetics presents its logo for TCI Skincare Products to

10  consumers as "THRIVE causemetics" with the word "THRIVE" emphasized at the

11  top in much larger bold font, and "causemetics" in small font below. Further,

12  Thrive Causemetics displays its logo with a "TM" symbol appearing to the right of

13  the "THRIVE" portion of the mark, which creates the appearance that Thrive

14  Causemetics is using "THRIVE" as the trademark for its products. An example is

15  shown below.



22    58. The TCI Skincare Products range in price between about $10 to $78.

23    59. Thrive Causemetics' product prices are consistent with the mid-range

24  "affordable premium" market segment of skincare products, rather than the high-

25  end, luxury market segment. That is the exact market segment that targeted by

26  Thrive Natural Care. High end, luxury skincare products (brands such as La Prairie,

27  La Mer, SK-II, and Lancôme) sell at much higher prices, usually starting at around

28  $95 and ranging up to $850 or more, depending on the product.

60.     In 2020, Thrive Causemetics added to its website, for the first time, a navigation page entitled "Skincare", which is separate from its "Makeup" navigation page, and which displays most of the TCI Skincare Products.

61.     Thrive Causemetics sells its products to both men and women. It does not target its products toward any particular consumer age group.

62.     Thrive Causemetics' TCI Skincare Products prominently feature the THRIVE name on the front of their packaging. Similarly, Thrive Natural Care's skincare products prominently feature the THRIVE mark on their packaging. Examples of the parties' products are shown below.







PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

63.     Thrive Causemetics' TCI Skincare Products are identical in kind to the Thrive Products sold by Thrive Natural Care under its THRIVE Mark. Since Thrive Causemetics' move into skincare products, both parties now sell skin cleansers, moisturizers, lotions, creams, sunscreens, and lip balms.

64.     By expanding from makeup and into the skincare market in 2018, Thrive Causemetics became a direct competitor of Thrive Natural Care.

65.     Thrive Causemetics used the term "Thrive Tribe" in its own advertising from approximately 2018 to mid-2020. Thrive Causemetics even acquired and advertised using a vanity URL "thrivetribe.cc".

66.     In or about 2017, Thrive Causemetics began calling its headquarters the "Thrive Lab" in marketing and advertising. Thrive Causemetics used the term "Thrive Lab" in its advertising without including the word "Causemetics" in that phrase.

67.     Thrive Causemetics has spent millions of dollars on advertising for its TCI Skincare Products. Thrive Causemetics spends approximately 50-52% of its revenue from sales of TCI Skincare Products on advertising for those products.

68.     Thrive Causemetics' total revenue in 2020 was $168 million. The media, both industry-specific and national, has heavily covered Thrive Causemetics and Ms. Bodnar.

69.     Thrive Causemetics' total profits from sales of all TCI Skincare Products from 2018 through May 2021 are $21,524,380. This amount constitutes cost of goods and direct expenses subtracted from gross revenue.

70.     Thrive Causemetics' claimed overhead expenses include a wide variety of items such as rent, travel, employee costs, public relations, donations, bank or consulting fees, legal fees, and taxes. Those overhead expenses have no relation to the production or sale of any particular product but instead were allocated on a percentage basis based on the revenue produced by each product.

/ / /

**J.      Ms. Bodnar's 2019 Call to Ask Permission to Use THRIVE Mark**

71.      In June 2019, Thrive Causemetics' CEO, Ms. Bodnar, again reached out to Thrive Natural Care's CEO, Mr. McIntosh, this time by phone. During that telephonic discussion, Ms. Bodnar asked repeatedly for Thrive Natural Care to allow Thrive Causemetics to use the "THRIVE" name. However, Ms. Bodnar never disclosed during the call that Thrive Causemetics was already selling skincare products or planned to dramatically expand its skincare line in 2020. Mr. McIntosh did not know at that time that Thrive Causemetics was selling skincare products.

72.      Mr. McIntosh refused Ms. Bodnar's request and reminded Ms. Bodnar about Thrive Natural Care's trademark registrations and stated that, for there to be any agreement, Thrive Causemetics must at a minimum (1) alter its logo to deemphasize the word "Thrive" as compared to "Causemetics," and (2) agree to compensate Thrive Natural Care for use of the THRIVE mark.

28.      Ms. Bodnar attempted to negotiate by offering that Thrive Causemetics could make a donation to charity instead. Mr. McIntosh rejected that proposal and told Ms. Bodnar to discuss the matter with Thrive Causemetics' Board and respond with a reasonable licensing offer. Ms. Bodnar never responded, and Thrive Causemetics continued to use the THRIVE mark and to expand its skincare line.

**K.      Appearance of Parties' Products Together Online**

73.      Both Thrive Natural Care and Thrive Causemetics advertise their skincare products almost entirely online and on social media, including Facebook and Instagram.

74.      Thrive Causemetics has paid to advertise its products on Amazon, which is a major online retail partner of Thrive Natural Care.

75.      Part of Thrive Causemetics' advertising includes purchasing Google advertising keywords ("AdWords") for terms including "Thrive," "Thrive cleanser," and "Thrive moisturizer"—none of which contain any reference to

"causemetics". Thrive Causemetics has purchased many Google AdWords for terms that included the word "thrive" but did not include the word "causemetics," including "thrive," "thrive cleanser," "thrive moisturizer," "+thrive +lip +balm," "thrive liquid balm," "thrive promo code," "+thrive +holiday +set," and "thrive lip treatment," among others.

76.   In online searches of popular search engines including Google, Bing, and DuckDuckGo, and on comparative shopping searches on Google Shopping and Bing Shopping, the parties' skincare products frequently appear together and side-by-side, including photographs of Thrive Causemetics' TCI Skincare Products and of Thrive Natural Care's Thrive Products, along with links to the purchase pages for each company. Online search results for "Thrive skincare," "Thrive lotion," and "Thrive moisturizer," for example, display results for both Thrive Causemetics and Thrive Natural Care—along with paid ads from Thrive Causemetics. This even occurs when searches are specifically tailored to seek information on Thrive Natural Care and the Thrive Products, such as "thrive natural care," "mens thrive natural care," and "amazon thrive natural care". An example is below.



77.   In the search results, as seen above, Thrive Causemetics' products are described as "Thrive [product name]" in the same way as Thrive Natural Care's products. The primary product names of Thrive Causemetics' products often do not

1  include the word "Causemetics" and often, as shown, do not even spell out the

2  word "Causemetics" entirely in the link and image.

3      78.    Thrive Natural Care's Thrive Products and Thrive Causemetics' TCI

4  Skincare Products also appear together on searches in online marketplaces,

5  including Amazon, Walmart.com, eBay, and Mercari, and both parties' skincare

6  products can be purchased from those online marketplaces.

7      79.    The parties' products appear together on Amazon.com in searches for

8  skincare products. One example is below.



26      80.    The above search results for "Thrive" on Amazon.com shows how a

27  consumer would search for Thrive Natural Care's skincare product on the website

28  that constitutes the majority of its sales: Amazon.com. Thrive Causemetics'

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

- 18 -

273631750v.2

skincare product "Buildable Blur CC Cream" is shown side-by-side for sale with Thrive Natural Care's Thrive Products.

81.    A consumer searching online for Thrive Natural Care or the Thrive Products is highly likely to be presented with images of and links to Thrive Causemetics' TCI Skincare Products together with Thrive Products, with links to directly purchase each one.

82.    Consumers are likely to seek out Thrive Natural Care's products via an online search for terms such as "thrive skincare" and "Thrive Natural Care". When Thrive Causemetics' products, also referred to as "Thrive" products in search results are shown together with the Thrive Products, consumers may click on links to Thrive Causemetics' products believing them to originate from or be affiliated with Thrive Natural Care.

**L.    Actual Confusion Between Parties' and Their Products**

83.    There is evidence of actual confusion between Thrive Natural Care and Thrive Causemetics. Consumers have been confused and believed that the parties' products originated from the same source or connected or affiliated sources.

84.    On June 30, 2021, an Amazon customer left a review of Thrive Natural Care's sunscreen on its Amazon.com page, which stated: "I like Thrive products and have bought eye liner and mascara from them as well as moisteurizer [sic]." This indicates the customer erroneously believed that Thrive Causemetics' eyeliner, mascara, and moisturizer products originated from Thrive Natural Care. Moisturizers are a skincare product.

85.    Another customer who purchased Thrive Natural Care sunscreen on Amazon gave a highly laudatory review only to end it with: "Well done, Thrive Causemetics." A third Amazon customer left a positive review for Thrive Natural Care's moisturizer stating, "Thrive is an up and comer in the cosmetics field. Their mascara is phenomenal." Thrive Natural Care does not sell mascara, but Thrive Causemetics does.

273631750v.2

86.    Walmart—a retail partner of Thrive Natural Care—mistakenly listed Thrive Products as originating from Thrive Causemetics on the Walmart.com webpage where consumers could purchase Thrive Products.

87.    A consumer posting an online product listing for Thrive Products on the Poshmark online marketplace stated in the ad that Thrive Natural Care's products originated from Thrive Causemetics.

88.    The representative of two professional athletes who were considering a potential advertising partnership with Thrive Natural Care demonstrated confusion between Thrive Natural Care and Thrive Causemetics, mistakenly believing—when she was told Mr. McIntosh was the CEO of "Thrive"—that his skincare company was Thrive Causemetics. The potential partnership did not proceed in part because of that confusion relating to the THRIVE brand.

89.    Thrive Natural Care's marketing expert conducted two 600-person surveys comparing skincare products by Thrive Natural Care to products by Thrive Causemetics and control products from third parties. The survey that tested Thrive Natural Care's newer packaging design found a net 54.5% rate of confusion between the parties' skincare products. The survey that tested Thrive Natural Care's older packaging design found a net 56.6% rate of confusion between the parties' skincare products.

**M.    The Lawsuit**

90.    Thrive Natural Care filed suit against Thrive Causemetics on October 2, 2020, alleging federal, common law, and statutory trademark infringement and unfair competition.

91.    Thrive Natural Care's First Amended Complaint alleges that Thrive Causemetics' TCI Skincare Products are infringing Thrive Natural Care's registered trademarks and Thrive Causemetics' use of its "Thrive Causemetics" brand on skincare products constitutes a false designation of origin.

/ / /

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Federal Trademark Infringement (15 U.S.C. § 1114)

1.   Thrive Natural Care has proven by a preponderance of the evidence that (1) it has a protectable ownership interest in the THRIVE mark; and (2) Thrive Causemetics' use of its mark on skincare products is likely to cause consumer confusion. Therefore, Thrive Causemetics has infringed on Thrive Natural Care's registered THRIVE mark by offering to sell and selling the TCI Skincare Products under the "Thrive Causemetics" brand. *See Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

2.   Thrive Natural Care's '942 Registration constitutes "conclusive evidence" of the validity of the THRIVE mark, the registration of the mark, Thrive Natural Care's ownership of the THRIVE mark, and Thrive Natural Care's exclusive right to use the THRIVE mark in commerce. 15 U.S.C. § 1115(b); *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006); *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) ("If the mark at issue was federally registered and had become 'incontestable', pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal protectability, and ownership are proved.").

3.   Thrive Natural Care's '303 Registration for the THRIVE mark constitutes "'prima facie evidence' of the mark's validity and entitles [Thrive Natural Care] to a 'strong presumption' that the mark is a protectable mark." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010).

4.   The Court finds Thrive Causemetics has not rebutted the '303 Registration's validity, because it has not shown that the mark THRIVE is merely descriptive of skincare products. "The strength of a mark is determined through the 'imagination test,' in which a court asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies, the more

imagination required, the stronger the mark is; and the 'need test,' which asks to what extent a mark is actually needed by competitors to identify their goods or services." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1221 (9th Cir. 2003). The word "thrive" does not describe a quality or characteristic of skincare products in a way that "requires no exercise of the imagination to be understood." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1988). There are many ways to describe skincare lotions, creams, and balms without using the word "thrive" in that description, and Thrive Causemetics has not identified evidence of competitors using "thrive" descriptively in that fashion. *See Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 872 (9th Cir. 2002) (explaining that descriptive marks "tend to consist of common words that might be the only way to describe a category of goods."). For example, "creamy" or "hydrating" would be words that are descriptive of skincare products. *Compare to Kendall-Jackson*, 150 F.3d at 1047 n.8 ("Thus, 'Honey Baked Ham' is a descriptive term for a ham that has been baked with honey, and 'Honey Roast' is a descriptive term for nuts that have been roasted with honey."); *Am. Tire Distributors, Inc. v. Am. Tire Corp.*, No. CV-08-02971-MMM-JTLX, 2009 WL 10672268, at *7 (C.D. Cal. June 10, 2009) (finding "American Tire Distributors" descriptive of a tire distributor). The word "thrive," however, differs significantly in that it requires multi-step reasoning to associate the word with skincare products. *See Kendall-Jackson*, 150 F.3d at 1047 n.8. At the very least, "thrive" is suggestive of skincare products because it is not immediately apparent from the name what product is at issue. *See Fin. Exp. LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1169 (C.D. Cal. 2008) ("Although the term 'DealTrace' is suggestive of its purpose—to trace deals—it is not immediately apparent what product is at issue or to whom the product is directed."). Therefore, the THRIVE mark claimed in the '303 Registration is valid and receives full protection under the Lanham Act.

5.   Through its ownership of the incontestable '942 Registration, and also

273631750v.2

its ownership of the '303 Registration, Thrive has a protectable ownership interest in the THRIVE mark, satisfying the first step of the infringement test. *See Network Auto.*, 638 F.3d at 1144.

6.      Thrive Causemetics' use of its mark on the TCI Skincare Products is likely to cause confusion "likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association" between the parties or their products. *Mattel,  Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806-07 (9th Cir. 2003). ). Actionable confusion includes initial interest confusion, point-of-sale confusion, and post-sale confusion. *See Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1133 (C.D. Cal. 2001); *ACI Int'l Inc. v. Adidas-Salomon AG*, 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005). The facts demonstrate that there exists a likelihood of both forward and reverse confusion.

7.      Because the parties are both e-commerce companies who sell primarily on the internet, "three most important *Sleekcraft* factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods and services, and (3) the parties' simultaneous use of the Web as a marketing channel." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1173-74 (9th Cir. 2007); *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002); *BDO Remit (USA), Inc. v. Stichting BDO*, No. 11-CV-04054-MMM-CWX, 2012 WL 12895658, at *15 (C.D. Cal. Sept. 19, 2012) (holding these factors were most important "[i]n the context of parties that use the Internet to market their goods or services"). "When this controlling troika or internet trinity suggests confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement." *Perfumebay.com*, 506 F.3d at 1173-74.

8.      The "similarity of marks" factor weighs heavily in favor of Thrive Natural Care. Thrive Natural Care's THRIVE Mark and the mark used by Thrive Causemetics, which is primarily displayed as "THRIVE causemetics", are virtually identical. Thrive Causemetics incorporated Thrive Natural Care's entire mark. The

USPTO has found the term "Causemetics" is merely descriptive, as it is a phonetically identical misspelling of "cosmetics," and required Thrive Causemetics to file a disclaimer of that portion of its mark. These similarities weigh heavily in favor of finding a likelihood of confusion. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1127-28 (9th Cir. 2014); *Electropix*, 178 F. Supp. 2d at 1129; *Perfumebay.com*, 506 F.3d at 1174.

9.      The visual, aural, and semantic similarities of the marks, coupled with the fact that Thrive Natural Care's THRIVE Registrations are for standard character marks and entitled to a broad scope of coverage, outweigh the differences in the parties' product packaging. *See Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 837 (C.D. Cal. 2018); *Pom*, 775 F.3d at 1125; *AOP Ventures, Inc. v. Steam Distribution, LLC*, No. 15-CV-1586-VAP-KKX, 2016 WL 7336730, at *7 (C.D. Cal. Oct. 11, 2016) (order modified on other grounds in 2016 WL 10586307 (C.D. Cal. Dec. 27, 2016)).

10.     The "relatedness of goods" *Sleekcraft* factor weighs heavily in favor of likelihood of confusion because the parties both sell skincare products that are identical in kind. *See Pom*, 775 F.3d at 1127; *AOP Ventures*, 2016 WL 7336730, at *7 (holding, where goods "are identical in kind and directly compete with one another," "[t]his factor . . . weighs heavily in favor of" plaintiff); *Perfumebay.com*, 506 F.3d at 1174 (parties "sell similar products on the internet—perfume," which weighed in favor of confusion).

11.     The *Sleekcraft* factor relating to marketing channels and use of the internet for sales and marketing weighs heavily in favor of finding a likelihood of confusion because: (a) both parties sell competing skincare products through their online stores, which are both accessed through domain names beginning with "thrive" (www.thrivecare.co and www.thrivecausemetics.com); (b) both parties advertise almost exclusively online and on the same social media sites; (c) both parties' advertisements and products appear together in online searches on popular

search engines such as Google and Bing, and their products appear together in other online marketplaces; and (d) the parties sell through overlapping marketing channels to the same customer base. *See Perfumebay.com*, 506 F.3d at 1174; *Pom*, 775 F.3d at 1130; *Sleekcraft*, 599 F.2d at 353.

12.     Because the three most important factors relevant to products sold in e-commerce favor Thrive Natural Care and finding a likelihood of confusion, "the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement." *Perfumebay.com*, 506 F.3d at 1173. The other factors do not strongly favor Thrive Causemetics.

13.     The "strength of the mark" *Sleekcraft* factor weighs in favor of finding a likelihood of confusion. *See, e.g., Henderson v. Lindland*, No. 11-CV-01350-DDP-DTBX, 2013 WL 1181957, at *4 (C.D. Cal. Mar. 21, 2013), aff'd, 602 F. App'x 391 (9th Cir. 2015); *Electropix*, 178 F. Supp. 2d at 1128. The THRIVE mark is arbitrary and receives maximum protection under the Lanham Act, as it is not descriptive of a particular quality of skincare products and has no "obvious" connection to skincare that would render the mark suggestive of Thrive's goods. *See Henderson*, 2013 WL 1181957, at *4 (holding, at summary judgment stage, that TEAM QUEST mark was arbitrary with regard to mixed martial arts gyms, despite services relating to groups of professional fighters); *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) (finding DREAMWORKS arbitrary with regard to movie production services although such services arguably brought dreams to life); *cf. Glow Ind., Inc. v. Lopez*, 252 F. Supp. 2d 962, 980 (C.D. Cal. 2002) (finding GLOW to be suggestive of bath and body products because it implied the products left the skin "glowing"). Further, Thrive Natural Care has used the mark in commerce continuously since 2013 and is the only holder of trademark registration for the mark "THRIVE" in relation to skincare lotions and creams. *See Electropix*, 178 F. Supp. 2d at 1128 (explaining that "long and continuous use of a mark in the marketplace enhances its strength.").

14.     The "strength of the mark" *Sleekcraft* factor also favors finding for Thrive Natural Care with regard to its claim of reverse confusion. *See Drain v. Newsted*, 307 F. Supp. 2d 1116, 1124-25 (C.D. Cal. 2003) (on reverse confusion claim, under this factor courts "evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark."). Thrive Causemetics' mark has significant commercial strength due to Thrive Causemetics spending millions of dollars on wide-spread advertising, which has "resulted in a saturation in the public awareness of the junior user's mark." *Id.* at 1125; *see also Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) (Reverse confusion "can occur when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user.").

15.     The "actual confusion" factor weighs heavily in favor of finding a likelihood of confusion because Thrive Natural Care has offered evidence of actual confusion, both forward and reverse, by consumers and retailers between the parties or their products. *See Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (actual confusion evidence "constitutes persuasive proof that future confusion is likely."); *Synoptek*, 309 F. Supp. 3d at 839 ("Evidence of actual consumer confusion is not necessary for a finding of likelihood of confusion, but it bears on the inquiry and is particularly potent.").

16.     In addition, with regard to the "actual confusion" factor, Thrive Natural Care's consumer surveys conducted by its expert, Rob Wallace, strongly support finding a likelihood of confusion. *See Playboy Enters., Inc. v. Netscape Comm. Corp.*, 354 F.3d 1020, 1026 n.28 (9th Cir. 2004) (courts regularly accept the results of consumer surveys as surrogate evidence of actual confusion). Thrive Natural Care's surveys found net 54.5% and 56.6% rates of confusion between the parties' skincare products. Those rates of confusion constitute "persuasive evidence" of likely confusion. 6 J. Thomas McCarthy, McCarthy on Trademarks &

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

Unfair Competition § 32:188 (confusion levels over 50 percent are "persuasive evidence" of likely confusion)); *Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG, 2012 WL 6951315, at *10 (C.D. Cal. Dec. 10, 2012) ("Generally, confusion levels of 25 to 50 percent provide 'solid support' for a finding of likelihood of confusion, while confusion rates below 20 percent support a finding of confusion only in connection with other corroborating evidence.") (citing *Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (granting a preliminary injunction where survey evidence from over 400 respondents showed a confusion level of 24.2 percent).

17.     The surveys conducted by Mr. Wallace appropriately used a double-blind protocol and limited the universe of respondents to those who had purchased skincare products online in the past six months, who intended to do so in the next six months, and who did not have ties to the skincare industry. Respondents were shown screenshots of the point-of-sale webpage of each party's skincare product, and two control skincare products, and the order of the images was randomly rotated to avoid creating bias. Respondents were then asked questions after each series of images about whether they believed the products originated from the same or affiliated companies, and Mr. Wallace then reviewed the results and tabulated the rates of confusion. The Ninth Circuit has approved of surveys following an identical format in *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010), and *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902-03 (9th Cir. 2002).

18.     While Dr. Itamar Simonson conducted a consumer survey on behalf of Thrive Causemetics, the Court finds that Dr. Simonson's survey failed to demonstrate an understanding of the marketplace in which the parties advertise and sell their products and therefore has little probative value. Dr. Simonson did not take into account that, as explained above, the parties' skincare products can regularly appear together and side-by-side on the same computer screen. Dr.

273631750v.2

Simonson himself stated that the *Eveready* survey format used for his survey was appropriate when consumers would rarely, if ever, see the parties' products together. Further, the *Eveready* survey format "does not inform respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." McCarthy § 32:173.50 (5th ed. 2019). Thus, "[w]hile the *Eveready* format is generally accepted and represents the 'gold standard' for cases involving strong marks, by design it will underestimate confusion for marks that are not highly accessible in a consumer's memory." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013); *see also* Jerre B. Swann, Likelihood of Confusion Studies and the Straitened Scope of Squirt, 98 Trademark Rep. 739, 739 (2008) ("Comparatively few [marks] have (or can hope to develop) sufficiently strong memory traces so as to be cued by pattern matching engendered by a monadic exposure to a similar junior use. The internal search of memory for a strong brand's schema that exists at the core of an *Eveready* study is thus hostile to the general run of marks. For weak marks, an Eveready format will consistently produce negligible estimates of likelihood of confusion."). As part of his survey, Dr. Simonson did not do any analysis to calculate what percentage of the population could be expected to know of Thrive Natural Care, Thrive Causemetics, or either of their brands. In addition, his survey sample size included only 199 respondents in the test group, rather than a larger sample size to take into account the significant portion of the population who would not know of the parties' brands. *Cf. Joules Ltd. v. Macy's Merch. Grp. Inc*, No. 15-CV-3645 KMW, 2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016) (finding *Eveready* format survey admissible where expert calculated the percentage of the population likely to be aware of the plaintiff and intentionally took a very large sample which "created a 'survey within a survey' to test whether consumers with awareness of [plaintiff] were confused by the [defendant's] mark as it appeared in the marketplace.").

19.     In addition, Dr. Simonson failed to take into consideration that nine

out of 199 respondents to his survey did—with zero prompting and without once seeing any reference to Thrive Causemetics, its brand, or makeup/cosmetics in the survey—submit responses that demonstrated actual confusion between Thrive Natural Care and Thrive Causemetics. Dr. Simonson disregarded respondents indicating Thrive Natural Care was associated with "bodnar," "Thrive Cosmetics," and makeup and cosmetics products, demonstrating his own bias in constructing and analyzing Thrive Causemetics' consumer survey. For these reasons, Dr. Simonson's survey has very little probative value.

20.     The "degree of care" *Sleekcraft* factor favors finding a likelihood of confusion because the goods in question are relatively inexpensive and the parties' brands are centered on the same name—THRIVE. *See Electropix*, 178 F. Supp. 2d at 1131 (holding that less care is exercised where products are fungible and not unique, and "virtually no amount of consumer care can prevent confusion where two entities have the same name."); *Pom*, 775 F.3d at 1127 ("Unlike purchasers of expensive goods—whom we expect to be more discerning and less easily confused—purchasers of inexpensive goods are likely to exercise less care, thus making confusion more likely."). "[T]he standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000); *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1065 (N.D. Cal. 2012). "Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous." *Sleekcraft*, 599 F.2d at 353. "What is expected of this reasonably prudent consumer depends on the circumstances." *Id.* Under the circumstances here, including that Thrive Causemetics has incorporated the entire THRIVE mark into its brand, the goods are identical in kind, and the prices range between \$10 and \$78, consumers are likely to exercise a relatively low standard of care and are highly likely to be confused. *See Electropix*, 178 F. Supp. 2d at 1131 (finding a high degree of care where parties offered "specialized,

273631750v.2

1   custom-tailored technical and creative services to sophisticated customers," but

2   holding this factor still weighed in plaintiff's favor where names were nearly

3   identical); *Stark*, 907 F. Supp. 2d at 1065 (finding wine purchasers exercised low

4   degree of care, thus supporting likelihood of confusion).

5       21.     The "defendant's intent" *Sleekcraft* factor favors finding a likelihood

6   of confusion because Thrive Causemetics knew of Thrive Natural Care's THRIVE

7   mark and the THRIVE Registrations at the time when Thrive Causemetics

8   expanded into the skincare market and began selling the TCI Skincare Products. *See*

9   *Brookfield*, 174 F.3d at 1059; *Synoptek*, 309 F. Supp. 3d at 841 (finding this factor

10  weighed in favor of likelihood of confusion where defendant's founders were not

11  aware of plaintiff at time they chose the accused mark, but they continued to use the

12  accused mark after having "constructive or actual knowledge of the [plaintiff's]

13  mark" from PTO office actions); *Brooklyn Brewery Corp. v. Black Ops Brewing,

14  Inc.*, 156 F. Supp. 3d 1173, 1184 (E.D. Cal. 2016) (factor favors plaintiff where

15  "[e]ven though the injunctive record supports Defendant's assertion that it selected

16  its mark in good faith, Defendant continued using its mark after it became aware of

17  Plaintiff's registered mark."). The "appropriate inquiry" is whether Thrive

18  Causemetics had actual knowledge of Thrive Natural Care's existence and mark

19  usage at the point when Thrive Causemetics began to use the infringing mark in the

20  relevant skincare market. *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F.

21  Supp. 2d 1063, 1080 (N.D. Cal. 2012). By the time Thrive Causemetics expanded

22  into skincare in 2018, Thrive Causemetics was in possession of a trademark

23  clearance report identifying Thrive Natural Care's '942 Registration as a potential

24  conflict, and Thrive Causemetics had received two Office Actions from the USPTO

25  identifying the THRIVE Registrations as conflicts. Thrive Causemetics had also

26  received a cease-and-desist letter from Thrive Natural Care, and Thrive

27  Causemetics' founder had received a rejection from Thrive Natural Care of her

28  request to use the THRIVE mark. There is thus no doubt that Thrive Causemetics

acted with knowledge and intentional disregard of Thrive Natural Care's trademark rights. *See Bellagio Jewelry, Inc. v. Croton Watch Co.*, No. CV-06-6672-ODW-RZx, 2008 WL 3905895, at *10 (C.D. Cal. Aug. 20, 2008) ("[A]fter Plaintiffs' cease and desist letter . . . Croton continued to use the Bellagio mark to market its watches. While there is no evidence that Croton maliciously intended to deceive consumers, this factor still tips in favor of Plaintiffs."); *Synoptek*, 309 F. Supp. 3d at 841; *Brooklyn Brewery*, 156 F. Supp. 3d at 1184.

22.    The "expansion of product lines" *Sleekcraft* factor weighs in favor of finding a likelihood of confusion, as the parties will continue to be direct competitors and there is "potential for even more direct competition between the two lines in the future." *Glow*, 252 F. Supp. 2d at 1001; *Stark*, 907 F. Supp. 2d at 1064. However, where "the parties already compete to a significant degree because they sell related products and use similar marketing channels, this factor is relatively unimportant to the likelihood of confusion analysis." *Fiji Water*, 741 F. Supp. 2d at 1183.

The three factors that courts have found most important in e-commerce infringement cases—similarity of the marks, relatedness of the goods, and use of similar marketing channels—strongly favor finding a likelihood of confusion. *See GoTo.com*, 202 F.3d at 1205; *Brookfield*, 174 F.3d at 1054. The remaining factors therefore would have to "weigh strongly against a likelihood of confusion to avoid the finding of infringement." *Perfumebay.com*, 506 F.3d at 1173-74. But the other relevant factors also weigh in favor of finding that a likelihood of confusion exists between Thrive Natural Care's THRIVE skincare products and Thrive Causemetics' "Thrive Causemetics" skincare products. Thrive Natural Care has therefore successfully demonstrated that Thrive Causemetics has infringed Thrive Natural Care's registered trademark rights in the THRIVE mark.

**B.    False Designation of Origin (15 U.S.C. § 1125(a))**

23.    Because the Court has found in Thrive Natural Care's favor on federal

273631750v.2

trademark infringement, a finding in Thrive Natural Care's favor is also warranted on its federal false designation of origin claim, which relies on the same analysis. *See Brookfield*, 174 F.3d at 1046 n.6.

### C.  Common Law Trademark Infringement

24.  To prove its claim for trademark infringement under California common law, Thrive Natural Care must prove only: "1) their prior use of the trademark and 2) the likelihood of the infringing mark being confused with their mark." *Juan Pollo Fran., Inc. v. B & K Pollo Enterprises, Inc.,* ED-CV-13-2010J-GBSPX, 2015 WL 10695881, at *2 (C.D. Cal. Aug. 6, 2015); *Left Coast Wrestling, LLC v. Dearborn Int'l LLC*, No. 3:17-CV-00466-LAB-NLS, 2018 WL 2328471, at *7 n.4 (S.D. Cal. May 23, 2018); *Wood v. Apodaca*, 375 F. Supp. 2d 942, 947–48 (N.D. Cal. 2005); *see also All Cities Realty, Inc. v. Brunet*, No. B241999, 2013 WL 4017121, at *4 (Cal. Ct. App. Aug. 6, 2013) ("To prove liability for [common law] trademark infringement, plaintiff need only prove defendants used the mark plaintiff used first and continuously.") (citing *Sunset House Distrib. Corp. v. Coffee Dan's, Inc.*, 240 Cal. App. 2d 748, 754 (Ct. App. 1966)).

25.  For the reasons identified above, Thrive Natural Care has shown by a preponderance of evidence that it is the senior user of the THRIVE mark on skincare products, and Thrive Causemetics' use of its mark has caused a likelihood of confusion.

### D.  Common Law Unfair Competition

Because Thrive Natural Care has proven infringement, it has also proven common law unfair competition, which relies on the same analysis. *See Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1161 (C.D. Cal. 2017); *Fleischer Studios, Inc. v. A.V.E.L.A. Inc.*, 772 F. Supp. 2d 1155, 1167 (C.D. Cal. 2009).

### E.  Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*)

26.  Because Thrive Natural Care has proven infringement, it has also

proven statutory unfair competition in violation of Cal. Bus. & Prof. Code § 17200, which relies on the same analysis. *See S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014).

### F.  Willful Infringement

27.  Thrive Natural Care has proven by a preponderance of evidence that Thrive Causemetics' infringement was willful. *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1219 (9th Cir. 2003) (finding willful trademark infringement where the defendant "utilized a mark that was similar to that of its competitor, was informed of actual confusion, and deliberately chose not to make a reasonable effort to ascertain whether it might actually be infringing."). "Willfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with 'an indifference to plaintiff's rights'—in other words, that defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it." *Coach, Inc. v. Celco Customs Servs. Co.*, No. CV-1110787-MMM-FMOX, 2012 WL 12883972, at *6 (C.D. Cal. Oct. 31, 2012); *see also Capbran Holdings, LLC v. Firemall LLC*, No. CV-16-02980-DSFA-FMX, 2017 WL 4769434, at *6 (C.D. Cal. Aug. 23, 2017) ("A defendant may be liable for willful trademark . . . infringement for knowing conduct or willful blindness."); *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1050 (N.D. Cal. 2010) ("Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark."); *Hydramedia Corp. v. Hydra Media Grp., Inc.*, No. CV-06-05293-DDP-JTLX, 2008 WL 11336118, at *3 (C.D. Cal. Dec. 29, 2008), aff'd, 392 F. App'x 522 (9th Cir. 2010) (holding "the Court finds that a showing of 'objective recklessness' is sufficient to demonstrate willful infringement" and noting that standard is consistent with Ninth Circuit decisions "which permit circumstantial evidence of reckless behavior even where the infringing party ignores objective evidence of infringement.") (citing *Earthquake Sound*, 352 F.3d at 1219.

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

28.     Thrive Causemetics knew Thrive Natural Care's rights in 2018 when Thrive Causemetics began selling skincare products, and Thrive Causemetics nonetheless proceeded to broadly use the THRIVE mark on directly competitive skincare products at Thrive Natural Care's expense. *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993); *Razor USA LLC v. Vizio, Inc.*, No. 14-CV-01586S-JOJ-CGX, 2015 WL 12656941, at *6 (C.D. Cal. Oct. 19, 2015).

29.     Further, there is "strong evidence of willful infringement" in the facts that—prior to Thrive Causemetics expanding into the skincare market—it was in possession of a trademark clearance search identifying Thrive Natural Care's trademark registration as a potential conflict, and Thrive Causemetics had received two USPTO office actions recognizing Thrive Causemetics' use of the "Thrive Causemetics" brand created a likelihood of confusion with the THRIVE Registrations. *Razor USA*, 2015 WL 12656941, at *6 ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement.") (quoting E. *& J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 472, 475 (N.D. Cal. 1992) (holding defendant "was on notice that there could be a likelihood of confusion" when Canadian trademark officials cited plaintiff's mark as a reason for denying defendant's trademark application)); *see also Synoptek, LLC v. Synaptek Corp.*, No. SA-CV-1601838-CJC-JCGX, 2018 WL 3359017 ("*Synoptek II*"), at *9 (C.D. Cal. June 4, 2018) ("Synaptek nevertheless continued to use the 'Synaptek' mark and to pursue federal registration of that mark despite multiple PTO denials on the same grounds. Synaptek's blatant use of the 'Synaptek' mark in spite of the PTO denials provides strong evidence of willful infringement."). There is "no doubt but that [Thrive Causemetics] was on notice that there could be a likelihood of confusion caused by its use of the "[THRIVE]" mark." *Consorzio*, 782 F.Supp. at 475. While Thrive Causemetics was able to overcome the USPTO's 2015 Office Action based on the '942 Registration, Thrive Causemetics did so by arguing that its color cosmetics were in a different category

of goods from Thrive Natural Care's skincare products. That argument could no longer apply when Thrive Causemetics expanded into skincare in 2018. *See Synoptek II*, 2018 WL 3359017, at *10 (holding defendant's belief it was not infringing was not reasonable "because . . . the PTO's decision directly contradicted this belief.").

30.     In addition, the fact that Thrive Causemetics received a cease-and-desist letter from Thrive Natural Care prior to expanding into the skincare market also strongly supports a finding of willful infringement. *See Consorzio*, 782 F.Supp. at 475. While Thrive Causemetics responded to that letter arguing its color cosmetics differed from Thrive Natural Care's skincare products, that argument no longer carried force when Thrive Causemetics started selling skincare products in 2018. While Thrive Causemetics may have had reason to believe it did not infringe when selling color cosmetics, that belief could not have been reasonable when applied to its sale of skincare products. *See Synoptek II*, 2018 WL 3359017, at *10 (finding willful infringement where "Synaptek's continued use of 'Synaptek' demonstrates an indifference to Synoptek's trademark rights and a willingness to determine unilaterally, in spite of the PTO's denials, that Synoptek's rights in its marks should be ignored."); *Bellagio*, 2008 WL 3905895, at *10. As such, the Court finds that Thrive Natural Care has proven that Thrive Causemetics' infringement was willful.

## G.     Abandonment Affirmative Defense

31.     Thrive Causemetics has failed to prove by clear and convincing evidence that the '942 Registration is invalid due to abandonment by its owner. The Ninth Circuit has held that abandonment must be "strictly proved." *Prudential Ins. Co. of America v. Gibraltar Fin. Corp. of Calif.*, 694 F.2d 1150, 1156 (9th Cir.1982). "The majority of courts have interpreted the 'strictly proved' rule to mean that evidence of the elements of abandonment must be clear and convincing." 3 McCarthy on Trademarks and Unfair Competition § 17:12 (5th ed.); *see also*

*Cash Processing Servs. v. Ambient Entm't, Inc.*, 418 F.Supp.2d 1227, 1231-1232 (D. Nev. 2006) ( "While the Ninth Circuit has not defined 'strictly proved' further, the majority of courts applying that standard have found that evidence of abandonment must be clear and convincing."). Courts in this District have agreed that clear and convincing evidence is the proper standard. *See eMachines, Inc. v. Ready Access Memory, Inc.*, No. EDCV00-00374-VAP-EEX, 2001 WL 456404, at *5 (C.D. Cal. Mar. 5, 2001) ("Because a trademark owner's certificate of registration is prima facie evidence of the registration and continued use of the mark, the burden of proof is on the party seeking to show abandonment, and *abandonment must be shown by clear and convincing evidence*."); *Partners for Health & Home, L.P. v. Seung Wee Yang*, No. CV-09-07849-CBM-RZX, 2010 WL 11549564, at *3 (C.D. Cal. Sept. 13, 2010) ("The burden of proof is on the party seeking to show abandonment, which must be shown by clear and convincing evidence."). The TTAB also agrees that abandonment must be proven by clear and convincing evidence. *See Winnebago Indus., Inc.*, 207 USPQ ¶ 335 (TTAB June 30, 1980) ("[I]t is also well settled that insofar as the question of abandonment of a mark is concerned, the burden is on petitioner to establish as a fact by clear and convincing proofs the abandonment of such mark by respondent.").

32.    Thrive Causemetics challenges the assignment of the '058 Application from Ecomundi to Thrive Natural Care in May 2013 as allegedly invalid under 15 U.S.C. § 1060(a)(1). That section states that no intent-to-use trademark application may be assigned "except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing." 15 U.S.C. § 1060(a)(1). This challenge fails first for the reason that the '942 Registration did not issue directly from the '058 Application, but rather from a subsequent application, the '517 Application, which was created as a result of Thrive Natural Care filing a request to divide. Further, when the '517 Application was created in November 2013, it was not an intent-to-use application,

as Thrive Natural Care had already filed a Statement of Use regarding the goods in that application in October 2013. Therefore, the trademark application that matured as the '942 Registration cannot be invalid under § 1060(a)(1), and the '942 Registration—which registered to Thrive Natural Care—was not abandoned.

33.     In addition, Thrive Natural Care is and has always been the registrant of the '942 Registration, and the registration has been deemed incontestable by the USPTO. By statute, Thrive Natural Care's incontestable registration "shall be conclusive evidence . . . of the *registrant's* ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b) (emphasis added). Thrive Natural Care's ownership cannot be challenged based purported abandonment by Ecomundi, who is neither the registrant nor alleged to be a legal successor to the registrant, as that would contradict § 1115(b) and Supreme Court precedent that incontestability "provide[s] a means for the registrant to quiet title in the ownership of his mark." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). Refusing to give effect to the language in § 1115(b) expressly requiring a conclusive determination of ownership would "run[] afoul of the rule that a statute should not be construed so as to render any provision of that statute meaningless or superfluous.'" *Fuentes v. Lynch*, 788 F.3d 1177, 1181 (9th Cir. 2015) (quoting *Beck v. Prupis*, 529 U.S. 494, 506 (2000)). Rather, consistent with § 1115(b), the Court only reviews the registration itself to determine ownership. "Because an incontestable trademark registration constitutes 'conclusive evidence' of 'the registrant's ownership of the mark,' . . . it is unnecessary to consider any other evidence regarding ownership of the [incontestable] trademark." *Cyclone USA, Inc. v. LL&C Dealer Servs., LLC*, No. 03-0992 AJW, 2007 WL 9662337, at *26 (C.D. Cal. Nov. 8, 2007); *see also Rexel Inc. v. Rexel Int'l Trading Corp.*, 540 F. Supp. 2d 1154, 1163 (C.D. Cal. 2008) (accepting undisputed incontestable registration as conclusive evidence of plaintiff's ownership of mark). The Court therefore must conclusively determine

that Thrive Natural Care owns the '942 Registration. *See* 15 U.S.C. § 1115(b). Any other ruling would render meaningless § 1115(b)'s conclusive evidence language, which would violate Ninth Circuit and Supreme Court rules of statutory construction.

34.     Even if the Court does consider the assignment of the '058 Application, the result remains the same. The Trademark Trial & Appeals Board and other courts have held that § 1060(a)(1) "must allow for the transfer of an intent to use application claiming a bona fide intention to use the mark for goods which are not yet in production or which may be in the planning stage . . . ." *Exel Oyj v. D'Ascoli*, Opposition No. 91160397, 2008 WL 4354180, at \*7 (T.T.A.B. Sept. 19, 2008)); *Vacation Rental Partners, LLC v. VacayStay Connect, LLC*, No. 15 CV 10656, 2017 WL 1150806, at \*6 (N.D. Ill. Mar. 28, 2017) (quoting *Exel Oyj*). "Prior to filing a statement of use, an applicant may not have actually used the mark in commerce yet, but it may have goodwill or existing business tied to the mark (e.g., relationships based on planned use of the mark)—that is enough to ensure that a trademark has no existence separate from the product or service it symbolizes." *VacayStay*, 2017 WL 1150806, at \*7 (citing § 1060 legislative history). Therefore, "Section 1060(a)(1) was designed to allow assignment of intent-to-use applications before actual use." *Id.* Thrive Natural Care has demonstrated that Ecomundi engaged in substantial business planning relating to the THRIVE mark and THRIVE-branded skincare products in 2012 and prior to the assignment in 2013, which built goodwill in the THRIVE mark. Thrive Natural Care received from Ecomundi an assignment of all of that goodwill in the THRIVE trademark that had been built through these business planning activities and all aspects of the business relating to the THRIVE mark. The assignment thus satisfied the requirements of 15 U.S.C. § 1060(a)(1) and is valid.

**H.     Laches Affirmative Defense**

35.     Thrive Causemetics has failed to prove by a preponderance of

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

- 38 -

evidence that Thrive Natural Care's claims are barred by the doctrine of laches, because Thrive Natural Care did not wait to file suit for more than four years after it knew or should have known it had a valid infringement claim against Thrive Causemetics. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 n.11 (9th Cir. 2006) (noting laches limitations period is four years and "[i]f a plaintiff files suit within the applicable period of limitations for his claim, there is a strong presumption that laches does not bar the claims."). Thrive Natural Care was not obligated to file suit "until its right to protection has ripened such that plaintiff knew or should have known that it *had a provable infringement claim* against defendant." *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (emphasis added). In other words, "the trademark owner need not sue until the likelihood of confusion looms large[.]" *Id.* That is not the same as the plaintiff knowing the defendant is using the potentially infringing mark. *See id.* A trademark holder is "not required to . . . fire both barrels of [its] shotgun instantly upon spotting a possible infringer." *Luna Distrib. LLC v. Stoli Grp. (USA), LLC*, No. SA-CV-171552DOC-JDEX, 2018 WL 5099277, at *6 (C.D. Cal. July 10, 2018).

36.     Further, the doctrine of progressive encroachment holds "the trademark owner need not sue in the face of *de minimis* infringement by the junior user" but "may wait until the junior user of a mark moves into direct competition selling the same 'product' through the same channels and causing actual market confusion." *Tillamook*, 465 F.3d at 1110 (question is whether "the [junior user], after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks"). A common method of encroachment is "the junior user's expansion of its business . . . into different markets." *Id.*

37.     Thrive Causemetics' move from the makeup market to the skincare market in October 2018 constitutes progressive encroachment from a different

market into a market in direct competition with Thrive Natural Care. *See Tillamook*, 465 F.3d at 1110 (noting that had defendant who sold smoked meats "'expanded its business' into selling cheese in grocery stores [plaintiff sold cheese], it would be a different story."). Thrive Natural Care's claims are for infringement in relation to skincare products, not makeup. The clock for laches purposes therefore did not start running until, at the very earliest, October 2018. Thrive Natural Care filed suit two years later, the same year it learned that Thrive Causemetics was selling skincare products. That was not an unreasonable delay. *See Miller*, 454 F.3d at 997.

38. Even if Thrive Causemetics' market expansion were not progressive encroachment, Thrive Natural Care had no reason to believe that infringement "loomed large" from a single email interaction with Thrive Causemetics in 2016, which is the only interaction between the parties outside the four-year limitations period. *See Tillamook*, 465 F.3d at 1108. In that email exchange between the parties' CEOs, Ms. Bodnar stated Thrive Causemetics only sold color cosmetics to help women with cancer and requesting permission to use the "Thrive" name, which Thrive Natural Care denied. It is unreasonable to conclude that Thrive Natural Care's obligation to sue a party that solely sold makeup began after that sole contact. Thrive Natural Care reasonably expected Ms. Bodnar to abide by its response (otherwise why ask permission?) and correctly believed Thrive Causemetics was not selling skincare products. This single interaction could not have triggered Thrive Natural Care's obligation to sue for skincare products when Thrive Causemetics was not even selling skincare products at this time and there was no indication it ever would. Thrive Causemetics' letter of April 2017 supports this conclusion, as it argued that Thrive Natural Care had no cause of action against Thrive Causemetics for selling makeup, which did not encroach upon Thrive Natural Care's lane of skincare products.

39. Neither could the parties' later interactions that were well within the four-year laches period trigger a bar of Thrive Natural Care's claims. Until Thrive

1  Natural Care learned Thrive Causemetics had become a direct competitor in

2  skincare, Thrive Natural Care did not know it had a "provable infringement claim."

3  *See Tillamook*, 465 F.3d at 1108. Throughout 2017-2018, when Thrive Causemetics

4  sold only makeup, infringement did not "loom large." *Id*. Thrive Causemetics

5  therefore has not shown that laches bars Thrive Natural Care's claims.

6       **I.     Disgorgement of Thrive Causemetics' Profits**

7       40.    Thrive Natural Care has proven by a preponderance of evidence Thrive

8  Causemetics' profits from sales of TCI Skincare Products total $21,524,380, which

9  constitutes Thrive Causemetics' gross revenues minus direct expenses, including

10  cost of goods sold, relating to sale of those products. *See* 15 U.S.C. § 1117(a).

11  Thrive Natural Care is thus entitled to disgorgement of Thrive Causemetics' profits

12  in that amount. *See id*.

13      41.    While willful infringement is not required to receive disgorgement,

14  Thrive Natural Care has shown Thrive Causemetics possessed *mens rea* to infringe,

15  which remains "a highly important consideration in determining whether an award

16  of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc*., 140 S. Ct. 1492,

17  1497 (2020).

18      42.    Disgorgement is also a proper remedy because it ensures Thrive

19  Causemetics does not profit from its infringement and serves to deter similarly-

20  situated defendants. *See Monster Energy Co. v. Integrated Supply Network, LLC*,

21  No. ED-CV-17548-CBM-RAOx, 2021 WL 1521981, at *2 (C.D. Cal. Apr. 12,

22  2021); *Playboy Enters., Inc. v. Baccarat Clothing Co*., 692 F.2d 1272, 1275 (9th

23  Cir. 1982) ("Any other remedy" besides disgorgement of profits earned from the

24  infringing activity "results in the defendants being unjustly enriched."). In *Playboy*,

25  the Ninth Circuit found the district court abused its discretion in failing to award

26  disgorgement of profits after it awarded the plaintiff compensatory damages equal

27  to one-tenth of the profits earned from the defendants' infringement. *Id*. at 1274.

28  The *Playboy* court emphasized "the trial court's *primary function* should center on

making any violations of the Lanham Act unprofitable to the infringing party." *Id.* at 1274 (emphasis added); *see also Monster*, 2021 WL 1521981, at *2 ("Fairness also supports disgorgement of profits so that Defendant does not profit from its unlawful infringement."). Similarly, in *Maier Brewing Co. v. Fleischmann Distilling Corp.*, the Ninth Circuit explained that "granting an accounting of profits" is proper to prevent unjust enrichment by an infringer, reasoning "[s]uch an approach to the granting of accountings of profits would, by removing the motive for infringements, have the effect of deterring future infringements. The courts would therefore be able to protect the intangible value associated with trade-marks and at the same time be protecting the buying public from some of the more unscrupulous members of our economic community." 390 F.2d 117, 123 (9th Cir. 1968). An award of disgorged profits here appropriately serves the interests of deterrence and preventing unjust enrichment to Thrive Causemetics.

43.    "In determining the defendant's profits, the plaintiff bears the burden of proving the defendant's sales; the defendant must then prove any costs or deductions from the gross sales figure." *A & M Recs., Inc. v. Abdallah*, 948 F. Supp. 1449, 1458 (C.D. Cal. 1996). Thrive Causemetics has failed to meet its burden of proving claimed indirect expenses were "of actual assistance" in the production, distribution, or sale of the infringing products, and therefore such indirect expenses are not properly deductible from the award of total profits. *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984); *Folkens v. Wyland*, No. C-01-1241 EDL, 2002 WL 1677708, at *5 (N.D. Cal. July 22, 2002) (holding that a "pure allocation" of indirect expenses based on percentage of revenue is not permissible and has been "specifically rejected" by the Ninth Circuit); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985) (rejecting defendants' attempt to deduct indirect costs based on allocation by percentage of revenue, as "[t]hat is not the law of this circuit."). As just one example, Thrive Causemetics sought to deduct income taxes, but "income

taxes paid during the period in question are not proper deductions in the absence of mitigating circumstances." *Monster*, 2021 WL 1521981, at *7 (listing cases). Therefore, Thrive Causemetics is not entitled to deduct any expenses from its gross revenues other than cost of goods sold, as noted above.

### J.    Enhanced Damages

44.    The Court has discretion to increase the profit award above the net profits proven "[i]f the court shall find . . . the amount of the recovery . . . inadequate." 15 U.S.C. § 1117(a). "If the violation is found to be willful, the trial court should award treble damages unless it finds 'extenuating circumstances." *A & M Records*, 948 F. Supp. at 1458. As noted above, Thrive Causemetics' infringement was willful. To the extent the award of monetary damages is inadequate, the Court orders that the damages award be increased or trebled pursuant to 15 U.S.C. § 1117(a).

### K.    Permanent Injunction

45.    Given that Thrive Natural Care has proven trademark infringement and unfair competition, the Court finds it proper to grant a permanent injunction barring Thrive Causemetics from displaying or selling TCI Skincare Products under the "Thrive Causemetics" mark or otherwise infringing Thrive Natural Care's THRIVE mark. *See* 15 U.S.C. § 1116(a). Where the infringing use of the mark is for similar goods, "broad injunctions are especially appropriate." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988) (finding no abuse of discretion in district court's issuance of permanent injunction, in light of likelihood of confusion from infringer's use of the word "Century" in offering service "very similar" to that of Century 21).

46.    Because Thrive Natural has proven infringement, it is entitled to a presumption of irreparable harm pursuant to the recent Trademark Modernization Act of 2020. *See id*. Further, Thrive Natural Care has suffered irreparable harm in the loss of control over its brand, goodwill, and reputation. *See Vineyard House*,

273631750v.2

*LLC v. Constellation Brands U.S. Ops., Inc.*, No. 4:19-CV-01424-YGR, 2021 WL 254448, at *14 (N.D. Cal. Jan. 26, 2021) ("The loss of control over one's trademarks, reputation, and goodwill is 'a quintessentially irreparable injury.'") (quoting *Adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1249 (D. Or. 2016) and McCarthy on Trademarks, § 30:47.70 ("A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.")); *see also Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1017 (C.D. Cal. 2017) ("By borrowing [plaintiff]'s mark, Defendants impair [plaintiff]'s control over its reputation" and finding irreparable harm where defendant used mark "Offloader One" for knee braces, which was substantially similar to plaintiff's "Unloader One" mark for the same products); *Fiji Water*, 741 F. Supp. 2d at 1183 ("If VITI continues to introduce its infringing product into the marketplace, FIJI will undoubtedly have great difficulty maintaining and restoring its reputation and goodwill with the public, many of whom are already confused."); *Starbucks Corp. v. Heller*, No. CV-14-01383-MMM-MRWx, 2014 WL 6685662, at *8 (C.D. Cal. Nov. 26, 2014) ("[T]he injury caused by the presence of infringing products in the market—such as lost profits and customers, as well as damage to goodwill and business reputation—will often constitute irreparable injury.").

47.     Without an injunction, "[Thrive Causemetics] will continue to try and use the [THRIVE] term for its own benefit and such use will not only be a violation of [Thrive]'s trademark rights but will harm the public as it will suggest an inference regarding the origin of the [accused goods] that is unsupported in any credible manner. [Thrive Causemetics] will suffer no hardship as it has no right, or credible basis, to use the term." *Vineyard House*, 2021 WL 254448, at *14. The facts and the Court's findings therefore warrant granting a permanent injunction as requested by Thrive Natural Care.

PLAINTIFF'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW
CASE NO. 2:20-CV-09091-PA-AS

273631750v.2

L.     **Attorneys' Fees and Costs**

48.     The Court finds that, in light of its findings above, this is an "exceptional case" under the Lanham Act and grants an award of attorneys' fees and costs to Thrive Natural Care. *See* 15 U.S.C. § 1117(a).

49.     An "exceptional" case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "While 'exceptional' is not defined in the statute, 'generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate, or willful.'" *Zynga Game Network, Inc. v. Goh*, No. C-09-05297-SBA (DMR), 2011 WL 13376996, at *17 (N.D. Cal. Feb. 14, 2011), report and recommendation adopted, No. C 09-05297 SBA, 2011 WL 13376997 (N.D. Cal. Mar. 1, 2011) (quoting *Lindy Pen*, 982 F.2d at 1409). "Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark." *Id*. "Egregious conduct is not required." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015).

50.     As explained above, Thrive Causemetics knowingly and intentionally infringed the THRIVE mark when it began selling skincare products under the "Thrive Causemetics" brand. Thrive Causemetics knew that was likely to be infringing but made the calculation to continue with its skincare launch and expansion anyway. Thrive Natural Care is an innocent actor who was forced to file suit and litigate through trial to protect its brand from Thrive Causemetics' willful infringements. These facts support that this is an "exceptional case" under the Lanham Act, and the Court therefore awards Thrive Natural Care its attorneys' fees and costs incurred in this action. *See Earthquake Sound*, 352 F.3d at 1218.

/ / /

### M. Pre- and Post-Judgment Interest

51. The Court awards post-judgment interest on monetary damages, as such an award is mandatory. 28 U.S.C. § 1961; *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

52. "[P]rejudgment interest is an element of compensation, not a penalty." *Id.* For the reasons identified above, Thrive Natural Care has shown that the balance of equities favors awarding prejudgment interest on monetary damages awarded herein. *See Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F. 3d 948, 963 (9th Cir. 2018).

## III. CONCLUSION

Thrive Natural Care has proven its claims for federal, common law, and statutory trademark infringement and unfair competition against Thrive Causemetics. Thrive Causemetics has failed to meet its burden to show Thrive Natural Care's claims are barred by laches. Accordingly, judgment shall be entered in favor of Thrive Natural Care and against Thrive Causemetics.

DATED: October 14, 2021

Respectfully submitted,

THE MCARTHUR LAW FIRM, PC

By: */s/ Stephen McArthur*
Stephen McArthur
Thomas Dietrich

*Attorneys for Plaintiff Thrive Natural Care*

# CERTIFICATE OF SERVICE

Case Name: *Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*
Case No.: 2:20-cv-9091-PA-AS

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 9465 Wilshire Blvd., Ste. 300, Beverly Hills, CA 90212. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**PLAINTIFF THRIVE NATURAL CARE, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

on the following parties by electronically filing the foregoing on October 14, 2021, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rollin Ransom (SBN 196126)                   *Attorneys for Defendant*
rransom@sidley.com
Ryan Stasell (SBN 307431)
rstasell@sidley.com
Paula Salazar (SBN 327349)
psalazar@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth St., Ste. 4000
Los Angeles, CA 90013

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date:   10/14/2021              By:   */s/ Thomas Dietrich*
                                     Thomas Dietrich