Rollin Ransom (State Bar No. 196126)
rransom@sidley.com
Lauren M. De Lilly (State Bar No. 301503)
ldelilly@sidley.com
Paula Salazar (State Bar No. 327349)
psalazar@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite-4000
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

*Attorneys for Defendant Thrive Causemetics, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRIVE NATURAL CARE, INC.<br><br>Plaintiff,<br><br>v.<br><br>THRIVE CAUSEMETICS, INC.,<br><br>Defendant. | Case No. 2:20-cv-9091-PA-AS<br><br>**TRIAL DECLARATION OF NED A. MENNINGER**<br><br>Trial Date:   November 9, 2021<br>Time:   9:00 a.m.<br>Place:   Courtroom 9A |

**TRIAL DECLARATION OF NED A. MENNINGER**

I, Ned A. Menninger, declare and state as follows:

1. I am the Vice President ("VP") of Finance at Thrive Causemetics, Inc. ("Thrive Causemetics"). This declaration sets forth my direct trial testimony in support of Thrive Causemetics' case-in-chief. I have personal knowledge of the facts stated in this declaration and I would and could testify as to them if called as a witness in this action.

2. I graduated in 1984 from the University of Southern California with a Bachelor of Science degree in Business and since then have worked for over 35 years in various financial, administration, and public accounting roles, including management and senior management with responsibility for financial reporting, raising capital, and analysis and advisement of strategic business options.

3. I joined Thrive Causemetics in 2017 as a contract Chief Financial Officer ("CFO") and served in that role for approximately two years, transitioning to an employee CFO role around July 2019. My title changed to VP of Finance in 2021 but my job responsibilities remained the same. I was attracted to Thrive Causemetics in part because of my background and interest in advising young companies, but also because of the quality of Thrive Causemetics' products, the drive of its founder and Chief Executive Officer ("CEO"), Karissa Bodnar, and its commitment to support women in need through charitable giving.

4. As VP of Finance, my responsibilities include managing, supervising, and executing on all of Thrive Causemetics' financial reporting obligations, maintaining the general ledger, managing Thrive Causemetics' accounting, corresponding with Thrive Causemetics' professional advisors, evaluating business opportunities, reporting to and updating Thrive Causemetics' Board of Directors, and providing strategic advice and support to Ms. Bodnar. I also supervise another employee who assists me with Thrive Causemetics' financial reporting and accounting. Due to my responsibilities for Thrive Causemetics' financial reporting

and accounts, I have personal knowledge of all of Thrive Causemetics' financial information, including its revenue, advertising expenditures, and other costs.

5. During the course of discovery in this lawsuit, I understood that Plaintiff sought the production of certain financial information, including revenue, profit, and costs, by product, for Thrive Causemetics' products. Accordingly, in March 2021, I created spreadsheets of Thrive Causemetics' financial information for all of Thrive Causemetics' products, and separately, for its skincare products, from November 2016 through February 2021, and provided those spreadsheets to Thrive Causemetics' counsel for production in this action, true and correct copies of which have been marked as Trial Exhibits 2 and 3, respectively.

6. Thrive Causemetics maintains certain of the information reflected in Trial Exhibits 2 and 3 (*e.g.*, revenues and landed costs of goods sold) on a product-by-product basis in its financial records. However, in the ordinary course of business, Thrive Causemetics does not track certain other costs, including particularly its overhead costs, on a product-by-product basis; instead, the company tracks those costs on an all-up basis. Accordingly, in preparing the spreadsheets marked as Trial Exhibits 2 and 3, I apportioned overhead costs by calculating the percentage of units sold of each skincare product relative to the total units of all products sold (*i.e.*, units of a specific skincare product sold divided by total units sold), applied that percentage to the company's total overhead costs for each year, and then allocated the resulting cost figure to the corresponding skincare product.

7. In June 2021, I provided updated financial information for Thrive Causemetics' skincare products as well as updated financial information for Thrive Causemetics' "Buildable Blur CC Cream" color cosmetics product. Trial Exhibit 38 is a true and correct copy of the spreadsheet that I prepared reflecting this financial information; it was prepared using the same methodology described above with respect to Trial Exhibits 2 and 3.

8.	In July 2021, I provided financial information for Thrive Causemetics' Filtered Effects Blurring Primer color cosmetics product.  Trial Exhibit No. 452 is a true and correct copy of the spreadsheet that I prepared reflecting this financial information; it was prepared using the same methodology described above with respect to Trial Exhibits 2 and 3.

9.	Thrive Causemetics has achieved remarkable success since its founding, with significant year-over-year growth.  From late 2016 through February 2021, Thrive Causemetics achieved a total of $422,764,692 in revenues, including $27,436,054 attributable to the sale of skincare products, as detailed in Trial Exhibit Nos. 2, 3, 38, and 452.

10.	Since 2016, Thrive Causemetics has devoted substantial and increasing amounts to advertising its products and building its brand, as reflected in Trial Exhibit Nos. 2, 3, 38, and 452.

11.	In addition to other costs, Thrive Causemetics incurs (and Trial Exhibits 2, 3, 38, and 452 reflect) overhead expenses in the operation of its business. Although, as noted above, Thrive Causemetics does not track these overhead expenses on a product-by-product basis in the ordinary course of business (as many of the costs relate to the growth and success of Thrive Causemetics' brand and entire product range, including skincare products, as a whole), each category of overhead expense is of actual assistance in the production, distribution, and/or sale of Thrive Causemetics' skincare products, as follows:

a.	Thrive Causemetics pays salaries and benefits to its employees, which allow it to employ nearly one hundred people who are indispensable to the development, production, advertising, marketing, distribution, and sale of all Thrive Causemetics' products, including its skincare products; these employee roles include personnel responsible for procurement and purchasing and product management (*e.g.*, Fulfillment Coordinator, Purchasing Manager, Inventory Manager, Supply Chain Planning Manager, etc.), sales (*e.g.*, CRM Manager, eCommerce Merchandising

Manager, etc.), and marketing (*e.g.*, Growth Marketing Manager, Social Media Coordinator, Manager of Creative Services, Graphic Designer, etc.).

   b. As described in greater detail in Ms. Bodnar's Trial Declaration, Thrive Causemetics' charitable expenses are a core part of its mission and business model, and are a key driver of Thrive Causemetics' product sales, including sales of Thrive Causemetics' skincare products.

   c. Thrive Causemetics' research and development ("R&D") expenses, which are, by definition, of actual assistance in the production of Thrive Causemetics' skincare and other products – those products would not exist, and could not be produced (much less distributed and sold) without R&D expenses.

   d. Thrive Causemetics' rent and related office equipment and administrative expenses enable the company to maintain its two office locations (one in Bellevue, Washington and another in Los Angeles, California) which it actively uses in the production, distribution, and sale of all of Thrive Causemetics' products, including skincare products.

   e. Thrive Causemetics' expenses related to travel, entertainment, and public relations include, for example, expenses related to new product launches (such as travel to contract manufacturers for quality assurance testing) and product marketing (such as meetings with press and social media influencers to help create awareness and enthusiasm for the new products). These expenses are incurred for the purpose of marketing and promoting Thrive Causemetics and its products, including its skincare products, and thus directly facilitate and assist in the sale of those products.

   f. Thrive Causemetics is required by law to pay taxes, including income taxes, which arise from and are attributable to the sale of its products, including its skincare products, and the payment of those taxes is necessary to permit the continued production, distribution, and sale of those products. Likewise, Thrive Causemetics maintains insurance for which it pays premiums included in the

company's overhead expenses, which is necessary (and in some cases, required by law) for the company to produce, distribute, and sell its products, including its skincare products.

   g. Thrive Causemetics engages legal counsel for a variety of issues, including regulatory compliance related to its skincare and other products, and those legal fees are thus necessary to, and thus of actual assistance in, the production, distribution, and sale of those products.

   h. Finally, Thrive Causemetics engages a variety of non-legal professional services necessary to the company's ongoing business operations, such as auditing, tax preparation services and other banking services, the retention and payment of which are necessary for the continued operation of Thrive Causemetics' business and thus instrumental to the company's ability to maintain and grow the production, distribution, and sale of Thrive Causemetics' skincare and other products.

  12. I understand that Plaintiff has taken the position that legal expenses incurred by Thrive Causemetics in connection with the class action case *Barker v. Thrive Causemetics, Inc.* were not "of actual assistance" in the production, distribution, or sale of Thrive Causemetics' skincare products. That claim is incorrect. At issue in that lawsuit was not a specific product or product line, it was instead a claim regarding Thrive Causemetics' charitable giving mission. Although the action was filed shortly before the public launch of Thrive Causemetics' skincare products, legal expenses incurred in connection with Thrive Causemetics' defense of its marketing, advertising, and representation of its charitable giving mission are directly tied to the manner in which Thrive Causemetics can advertise and market *all* of its products, including the skincare products first sold shortly after the lawsuit was filed, because Thrive Causemetics' charitable giving mission is core to its brand identity and is inextricably linked to how the company sells products, including skincare products.

  13. I further understand that Plaintiff has taken the position that Thrive Causemetics has a strong commercial presence in part because it was allegedly in

talks with Goldman Sachs as of July 2020 "to assess an IPO or a sale to a larger company." This is also incorrect. Although Thrive Causemetics had discussions with Goldman Sachs respecting various strategic issues related to the company, including the prospect of a potential acquisition of or for the company, Thrive Causemetics' discussions with Goldman Sachs were exploratory only and ended in the first quarter of 2020, at the start of the COVID-19 global pandemic.

I declare under penalty of perjury under the laws of the United States that the above facts are true and correct, and that this declaration was executed this 26th day of October 2021, in Sammamish, Washington.

Ned A. Menninger