1  Rollin Ransom (State Bar No. 196126)
   rransom@sidley.com
2  Lauren M. De Lilly (State Bar No. 301503)
   ldelilly@sidley.com
3  Paula Salazar (State Bar No. 327349)
   psalazar@sidley.com
4  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite-4000
5  Los Angeles, CA 90013
   Telephone:  (213) 896-6000
6  Facsimile:  (213) 896-6600

7  *Attorneys for Defendant Thrive*
   *Causemetics, Inc.*

8

9

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12

13  THRIVE NATURAL CARE, INC.          Case No. 2:20-cv-9091-PA-AS

14            Plaintiff,               **TRIAL DECLARATION OF**
                                       **EXPERT WITNESS DR. ITAMAR**
15       v.                            **SIMONSON**

16  THRIVE CAUSEMETICS, INC.,          Trial Date:   November 9, 2021
                                       Time:         9:00 a.m.
17            Defendant.               Place:        Courtroom 9A

18

19

20

21

22

23

24

25

26

27

28

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

## TRIAL DECLARATION OF DR. ITAMAR SIMONSON

I, Dr. Itamar Simonson, declare and state as follows:

1.     I am an expert witness designated by Thrive Causemetics, Inc. ("Defendant" or "Thrive Causemetics"), the Defendant in the above-captioned action. This declaration sets forth my direct trial testimony in support of Thrive Causemetics' case-in-chief.  I have personal knowledge of the facts stated in this declaration and I would and could testify as to them if called as a witness in this action.

2.     I served as the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University, from 1993 through 2020.  Since the beginning of 2021, I have served as the Sebastian S. Kresge Emeritus Professor of Marketing (while continuing to teach and advise doctoral students at the Stanford Business School).  I hold a Ph.D. in Marketing from the Duke University Fuqua School of Business, a Master's degree in Business Administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree with majors in Economics and Political Science from The Hebrew University.  A copy of my curriculum vitae is attached hereto as **Exhibit A**.

3.     My field of expertise is consumer behavior, marketing management, the role of price, brand, and product features as they relate to consumer behavior, research methods, the design and analysis of consumer surveys and common survey mistakes, and human judgment and decision-making.  Most of my research has focused on consumers' purchasing behavior, and the effects of product characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions and advertising) on buying decisions.

4.     I have published numerous articles in my career, which are listed in my curriculum vitae (Exhibit A), which deal with consumer decision-making, the role of brands, likelihood of confusion from the consumer's perspective, and many other topics.  Among those are academic articles relating to methodological aspects of likelihood of confusion surveys.  For example, one article examined "The Effect of

Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test."[1]  Although this article, which tested alternative methods across a dozen different pairs of marks, was not designed to estimate marketplace confusion (*e.g.*, the respondents did not represent any particular universe, and the survey did not include controls), it provided insights into various old and new methods.[2]  I also co-authored a chapter on "Demand Effects in Likelihood of Confusion Surveys," in the ABA-published book entitled *Trademark and Deceptive Advertising Surveys*.[3]

5.    I have received various awards, including (a) the 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award; (b) an Honorary Doctorate from the University of Paris – Sorbonne Universities; (c) the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 1987 and 1989; (d) the 1997 O'Dell Award, given for the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (e) the 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, 2008, and 2012); (f) the award for the Best Article published in the *Journal of Public Policy & Marketing* (the main journal on public policy and legal aspects of marketing) between 1993 and 1995; (g) the Ferber Award from the Association for Consumer Research, the largest association of consumer researchers in the world; (h) Elected Fellow of the Association for Consumer Research; (i) the 2016 American Marketing Association Award for the Best Book in Marketing; (j) the 2002 American Marketing Association award for the Best Article in the area of

---

[1] Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test," *Trademark Reporter*, 83 (3), 364-39; *see also* Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing*, 13(2), 181-199.
[2] For example, in that survey, the estimates derived using the "Eveready" method were, on average, 10% higher than most other survey methods.
[3] Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11, Shari Diamond and Jerre Swann, Eds., American Bar Association.

1   services marketing; and (k) the 2016 Association for Consumer Research Conference
2   Best Paper Award.

3       6.      My co-authored book that received the Best Book in Marketing Award is
4   titled: "*Absolute Value: What Really Influences Customers in the Age of (Nearly)*
5   *Perfect Information*."  Its primary focus is on the role of brands and consumer
6   decision-making in the age of the Internet.  The book generated a great deal of
7   discussion among experts and other authorities regarding the impact of brands in
8   today's information environment.[4]

9       7.      At Stanford University, I have taught MBA and executive courses on
10  Marketing Management, covering such topics as brand management and brand equity,
11  buyer behavior, developing marketing strategies, pricing, building brand equity,
12  advertising, sales promotions, and retailing.  I have also taught courses dealing with
13  the Marketing of High Technology Products, Business-to-Business Marketing,
14  Behavioral Economics, and Critical-Analytical Thinking.  Over the past several years,
15  I have also taught an MBA course regarding "Applied Behavioral Economics," which
16  examines the judgment and decision-making behavior and common errors/tendencies
17  of managers, organizations, and consumers.  In addition to teaching MBA courses, I
18  have guided and supervised numerous MBA student teams in their work on company
19  and industry projects dealing with a variety of markets.

20      8.      All doctoral courses that I have taught over the past 33 years have
21  involved educating students regarding proper and improper ways to conduct and
22  evaluate consumer and managerial decision-making studies.  For example, in addition
23  to general principles of decision-making, the courses examine the various stages
24  involved in a consumer survey, including defining the problem to be investigated,
25  selecting and developing the research approach, collecting and analyzing data, and
26  deriving conclusions.  In each class meeting, we carefully investigate the key errors (if
27  any) in the research we discuss, and I teach the doctoral students what key aspects

28  ---

[4] *See, e.g.*, https://www.newyorker.com/magazine/2014/02/17/twilight-brands.

-4-

they should focus on when designing and evaluating studies.  One doctoral course I have taught over the past 25 years has focused on studies of psychological and behavioral aspects of consumer decision-making and judgment and decision-making more generally.  Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley (1987-93), I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision-making.  I also taught in various executive-education programs, including a program for marketing managers in high-technology companies.

9.     After completing my MBA studies and before starting my Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product-marketing manager for various communications products.  My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor surveys and analysis, (c) pricing and advertising, and (d) sales forecasting.

10.     I have conducted, supervised, or evaluated well over 2,000 marketing research studies dealing with various aspects of consumer behavior, covering topics such as branding, pricing, product configurations, marketing strategies, and advertising-related issues.  Based on this experience, as well as my education, teaching, participation in consumer-research conferences, and numerous projects with companies and students, I have developed expertise in how to design consumer surveys, how to conduct consumer surveys, problems and pitfalls that are common in consumer surveys, how to analyze the data from consumer surveys, and what the results of consumer surveys can—and cannot—show.

11.     I serve on many journal editorial boards, such as the Journal of Consumer Research, the Journal of Marketing Research, the Journal of the Academy of Marketing Science, and the Journal of Consumer Psychology.  I also frequently review articles submitted to journals in other fields, such as psychology, decision-making, and economics.  Almost all the articles I review include surveys that I

-5-

carefully examine, often identifying issues that need to be addressed and suggesting to the authors how to conduct new studies.  I received (twice) the Outstanding Reviewer Award from the Journal of Consumer Research.  As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. In addition, I have worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics, the design of consumer surveys, and the measurement of consumer preferences.

12.    I have also served as an expert in well over 200 prior lawsuits involving various marketing and buyer behavior issues (including consumer surveys), technology marketing, the impact of product features, class actions, trademark-related matters, false advertising, branding, survey methods, and other issues.  My surveys and expert opinions have been relied upon by various courts.[1]  A list of cases in which

---

[1] *See, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007) (noting that Dr. "Simonson is eminently qualified to analyze survey techniques");; *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370, 2017 WL 6611635, at *29 (C.D. Cal. Dec. 21, 2017) ("Dr. Simonson is exceptionally well credentialed in survey work."); *VIP Prods., Inc. v. Jack Daniel's Props., Inc.*, No. 14-cv-2057, 291 F. Supp. 3d 891, 902 (D. Ariz. 2018) ("Dr. Simonson has served as an expert witness on numerous occasions, providing testimony on issues related to marketing, consumer behavior, trademark-related matters, false advertising, and branding."); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011) (agreeing with Dr. Simonson's survey analysis); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232–42 (S.D.N.Y. 2010) (relying on Dr. Simonson's opinions to exclude opposing expert's survey); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043–44, 1048, 1050 (S.D. Ind. 2000) (repeatedly citing Dr. Simonson's expert report as support for excluding opposing expert's survey); *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017) (relying on Dr. Simonson's survey: "Fetzer's expert's analysis using a modified Eveready survey was far superior to the two room survey employed by Sazerac's expert"); *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Cv. 550(JFK), 2007 WL 2258688, at *9–10, 15–16 (S.D.N.Y. Aug. 6, 2007) (embracing Dr. Simonson's report as stating "unassailable commonsense" and denying motion to exclude his testimony); *Schechner. v. Whirlpool Corp.*, No. 2:16-cv-12409, 2018 U.S. Dist. LEXIS 221847, at *27 (E.D. Mich. Oct. 30, 2018) ("Simonson's credentials are impressive, and his qualifications related to consumer research cannot be reasonably challenged."); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C-07-05923-WHA, Dkt. No. 477 at 51 (N.D. Cal. Aug. 10, 2010) ("This remarkably candid opinion was echoed throughout Expert Simonson's *direct* testimony"); In June 2021, a Court opined as follows about a survey that I presented at trial: "The Court finds that the survey performed by Dr. Simonson was exemplary and a model of how litigation surveys should be conducted. The Court, accordingly, affords the survey's results and conclusions based thereon a high degree of credibility and weight."

---

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

1  I testified as an expert during the past four years is included as Exhibit B to the expert

2  report that I prepared in this case.

3      13.    I was asked by counsel for Thrive Causemetics to (a) evaluate the report,

4  including the surveys, submitted by Mr. Rob Wallace ("Wallace Report") on behalf of

5  Plaintiff Thrive Natural Care, Inc. ("Plaintiff" or "Thrive Natural Care"), and (b)

6  conduct a proper likelihood of confusion survey that follows basic likelihood of

7  confusion survey principles.  The documents that I considered in connection with my

8  work in this matter are listed in Exhibit C to the report I prepared in this case.

9      14.    The overall opinions that I reached in this matter are as follows:

10         a.    The surveys conducted by Plaintiff's expert Mr. Wallace (the

11  "Wallace Surveys") are neither reliable nor relevant with respect to the issue of

12  likelihood of confusion.

13             b.    Mr. Wallace's opinions concerning the ultimate issue of likelihood

14  of confusion and various *Sleekcraft* factors are neither reliable nor scientific.

15             c.    A properly designed survey demonstrates that there is no

16  meaningful confusion regarding the source, affiliation, or approval of Plaintiff's

17  products.

18      15.    This declaration will cover each opinion and its bases in turn and in

19  detail.

20      16.    My first opinion is that the Wallace Surveys are neither reliable nor

21  relevant with respect to the issue of likelihood of confusion.

22      17.    The Wallace Surveys failed to use the proper survey methodology –

23  namely, an "*Eveready*" survey, from the case *Union Carbide Corp. v. Ever-Ready,*

24  *Inc.*, 531 F.2d 366 (7th Cir. 1976) – given the marketplace reality at issue in which

25  consumers rarely encounter the parties' respective products for purchase together.

26  Instead, the Wallace Surveys relied on a variant of the survey methodology from

27  _____

28  (*People of the State of California v. Macy's Inc*.; Statement of Decision; Superior
Court of CA, County of Los Angeles; Case No. BC643040).

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

1   *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980), which is biased and leading

2   given the marketplace conditions in this case. Not surprisingly, courts have criticized

3   and excluded many surveys that have used even much less flawed variants of the

4   method employed by Mr. Wallace here (a few examples of such court decisions are

5   described, for example, in my ABA-published chapter on "demand effects" in

6   likelihood of confusion surveys[5]).

7       18.    As Professor McCarthy points out, "the closer the survey methods mirror

8   the situation in which the ordinary person would encounter the trademark, the greater

9   the evidentiary weight of the survey results."[6] Indeed, courts have given little or no

10  weight to (or excluded) likelihood of confusion surveys that failed to capture essential

11  characteristics of the marketplace, such as showing two marks side-by-side or

12  sequentially even though the products are rarely (if ever) available for purchase side-

13  by-side (*i.e.*, on store shelves or on the same website).[7]

14      19.    In its First Amended Complaint (ECF No. 28 ¶ 4), Plaintiff alleges:[8]

15          "TCI's multi-million dollar per year growth has enabled it to
16          flood the market with advertising for its own skincare
            products such that consumers have now come to believe that
17          plaintiff Thrive is related to or affiliated with defendant TCI
18          and that Thrive's goods originate from TCI. TCI's actions
            have created consumer and retailer confusion."
19

20  This statement suggests that Plaintiff primarily alleges so-called likelihood of "reverse

21  confusion." That is, it is alleged that Thrive Causemetics "flooded the market with

22

23  _____

    [5] Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of
24  Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11,
    Shari Diamond and Jerre Swann, Eds., American Bar Association.
25  [6] 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    (September 2007) (McCarthy) at §32:163.
26  [7] *See, e.g.*, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010). *See also*
    Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of
27  Confusion Surveys," *Trademark and Deceptive Advertising Surveys*, Chapter 11,
    Shari Diamond and Jerre Swann, Eds., American Bar Association.
28  [8] TCI is the abbreviation used in the First Amended Complaint for Thrive
    Causemetics, Inc.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

advertising," leading to the allegation that consumers have come to believe that the Plaintiff is related to Thrive Causemetics, which is clearly an allegation of reverse confusion (*i.e.*, it does not pertain to "forward confusion" whereby consumers mistakenly believe that the Plaintiff is Thrive Causemetics' source). Furthermore, in paragraph 36 of his report, Mr. Wallace defined his survey universe based on previous purchases of "skin care products," which is consistent with a universe for a reverse confusion survey (*i.e.*, prospective customers of Plaintiff; consumers who purchased cosmetics products such as make-up but not skincare products were not qualified for survey participation). It is well-established that "in cases alleging reverse confusion (*i.e.*, that consumers would likely believe that the senior user's products or services are made or sponsored by the junior user), the relevant universe is the senior user's potential customers."[9]

20.     Likelihood of confusion survey methods can be divided into two primary types. One type involves surveys in which respondents are shown a webpage or a product that displays the plaintiff's mark and asked to identify the company that offers (or makes/puts out) the products. As discussed in my articles, the most common method in this category is referred to as the *Eveready* format,[10] named after a case in which the issue involved source confusion between Ever-Ready lamps and Eveready batteries. Professor McCarthy describes the sequence of questions as follows:[11]

> "1.     [Screening question to eliminate persons in the bulb or lamp industries.]
>
> 2.     Who do you think puts out the lamp shown here? (A picture of defendant's EVER-READY lamp with its mark is shown).

---

[9] William Barber (2012), "The Universe," in *Trademark and False Advertising Surveys* (Shari Diamond & Jerre Swann eds., 2012); pages 28-31.
[10] *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 188 U.S.P.Q. 623 (7th Cir. 1976), *cert. denied,* 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91, 191 U.S.P.Q. 416 (1976).
[11] McCarthy at §32:174.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

3.      What makes you think so?

4.      Please name any other products put out by the same concern which puts out the lamp shown here."[12]

As indicated, the *Eveready* survey format is the standard approach when the two products at issue are not encountered together or one after the other for purchase in the great majority of real-world situations. A survey involving side-by-side or sequential presentation of the two marks at issue (alongside other marks that are likely to be seen at the same time) may be appropriate only if the marks at issue are often encountered together for purchase by prospective consumers. Indeed, courts have harshly criticized and even excluded surveys in which marks were shown side-by-side or sequentially if that presentation failed to approximate what is likely to occur under the great majority of marketplace conditions.[13]

21.      As described in paragraphs 31 and 32 of Mr. Wallace's report, Mr. Wallace relied on the other type of survey, employing a variation of the so-called *Squirt* survey, from *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980), in which both parties' products are shown to respondents side-by-side or in sequence.

22.      In the Wallace Surveys, respondents were shown a lineup consisting of one of Plaintiff's products, one of Thrive Causemetics' products, and two other products with completely dissimilar names ("WLDKAT" and "Ursa Major"). Respondents were then sequentially shown pairs of products, including the Plaintiff's and Defendant's products, and asked if they come from the same company (and similar questions); the first such question was the following:

---

[12] In many applications, the *Eveready* format also includes questions as to whether the company that puts out the presented mark has a business connection or affiliation with or received permission from another company.

[13] *See, e.g., Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000); *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010).

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

*Do you believe that these two products come from the same company/manufacturer/source?*

- *Yes, same company/manufacturer/source?*

- *No, different companies/manufacturers/sources?*

- *Not sure/ don't know*

23.     Survey respondents who failed to provide the expected "Yes" answers were next given another opportunity:

*If you said different companies, do you believe that these companies are affiliated, connected, or associated with each other?*

- *Yes, companies are affiliated, connected or associated*

- *No, companies are not affiliated, connected or associated*

- *Not sure/ don't know*

24.     In paragraph 32 of this report, Mr. Wallace attempted to justify use of the *Squirt* methodology on the ground that both parties sell their products on the Internet and so it is conceivable that a consumer would have two web browsers open simultaneously, with each browser showing one of the two marks at issue, and because of one alleged instance in which where the parties' respective products were displayed on the same page on eBay[14]:

> If a consumer shopping for skin care products online had
> two web browser tabs open, which is a common experience,
> they could engage both products in question adjacent to one
> another, which qualifies this case to use the *Squirt*
> methodology. In addition, if consumers were shopping on

---

[14] My understanding is that the only authorized seller of TCI skincare products online is thrivecausemetics.com (*i.e.*, TCI does not authorize sales of its products through eBay), and that Plaintiff testified at its deposition that it does not make any authorized sales of its products on eBay.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

Ebay, they could encounter both products in question adjacent to one another, as illustrated in the image following paragraph 29 of this report.

25.     Thus, Mr. Wallace's primary "justification" for his choice of survey methodology was a speculative scenario in which a consumer would not be satisfied with just one browser and instead would open two browsers that just happen to display the two products.  Mr. Wallace's scenario, however, is highly unlikely, and he presented no evidence in his report that such a scenario has ever occurred (much less that it occurs with appreciable frequency).  This pure conjecture is the basis for Mr. Wallace's conclusion that over half of all of the Plaintiff's customers confuse it with Thrive Causemetics.

26.     As for the eBay search result also relied upon by Mr. Wallace, it is noteworthy that it appears the result was obtained by searching "Thrive moisturizer." Mr. Wallace cites no evidence in his report that a consumer has ever utilized this specific search term on eBay to look for the parties' products, or that such a scenario occurs with any appreciable frequency.

27.     Additionally, the mere fact that two products are mentioned or sold on the Internet is irrelevant to the selection of survey methodology, unless the two products are often seen together in the same online stores, and in this case, the parties do not sell their products in the same online stores.  Mr. Wallace's survey design was thus premised on unlikely scenarios for which he cites no evidence in support of their occurrence or the extent or frequency of any such occurrence.  The design of the Wallace Surveys is not representative of any marketplace conditions relevant to this case, as there is no evidence supporting that the scenarios on which the surveys were based actually occur with frequency in the marketplace.

28.     As indicated, the likelihood that consumers would just happen to have two web browsers open simultaneously, showing the particular product images chosen for the Wallace Surveys, is extremely unlikely.  Needless to say, there are numerous

-12-

websites on the Internet, and the likelihood of seeing these two simultaneously is negligible and has nothing to do with likelihood of confusion in reality.  Mr. Wallace fails to explain how a consumer would happen to land on the images chosen for the Wallace Surveys and how such a scenario would replicate a typical consumer's shopping and purchasing experience.  Indeed, if one were to credit Mr. Wallace's claim that such a scenario is likely to happen and can therefore justify relying on his methodology for assessing likelihood of confusion, then virtually all likelihood of confusion surveys would have relied on this method.  However, while the sequential presentation method has been used in a few cases, for example, where the two products were sold in the same stores, I am not aware of any court that has ever accepted the method used in this case by Mr. Wallace in a comparable matter.  The surveys from other cases described herein that were excluded for being unrealistic and leading,[15] were far less biased and leading than the surveys used by Mr. Wallace in this case.

29.    As I have explained, the objective of a survey is to estimate marketplace confusion.  If a survey's methodology is based on highly unlikely scenarios for which there is no evidentiary support, it simply cannot reliably measure any likelihood of confusion that is relevant to the marketplace at issue.  The Wallace Surveys' methodology premised on unlikely and factually unsupported scenarios is a fatal flaw that makes the surveys unreliable and uninformative, and their findings meaningless.

30.    I understand that during his deposition (which was conducted *after* my report was served) and in response to my report, Mr. Wallace defended his survey format by claiming that links to both parties' websites appear "adjacent" to each other in Google and other search engine results for specific search terms.  Even if true (and again, Mr. Wallace's reports and surveys do not include evidence of *consumers* – as

---

[15] *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000); *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007); see also *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010).

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

opposed to Mr. Wallace, Plaintiff, and Plaintiff's lawyers – actually conducting these specific searches), a consumer would be directed to the parties' respective websites to actually purchase any products, where the other party's products would not appear.

31.     Moreover, Mr. Wallace has presented no evidence as to the frequency with which such online searches occur or result in consumers connecting to either party's website (or that either event occurs with appreciable frequency), and he still fails to account for the fact that the locations in which the parties actually sell their respective products are completely distinct.  I understand that Plaintiff sells its products online through its website thrivecare.co, and through third-party websites Amazon.com and Walmart.com, and at certain brick-and-mortar Whole Foods locations, and that Thrive Causemetics does not sell its products at any of these locations but instead sells its products exclusively through its website thrivecausemetics.com.  Mr. Wallace and his surveys do not even attempt to account for these marketplace realities.

32.     In addition, even if Mr. Wallace had established that consumers conduct the particular Internet searches referenced by Mr. Wallace with appreciable frequency, *he did not test for confusion based on those search results.*  That is, he did not display the allegedly offending search results to respondents as the stimuli for his survey, and thus did not test whether consumers encountering *those* images are likely to be confused.  Instead, the sole images displayed to respondents were the parties' products as they appear on the parties' actual respective websites, shown in sequence.  In other words, there is a fundamental and fatal disconnect between alleged "marketplace conditions" that Mr. Wallace asserts are illustrated by the Internet search results and the (non-existent) "marketplace conditions" utilized in the Wallace Surveys.

33.     The Wallace Surveys were further removed from the marketplace reality at issue because they created 100% awareness of both marks.  For reverse confusion to occur in reality (as Plaintiff has alleged in this case), a consumer must at least be aware of Thrive Causemetics' mark (a consumer who has never seen or heard of

-14-

Thrive Causemetics' mark cannot confuse the Plaintiff's mark with Thrive Causemetics).  The Wallace Surveys avoided this condition by artificially creating awareness of both parties marks, and then depicting them side-by-side.  Thus, even if in reality most consumers are unaware of these brands and therefore cannot confuse the two when making a purchase, the Wallace Surveys' respondents were all made aware of both parties' marks and could not avoid seeing them side-by-side.  This is one of the reasons as to why the *Eveready* format, in which consumers are not artificially exposed to both parties' marks, was the proper and only viable method in the present case.

34.     In addition to the flawed survey methodology that failed to replicate the marketplace conditions at issue in this case, the Wallace Surveys suffered from additional flaws that also undermine their reliability.

35.     As Professor McCarthy points out,[16] survey questions (and other information presented to respondents) must not be slanted or leading, and it is improper to suggest a business relationship when the respondent might previously have had no thought of such a connection.  For example, the question: "Do you think that there may or may not be a business connection between Beneficial Corp. and the Beneficial Finance System Companies?" was rejected as a leading question.[17]  In other words, a survey must be carefully designed to exclude leading questions that may impermissibly skew the survey results.

36.     As I teach my students in courses that deal with consumer research, when designing a survey, the researcher also must avoid "demand effects."  Demand effects[18] relate to the phenomenon whereby survey respondents use cues provided by

---

[16] See McCarthy at §32:172.
[17] *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 213 U.S.P.Q. 1091 (S.D.N.Y. 1982).
[18] *See, e.g.*, "On the Social Psychology of the Psychological Experiment," M. Orne, American Psychologist, 17, 776-783.  For a review of the impact of demand effects in likelihood of confusion surveys, see Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by Shari Diamond and Jerre Swann, American Bar Association.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

1   the survey procedure and questions to figure out the purpose of the survey and what

2   they imagine to be the "correct" answers to the questions they are asked.  The

3   respondents then tend to provide what they perceive as the "correct" answers, to make

4   sure that the results "come out right."  Demand effects can pollute the results of a

5   survey dramatically.  I understand that courts have also recognized the significance of

6   demand effects, and such problems have contributed to the rejection of surveys.[19]

7   Yet, the Wallace Surveys suffer from this well-known methodological flaw.

8        37.    The chapter I coauthored regarding demand effects in likelihood of

9   confusion surveys, which was published by the ABA, reviewed a number of surveys

10  that were excluded and/or harshly criticized by courts because they suffered from

11  demand effects and relied on leading questions.  If consumers in the marketplace are

12  unlikely to encounter the parties' respective products for purchase one immediately

13  after the other, the survey should not rely on a sequential presentation, and,

14  importantly, the questions should not suggest to respondents that the two marks might

15  be related.  Instead, in such situations, the *Eveready* methodology is the obvious,

16  correct way to estimate likelihood of confusion.

17       38.    One of the cases discussed in my chapter regarding flawed surveys that

18  suffered from severe demand effects was *Leelanau Wine Cellars v. Black &Red, Inc.*

19  case,[20] which involved two wineries.  The survey submitted by the plaintiff's expert

20  sequentially presented products of the two wineries, even though their respective

21  wines were sold through different stores.  As the Court pointed out:

> … The survey in this case was conducted in a manner that
> was substantially at odds with the circumstances under
> which most consumers encounter Defendants' wine.  As
> noted above, Defendants' wine is sold through Defendants'
> tasting rooms and website, which offer only one brand of

---

[19] *See, e.g.*, *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000).

[20] 452 F. Supp. 2d 772, *784; 2006 (U.S. West. Dist. of Mich., South. Div.), LEXIS 63774.

wine – Chateau de Leelanau.  That is, actual purchasers would not be presented with a situation where Defendants' wine is displayed side-by-side with other wines, and they would be purchasing from a location identified expressly and exclusively with Chateau de Leelanau.  *See Juicy Couture, Inc. v. L'Oreal USA, Inc.*[21] ("Most significantly, the survey did not replicate the marketplace conditions in which consumers encounter Lancome's products. Lancome's cosmetics are sold at Lancome counters or department store sections, or over websites, with prominent signage identifying Lancome as the seller, and the product as Lancome products").  Moreover, there is no indication that in the actual marketplace, purchasers of Chateau de Leelanau wine are ever exposed to LWC's advertising shortly before they view or purchase Chateau de Leelanau wine.  Thus, the survey, in which participants were shown LWC's advertisement and then asked whether they believed that any of the five wines, including one including the word 'Leelanau' in its name, were the same or came from the same source as the wine in the advertisement, was 'little more than a memory test, testing the ability of the participants to remember the name []of the [wine they had been shown.'[22]

…

In the present case, the entire survey was suggestive. Participants were first shown LWC's advertisement and then asked whether they believed that any of the wines in the display, only one of which, the Defendants' product, contained the word Leelanau on it, was the same as or came from the same winery as the winery that puts out the wine in the advertisement.  These circumstances not only suggested that participants should find a connection between the wine in the display and some other product, but specifically LWC's wine.[23]

---

[21] 2006, U.S. Dist. LEXIS 20787, No. 04 Civ 7203(DLC), 2006 WL 1012939, at 25 (S.D.N.Y Apr. 19, 2006).
[22] Starter Corp. v. Converse, Inc. 170 F.3d 286, 297 (2d Cir. 1997).
[23] *See Powerhouse Marks*, 2006 U.S. Dist. LEXIS 61, 2006 WL 20523 at *6.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

As this Court opinion illustrates, the relevant question for assessing the validity and reliability of a survey is largely determined by the degree to which the survey's setup/procedure and the questions asked suggest the "correct answer," deviate from marketplace conditions, and create demand effects that produce predictable results.[24] Whether or not the goods at issue belong to the same general category is less important.

39.     The Wallace Surveys suffered from demand effects that fatally undermine their reliability.  Completely ignoring the relevant marketplace reality at issue and basic survey principles, the Wallace Surveys presented survey respondents with four names, two of which had a word in common (*i.e.*, Plaintiff's and Thrive Causemetics) and the other two names were completely dissimilar.  Respondents were asked questions that left little doubt that there was a "correct" answer, with the only obvious, correct "solution" being the two names that had a word in common, namely, the term "thrive."  Thus, unless a respondent was not paying attention or was willing to resist the pressure to provide the expected answer, there was no doubt that most respondents could figure out what they were expected to choose as their answer, and then go on and explain their "choice" based on the shared name element.

40.     If Mr. Wallace merely wanted to prove that the two marks at issue share the "Thrive" name element, no survey was needed.  He could simply present the two names and point to the word "Thrive" in both.  That is, the Wallace Surveys were merely a trivial matching game that could not and did not provide any information relevant to the likelihood of confusion.  All the Wallace Surveys showed was that most respondents can point to a shared name element when presented with the four names, which is simply irrelevant to the issue of whether consumers are likely to be

---

[24] Similar issues were discussed, for example, in *THOIP v. The Walt Disney Co. et al.*, OPINION AND ORDER, (08 Civ. 6823; S.D. NY; Feb. 2010);  *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, "Opinion & Order," 06 Civ. 550 (U.S. S.D.N.Y.; Aug. 2007), * 20;  *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana.  In both the *Kargo* and *MySimon* cases, I conducted a survey on behalf of the defendant and evaluated a survey performed by the other side's expert.

confused between Plaintiff and Thrive Causemetics' respective marks.

41.   Furthermore, the Wallace Surveys relied on blatantly suggestive questions, which left no doubt as to the expected answer.  For example, the first question was:

> *Do you believe that these two products come from the same company/manufacturer/source?*

The suggestive nature of this question is self-evident as it immediately conveys to participants that they should ascertain a connection between the two products, and the possibility that the two products do not come from the same company was not even mentioned in the question.  This demand effect, which left no doubt as to the "expected" answer, is much more extreme than the demand effects that led to the exclusion and/or harsh court criticism of the other surveys I have referenced herein. With such a biased question, the only surprise is that only about half of the Wallace Survey respondents gave the "correct answer."  Without repeating this obvious fatal flaw, the exact same bias made the subsequent questions in the Wallace Surveys meaningless and unreliable.

42.   The Wallace Surveys also lacked any real control, which made the results unreliable because failure to include a proper control will inflate the resulting net estimate of confusion.  The controls used by Mr. Wallace were completely dissimilar from Thrive Causemetics' mark, and thus were not real controls at all.

43.   In general, a survey designed to estimate likelihood of confusion must include a proper "control."[25]  A control is designed to estimate the degree of "bias," "noise" or "error" in the survey.  Indeed, without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects the flaws and biases of the survey methodology and guessing, and is thus uninformative regarding the alleged confusion at issue.

---

[25] *See, e.g.*, S. Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evidence* 221, 226 n.8 (Federal Judicial Center ed., 1994).

44.     Importantly, the impact of a control in a likelihood of confusion survey is very different depending on whether the survey is conducted on behalf of the party alleging confusion as opposed to a survey conducted on behalf of the party claiming lack of confusion.  Specifically, a control in a likelihood of confusion survey can only *lower* (or keep unchanged) the obtained net (*i.e.*, final) confusion estimate – it can never raise the observed (net) confusion rate.  The reason is quite simple – because the confusion estimate in the control group is *subtracted* from the confusion number measured in the Test group, the control can only lower the *net* (*i.e.*, Test minus Control) estimate.  Accordingly, a dissimilar control (*i.e.*, as compared with the allegedly infringing mark) that produces an artificially low "confusion" number can only "help" the party alleging confusion (the Plaintiff), because the net estimate derived after subtracting the control is likely to be too high.  By contrast, if a dissimilar control is used by the party claiming that there is no confusion (i.e., the defendant), it cannot "help" the defendant, but it may "support" the plaintiff's claim (assuming the confusion estimate obtained in the Test group is greater than zero).

45.     Thus, when the plaintiff's survey expert selects a control, the control must be as similar as possible to the "junior" (allegedly infringing) mark, without infringing on the "senior" mark.  For example, the Court's evaluation of the plaintiff's survey in a case involving *Simon Property Group* and *mySimon, Inc.*, it was determined that any likelihood of confusion survey with a control that does not include the "Simon" name component (which is commonly used and is not the property of just one company) "amounts to little more than a meaningless word association or memory exercise."[26]

46.     As explained above, to fulfill its essential function, a (real) control must be similar to the allegedly infringing mark, without itself infringing.  As Professor Diamond pointed out in her highly cited *Reference Guide on Survey Research* chapter:

---

[26] *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000).  Consistent with the Court's opinion, the (Eveready) survey that I conducted in that case used the control name "Simonson.com."

-20-

27

> In designing a survey-experiment, the expert should select a
> stimulus for the control group that shares as many
> characteristics with the experimental stimulus as possible,
> with the key exception of the characteristic whose influence
> is being assessed.

47.     In contrast to Professor Diamond's guidance, the "controls" used in the Wallace Surveys were "WLDKAT" and "Ursa Major."  These names have nothing in common with the marks at issue, so they were not controls at all.  This was yet another fatal flaw of the survey, which means that, by itself, it made the entire survey unreliable, producing a high net "confusion" number that has nothing to do with marketplace confusion.  The Wallace Surveys' failure to include a proper control ensured that respondents merely needed to recognize that the Plaintiff's name and Thrive Causemetics' name share a common word, and again, this matching exercise has nothing to do with measuring any real-world likelihood of confusion.

48.     Mr. Wallace supplemented the Wallace Surveys with an exercise in which the surveys' respondents were told to assume that they saw two Instagram posts with the same hashtag one after the other and asked if the two posts came from the same company.   For the reasons explained below, this contrived exercise offered no information relevant to the issue of likelihood of confusion.

49.     The Wallace Surveys respondents were given a "scenario" whereby they were researching skin care products and just noticed two posts (that they happened to encounter one after the other) on Instagram showing a skin moisturizer with the hashtag #THRIVETRIBE.  Respondents were then asked:

> Based on these posts, do you believe that they refer to the
> same products and come from the same company or
> companies that are affiliated, connected or associated with
> one another - or from different companies that are not

---

[27] Shari Seidman Diamond, Reference Guide on Survey Research, Reference Manual on Scientific Evidence 399 (Fed. Jud. Ctr. 3d ed. 2011).

*affiliated, connected, or associated?*

50.     This #THRIVETRIBE Instagram scenario was detached from reality and blatantly leading.  Mr. Wallace failed to even attempt to replicate any such event in his surveys, as his surveys showed consumers only images of the parties' respective point-of-sale websites.  Instead, the Wallace Surveys attempted to merely describe the scenario to respondents.  Furthermore, Mr. Wallace has presented no evidence that such an event has ever happened to any consumer or that it happens with any appreciable frequency.  That this exercise is part of the basis of Mr. Wallace's "conclusion" that over half of all consumers are confused between the two marks renders Mr. Wallace's conclusion devoid of factual support and completely unreliable.  There was absolutely nothing scientific about asking respondents to imagine a scenario that is not replicated in the survey as a means of trying to measure the likelihood of confusion.

51.     In light of the above fatal flaws and biases, the Wallace Surveys' findings concerning the net confusion rate were predetermined by the flaws, and therefore are not probative of the issue of likelihood of confusion.

52.     Each of the above flaws, by itself, makes the Wallace Surveys unreliable; the combination of these flaws establishes that the Wallace Surveys provide no relevant information about marketplace likelihood of confusion in this case.  The Wallace Surveys merely show that the survey respondents are capable of recognizing that two names share a common word.

53.     My second opinion is that Mr. Wallace's opinions concerning the ultimate issue of likelihood of confusion and various *Sleekcraft* factors are neither reliable nor scientific.

54.     In his reports, Mr. Wallace opines on the likelihood of confusion based on his personal and subjective, non-scientific assessment of the *Sleekcraft* factors; Mr. Wallace has not studied or ever published a scientific, peer-reviewed article about

consumer psychology, consumer decision making, or the psychological factors that underlie consumer confusion.  Mr. Wallace's *Sleekcraft* analysis thus does not provide any information meaningful to this case.

55.     For example, in paragraph 9 of his report, and without presenting any evidence, Mr. Wallace "decided" the following:

> This includes a likelihood of forward confusion, in which consumers believe the Defendant's products originate from or are affiliated with the Plaintiff, as well as reverse confusion, in which consumers believe the Plaintiff's products originate from or are affiliated with the Defendant.

For the reasons previously explained as to the significant flaws in the Wallace Surveys that provide no reliable information concerning likelihood of confusion in this case, Mr. Wallace's conclusion is unsupported and unsupportable as Mr. Wallace has not presented any reliable, scientific evidence supporting it.  Furthermore, the survey that I conducted, which I discuss next, followed all accepted scientific principles for estimating likelihood of confusion, and provides reliable evidence that there is no meaningful confusion whatsoever between the parties' respective products and marks.

56.     Mr. Wallace also provides his unscientific assessment of specific *Sleekcraft* factors, including the strength of Plaintiff's mark and the degree of consumer care exercised by purchasers of skin care products.   Mr. Wallace claimed that the Plaintiff's mark must be strong because the Plaintiff has sent cease-and-desist letters to other companies that have "Thrive" in their names.  He also claimed that skincare products involve a low degree of care, as if people's appearance and the products they apply to their bodies are not important to them, so they purchase them without thinking much about the choices they make.  Neither of these assessments is reliable, scientific, or correct.

57.     In paragraph 85 of his report, Mr. Wallace suggests that the Plaintiff's mark is strong and relies on the fact that the Plaintiff recently sent cease-and-desist

-23-

letters to third parties who were utilizing or planning to utilize the term "thrive" in connection with their businesses.  Having studied, published about, and taught about the factors that make brand names strong and distinctive, I have never before encountered a claim that sending cease-and-desist letters proves that a brand name is strong.  Mr. Wallace's opinion has no academic basis from either a marketing or branding perspective.  In fact, based on basic consumer behavior and marketing principles that I have taught at the Stanford Graduate School of Business, the word "thrive" is likely to be a weak brand name, for multiple reasons.

58.     "Thrive" is a word that can be and is associated with numerous different domains, products, self-improvement, services, and various other things.  Not surprisingly, the word "Thrive" has been included, for example, in the names of a wide range of products by different companies and organizations.  Trial Exhibit Nos. 364 through 371 and Trial Exhibit Nos. 424 through 451 are true and correct copies of publicly available United States Patent and Trademark Office search results and records and third-party websites reflecting use of the term "thrive" by third parties, including in connection with skin care and other personal care goods.  Trial Exhibit No. 351 is a true and correct copy of the Collins English Dictionary definition of the term "thrive," which includes to prosper, improve, or flourish.  I understand that Plaintiff intends for its products to help consumers' skin be healthier, and for its sustainable business model to support the Costa Rican farmers who supply certain of the product ingredients and the environment– or to otherwise help consumers' skin, the Costa Rican farmers, and the environment to "thrive" – all within the meaning of the term's ordinary dictionary definition, which also suggests that the mark is conceptually weak.

59.     With such a commonly used word, unless the company supplements it with one or more other words or coined terms that are more unique and meaningful (such as "Causemetics"), it is highly unlikely to stand out or create a memory trace.  This conclusion is particularly true for a company like Plaintiff that, despite operating

-24-

for several years, has not been able to build wide recognition and a unique brand identity.

60.    Mr. Wallace also suggests that purchasing skincare products involves a low degree of care.  With no evidentiary basis and contrary to basic principles of consumer decision making,[28] he suggests that people's appearance and products they apply to their bodies are not important to them, so consumers purchase them without thinking much about the choices they make.  Consistent with principles of consumer decision making, and contrary to Mr. Wallace's assessment, a number of courts specifically pointed out that purchasers of skin care products tend to exercise a high degree of care.  For example, as one court stated:[29]

> Courts have previously recognized, however, that purchasers of fragrances and skin care products tend to exercise a high degree of care and brand consciousness. See *Lucien Lelong, Inc. v. Lenel, Inc.,* 181 F.2d 3, 4 (5th Cir.1950) ("The pronunciation of these names might bring about a sounding of similarity; but buyers of [cologne] are meticulous and do not depend solely on pronunciation").

61.    For these reasons, Mr. Wallace's personal and unscientific opinions concerning the ultimate issue of likelihood of confusion and his flawed assessment of various *Sleekcraft* factors provide no reliable or meaningful information to whether confusion is likely in this case.

62.    My third opinion is that a properly designed survey demonstrates that there is no confusion regarding the source, affiliation, or approval of Plaintiff's products.

63.    A properly designed likelihood of confusion survey in this case would (1) take into account the pertinent marketplace conditions; (2) focus on reverse confusion; and (3) employ the "gold standard" *Eveready* methodology.

---

[28] *See, e.g.*, G. Laurent and J. Kapferer (1985), "Measuring Consumer Involvement Profiles," *Journal of Marketing Research*, 21, 41-53.
[29] *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 1001 (2002).

64.     Reverse confusion is the proper focus here given Thrive Causemetics'
significantly greater commercial success and Plaintiff's allegation that Thrive
Causemetics' has "flood[ed] the market with advertising," allegedly leading
consumers to believe Plaintiff is related to Thrive Causemetics.

65.     Using the *Eveready* methodology, respondents are shown the senior mark
and are asked about its source and its possible business affiliation and approval.
Report ¶ 26. The *Eveready* survey format is the appropriate methodology when the
two products at issue are not actually sold side-by-side in the great majority of real-
world situations, as is the case here, where Thrive Causemetics and Plaintiff do not
offer their respective products for sale on the same websites or at the same retail
locations.

66.     The survey that I designed to estimate the likelihood of reverse confusion
that Plaintiff has alleged corrected the fatal flaws of the Wallace Surveys that I
previously described.  It followed the accepted standards and employed the proper
methodology.  In particular:

a.     It approximated normal marketplace conditions by presenting the
Plaintiff's mark without forcing respondents to also artificially consider Thrive
Causemetics' mark, which represents the overwhelming majority of marketplace
conditions relevant to this case.

b.     It avoided the leading and biased questions of the Wallace
Surveys.

c.     It did not artificially produce 100% respondent awareness of both
marks at issue.

d.     It focused on reverse confusion.

e.     It followed other basic survey principles.

67.     As indicated, my survey employed the proper *Eveready* methodology for
estimating reverse confusion in cases where the two marks at issue are rarely
encountered by consumers at about the same time.  Given the focus on reverse

-26-

1   confusion, the respondents were the Plaintiff's prospective customers, who were

2   shown the Plaintiff's webpage with the products displayed on the home page.

3       68.    The survey followed the accepted standards regarding the manner in

4   which questions are asked, proper filters are used, response options are rotated,

5   interviews are validated, and so on.  The survey was administered via the Internet

6   during June 2021.  The universe of survey participants was 400 prospective

7   purchasers of the Plaintiff's products, who were randomly assigned to the Test group

8   or the Control group.  Survey participants were members of the Veridata Insights

9   Internet survey panel.  All survey respondents as well as the online research firm were

10  "blind" to the purpose of the survey and the identity of its sponsor.  Similarly, those

11  who coded the respondents' verbatim answers were "blind" to the purpose of the

12  study and the identity of its sponsor.  More details regarding respondent screening, the

13  questions that were asked, the survey procedure, and the results are presented next.  A

14  complete draft of the questionnaire (before programming) is included in Exhibit D to

15  my report.  Trial Exhibit No. 435 is a true and correct copy of the stimuli shown to

16  respondents and the screenshots (as seen by respondents) of the Test (Cells 1 and 2)

17  and Control (Cells 3 and 4) groups of the entire questionnaire (which was also

18  included as Exhibits E1 and E2 to my report).

19      69.    All survey respondents expected to purchase skincare products on the

20  Internet within the subsequent six months.  Other standard screening criteria were

21  applied.  Respondents with potentially unrepresentative expertise or knowledge were

22  not allowed to participate.  They included those working for (a) an advertising or

23  public relations agency, (b) a market research firm or a marketing research department

24  of a company, and (c) a company that makes or sells skincare products.

25      70.    At the beginning of the main part of the questionnaire, respondents were

26  given the following instruction:

27          "First, for each question, if you don't know or don't have an
            answer, please don't guess, just indicate that you "don't

28

know" or "don't have an answer" by <u>typing in the words</u> <u>"don't know"</u> and it will go on to the next question.  Also, you should complete this survey without stopping in the middle, and please make sure <u>not</u> to consult anyone and <u>not</u> open another browser while working on this survey."

71.    Respondents were next told:

Q260:

> Suppose that you are visiting the website shown below.
>
> Please review the webpage as you would if you were thinking of buying a product.
>
> Please scroll down to view the entire webpage.
>
> When you are finished viewing the webpage, click on the "NEXT" at the bottom of the screen to continue.
>
> When you continue to the next screens, you will need to scroll to the bottom of each screen to answer some questions.

72.    Depending on whether respondents were randomly assigned to the Test group or the Control group, they were next shown the Plaintiff's home page (the Test group) or the same webpage with the word "Energized" (Control group) replacing the word "Thrive" (see Trial Exhibit No. 453).  As explained above, the survey conservatively used a dissimilar control, to make sure that the Plaintiff would not suggest that the control name was also infringing.  The Test and Control group respondents were next asked the same questions:

Q270:

> Which company makes the products shown on this webpage?  (Record name of company on the line below).

-28-

Q275/278:

> Why do you say that (INSERT) makes the products
> shown on this webpage?  Please type your answer
> below.  Please be as specific as you can.

> Any other reason?  Please type your answer below.
> Please be as specific as you can.

73.     Following the standard *Eveready* methodology format, respondents were next asked:

Q280:

> Does or doesn't the company that makes the products
> shown on this webpage make any other products or
> brands? (Select <u>one</u> response)

> 1: Yes, it does make other products or brands
> (CONTINUE WITH Q.285)

> 2: No, it doesn't make other products or brands (SKIP
> TO Q.290)

> 3: Don't know/unsure (SKIP TO Q.290)

> [IF CHOSE "YES"]

Q285:

> What other products or brands are made by the
> company that makes the products shown on this
> webpage?

74.     The standard *Eveready* survey protocol further examines the possibility of confusion about business affiliation and permission.  Accordingly, respondents (in both the Test and Control) groups were next asked:

Q290:

> Does or doesn't the company that makes the products

-29-

shown on this webpage have a business affiliation or connection with another company or brand? (Select one response)

1: Yes, it does have a business affiliation or connection with another company/brand (CONTINUE WITH Q.295)

2: No, it doesn't have a business affiliation or connection with another company/brand (SKIP TO Q.300)

3: Don't know/unsure (SKIP TO Q.300)

Q295:

With which other company or brand does the company that makes the products shown on this webpage have a business affiliation or connection? (Record name of company/brand on the line below).

Company/Brand

_____

Don't know/unsure    (    )☐ (SKIP TO Q.300)

Q296:

What makes you say (INSERT COMPANY/BRAND MENTIONED IN Q.295) has a business affiliation or connection with the company that makes the products shown on this webpage? Please type your answer below.  Please be as specific as you can.

Q298:

Any other reason?  Please type your answer below. Please be as specific as you can.

Q300:

Did or didn't the company that makes the products shown on this webpage receive permission or approval from another company or brand? (Select one

-30-

response)

1: Yes, it did receive permission or approval (CONTINUE WITH Q.305)

2: No, it didn't receive permission or approval (SKIP TO Q.310)

3: Don't know/unsure (SKIP TO Q.310)

Q305:

Which other company or brand gave permission or approval to the company that makes the products shown on this webpage?  (Record name of company/brand on the line below).

Company/Brand

_____

Q306

What makes you say (INSERT COMPANY/BRAND MENTIONED IN Q.305) gave permission or approval to the company that makes the products shown on this webpage? Please type your answer below.  Please be as specific as you can.

Q308:

Any other reason?  Please type your answer below. Please be as specific as you can.

75.     Given a theory of reverse confusion, in which Plaintiff has alleged that Thrive Causemetics has flooded and swamped the market such that consumers are likely to be confused between the parties, one would expect respondents to have specific information about Thrive Causemetics' mark, which presumably "overwhelmed" the Plaintiff and the market.  Accordingly, the final question provided respondents the opportunity to provide any additional information they might have had about the company they named as the one that offered the products shown on the

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

webpage.

76.     Given the history of Thrive Causemetics and its pro-women cause, the following final question provided respondents, if they mistakenly believe that the Plaintiff is related to or is Thrive Causemetics, another opportunity to provide information that identifies Thrive Causemetics:

> Q310:
>
>> You mentioned earlier that (INSERT COMPANY MENTIONED IN Q.270) makes the products shown on the webpage you saw.  Please provide any information you have about that company. Please type your answer below.  Please be as specific as you can.
>
> Q315:
>
>> Anything else you know about the company that makes the products shown on the webpage you saw? Please type your answer below.  Please be as specific as you can.
>
>> The survey's findings are summarized next.

77.     The findings of my survey were as follows.  A total of 438 respondents completed the survey between June 16 and June 24, 2021.  Consistent with standard practice, 14 respondents who took too long (an hour or more) or might not have spent enough time completing the survey (under three minutes) were removed from the sample (the data for these respondents are available).  Thus, a total of 424 respondents are included in the summary tables (Exhibit F to my report), with approximately equal numbers of men and women.  With respect to age, about half of the respondents were between 18 and 39 years old and the other half were 40 years old or older.

78.     I will review the survey's main findings (additional findings appear in Exhibits F and G of my report) and discuss their implications.  The tabulated answers to closed-ended (including screening) questions and the (coded) open-ended question

1   are presented in Exhibit F to my report.  The complete data set with all of the

2   respondents' closed-ended and open-ended answers are presented in Exhibits G (full

3   data set) and H (replacing the open-ended answers with the assigned codes) to my

4   report.  Exhibit I to my report presents the codebook used by coders when coding

5   verbal (open-ended) responses.

6         79.     In general, an analysis of the statistical significance of the differences

7   between the answers provided by respondents who view the Test or Control product is

8   designed to measure whether these differences can be attributed to anything more than

9   random chance.  The results in Exhibit G to my report (and in numerous other

10  surveys) are mostly expressed in terms of proportions or percentages, such as "[x]% of

11  the respondents in the Control group indicated that the company makes other

12  products."  Accordingly, statistical tests of differences between the proportions

13  observed in two different groups (often pertaining to the contrast between the Test and

14  Control groups) are usually based on whether the magnitude of any difference in

15  group proportions reaches the level of statistical significance, typically at the 95%

16  confidence level.  If a difference in proportions is found to be statistically insignificant

17  (at the 95% confidence level) it means that, if the same survey were to be replicated

18  100 times, 95 out of the 100 replication surveys would obtain results that are within

19  the "confidence interval" (or "margin of error") of the survey being examined.[30]

20  Thus, differences that are not statistically significant indicate that the factor/s or

21  variable/s on which the two groups differ (*e.g.*, the displayed products) has no impact

22  on the dependent measure (such as the percent of respondents who provide a

---

[30] The confidence interval, in turn, depends on two primary factors: the sample sizes involved (such as the number of respondents in the Test and Control groups) and the obtained proportions.  In general, the closer the obtained proportion is to 50%, the larger the margin of error is.  I the present survey, differences that are greater than about 9.5% are statistically significant.  Also, when the dependent measures are numbers (rather than percentages), such as ratings on a 0 to 10 scale, the formula for testing statistical significance for differences between means is the following ("sd" refers to standard deviation, and "n" refers to the sample size for the group): $1.96 \times [\text{square-root}[(sd2/na) + (sd2/nb)]$.  Thus, whether a given difference is statistically significant depends greatly on the corresponding sample standard deviations as they pertain to the specific scale ratings.

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

1   particular answer).

2       80.    As shown in Table 5 of Exhibit F to my report, not surprisingly, most

3   respondents in the Test group named Thrive Natural Care as the <u>company that makes</u>

4   <u>the products</u> shown on the website and most respondents in the Control group named

5   Energized.  Most explanations provided by respondents (Table 6), not surprisingly,

6   referred to the fact that the name appeared on the website and/or on the products (*e.g.*,

7   "It's on the top of the page").  One respondent mentioned the name "Bodnar," which

8   is the last name of Thrive Causemetics' founder and CEO Karissa Bodnar.

9       81.    A third of the respondents indicated that the same <u>company makes other</u>

10  <u>products</u> (Table 7), and two-third said that it did not make other products or they did

11  not know.  Those who said that it did offer other products were asked to name the

12  products (Table 8).  For the most part, respondents referred to products that were

13  displayed on the website, such as "energy scrub" and "face wash."  Only four

14  respondents in the Test group referred to cosmetics or cosmetic products (*e.g.*,

15  mascara).  One respondent in the Control group mentioned cosmetics when answering

16  Question 310 regarding information the respondent had about the company that makes

17  the displayed product.  Overall, mentions of cosmetics were negligible.  It is also

18  noteworthy that not a single respondent referenced "Causemetics."

19      82.    Close to 30% of the respondents said that the company that makes the

20  products has a <u>business affiliation</u> with another company (Table 9).  When these

21  respondents were asked to name the company they were thinking about (Table 10),

22  Vogue was mentioned by about 10% of all respondents (the Plaintiff's website

23  prominently displays a favorable review that appeared in Vogue).

24      83.    About 30% of the respondents said that the company that makes the

25  products offered on the website received <u>permission or approval from another</u>

26  <u>company</u>.  When asked to name the company that gave permission, Vogue was again

27  the most common response.

28      84.    Finally, respondents were asked if they had any other information about

-34-

1  the company that makes the products (Table 15).  This question provided respondents,

2  if they were confused, to mention that unique background.  However, none of the

3  respondents did, consistent with the overall survey findings indicating that there is no

4  meaningful confusion between the Plaintiff and Thrive Causemetics.

5       85.    As noted above, some survey respondents mentioned products or terms

6  that are arguably indicative of Thrive Causemetics in their responses, although it is not

7  possible to ascertain the precise understanding of the respondent in most such

8  instances.  For example, in response to Q.285 "What other products or brands are

9  made by the company that makes the products shown on this webpage?," four

10  respondents in the Test Group mentioned eyeliner, mascara, or other make

11  up/cosmetics terms, and in response to Q.310/315 "You mentioned earlier that (insert

12  company mentioned in Q.270) makes the products shown on the webpage you saw.

13  Please provide any information you have about that company / anything else you

14  know about the company that makes the products shown on the webpage you saw?,"

15  some respondents in the Test group mentioned "They make sustainable makeup

16  products" or "beauty products" or "it is a company that is interested in cosmetic

17  products."  Additionally, in response to Q.270 "Which company makes the products

18  shown on this webpage?," one respondent mentioned the name "Bodnar," which is the

19  last name of Thrive Causemetics' founder and CEO Karissa Bodnar.  However, the

20  number of these mentions was so few relative to the survey population as a whole as

21  to not indicate a likelihood of confusion between the parties.

22       86.    Mr. Wallace submitted a reply to my rebuttal report in which he raised

23  several criticisms of my survey.  None of these criticisms has any merit, nor do they

24  undermine the results of my survey that there is no meaningful confusion between

25  Plaintiff and Thrive Causemetics.

26       87.    First, Mr. Wallace challenged my use of the *Eveready* format for my

27  survey as inappropriate because he claims that I ignored that both parties sell their

28  products primarily online and that the parties' respective products allegedly appear

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

side-by-side in online search engine results.  As an initial matter, I did not ignore that both parties sell their products on the Internet.  Indeed, my report expressly acknowledged that fact but explained that the mere fact that two products are mentioned or sold on the Internet is irrelevant to the selection of survey methodology unless the two products are often seen together in the same online stores.  I found that fact irrelevant in this case because, as previously explained, the parties do *not* sell their products in the same online stores.  Mr. Wallace suggests that the parties sell their products in the same online locations such as eBay and Amazon, but my understanding is that thrivecausemetics.com is the only location where Thrive Causemetics sells its products and that any sales of Thrive Causemetics products on third-party websites like eBay or Amazon are unauthorized resales.

88.    In this case in particular, the *Eveready* format replicated the actual purchase conditions respecting the parties' products.  Plaintiff and Thrive Causemetics do not sell their respective products on the same websites, and more specifically, Thrive Causemetics' products are not available for sale on Plaintiff's website and vice versa.

89.    Mr. Wallace does not address this fact, and claims that consumers can allegedly view the parties' products together in online search engine results and thus the *Eveready* format is inappropriate.  As previously explained, Mr. Wallace has not presented *any* evidence that consumers have ever found the parties' respective products through the use of the specific search keywords that Mr. Wallace used to generate the search engine results upon which he relies, or that such an event occurs with any appreciable frequency, as is required to reliably measure any likelihood of confusion.

90.    Mr. Wallace also did not test for any confusion stemming from online search engine results or survey consumer behavior when using online search engine results.  The Wallace Surveys showed respondents the parties' respective point-of-sale websites and did not show respondents any online search engine results.  Mr.

1  Wallace's criticism of my survey design on these grounds therefore has no factual

2  support.

3        91.    Second, Mr. Wallace criticizes my survey because it focused on reverse

4  confusion.  I have reviewed the First Amended Complaint in this action, and as I

5  mentioned above, the overwhelming focus of Plaintiff's allegations (including its

6  claim that Thrive Causemetics has overwhelmed and swamped the market and its

7  descriptions of alleged actual confusion) reflect a reverse confusion claim.

8        92.    In light of these allegations (and assuming Plaintiff has not now

9  abandoned its reverse confusion claim), I appropriately designed my survey to test for

10  reverse confusion.  The *Eveready* survey format has also been explicitly approved by

11  several courts for use in reverse confusion cases, so my survey methodology was both

12  appropriate in light of Plaintiff's allegations and consistent with the case law.

13  Notably, while I do not believe the Wallace Surveys are probative of likely confusion

14  at all for the reasons described above, in all events they provide no information

15  regarding the *direction* of any confusion – because the parties' respective products are

16  both shown to respondents, it is impossible to tell whether any response associating

17  the two is because of forward or reverse confusion.

18        93.    Third, Mr. Wallace claims that I ignored evidence of actual confusion in

19  my survey results.  This is simply incorrect.  As previously discussed, although some

20  survey respondents mentioned products or terms that are arguably indicative of Thrive

21  Causemetics in their responses, it is not possible to ascertain the precise understanding

22  of the respondent in most such instances.  Furthermore, the number of those instances

23  in the Test group responses was so few in relation to the survey population as a whole

24  as to not be indicative of a likelihood of confusion.  De minimis confusion does not

25  equate to a likelihood of confusion.

26        94.    Finally, Mr. Wallace claims that the universe selected for my survey was

27  inappropriate because the survey did not ask respondents a screening question

28  regarding whether they had purchased skincare products in the past, and thus my

TRIAL DECLARATION OF EXPERT WITNESS DR. ITAMAR SIMONSON

1  survey failed to limit the universe to individuals who may have been exposed to
2  Thrive Causemetics' mark in the past.  This criticism is baseless.  The universe for my
3  survey consisted of individuals who planned to purchase skincare products within the
4  next six months, which was entirely appropriate.  I am unaware of any legal
5  requirement or standard in consumer confusion surveys that requires survey
6  respondents to have purchased the product at issue in the past *and* plan to purchase the
7  product in the future.  Mr. Wallace's suggestion that I needed to evaluate consumer
8  awareness of Thrive Causemetics' mark is also wrong.  Scholarship in survey analysis
9  and case law make clear that use of the *Eveready* format is appropriate regardless of
10 whether the tested mark is widely known.  In other words, there is no requirement that
11 Thrive Causemetics' mark be "top-of-mind" for a person in order for that person to
12 appropriately participate in a likelihood of confusion survey.  Mr. Wallace's rebuttal
13 report does not cite any legal or academic authority to the contrary.

14    95.    For these reasons, none of Mr. Wallace's criticisms of my survey have
15 any merit.  My properly-designed likelihood of confusion survey in this action
16 demonstrated that there is no meaningful confusion between Plaintiff and Thrive
17 Causemetics, that is, there is no meaningful confusion as to source, approval, or
18 affiliation between the parties.

19    I declare under penalty of perjury under the laws of the United States that the
20 above facts are true and correct, and that this declaration was executed this 25 day of
21 October 2021, in Burlingame, California.

Dr. Itamar Simonson