1
2
3
4
5
6

Stephen McArthur (SBN 277712)
stephen@smcarthurlaw.com
Thomas Dietrich (SBN 254282)
tom@smcarthurlaw.com
THE MCARTHUR LAW FIRM
9465 Wilshire Blvd., Ste. 300
Beverly Hills, CA 90212
Telephone: (323) 639-4455

*Attorneys for Plaintiff Thrive
Natural Care, Inc.*

7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| THRIVE NATURAL CARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> THRIVE CAUSEMETICS, INC., <br><br> Defendant. | Case No. 2:20-CV-9091-PA-AS <br><br> **DIRECT EXAMINATION TRIAL DECLARATION OF ALEX MCINTOSH** <br><br> **Judge:** Hon. Percy Anderson <br> **Trial Date**: November 9, 2021 <br> **Courtroom:** 9A |

17
18
19

Alex McIntosh, upon his oath and subject to the penalty of perjury, declares as follows:

20
21
22
23
24

1.      I make this Declaration containing my direct examination testimony in support of Plaintiff Thrive Natural Care, Inc. ("Thrive") in the bench trial against Defendant Thrive Causemetics, Inc. ("TCI"). I am over 18 years of age. The matters set forth herein are of my own personal knowledge if called upon to testify as to such matters, I could and would do so.

25
26
27
28

2.      I am the co-founder of Thrive and have been Thrive's CEO since its beginning in 2013. Thrive has represented for me, from its birth to the present, far more than a company: it has represented a passion that marries my deepest values. My intent from day one was to create a company that would sell the best, healthiest

skincare for people of all genders and ages and races. But more ambitiously, my intent was to create a blueprint and a role model for other businesses across the globe: a regenerative business that, through its very operations, restored degraded lands to health and boosted the lives of rural farmers. A business model that aimed far beyond "giving back" or "buy one, give one", to leave places and people healthier than they were before we started.

3.     To bring this vision to life, I have poured over the past eight years the entirety of my energy and labor (working long hours, nights, weekends and holidays), my life savings (including all my retirement savings), and the inspiring support of my family and my friends. Building a new business from scratch, in a competitive market like skincare; creating a visionary new regenerative business model, and building a leadership and farmer-partner team across cultures—it has not been without challenge and struggle. But today, as my company's e-commerce sales have reached the top 1% tier of Amazon sellers (from among five million-plus sellers), and as 'regenerative' has entered the mainstream (with companies from Nestle to Walmart to General Mills to Patagonia all developing 'regenerative operations'), the many sacrifices of the past eight years now bear fruit.

4.     At each step, both successful and challenging, I have played by the rules, holding myself and my company to the highest standards of honesty and integrity. This moral compass I also applied to my trademark: I spent a lot of time in my company's first months, learning what my options were, what was required. And then applied to the best of my ability my time and my resources to acquire, use and defend my trademark according to the dictates of the law and the market. My belief was and is that by doing my homework, working diligently, and playing by the rules that I could build Thrive into a business that was not only commercially successful, but inspiring in its impact and its values.

5.     Before founding Thrive, I was a successful executive in both consumer package goods (Nestle Waters) as well as environmental sustainability (Nature

Conservancy). Immediately prior to becoming CEO of Thrive, I was the CEO and sole owner of Ecomundi Ventures, LLC ("Ecomundi"), which combined my consumer good and sustainability expertise.

6.     I was fortunate to earn an academic scholarship to and graduate from Duke University with honors, earning a BA in political science in 1991. Subsequently, I attended and graduated from Yale Environmental School, graduating in 2005 with a Masters' Degree in Environmental Management, special focus on business and the environment.

7.     I have significant expertise in consumer-packaged goods, skincare, and sustainable business strategies—all elements that have made our company unique. In my capacity as a senior executive at Nestle Waters, I participated in consumer packaging, marketing, public relations, media relations, and retail sales activities for our healthy living product line.  In my role as senior executive at The Nature Conservancy, I raised capital, established innovative corporate-environmental partnerships, and supported rural community development projects in the USA and abroad. With this experience in healthy product consumer goods and sustainability, I have been a featured speaker at many venues such as the opening keynote speech at The Future of Sustainability 2017 conference, hosted by the New York Society of Cosmetic Chemists; as well as a quoted expert on innovative skincare in publications such as: *USA Today* ("How a Small, Sustainable Skincare Brand Became a Best-Selling Amazon Partner"), *Whole Foods Magazine* ("Meet the New and Improved Health and Beauty"), *Beauty Independent* ("What Clean Beauty Means to Beauty Brands"), and *Byrdie* ("17 LGBTQIA+ Owned Beauty Brands to Support During Pride").

8.     From my duties for Thrive, I have personal knowledge of Thrive's origin; skincare products developed by Thrive; Thrive's marketing and sale of skincare products bearing the mark "THRIVE" (the "THRIVE mark"), including target demographics and markets; and Thrive's interactions with Defendant TCI.

While serving as Thrive's CEO for the past eight years, I have been personally involved in the marketing and selling of skincare products and have acquired a deep and extensive knowledge of how those products are marketed and sold.

### A.   Thrive's Registered Trademarks

9.     Thrive owns all right, title, and interest in and to U.S. Trademark Registration No. 4,467,942 (the '942 Registration"), which was registered January 14, 2014, from an application created by division on November 5, 2013, for the word mark "THRIVE" in relation to the following goods in International Class 003: "Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams." The '942 Registration certificate has been marked as <u>Trial Exhibit 117</u>, a true and correct copy of which is attached hereto. This certificate was obtained from the Trademark Status & Document Retrieval ("TSDR") website operated by the United States Patent & Trademark Office ("USPTO").

10.     The USPTO deemed the '942 Registration to be "incontestable" on March 7, 2020, when the USPTO accepted a Combined Declaration of Use and Incontestability under Sections 8 & 15, which was filed by Thrive on January 13, 2020. Thrive's Combined Declaration and the USPTO Acceptance has been marked as <u>Trial Exhibit 118</u>, a true and correct copy of which is attached hereto. These documents were obtained from the USPTO's TSDR website.

11.     Thrive owns all right, title, and interest in and to U.S. Trademark Registration 6,164,303 (the "'303 Registration," and, together with the '942 Registration, the "THRIVE Registrations"), which was registered September 29, 2020, for the word mark "THRIVE" in relation to the following goods in International Class 003: "Body and non-medicated soaps and skin cleansing gels; non-medicated skin care preparations, namely, facial lotions, cleansers and creams, oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and

sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams." The application which matured into the '303 Registration was filed May 2, 2016. The '303 Registration certificate has been marked as <u>Trial Exhibit 119</u>, a true and correct copy of which is attached hereto. This certificate was obtained from USPTO's TSDR website.

### B. Beginnings of the THRIVE Brand and Ecomundi Transfer

12.    I first had the idea for a line of skincare products sold under the brand "Thrive" in early 2012. I decided to use the "Thrive" name because I thought it encapsulated best the innovative new model I envisioned for my company: creating natural, effective, differentiated personal care products via a regenerative business model that restored degraded lands and boosted livelihoods of small-holder farmers and rural communities, first in Costa Rica and eventually around the world. In other words, I wanted to create a business model that would help degraded lands and rural farming communities to grow and thrive. I did not choose the name because it had any relation to a particular quality of the skincare products we sell or to any skincare products in general.

13.    As further evidence that the word "thrive" was not selected to describe a feature of skincare products, dictionary definitions of "thrive" have been marked as <u>Trial Exhibit 141</u>, a true and correct copy of which is attached hereto. The definitions include "to grow, develop, and become successful," "to grow or develop vigorously," and "to prosper; be fortunate or successful." None of these definitions describe any of the products Thrive has ever sold or a feature of those products. Rather, from founding, the term THRIVE was chosen for and used in relation to the company's business model, not skincare products.

14.    While our products cleanse, moisturize, and hydrate skin, they do not make skin prosper or even grow vigorously, which is how the word "thrive" is defined by certain dictionaries. There is nothing in our products that makes skin grow, whether vigorously or otherwise. Our skincare products are cleansers and

moisturizers.

15.   In 2012, I was the sole owner and CEO of Ecomundi. I used Ecomundi as a vehicle for environmentally-sustainable projects I wanted to develop. I therefore began working on plans to launch THRIVE skincare products through Ecomundi.

16.   From early 2012 into May 2013, through Ecomundi I conducted substantial planning and preparation—and invested a significant amount of personal financial resources—to develop a line of THRIVE-branded skincare products, and Ecomundi used the mark THRIVE in the course of those activities. Those activities included the following:

- Entering into agreements with contractors to formulate skincare products and provided related strategy, research, and recommendation services.
- Conducting presentations, pitches, and strategy sessions regarding development of THRIVE-branded skincare products.
- Releasing a request for proposal regarding branding and advertising for THRIVE-branded skincare products and conducting related meetings and discussions.
- Brainstorming, research, and building relationships regarding a line of THRIVE-branded skincare products.
- Traveling to Costa Rica to research product ingredients, meet potential suppliers, and build relationships relating to a THRIVE-branded line of skincare products.
- Hired ecological consultants to help develop and define the THRIVE brand's unique regenerative farming model.
- Hired skincare formulation professionals.
- Developed the THRIVE product formulas.
- Began developing the THRIVE packaging and product design.

- Interviewed and evaluated manufacturers for the THRIVE product.
- Planned and executed a national competition to hire a Research & Development lead for the THRIVE brand.
- Interviewed sales representatives to work on products branded as THRIVE.
- Registered Thrivenaturalcare.com website and email domains.
- Recruited angel investors.

17.     Attached hereto is <u>Trial Exhibit 324</u>, which is a true and correct copy of an email exchange dated August 6, 2012, between me and Sonia Sousa, a fellow entrepreneur with whom I brainstormed with and discussed bringing the skincare and body care line that I envisioned to market. As I stated in the email that I wrote on that date, "Our vision is to create a natural care product line called 'Thrive'." By August 2012, we had begun using the "Thrive" name to refer to the product line we were developing and had begun meeting with other people who could serve as advisors and potential customers for THRIVE-branded skincare products.

18.     On September 11, 2012, having selected THRIVE as the mark for the skincare and body care products I envisioned, legal counsel filed trademark application Serial No. 85726058 (the "'058 Application") on Ecomundi's behalf to register the mark THRIVE in connection with a variety of different skincare and body care products. My intention at the time I filed this application was to bring Thrive products to market through Ecomundi. The '058 Application has been marked as <u>Defendant's Trial Exhibit 95</u>, a true and correct copy of which is attached hereto. This document was obtained from the USPTO's TSDR website.

19.     By November 2012, acting through Ecomundi, I had made significant strides towards building a company to launch THRIVE skincare products. That included bringing in a skincare Formulation and Regulatory Advisor, a Branding and Marketing Advisor, an Ecosystem Restoration and Costa Rican Biome Advisor, as well as two C-suite Strategy Advisors. These individuals are identified in <u>Trial</u>

Exhibit 318 at pages 15-16, a true and correct copy of which is attached hereto.

20.     Exhibit 318 is a presentation dated November 20, 2012, which I prepared together with Andrea Becerra, my associate at the time in developing the THRIVE brand and products. In this presentation, acting through Ecomundi, I used the THRIVE mark repeatedly to refer to the line of skincare products and personal care products we were developing.

21.     Attached hereto is Trial Exhibit 319, which is a true and correct copy of a pitch presentation that I created and gave on or about November 15, 2012, to Tammy E. Newmark, the CEO and Managing Partner of the EcoEnterprise Fund. The EcoEnterprise Fund is an investment group that provides funding to sustainable, biodiverse businesses in order to scale and optimize their financial, environmental, and social performance. In this presentation, acting through Ecomundi, I used the THRIVE mark to refer to the line of skincare products and personal care products we were developing. As noted in this presentation, my strategy at the time was to launch THRIVE products to men and then quickly expand to women. *See* Ex. 318 at 9.

22.     Attached hereto is Trial Exhibit 320, which is a true and correct copy of a Request for Proposal (RFP) that I created as part of our search for a branding and advertising team that could create a strong brand presence around THRIVE skincare products. This RFP was released publicly on or around January 18, 2013, and it was distributed by email to three different advertising agencies, a business advisor, Jane O'Reilly, and a Costa Rican skincare entrepreneur, Andrea Becerra. This presentation clearly identifies the THRIVE mark as being associated with the THRIVE-branded line of skincare and body care products we were developing.

23.     By January 2013, I had also brought on an Agroecological Field Coordinator and Ethnobotanical Specialist and Chemist to assist in developing skincare formulations and ensuring a sustainable chain of unique-to-market botanical oils that would serve as "hero ingredients" for Thrive's skincare products.

I discussed with these advisors that they would be working to bring THRIVE-branded skincare products to market.

24.     In and around April-May 2013, I started to transition tasks and relationships relating to the THRIVE products from Ecomundi to Thrive Natural Care, Inc., which I had formed in December 2012. The purpose of the transition was to facilitate the accounting and fundraising activities of Thrive, particularly as outside investors were contemplating involvement. By this time, we had decided that the initial launch of THRIVE skincare products would consist of three items—a facial moisturizer/cream, facial cleanser, and shaving oil. Attached hereto is Trial Exhibit 252, which is a true and correct copy of a memo dated May 5, 2013, that I wrote regarding the formulation and creation of product recipes for the initial three THRIVE products. This memo refers to Thrive Natural Care and the THRIVE products and was distributed to the team that was assisting with product development.

25.     Attached hereto Trial Exhibit 325, which is a true and correct copy of a confidentiality agreement dated May 21, 2013, that was entered into between Thrive and Arthur Georgalas, a consultant with expertise in product development and formulation of skincare products. Previously, through Ecomundi I had entered into an agreement with Mr. Georgalas in September 2012 to provide advice on product formulation and development. From September 2012 onward, Mr. Georgalas worked to formulate product recipes and product strategy relating to THRIVE skincare products.

26.     Completing the transition of THRIVE business from Ecomundi to Thrive, on May 23, 2013, I signed a Restricted Stock Purchase Agreement and Technology Assignment Agreement, which transferred all aspects of the THRIVE business, including trademarks and all goodwill associated with the THRIVE mark, from Ecomundi to Thrive. The Restricted Stock Purchase Agreement has been marked as Trial Exhibit 323, a true and correct copy of which is attached hereto.

27.     In August 2013, Thrive began marketing and offering for sale skincare products under the THRIVE mark. Those products consisted of Thrive Face Balm (a skin lotion/cream/moisturizer product), Thrive Face Wash (a cleanser), and Thrive Shave Oil (a skin moisturizing oil). On August 21, 2013, I mailed a shipment of these three products to the Whole Foods Senior Buyer for Northern California, after exchanging email correspondence with her.  A true and correct copy email correspondence with Whole Foods regarding this shipment and a photograph I took in August 2013 of the handwritten note I wrote to Whole Foods and included with the package I mailed to them, has been marked as <u>Trial Exhibit 275</u> and is attached hereto.

28.     Another sale of these three products occurred in early September 2013. A true and correct copy of an email from the first purchaser of these products to me dated September 5, 2013, has been marked as <u>Trial Exhibit 298</u> and is attached hereto.

29.     By October 2013, we were in the middle of the process for submission of Thrive Products for sale at Whole Foods stores in the Bay Area. We had begun that submission in August 2013 by sending samples of the three then-existing Thrive Products to the aforementioned Whole Foods Senior Buyer. A true and correct copy of an email exchange with the Whole Foods representative in late October-early November 2013, has been marked as <u>Trial Exhibit 299</u> and is attached hereto.

30.     Beginning in February 2014, inventory of the Thrive Products was placed on store shelves at several Pharmaca stores on the west coast. A true and correct copy of an email exchange with the Pharmaca representative from February 17, 2014, has been marked as <u>Trial Exhibit 289</u> and is attached hereto.

### C.     <u>Prosecution of THRIVE Trademark Application by Thrive</u>

31.     On September 27, 2013, I signed a Nunc Pro Tunc Trademark Assignment effective May 23, 2013, which transferred the '058 Application and

another pending application, both for THRIVE marks, from Ecomundi to Thrive. The Nunc Pro Tunc Trademark Assignment has been marked as <u>Trial Exhibit 322</u>, a true and correct copy of which is attached hereto.

32.     After the transfer of all business and trademark rights from Ecomundi to Thrive, Thrive took over prosecution of the '058 Application for the THRIVE mark, which was pending with the USPTO. On October 3, 2013, I signed a Request to Divide the '058 Application into two separate applications. One application was to cover goods for which the THRIVE mark was then in use, namely "[n]on-medicated skin care preparations, namely facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams" (collectively, the "Goods In Use"). The other application was to cover other body care products which we had not yet launched. Legal counsel filed the Request to Divide on October 4, 2013. The Request to Divide has been marked as <u>Trial Exhibit 352</u>, a true and correct copy of which is attached hereto.

33.     Also on October 4, 2013, I signed and legal counsel filed a Statement of Use on behalf of Thrive to support the Goods In Use for which the THRIVE mark was then in use. In this Statement of Use, we also requested that the USPTO change the owner of the mark from Ecomundi to Thrive. The Statement of Use has been marked as <u>Trial Exhibit 92</u>, a true and correct copy of which is attached hereto.

34.     On November 5, 2013, the USPTO issued a Notice of Divisional Request Completed, which granted Thrive's Request to Divide the '058 Application. The USPTO created a separate child application, Serial No. 85980517 (the "'517 Application"), which covered the Goods In Use. The '058 Application was separated and covered only the other body care products which we had not yet launched on the market. The Notice of Divisional Request Completed has been marked as <u>Trial Exhibit 350</u>, a true and correct copy of which is attached hereto.

35.     The '058 Application covering other body care products was eventually declared abandoned in May 2016 for failure to file a Statement of Use.

36.     The '517 Application matured into the '942 Registration on January 14, 2014, and was registered to Thrive. *See* Trial Ex. 117.

**D.     THRIVE Product Line and Targeting Female Purchasers**

37.     Thrive has continued to sell THRIVE-branded skincare products since its first launch and has significantly expanded its product line over the years, with each product developed from scratch by Thrive's team, and with each product powered by our company's unique-to-market regenerative botanical oils. Today, Thrive sells a range of skincare and grooming products, including face washes and scrubs, lotions, moisturizers, sunscreens, face balms, cleansing and shaving soaps, pre-shaving and shaving oils, and grooming oils—all of which use the THRIVE mark (collectively, the "Thrive Products").

38.     Thrive includes its THRIVE mark and branding on every product it sells, and it has done so since 2013. Each Thrive Product bears THRIVE branding, including the word THRIVE in block or bold letters on the package front as well as additional references to THRIVE on the bottle or package. The images below are correct and accurate representative examples of Thrive Products.



DIRECT EXAMINATION TRIAL
DECLARATION OF ALEX MCINTOSH
Case No. 2:20-CV-09091-PA-AS

39.     Attached hereto is <u>Trial Exhibit 229</u>, which is a true and correct copy of a screenshot of the "all products" page of Thrive's website, <u>www.thrivecare.co</u>, taken by me in or about June 2021. This document accurately depicts the Thrive Products currently offered for sale, along with their packaging and pricing.

40.     Thrive sells its products through its website as well as through online retail partners, including Amazon.com, Grove Collaborative, and Walmart.com, and at Whole Foods stores on the West Coast. Approximately 95% of Thrive Products are sold through online sites, including Thrive's website, Grove Collaborative, Amazon.com, and Walmart.com. Only about 5% of our Thrive Products are sold through brick-and-mortar retailers such as Whole Foods. Thrive sells its products nationally and has since its inception. Thrive is primarily an e-commerce company and online sales are by far the most significant focus of our marketing and advertising.

41.     Prices for Thrive's products range between $12.95 for a soap bar to $54.95 for a VIP Kit containing several Thrive skincare products. *See* Ex. 229.

42.     Thrive's pricing is consistent with what is known as the mid-range "affordable premium" market. That means prices that are higher than less expensive options such as those sold at big box stores like Target yet lower than the high-end, luxury skincare products sold at retailers like Bloomingdales. In my 10 years in the skincare business, I have found that high end, luxury skincare products (brands such as La Prairie, La Mer, SK-II, and Lancôme) sell at much higher prices, usually starting at around $95 and ranging up to $850 or more, depending on the product. By way of example, what has been marked as <u>Trial Exhibit 308</u> is a true and correct copy of a screenshot of Bloomingdale's "Luxury Skincare" product page taken on or about August 29, 2021, which demonstrates pricing of high-end, luxury skincare products that often start at $200 or more. I have personally visited this website and the screenshot is an accurate representation of what appears on the Bloomingdale's page. It is also a representative example of the cost of high-end skincare products,

based on my experience.

43.     The majority of Thrive's customers are women, and this has been the case for many years. As early as 2014, we received reports from one of our main retail customers, Whole Foods, that female Whole Foods employees and female customers were purchasing Thrive Products in significant numbers. For this reason, by the end of 2014, Thrive Products were being displayed on both men's and women's shelves in Whole Foods stores in Northern California. In 2015, Thrive began advertising directly to women. Thrive's products have continued to become even more popular with women since 2015.

44.     Where Thrive receives demographic data on purchasers, such as through Amazon.com, it indicates that about 60% of Thrive's customers are female. The document marked as <u>Trial Exhibit 326</u> is a true and correct copy of customer demographic information for purchasers of Thrive Products from Amazon.com for the fourth quarter of 2020. I obtained this information directly from Amazon, where it is available through our Amazon seller's account. The Amazon purchaser information indicates that approximately 60% of unique customers on Thrive's Amazon page are women and over 60% of total sales of Thrive Products were to women.

45.     The gender demographic information from Amazon also tracks with my personal experience. As CEO of Thrive, I have personally conducted well over two hundred training sessions, in store demos, and community or vendor fairs. I know that most of our customers are women, based on feedback I get, reviews received, and customer communications.

46.     Attached hereto is <u>Trial Exhibit 309</u>, which is a true and correct copy of a screenshot of Thrive's product page for Thrive Sensitive Skin Face Balm, is specifically targeted to women. This product page came from our website, www.thrivecare.co, and was taken within the last year. This accurately reflects the way we have advertised and marketed the product since years before this lawsuit

began.

47.     Attached hereto is <u>Trial Exhibit 193</u>, which is a true and correct copy of a screenshot of Thrive's product page from the Amazon site for THRIVE Natural Face Wash Gel for Men & Women taken on June 30, 2021. As noted in the product description, this is another of the Thrive Products intended for use by women as well as men.

48.     Attached hereto is <u>Trial Exhibit 285</u>, which is a true and correct copy of a screenshot of Thrive's product page from the Walmart.com site for Thrive Natural Face Moisturizer taken on April 16, 2021. As noted in the product description, this is another of the products specifically targeted to women and to men.

49.     Attached hereto is <u>Trial Exhibit 306</u>, which is a true and correct copy of an article published on the website Medium.com by Thrive on November 20, 2019, titled "I'm a Woman and I use Thrive Natural Care. Here's Why." (available at https://medium.com/@thrive.natural.care/im-a-woman-and-i-use-thrive-natural-care-here-s-why-e00f9d4eabf8). I was personally involved in reviewing and approving this article and can testify to the date of publication and its content. This is another example of Thrive targeting women with its advertising and marketing.

50.     Further, Thrive has frequently and repeatedly purchased paid advertising keywords on Amazon.com that are targeted towards women. By paying for these keywords, Amazon will return links to Thrive's skincare products in response to searches that include the keywords. Advertising keywords that Thrive has purchased, from 2016 to the present, include: "best face sunscreen for women," "black woman sunscreen," "face care for women," "face spf for women," "facial sunblock for women," "sunscreen for pregnant women," "tinted sunscreen for face," "face scrub for women," "face lotion women," "face cream for women," "anti aging face wash women," "best face wash for women," "woman gift basket," "women's spa gift set," "womens gifts for birthday," "womens skincare gift set,"

"mom gifts," "skin care kit mom," "natural mothers day," "womens facial products," and many more. The document that has been marked as <u>Trial Exhibit 228</u> is attached hereto and is a true and correct copy of Amazon advertising keywords purchased by Thrive from 2016 to the present for each of the products it sells on Amazon. This list includes many examples of advertising keywords focused on female customers.

51.     In prior proceedings in this case, TCI has cited certain presentations produced by Thrive dating from 2013-14, which were prepared by outside marketing consultants and presented to Thrive and focused on Thrive launching its products to men. I was directly involved in reviewing those presentations, discussing them with the consultants that created them, and making the decision to adopt or not adopt the suggestions in the presentations into Thrive's business strategy. Some of those presentations contained content that was never adopted by Thrive or followed in Thrive's actual marketing and advertising. They are simply draft recommendations by an outside agency. While some of the suggestions may have been implemented for a short time in 2013-14, they have not formed the foundation for our company's advertising for many years. Since at least 2015, as I have noted, Thrive has targeted female customers and focused on marketing and ads directed to women. That is also consistent with my initial vision for the THRIVE brand in 2012, which was to launch first to men followed immediately by a broader launch to women.

52.     Since founding, part of Thrive's mission focus is female empowerment. We specifically seek to source our ingredients from women-owned farm co-ops. By sourcing ingredients from women-led businesses, we are able to not only help regenerate their farmland but also to help build and support communities and their female leaders.

53.     Thrive used the term "Thrive Tribe" to refer to its customers and potential customers from 2014 through 2020. The term "Thrive Tribe" was featured

prominently on Thrive's website for years. The document marked as <u>Trial Exhibit</u> <u>206</u> is attached hereto and is a true and correct copy of Thrive's homepage as of August 12, 2020, which contains the heading "THRIVE TRIBE FAVORITES" directly in middle of the site. The document marked as <u>Trial Exhibit 329</u> is attached hereto and is a true and correct copy of a posting by Thrive on Instagram regarding a photo contest relating to Thrive products, which requested that people posting responses use the hash tag #THRIVETRIBE. The document marked as <u>Trial</u> <u>Exhibit 205</u> is attached hereto and is a true and correct copy of an email blast sent by Thrive on April 21, 2019, to its mailing list of customers, which is called the "Thrive Tribe" and used the mailing list address "thrive-tribe@thrivenaturalcare.com". In addition, a true and correct copy of the header of an email that was sent to all new customers or potential customers who signed up for Thrive's mailing list has been marked as <u>Trial Exhibit 328</u> and is attached hereto. This header prominently stated: "Welcome to the Thrive Tribe." We sent this email to customers for years, up through about December 2020.

### E.  <u>Thrive's Success and Broader Impact</u>

54.  Since 2013, Thrive has devoted substantial money, time, and resources to developing the THRIVE brand. Thrive advertises its skincare products extensively on the Amazon and Walmart online marketplaces. The company has promotional partnerships with Amazon, Grove Collaborative, and Whole Foods and advertises through marketing agencies, public relations firms, social media such as Instagram and Facebook, the Thrive website blog, and online articles published on sites such as Medium.

55.  From 2018 to 2020, Thrive spent more than $660,000 on advertising the THRIVE brand. Attached hereto is <u>Trial Exhibit 327</u>, which is a true and correct copy of a summary of Thrive's financial statements from 2013-2020. I obtained this data from Thrive's financial records. This document contains information concerning Thrive's expenditures on advertising and marketing.

56.     Thrive is a successful Public Benefit Corporation with a loyal customer base and significantly increased growth, revenue, and social and environmental impact each year. Thrive achieved over $1 million sales in 2020. *See* Trial Ex. 327 at TNC01296. As of October 25, 2021, Thrive's sales had grown 170% versus prior year, and are on track to double 2020 revenue by the end of this year to over $2 million of revenue. This information is contained in Trial Exhibit 227, which is a true and correct copy of a summary of Thrive's financial information from 2020-2021 and future projections and is attached hereto. I created this document with data from Thrive's financial records.

57.     In addition, per the company's Public Benefit charter, Thrive's regenerative business model is successfully restoring hundreds of acres of degraded lands and boosting the livelihoods of hundreds of farmers and community members in rural areas. As a Public Benefit corporation, Thrive makes an impact on the community and environment much greater than just its product sales.

58.     Thrive's positive business practices and high-quality products have gained significant attention from its retail partners. I am the primary point of contact for Thrive in communications with retail partners and can testify to these contacts from personal knowledge. In 2021, Thrive was featured in a marketing video produced by Amazon, which Amazon shared with its 700,000-plus employees and over 100 million customers. In December 2020, Thrive was one of just two small businesses selected by Amazon from among thousands of sellers to receive the first Amazon Launchpad Innovation Grant for most innovative products and business model. Further, Whole Foods Market has several times featured Thrive as a "favorite" brand for its customers.

59.     Most recently, on October 22, 2021, Grove Collaborative, a leading e-commerce retailer, and Thrive consummated a retail partnership to sell Thrive to women and men in Grove's customer base.

60.     Thrive regularly receives media coverage from major national news

outlets, such as a June 30, 2021, four-page article about Thrive in *USA Today* entitled "*How a small, sustainable skin care brand became a best-selling Amazon partner. Thrive Natural Care has grown by 1,300% in just four years*". A true and correct copy of the *USA Today* article has been marked as <u>Trial Exhibit 198</u> and is attached hereto.

61.     Thrive's products, mission, and business model have generated over 2 billion media impressions in recent months alone, with coverage in publications such as *USA Today, CNN, Vogue, Forbes, MarketWatch, Real Simple, People, Beauty News, The Zoe Report, Hollywood Reporter, Instyle, Byrdie, Runners World, Whole Foods Magazine*, and *Natural Solutions Magazine*. I have also spoken on numerous podcasts about Thrive's business, and I delivered the opening keynote speech at The Future of Sustainability 2017 conference, hosted by the New York Society of Cosmetic Chemists.

62.     In recognition of Thrive's innovative business model and market success, the company was selected by Conservation International Ventures, the investment arm of one of the world's leading environmental organizations, for a five-year partnership and investment. This partnership centers around using demand for Thrive's skincare products in the USA and other markets, to fuel regenerative impact in rural communities in developing countries.

## F.     <u>Thrive's Enforcement of Its Rights in the THRIVE Mark</u>

63.     Thrive has expended extensive resources enforcing its intellectual property against third-parties that have used the name "thrive" in connection with skincare products. I am Thrive's only contact with Thrive's legal counsel and have personally directed all enforcement efforts relating to the THRIVE mark and am familiar with those efforts and the results. Thrive has sent cease-and-desist letters to every third-party it has identified as potentially infringing its THRIVE family of trademarks. Its enforcement efforts have been very successful and are identified, in part, below:

DIRECT EXAMINATION TRIAL
DECLARATION OF ALEX MCINTOSH
Case No. 2:20-CV-09091-PA-AS

- The trademark registration for "ENTHRIVE", U.S. Reg. No. 4,841,662, for "Beauty and cosmetic moisturizers and creams for skin care and renewal" was surrendered and is now listed as Dead and Cancelled, after demand from Thrive sent January 14, 2021.

- A seller of skincare products, The Good Hippie, Inc., agreed to sell off and discontinue its use of "Thrive" branded skincare products after we sent a demand letter in October 2020. All of its "Thrive" skincare products have been removed from its website, distribution, and/or sale.

- The trademark registration for "DON'T JUST SURVIVE… THRIVE", U.S. Reg. No. 4,858,655, for skin creams was expressly surrendered on February 24, 2021, after a demand letter from Thrive sent in January 2021.

- The trademark application for "THRIVA", U.S. Serial No. 88049841, for skincare products was expressly permanently abandoned on February 19, 2021, after a December 2020 demand from Thrive.

- The trademark application for "Thriving Spirit", U.S. Serial No. 88908740, was amended on January 20, 2021, to remove all skincare and skincare-related products after a January 2021 demand letter from Thrive.

- The trademark registration for "NOURISH YOUR SKIN, AND THE REST WILL THRIVE", U.S. Reg. No. 6,037,264, was expressly surrendered by the owner on January 21, 2021, after a January 2021 demand letter from Thrive.

- The trademark registration for "THRIVING WITH DIABETES", U.S. Reg. No. 5,141,471, was amended on January 19, 2021, to remove all references to skincare products after a November 2020 demand letter from Thrive.

- A wellness center in Vancouver, Canada, Thrive Wellness Inc.,

removed its "Thrive" branded skincare products from sale and from its website after an October 2020 demand letter from Thrive.

- A demand letter was sent to Diathrive, Inc. on December 29, 2020, demanding that it amend its trademark registration to remove "lotions" and that it cease selling its diabetes lotion named Diathrive. The letter was successful, and Diathrive amended its trademark application and discontinued its sale of the infringing goods.

- On October 25, 2021, Fungac Essentials Incorporated signed a settlement contract with Thrive agreeing to surrender its Class 3 trademark application for the mark "Thrives Infinity" for skin care and to permanently cease use of the thrive brand.

- In February 2020, Thrive Natural Care successfully enforced its trademark against THRIVA LUXE skincare products, forcing its owner, Thriva Inc., to discontinue all sales of the products and expressly abandon its trademark application, serial number 88049841.

- Thrive filed a lawsuit and is currently in litigation against Le-Vel Brands, LLC in the Central District of California concerning the latter's use of "Thrive Skin" in relation to skincare products.

True and correct copies of communications and responses regarding a representative example of Thrive's enforcement efforts have been marked as Trial Exhibits 249 and 332-339, which are attached hereto.

64.     Through its efforts, Thrive has substantially cleared the field in the skincare market of other entities' use of the term "thrive" as a skincare product brand. As of August 20, 2021, based upon the findings of a trademark search on the USPTO's Trademark Electronic Search System ("TESS") website, which I reviewed, Thrive is the only entity with a live registered trademark for the word "THRIVE" either alone or at the beginning of a phrase, in connection with skin lotions or creams in International Class 03. A true and correct copy of a trademark

search result with the USPTO that searches for trademark registrations for Class 003 that include the word "thrive" anywhere in the mark and also include the word "skin" anywhere in the description of goods has been marked as <u>Trial Exhibit 316</u>, which is attached hereto and a screenshot of which appears below.



65.     The three THRIVE marks in the results above are owned by Thrive. We have not taken action against EAT. DRINK. THRIVE. because it is expressly limited solely to sea salt-based exfoliants, and does not cover lotions, creams, or moisturizers. As evidence of this, attached hereto is <u>Trial Exhibit 424</u>, which is a true and correct copy of the USPTO description of the EAT. DRINK. THRIVE. registration, which was obtained from the USPTO's TESS website on October 14, 2021.

66.     Thrive's THRIVE mark is particularly valuable because it is the only registered mark beginning with "thrive" or for "thrive" alone for skincare products. While some third-parties and TCI have attempted to use the mark THRIVE in relation to skincare products—demonstrating high demand for the mark—Thrive has taken steps and successfully cleared the field of other similar marks or similar products.

67.     Leading consumer packaged goods and impact investors have found Thrive an attractive and unique brand. In 2019, these and other investors invested in Thrive at a $6 million valuation. In 2020, Conservation International invested in Thrive at a $6.5 million valuation. Since that time, Thrive's revenues have more than doubled, as has the company's perceived valuation. In 2021, investors have

1    targeted a $10 million valuation.

2    ## G.    Initial Contact Between Thrive and TCI

3    68.    In April 2016, Thrive's general email account received an email from

4    Karissa Bodnar, the founder of Defendant TCI. In her email, Ms. Bodnar asked for

5    permission to use the THRIVE mark on TCI's color cosmetics products used to

6    help women with cancer. I responded the next day and politely denied that request.

7    A true and correct copy of our 2016 email exchange has been marked as Trial

8    Exhibit 226 and is attached hereto.

9    69.    After receiving the email from Ms. Bodnar in 2016, I chose not to

10   pursue the issue further at that time because (a) I assumed it was over and Ms.

11   Bodnar would abide by my decision to disallow TCI's use of our THRIVE mark,

12   (b) Ms. Bodnar promised in her email that TCI would "never use the word 'Thrive'

13   without the word 'Causemetics'," and (c) Ms. Bodnar's email clearly implied that

14   TCI was only interested in its narrow lane of women's color cosmetics, which was

15   not a market that Thrive intended to expand into. I understood her email to mean

16   that under no circumstances would TCI be moving into the skincare market.

17   70.    In 2017, I learned that Ms. Bodnar had ignored my response refusing

18   her request to use the THRIVE name, and I also learned that TCI had begun to de-

19   emphasize the word "Causemetics" in its advertising and branding and to refer to

20   itself as "Thrive" without always using "Causemetics" in its name, contrary to what

21   Mr. Bodnar had said in her email. As a result, Thrive sent a cease-and-desist letter

22   to TCI on March 3, 2017, requesting that TCI stop using the "Thrive" name on its

23   products. A true and correct copy of Thrive's 2017 cease-and-desist letter has been

24   marked as Trial Exhibit 31 and is attached hereto.

25   71.    TCI responded to Thrive's letter by rejecting the demand for TCI to

26   stop using the name THRIVE. A true and correct copy of TCI's response to

27   Thrive's 2017 cease-and-desist letter has been marked as Trial Exhibit 208 and is

28   attached hereto.

72.     TCI stated in its letter that there could be no consumer confusion between the parties' products because they sold "different product lines" (makeup for TCI vs. skincare products for Thrive). Ex. 208 at 1-2. In addition, TCI threatened that any litigation would be "time-consuming and expensive" for Thrive. *Id*. at 2.

73.     TCI's response to our cease-and-desist letter also referred to TCI's prosecution of its own trademark application for makeup products before the USPTO. *Id*. at 1. According to TCI, "the trademark examining attorney initially raised the issue of potential likelihood of confusion between TCI's THRIVE CAUSEMETICS trademark and your client's THRIVE trademark [but] the trademark examining attorney subsequently withdrew the refusal to register the THRIVE CAUSEMETICS mark based on your client's THRIVE trademark." *Id*.

74.     In my subsequent review of TCI's trademark application filings, I found this assertion by TCI's attorney about the prosecution history was generally accurate. On November 30, 2015, the USPTO had issued an Office Action ("2015 Office Action") refusing to register TCI's application for the mark THRIVE CAUSEMETICS because of a likelihood of confusion with two registrations: (a) U.S. Reg. No. 2938220 for the mark CAUSE-METICS; and (b) Thrive's '942 Registration. A true and correct copy of the 2015 Office Action has been marked as Trial Exhibit 134 and is attached hereto. This document was obtained from the USPTO's TSDR website.

75.     I further found that, on May 27, 2016—after Ms. Bodnar had emailed Thrive for permission to use the THRIVE mark and never disclosed that her company had filed a trademark application that had been blocked by our registration—TCI had filed a response to the 2015 Office Action. A true and correct copy of TCI's response to the 2015 Office Action has been marked as Trial Exhibit 135 and is attached hereto. This document was obtained from the USPTO's TSDR website.

76.     In its response to the USPTO, while trying to circumvent the refusal based on the CAUSE-METICS mark, TCI argued to the USPTO that "the word 'THRIVE' is neither generic nor descriptive as used in connection with the goods contained in Applicant's application, namely, false eyelashes, adhesives for affixing false eyelashes, eyeliner and eyebrow cosmetics." Ex. 135 at 4. In attempting to circumvent the refusal based on Thrive's '942 Registration, TCI argued in detail that "the goods in [TCI's] Application are different than those in the THRIVE registration." *Id*. at 7-8. TCI's argument continued as follows:

> The specific goods in Applicant's application are not identical to those in the THRIVE registration, and the examining attorney does not attempt to argue that they are. Nor are Applicant's goods even in the *same category* as those in the THRIVE registration. The common category of Applicant's goods is cosmetics, while the common category of the goods in the THRIVE registration is skincare and shaving products. Such products are found in different aisles or departments than standard make-up cosmetics, such as eyeliner, and are distinctly different types of consumer goods. Given the dissimilarity in the marks, a higher nexus in the relatedness of the parties' goods is required to support a finding of likelihood of confusion.

*Id*. at 8 (emphasis in original). This was essentially the same argument that TCI had made in its response to Thrive's cease-and-desist letter: that TCI's makeup products and Thrive's skincare products are not in the same category.

77.     As TCI had stated, in an Office Action issued in June 2016 in response to TCI's arguments, the USPTO withdrew its refusal to register the THRIVE CAUSEMETICS mark on the ground of a conflict with Thrive's '942 Registration, apparently because it agreed with TCI's argument that its makeup and Thrive's skincare products were not in the same category of goods.

78.     The USPTO, however, maintained its refusal based on the CAUSE-METICS registration. A true and correct copy of this 2016 Office Action has been marked as <u>Trial Exhibit 136</u> and is attached hereto. This document was obtained from the USPTO's TSDR website.

79.     After reviewing TCI's response to the USPTO and to Thrive's cease-

and-desist letter, I concluded that TCI was not selling and would not sell skincare products using the THRIVE brand and therefore that Thrive did not have a viable trademark infringement claim against TCI. I understood that litigation takes substantial time and money, and I did not want to expend those resources when it appeared that TCI was not going to be directly competing against Thrive for skincare products, and Thrive had no interest in moving into the makeup market.

80.     Thus, while I was aware after the communications in 2017 of TCI's continued use of the THRIVE name on color cosmetics, I did not take further action because TCI was not using the name on skincare products, and TCI had stated that Thrive would not have a valid legal claim unless the parties were selling the same type of goods. I relied in good faith on TCI's response that it was selling products in a different lane, color cosmetics, than my company, Thrive.

81.     The next time I had contact with anyone from TCI was in June 2019, when Ms. Bodnar contacted me by phone. We talked for about 20 minutes. During this call, Ms. Bodnar made clear that she was aware of our THRIVE Registrations that covered skincare products. However, she never said anything about TCI either selling skincare products or intending to expand its line of skincare products; I had no knowledge of that at the time. Instead, she asked repeatedly for me to allow TCI to use the "THRIVE" name for TCI's business. She led me to believe that that business was still limited to women's makeup, as she had said in her earlier email.

82.     I refused Ms. Bodnar's request for a co-existence agreement because blanket permission to use the Thrive mark would have allowed TCI to begin directly competing by selling skincare products, which is not something that I wanted unless a licensing fee was involved. From there, we moved to discussing TCI licensing the Thrive registered trademarks.

83.     I reminded Ms. Bodnar about Thrive's trademark registrations and stated that, for there to be any agreement, TCI must at a minimum (a) alter its logo to deemphasize the word "Thrive" as compared to "Causemetics," and (b) agree to

compensate Thrive with a significant licensing fee for TCI's use of the THRIVE Mark.

84.    After I proposed a licensing agreement, Ms. Bodnar attempted to negotiate by offering that TCI could make a donation to charity in Thrive's name to satisfy such agreement. I rejected that proposal because accepting a charitable donation as a license fee would not have provided Thrive with sufficient benefit from the license. I responded by continuing the negotiation, telling Ms. Bodnar to discuss the matter with TCI's Board and respond to me with a licensing fee offer. The call ended, and I did not hear from Ms. Bodnar or anyone at TCI again.

85.    I understand that Ms. Bodnar now claims that I suggested a licensing fee of $250,000 per year might be appropriate. That is incorrect. While I was open to continuing to negotiate a licensing arrangement, it would have been based on a reasonable percentage of TCI's total revenue from the sale of Thrive branded products, and not a flat fee arrangement. Additionally, at the time of our conversation in June of 2019, TCI had not shared with me nor was I aware of the fact the TCI was in the very near future planning to sell directly infringing skincare products. Knowledge of this fact would have substantially increased the risk to my business—and thus the price I was willing to set—to license my Thrive trademark to TCI.

86.    At the time in June 2019, I had no reason to believe that TCI was months away from announcing and officially launching a broad, new "Thrive Causemetics" skincare line. I now believe that the purpose of Ms. Bodnar's phone call was directly linked to TCI's imminent official launch of its skincare line, and her goal was to get me to give TCI blanket permission to use the THRIVE registered trademarks, which TCI intended to use for their directly competing products.

**H.    TCI's Skincare Sales and Expansion**

87.    I found out in 2020 that TCI had begun to sell skincare products under

the "THRIVE causemetics" brand. I refer to TCI's brand this way because TCI presents its logo to consumers with the word "THRIVE" emphasized at the top in much larger bold font, and "causemetics" in small font below. Further, TCI displays its logo with a "TM" symbol appearing to the right of the "THRIVE" portion of the mark, which creates the appearance that TCI is using "THRIVE" as the trademark for its products. An example is shown below.



88.     In 2020, I reviewed TCI's website, www.thrivecausemetics.com. I noted in my review that TCI's website has a "Skincare" section at https://thrivecausemetics.com/collections/all-skincare, which displays lotions, moisturizers, cleansers, and lip balms that TCI is selling under the THRIVE CAUSEMETICS brand. A true and correct copy of a screenshot of TCI's "all skincare products" webpage taken on September 21, 2020, has been marked as Trial Exhibit 11 and is attached hereto. This exhibit accurately depicts the TCI website as I saw it when I reviewed the page relating to TCI's skincare products.

89.     In addition, I found that TCI also sells skincare products in sets containing multiple products. A true and correct copy of a screenshot of TCI's "skincare sets" webpage taken on July 13, 2021, has been marked as Trial Exhibit 41 and is attached hereto.

90.     The following is a list of the skincare products sold by TCI: Overnight Sensation Brightening Sleep Mask; Liquid Balm Lip Treatment; Gravity Defying Transforming Moisturizer; Bright Balance 3-in-1 Cleanser; Defying Gravity Eye Lifting Cream; Liquid Light Therapy All-in-One Face Serum; Moisture Flash Active Nutrient Toner; Deluxe Travel Defying Gravity Transforming Moisturizer;

Defying Gravity Transforming Moisturizer; Deluxe Travel Bright Balance 3-in-1 Cleanser; Moisture-Enriched Hand Sanitizer; Overnight Sensation Gentle Resurfacing Peel; Pumpkin Spice Latte Liquid Lip Balm Treatment; Smart Microdermabrasion 2-in-1 Instant Facial; Defying Gravity Nourishing Hand + Nail Cream; Smart Microdermabrasion 2-in-1 Instant Facial; Buildable Blur CC Cream; Filtered Effects Blurring Primer; Timeless Ambition Power 10-Peptide Sculpting Serum; Timeless Ambition Power 7-Peptide Firming Moisturizer; all travel sized versions of these products; and all "sets" that include any of these products as part of the set. I refer to these products as the "Infringing Skincare Products" herein. [*See* Docket No. 129-1 at § 5 no. 15 (Proposed Amended Final Pretrial Conference Order)]

91.     TCI's Infringing Skincare Products are identical in kind to the Thrive Products sold by Thrive under its THRIVE mark. Both TCI and Thrive sell cleansers, moisturizers, lotions, creams, sunscreens, and lip balms under the same THRIVE brand.

92.     With regard to TCI's product called Filtered Effects Blurring Primer, I have reviewed TCI's product description for this product, which is available on TCI's website. A true and correct copy of a screenshot of TCI's webpage for Filtered Effects Blurring Primer, taken in or about July 2021, has been marked as Trial Exhibit 82 and is attached hereto. As seen in this exhibit, TCI advertises this product as a "makeup + skincare hybrid" and touted the skin-related benefits, such as skin hydration and smoothing lines and wrinkles, and the skincare-supporting ingredients of this product.

93.     I have also personally inspected the physical Buildable Blur CC Cream product and have determined that it is indeed sunscreen and skincare product. Below is a true and correct copy of a photograph taken of the packaging of TCI's Buildable Blur CC Cream product, which physical product has been marked as Trial Exhibit 267.





94. As seen in the photograph of the physical Trial Exhibit 267, above, the Buildable Blur CC Cream devotes its entire back of its product packaging to describing how to use it "[f]or sunscreen use". Every single "Active Ingredients" purpose is listed solely as "Sunscreen". Sunscreens are explicitly covered by the '303 Registration, which is registered for the goods: "cosmetic sun care preparations and sunscreens."

95. Further, true and correct copies of screenshots from a video on TCI's Facebook page for Filtered Effects Blurring Primer, dated June 23, 2020, have been

marked as <u>Trial Exhibits 83 and 195</u> and are attached hereto. As shown in these images, TCI advertises Filtered Effects Blurring Primer as "NOT JUST A PRIMER. SKINCARE TOO" and touts the skincare benefits and skin-boosting ingredients in this product. It is therefore reasonable to conclude that, while Filtered Effects Blurring Primer may contain some pigment, it is considered to be a skincare product by TCI and falls within the category of Infringing Skincare Products.

96.     The same is true of TCI's product named Buildable Blur CC Cream Broad Spectrum SPF 35. I have reviewed TCI's product description for this product, which is available on TCI's website. A true and correct copy of a screenshot of TCI's webpage for Filtered Effects Blurring Primer, taken on June 18, 2021, has been marked as <u>Trial Exhibit 127</u> (pages 11-24) and is attached hereto. TCI describes its Buildable Blur CC Cream as follows: "Made with vitamin C, our all-in-one makeup and skincare hybrid formula combines powerful ingredients to simultaneously treat, moisturize, brighten, protect, and color-correct skin." *Id*. at 13. TCI further advertises that this product is a sunscreen and contains other common skincare ingredients including vitamin C and flaxseed extract. *Id*. at 15. The customer comments about this product, as shown on TCI's website, indicate that customers view this product as a moisturizer and sunscreen. *Id*. at 21-22. It is therefore reasonable to conclude that, while Buildable Blur CC Cream may contain some pigment, it is considered to be a skincare product by TCI and falls within the category of Infringing Skincare Products.

97.     I also note that the customer comments regarding Buildable Blur CC Cream are just one of the many examples of purchasers identifying TCI as "Thrive" alone, not as "Thrive Causemetics". *Id*. at 21-22. For example, one TCI customer stated: "I've loved every product I have received from Thrive!" Another stated "[w]as using ilio before I tried thrive. I find thrive facial cream tinted much more moisturizing." *Id*. at 21. Similarly, a customer review relating to Filtered Effects Blurring Primer states "I love all of the Thrive products I use." *Id*. at 8.

98.     TCI's Infringing Skincare Products prominently feature the THRIVE name on the front of their packaging. Examples of Thrive's and TCI's skincare products are shown below, in images captured from each party's website.







99.     While TCI's package coloring differs from Thrive's package coloring, both parties' products prominently feature the THRIVE brand, and the goods are identical in kind.

100.    In my experience, the same company will often use different colored packaging for different product lines while using similar marks across lines so consumers can distinguish between the lines while also being able to see that they come from the same company. Often this is done when one line is intended to be targeted towards men and another line, from the same company, is intended to be targeted towards women. Some examples of this are Dove/Dove Men+Care, Everyman Jack/Own Beauty, Harry's/Flamingo. For this reason, even if a consumer were to look at TCI's product packaging and think "this product is for women," and look at Thrive's product packaging and think "this product is for men," that consumer would likely think the products were part of a men's line and women's line *from the same company*, since such packaging differences—used with a similar brand name—are often used in that way. The fact that consumers may perceive TCI's skincare products as a women's line and Thrive's skincare products as a men's line could lead to *more* confusion because still creates the appearance that they come from the same source.

101.    Upon reviewing TCI's Infringing Skincare Products on TCI's website and related advertisements, I understand those products to range in cost between about $10 to $65.

102.    The prices for TCI's skincare products are in the same range as pricing for our Thrive Products. Both companies' prices are consistent with the mid-range "affordable premium" market.

103.    While TCI may claim it sells "high-end" or "luxury" products, that is not consistent with its actual pricing. As I explained above, and as shown in Trial Exhibit 308, true high-end, luxury skincare products are priced much higher than TCI's skincare products, usually starting at around $95 and ranging up to $850 or

more, with many products in the $200-$300 range. Rather, both TCI and Thrive are targeting the exact same market segment with similar pricing strategies.

104.   Now that TCI has expanded into the skincare market, it is a direct competitor of my company, Thrive.

105.   Expansion from color cosmetics to skincare products would not, in my experience, be simple natural growth of the same product line. Rather, it would be expansion into a different market with a new product line. In fact, TCI took this exact position in both its 2017 response letter to us and in its USPTO Office Action responses arguing that there was no confusion between our trademarks because makeup and skincare are different product categories.

106.   In my 10 years of experience in the skincare and consumer goods industry, I have found that skincare products and makeup products (like eyeliner, lipstick, mascara, blush, etc.) are not considered to be in the same category. Skincare and makeup do not generally use the same materials so there is a lack of synergy and no lower cost in producing both types of products together. Both types of products are generally packaged differently and are made using different ingredients and formulas. Retailers who sell these products generally have different corporate buyers for color cosmetics versus skincare products, and industry research and market reports view color cosmetics and skincare products as different product categories. Further, I know from my time in the skincare industry that skincare products and color cosmetics are further considered different categories as they do not appear adjacent on the same shelves or sections of retail stores and generally are not sold in close proximity to each other. Indeed, I note that TCI has made this exact argument several times to differentiate its color cosmetics from Thrive's skincare products during the time before TCI sold skincare products.

107.   I understand TCI has claimed that it "markets its skincare as having the ability to beautify or improve the appearance of skin" and attempted to contrast that with how Thrive markets its Thrive Products. But TCI's marketing along these

lines is not unique. Most skincare brands, including Thrive, market their products on the basis that they can help beatify or improve the skin's appearance. As just one example, in Trial Exhibit 309, Thrive's Sensitive Skin Face Balm is advertised to help[] hydrate, restore, and protect your face" and to "make your skin look and feel healthier." This is shown on Thrive's website together with a photo of a woman applying the product, which is targeted towards female customers.

108.   I also found that TCI was using the same term, "Thrive Tribe" in its marketing and to describe its customers, despite Thrive having used this term for many years as I explained above. The document marked as <u>Trial Exhibit 36</u> is attached hereto and is a true and correct copy of an Instagram post on TCI's page that refers to its customers as the "Thrive Tribe" and uses the hash tag #THRIVETRIBE, exactly the same hash tag used by Thrive previously for its Instagram posts. Another true and correct copy of an Instagram post on TCI's website that uses the #THRIVETRIBE hash tag has been marked as <u>Trial Exhibit 263</u> and is attached hereto. The document marked as <u>Trial Exhibit 35</u> was produced by TCI and demonstrates that TCI even owned a vanity URL, THRIVETRIBE.CC, that it used to advertise its skincare products. TCI's use of the same "Thrive Tribe" name in its own marketing is another point that could readily cause consumers to be confused between our two companies.

## I.    Effect of TCI's Move Into Skincare: Online Marketplaces

109.   Since TCI launched its line of skincare products, now both Thrive's and TCI's skincare products frequently appear together in searches on online marketplaces, including Amazon, Google Shopping, Walmart.com, eBay, and Mercari. True and correct copies of screenshots of instances of the parties' products appearing together on such marketplaces have been marked as <u>Trial Exhibit 237,</u> which is attached hereto. These screenshots were captured from June through August 2021.

110.   One example is shown below and is particularly demonstrative of the

side-by-side confusion of our products and TCI's products directly where they are sold online. A search in the category of facial skin care products on Amazon.com for solely the word "thrive" returns TCI's skincare product called Buildable Blur CC Cream for purchase *directly below* our genuine Thrive Natural Care products. This is shown in the screenshot below.



111.   Perhaps even more demonstrative, a search for "thrive cream" in Amazon, with cookies cleared, in incognito mode, and without choosing any subcategories but simply searching broadly the entirety of Amazon.com, brings Thrive and TCI's products together **as the first three results** side-by-side. This is shown in the screenshot below, which is a true and correct copy of said search done by me on August 29, 2021, and which has been marked as <u>Trial Exhibit 313</u>:

/ / /

/ / /

DIRECT EXAMINATION TRIAL
DECLARATION OF ALEX MCINTOSH
Case No. 2:20-CV-09091-PA-AS



112.    Amazon is Thrive's largest retail partner and sales on Amazon comprise a significant portion of Thrive's business. It causes significant harm to Thrive when TCI's products are sold under the same mark are offered directly next to Thrive Products on the same online marketplace. TCI's products appearing side-by-side with Thrive's have made it far more expensive for me to distinguish and sell Thrive's products in the marketplace and it has inhibited our growth.

113.    As I testified to in my July 30, 2021, deposition, it has become incredibly expensive for Thrive to purchase advertisements using even its own company and product names because of TCI. Even if I were to spend hundreds of thousands of dollars per month in advertising Thrive skincare products, those sales would be drowned out by TCI's identically named skincare products because it spends millions of dollars in advertising. TCI is funneling and siphoning customers away from Thrive by flooding the skincare zone, pushing up Thrive's customer acquisition costs, and increasing our costs per click to purchase keywords for Thrive Skincare.  It has made it very difficult to market our own products over the

past few years and is the reason why we recently had to stop spending money advertising on Google AdWords and Facebook: because our own paid advertisements were turning into sales to TCI.  It has become prohibitively expensive for us to acquire customers from advertising.

### J.    Effect of TCI's Move Into Skincare: Online Searches

114.   As I explained above, Thrive is primarily an e-commerce company. Seventy percent (70%) of online traffic to Thrive's website that results directly in a product sale comes from a Google search. An appreciable number of those searches come from search terms such as "thrive skincare", "thrive natural care", "thrive natural skincare", "thrive face wash", "thrive skincare natural", and "healthy thrive skincare". I have access to this search data through Google Analytics that is tied in with our website, and I obtained this information directly from reviewing Google data.

115.   In addition to Thrive's product packaging, Thrive's online marketing and advertising often uses the term "Thrive skincare" to refer to Thrive Products, as well as terms that include the word "thrive" and words describing the product at issue, such as "Thrive moisturizer," "Thrive cleanser," and "Thrive sunscreen."

116.   Since TCI has launched its skincare product line, TCI's and Thrive's skincare products now regularly appear side-by-side on the same computer screen in online searches run on popular search engines and comparison-shopping searches, including Google, Google Shopping, Bing, and Bing Shopping. For example, images of and links to TCI's Infringing Skincare Products and Thrive's Thrive Products appeared together in searches for the following terms:

Google Shopping

- "thrive natural care"
- thrive natural skincare
- mens thrive natural care
- thrive mens skin

- amazon thrive natural skincare
- amazon thrive natural care

Google Search

- thrive natural care
- "thrive natural care"
- amazon thrive face balm
- amazon thrive natural care
- amazon thrive natural skincare

117.   The document marked Trial Exhibit 235 is attached hereto and depicts true and correct copies of screenshots taken by me in August 2021 of Google and Google Shopping search results for these terms demonstrating the parties' products appear side-by-side and in the same search results.

118.   The document marked Trial Exhibit 236 is attached hereto and depicts true and correct copies of screenshots taken by me in August 2021 of Bing and Bing Shopping search results for these terms demonstrating the parties' products appear side-by-side and in the same search results.

119.   With regard to these screenshots, I personally conducted each of the searches and took the screenshots. For about half of the screenshots, 13 of the total 27, I cleared my browser's cookies and history, and turned off the setting for personalized Google advertisements, such that I was searching from a "clean slate". For the remaining 14 searches, I did those shortly afterwards, but not immediately after clearing my browser's cookies that would have contained a small amount of identifying information and history. However, since it was still shortly after I cleared them, I have no reason to believe the "cookies" settings on my internet browser affected the results I received in these remaining searches. Furthermore, on August 30, 2021, I cleared the cookies on my internet browser and conducted the same searches in "guest mode" with personalized Google advertisements turned "off" in the settings menu (which I understand does not use cookies or any

personalization or history for tracking) and received identical results. This demonstrates that Thrive and TCI products are shown together regardless of search history and cookies.

120.   The document marked as <u>Trial Exhibit 311</u> is attached hereto and consists of true and correct copies of screenshots I captured of the results of my August 30, 2021, searches immediately after I had cleared my internet browser's cookies, turned personalized advertisements off, and searched in "guest" mode.

121.   I know from personal experience that the parties' products appear together extremely frequently in online product searches and online shopping locations like Google Shopping and Bing Shopping. In addition, in the last several months I have run several searches on Amazon and eBay for my company's products. Every time I have done so, I have found that TCI's products appear in the same search results. It is extremely common that the parties' products appear together in online marketplace search results.

122.   The fact that TCI's Infringing Skincare Products appear together with the Thrive Products in Google and Bing searches for "Thrive" and skincare-related terms, and even for my specific company name and in searches for men's products, creates an extremely high likelihood that consumers will see the parties' products together when they are searching online for "Thrive" skincare products. If someone hears from a friend about my company Thrive's great "Thrive skincare" product, the chances are they may use an online search engine like Google or Bing to find out what product the friend meant. A consumer searching online for Thrive or the Thrive Products is likely to use terms such as "Thrive skincare" and "Thrive Natural Care". When TCI's products, which are also referred to as "Thrive" products in search results, are shown together with the Thrive Products, it is highly likely a consumer would be confused and click on links to TCI's products believing them to originate from or be affiliated with Thrive.

123.   Additionally, and importantly, once my company has converted a

customer to purchase, sent them a product, and facilitated a good product use experience, when that same customer returns to search for more "Thrive skincare" to accompany her first purchase, she will be met instead by an avalanche of digital marketing and media promoting TCI. Thus, TCI's infringement also siphons away returning and repeating customers.

124.   Thrive's THRIVE mark is particularly valuable because it is the only registered mark beginning with "thrive" or that even contains the word "thrive" standing alone for skincare lotions or creams. While certain third parties and TCI have attempted to use the mark THRIVE in relation to skincare products—demonstrating high demand for the mark—Thrive has taken steps to clear the field of other similar marks. Further, the harm caused by TCI—and, in particular, by TCI's products showing up together with Thrive's products in nearly every online search for Thrive's products—is acute and must have led to many lost sales as people searching for Thrive's products will find TCI's and not know the difference.

125.   When Thrive has acquired a customer on Amazon or through a Google/Bing search, social media, or via media articles, and that customer has purchased and tried one of Thrive's products, the opportunity for Thrive is to cross-sell other Thrive Products to that same customer. But with TCI's advertising and misimpressions flooding our marketing channels, the customer is funneled away from Thrive and to TCI. Thus, our hard work of attracting the attention of a potential customer, converting the customer to purchase, and then creating repeat purchase and cross-selling opportunities is all for naught when TCI is siphoning off Thrive customers with TCI's infringing mark usage and extremely high ad budget. This can also have the effect of drawing away the interest of media and investors whose attention may have been attracted to Thrive from a news article or online search. This confusion occurs on a monthly basis, in my experience. And it has only gotten worse over the past year.

126.   At the present point in time, it would not be possible for Thrive to try

to correct the misimpressions created by TCI by doing counter-advertising. That would not be effective or a good investment of Thrive's advertising budget until TCI's infringing actions have ceased. TCI is currently out-spending Thrive 1,000 to 1 with a brand that says TCI is "selling Thrive skincare" products. Under the current circumstances where TCI's skincare products appear together with Thrive's skincare products in every online search, and TCI's advertising budget is exponentially higher than Thrive's, it would be difficult to conduct a corrective advertising campaign before TCI has ceased its infringing marketing efforts because TCI has saturated the market with misimpressions that the THRIVE mark relates to TCI and the cost to correct those misimpressions would be extremely high.

127.   When TCI stops selling "Thrive" branded skincare products, then my company can return to advertising and growing its own Thrive brand online without worrying about directly competing against TCI for ad space and losing its advertising revenue to TCI.

128.   Further, by the placement of TCI's ads and products, we know that TCI bids on advertising keywords containing the word "thrive," which in turn drives up the price for those keywords for anyone else attempting to bid on them, including myself. That cases Thrive to pay far more to secure advertising keywords for our own registered trademark. Those high costs are already significant to Thrive, and by TCI driving them higher, they are driving us out of our own market.

129.   If and when TCI is stopped from using the THRIVE mark and stops flooding the market with its own ads linking "THRIVE" to TCI, then spending money on corrective advertising could be highly effective. However, given the ubiquity of TCI's advertising, it would take a very substantial amount of corrective advertising to remedy the several years of misimpressions created by TCI. Until TCI's infringement is stopped, Thrive simply does not have the multi-million-dollar ad budget necessary to combat TCI's misimpressions.

130.   Unless TCI is forced to stop using the THRIVE mark on skincare products, the parties will continue to compete against each other in the same market selling the same types of goods. Each company will continue launching more new, overlapping products in the coming years. That will only continue to exacerbate the consumer confusion problem caused by TCI selling goods under my company's THRIVE mark and advertising in ways that cause TCI's skincare products to appear together with Thrive's skincare products in online searches and marketplaces.

**K.     Effect of TCI's Move Into the Skincare Market: Actual Confusion**

131.   TCI's use of the THRIVE Mark has caused actual confusion between Thrive and TCI, by consumers, retailers, and potential partners.

132.   Attached hereto is <u>Trial Exhibit 150</u>, which is a true and correct copy of a screenshot of Thrive's sunscreen product page on Amazon.com, depicting on page TNC03312 a customer review left June 30, 2021, which stated: "I like Thrive products and have bought eye liner and mascara from them as well as moisteurizer [sic]." However, Thrive does not sell eyeliner or mascara, but TCI does. TCI is also the only entity to my knowledge named "Thrive" that sells eyeliner, mascara, and moisturizer. This indicates to me that the customer purchased those items from TCI and believed them to originate from Thrive. Another copy of a screenshot of just this review is also attached hereto and marked as <u>Trial Exhibit 233</u>.

133.   Attached hereto is <u>Trial Exhibit 151</u>, which is a true and correct copy of a screenshot of Thrive's natural mineral sunscreen product on Amazon.com, depicting on pages TNC03300-01 a customer review left June 14, 2021, which details how much the customer loves Thrive mineral sunscreen and ends with: "Well done, Thrive Causemetics." In other words, because of consumer confusion TCI has now improperly gained a customer who feels very positively about TCI's products. And this after my company has sent time and resources to market to, attract attention of, convert to purchase, and send product to this customer.

134.   Attached hereto is Trial Exhibit 317, a true and correct copy of a screenshot of Thrive's Amazon product page for THRIVE Natural Face Moisturizer, which shows at the bottom right a customer's review left on Thrive's Amazon page on June 21, 2019. This review states: "Thrive is an up and comer in the cosmetics field. Their mascara is phenomenal and this facial moisturizer is a plus in their line." As I noted, Thrive does not sell cosmetics or mascara but TCI does. This is another example of a customer who now feels positive goodwill towards TCI because of their positive experience with a Thrive Product.

135.   TCI's use of the THRIVE mark has caused actual confusion with Thrive's retail partner Walmart as well. Attached hereto is the document marked as Trial Exhibit 121, which is a true and correct copy of a screenshot I took of Walmart.com's listing for Thrive Products where Walmart erroneously listed as originating from TCI. I personally added the yellow circles to this document after taking the screenshot to highlight the issue, but did not otherwise edit the document.

136.   Attached hereto is Trial Exhibit 223, which is a true and correct copy of an online product listing for Thrive's Skin Care Gift Set on the Poshmark website, which erroneously states Thrive's products originate from TCI. This indicates that the person who posted this listing was confused as to the origin of Thrive's skincare products.

137.   In 2019, Thrive worked for months to secure a partnership with Julie Ertz, a player on the U.S. national soccer team, and her husband, Zach Ertz, an NFL football player, for them to serve as brand ambassadors for Thrive. I was introduced to Lisa Ertz, Zach's mother, who played a significant part in managing their business decisions. In an email from Lisa Ertz to me sent June 19, 2019, Ms. Ertz showed that she was confused about Thrive's business and believed Thrive to be TCI, stating that she thought Thrive made the "3 must have beauty products in my case!" A true and correct copy of our email exchange has been marked as Trial

Exhibit 126 and is attached hereto. After I received that email, I had two phone conversations with Ms. Ertz. During those phone calls, it became clear when I referred to my company as "Thrive," Ms. Ertz had confused it with TCI.

138.   Unless TCI is forced to stop using the THRIVE mark on skincare products, the parties will continue to compete against each other in the same market selling the same types of goods. That will only continue to exacerbate the consumer confusion problem caused by TCI selling goods under my company's THRIVE mark and advertising in ways that cause TCI's skincare products to appear together with Thrive's skincare products in online searches and marketplaces.

139.   Additionally, this confusion, while starting with consumers, also spills over to confusion in media, investors, and partners, all to the detriment of my company and its marketplace brand value.

140.   I have reviewed the email chain marked as Trial Exhibit 28, which was produced by TCI. On page TCI_00019214 is a true and correct copy of an email from me to Margo Hays, which I sent on December 18, 2017. Ms. Hays was a Vice President at TSG Consumer, a very large and well-known investor in consumer brands, with whom I had discussed the idea of investing in Thrive. Ms. Hays had planned to give information on Thrive to Blythe Jack, who I knew to be the Managing Director of TSG Consumer, with authority to direct investments for the company. I did not know that Ms. Jack had connections to TCI at that time. However, seeing this email chain produced by TCI as part of this litigation, it is clear that Ms. Jack, rather than entertaining the idea of investing in Thrive, believed the name to be similar to TCI's—and Ms. Jack forwarded my email which contained a summary of our business for potential investors—to TCI's founder, Ms. Bodnar. Ms. Bodnar's response that Thrive had "been on my radar due to prior TM searches" failed to note that those trademark searches had found that Thrive's trademark application for the THRIVE mark had preempted TCI's use of the "Thrive" name by several years.

141.  Ms. Bodnar's response was apparently calculated to create the impression that *we* were copying TCI when in fact the opposite was true.

142.  The Trial Exhibit 28 email chain is indicative of the type of harm suffered by Thrive among potential investors.

143.  This is just one example of Thrive losing out on the chance to receive a substantial investment from a sizable partner because of TCI's use of the "Thrive" name. This is not an isolated incident; the obvious trademark confusion in the marketplace between my Thrive and TCI is a significant hurdle in investors' consideration process.

**L.    Email From Phil Segal**

144.  I have reviewed the email that is marked as Trial Exhibit 380, which is attached hereto and is an email dated August 12, 2019, from Phil Segal to myself and a coworker. I have also reviewed the article referred to by Mr. Segal in the email, which has been marked as Trial Exhibit 142 pp. 1-14, which is also attached hereto.

145.  Mr. Segal was never an employee of Thrive. He was a third-party consultant on paid media advertising with whom I spoke occasionally over a period of a few months about Thrive's business. Sometimes I would have Mr. Segal handle ad placements for Thrive Products. I never asked him for advice about TCI, and I have no reason to believe that he had any inside information or knowledge about TCI beyond the article he cited in his email.

146.  The article that Mr. Segal referred to is a puff piece about TCI's founder, Ms. Bodnar, from a beauty website, www.beautyindependent.com. Ms. Bodnar is asked questions in writing, and they are answered in writing. There is no reason to believe her statements are accurate or even were actually provided by her, as opposed to written by TCI's marketing or PR team. In his email to me, Mr. Segal simply summarizes in bullet points what Ms. Bodnar allegedly said in an interview. Thrive's marketing strategies are a closely guarded secret, given the highly

competitive, crowded nature of the skincare market. I do not think that in a written interview for a beauty website Ms. Bodnar would disclose TCI's actual marketing strategy or how discuss truly how important the "Thrive" name is to TCI's marketing.

147.   Having read the article that is marked as Trial Exhibit 142, I actually found that in the article TCI is referred to as "Thrive" alone, without "Causemetics" many times. For example, on the first page Ms. Bodnar is referred to as the "29-year-old founder of Thrive." The first sentence of the next paragraph states "Thrive is perhaps the beauty industry's most low-key breakout brand." Ms. Bodnar then repeatedly refers, on pages 7, 9, and 11, to TCI's customer community as the "Thrive Tribe"—exactly the same name used for years previously by Thrive. If anything, this article demonstrates the importance to TCI of using the word "Thrive" in its brand.

## M.   Thrive Causemetics' 2018 Trademark Application and Refusal

148.   I have reviewed the history of TCI's second trademark application for the THRIVE CAUSEMETICS trademark filed in 2018. On August 28, 2018, the USPTO issued an Office Action (the "2018 Office Action"), rejecting a second application by TCI to register THRIVE CAUSEMETICS and citing a likelihood of confusion with Thrive's '942 Registration and Thrive's then-pending trademark application, which matured into the '303 Registration. A true and correct copy of the 2018 Office Action has been marked as Trial Exhibit 137, which is attached hereto. This record was obtained from the USPTO's TSDR website. Exhibits to the Office Action not relevant to this litigation have been removed.

149.   TCI filed a response to the 2018 Office Action dated October 30, 2018, which has been marked as Trial Exhibit 138 and is attached hereto. This record was obtained from the USPTO's TSDR website In its response, similar to its arguments in response to the 2015 Office Action, TCI argued as follows:

Applicant's Goods and Services are not identical to the Cited Goods,

1

2

3

4

> and the Examining Attorney does not attempt to argue that they are.
> While Applicant's Mark and the Cited Mark are used in connection
> with goods in Class 3, Applicant's Class 3 goods are cosmetics, while
> the Cited Mark's Class 3 goods are skincare and shaving products.
> Such products are found in different aisles or departments than
> standard make-up cosmetics, such as eyeliner, and *are distinctly
> different types of consumer goods.*

5

*See* Trial Ex. 138 at 3-4 (emphasis added).

6

7

8

9

10

150.   Notably, as I explained above, TCI filed its response to the USPTO in the same month that TCI released its first Infringing Skincare Product. TCI thus must have known that, while cosmetics were "different types of consumer goods," that point of distinction did not apply to skincare products—which were the same types of goods my company was selling.

11

12

13

14

15

16

17

18

19

151.   On November 23, 2018, the USPTO issued a Suspension Notice maintaining the refusal to register TCI's second application for THRIVE CAUSEMETICS on the basis of a likelihood of confusion with the THRIVE Registrations. The USPTO also maintained its requirement that TCI must disclaim the term "CAUSEMETICS" because it is merely descriptive as an intentional misspelling of "COSMETICS". Attached hereto is Trial Exhibit 139, which is a true and correct copy of the USPTO's Suspension Notice issued on TCI's application on November 23, 2018. This record was obtained from the USPTO's TSDR website.

20

21

22

23

24

25

26

27

152.   Receiving this response from the USPTO apparently did not do anything to make TCI slow down its launch of skincare products in the subsequent two years. Also, Ms. Bodnar never disclosed in her June 2019 phone call with me that the USPTO had refused TCI's own trademark application based on finding a likelihood of confusion with my company's THRIVE Registrations. It seemed like she supposedly wanted to "coexist" but not on fair terms that involved actually disclosing TCI's issues with the USPTO or move into the skincare market in direct competition with Thrive.

28

153.   On July 28, 2021, the USPTO un-suspended TCI's second application

1   for THRIVE CAUSEMETICS and issued another Office Action refusing to register

2   TCI's application on the basis of a likelihood of confusion with the THRIVE

3   Registrations. Attached hereto is <u>Trial Exhibit 140</u>, which is a true and correct copy

4   of the USPTO's Office Action dated July 28, 2021. This record was obtained from

5   the PTO's TSDR website. Exhibits attached to the end of the Office Action not

6   relevant to this litigation have been removed.

7

8       I declare under penalty of perjury that the foregoing is true and correct.

9   Executed on October 26, 2021, at San Francisco, California.

10

11  _____
    Alex McIntosh

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: *Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*
Case No.: 2:20-cv-9091-PA-AS

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 9465 Wilshire Blvd., Ste. 300, Beverly Hills, CA 90212. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DIRECT EXAMINATION TRIAL DECLARATION OF ALEX MCINTOSH**

on the following parties by electronically filing the foregoing on October 26, 2021, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rollin Ransom (SBN 196126)               *Attorneys for Defendant*
rransom@sidley.com
Ryan Stasell (SBN 307431)
rstasell@sidley.com
Paula Salazar (SBN 327349)
psalazar@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth St., Ste. 4000
Los Angeles, CA 90013

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Date:  __10/26/2021_____   By:  _*/s/ Thomas Dietrich*_____

                                                      Thomas Dietrich

# TRIAL EXHIBIT NO. 117

# United States of America

## United States Patent and Trademark Office

# THRIVE

**Reg. No. 4,467,942**

**Registered Jan. 14, 2014**

**Int. Cl.: 3**

**TRADEMARK**

**PRINCIPAL REGISTER**

THRIVE NATURAL CARE, INC. (DELAWARE CORPORATION)
42 DARRELL PLACE
SAN FRANCISCO, CA 94133

FOR: NON-MEDICATED SKIN CARE PREPARATIONS, NAMELY, FACIAL LOTIONS, CLEANSERS AND CREAMS, CREAMS AND OILS FOR COSMETIC USE, SKIN MOISTUR-IZERS; PRE-SHAVING PREPARATIONS; AFTER SHAVE LOTIONS AND CREAMS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 9-5-2013; IN COMMERCE 9-5-2013.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

SN 85-980,517, FILED 9-11-2012.

GISELLE AGOSTO, EXAMINING ATTORNEY



**Deputy Director of the United States**
**Patent and Trademark Office**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

# TRIAL EXHIBIT NO. 118

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 10/31/2021)

# Combined Declaration of Use and Incontestability under Sections 8 & 15

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 4467942 |
| **REGISTRATION DATE** | 01/14/2014 |
| **SERIAL NUMBER** | 85980517 |
| **MARK SECTION** | |
| MARK | THRIVE (see, https://tmng-al.uspto.gov/resting2/api/img/85980517/large) |
| **ATTORNEY SECTION (current)** | |
| NAME | Tsan Abrahamson |
| ATTORNEY BAR MEMBERSHIP NUMBER | NOT SPECIFIED |
| YEAR OF ADMISSION | NOT SPECIFIED |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | NOT SPECIFIED |
| FIRM NAME | Cobalt LLP |
| INTERNAL ADDRESS | Building A21 |
| STREET | 918 Parker Street |
| CITY | Berkeley |
| STATE | California |
| POSTAL CODE | 94710 |
| COUNTRY | United States |
| PHONE | 510-841-9800 |
| FAX | 510-295-2401 |
| EMAIL | trademarks@cobaltlaw.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **ATTORNEY SECTION (proposed)** | |
| NAME | Travis Manfredi |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | Cobalt LLP |
| STREET | 1912 Bonita Avenue |
| CITY | Berkeley |
| STATE | California |
| POSTAL CODE | 94704 |

| COUNTRY | United States |
|---|---|
| PHONE | 510-841-9800 |
| FAX | 510-295-2401 |
| EMAIL | trademarks@cobaltlaw.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| DOCKET/REFERENCE NUMBER | THRIVE 03 |
| OTHER APPOINTED ATTORNEY | Tsan Abrahamson, Jessica Tam |

## CORRESPONDENCE SECTION (current)

| NAME | Tsan Abrahamson |
|---|---|
| FIRM NAME | Cobalt LLP |
| INTERNAL ADDRESS | Building A21 |
| STREET | 918 Parker Street |
| CITY | Berkeley |
| STATE | California |
| POSTAL CODE | 94710 |
| COUNTRY | United States |
| PHONE | 510-841-9800 |
| FAX | 510-295-2401 |
| EMAIL | trademarks@cobaltlaw.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## CORRESPONDENCE SECTION (proposed)

| NAME | Travis Manfredi |
|---|---|
| FIRM NAME | Cobalt LLP |
| STREET | 1912 Bonita Avenue |
| CITY | Berkeley |
| STATE | California |
| POSTAL CODE | 94704 |
| COUNTRY | United States |
| PHONE | 510-841-9800 |
| FAX | 510-295-2401 |
| EMAIL | trademarks@cobaltlaw.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| DOCKET/REFERENCE NUMBER | THRIVE 03 |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 003 |
|---|---|
| GOODS OR SERVICES | Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams |

| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT17\IMAGEOUT 17\859\805\85980517\xml3\8150002.JPG |
|---|---|
| | \\TICRS\EXPORT17\IMAGEOUT 17\859\805\85980517\xml3\8150003.JPG |
| SPECIMEN DESCRIPTION | pages from registrant's online store |

**OWNER SECTION (current)**

| NAME | THRIVE NATURAL CARE, INC. |
|---|---|
| STREET | 42 DARRELL PLACE |
| CITY | SAN FRANCISCO |
| STATE | California |
| ZIP/POSTAL CODE | 94133 |
| COUNTRY | United States |

**OWNER SECTION (proposed)**

| NAME | THRIVE NATURAL CARE, INC. |
|---|---|
| STREET | 42 DARRELL PLACE |
| CITY | SAN FRANCISCO |
| STATE | California |
| ZIP/POSTAL CODE | 94133 |
| COUNTRY | United States |
| EMAIL | XXXX |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

**LEGAL ENTITY SECTION (current)**

| TYPE | corporation |
|---|---|
| STATE/COUNTRY OF INCORPORATION | Delaware |

**PAYMENT SECTION**

| NUMBER OF CLASSES | 1 |
|---|---|
| NUMBER OF CLASSES PAID | 1 |
| COMBINED §§ 8 & 15 FILING FEE PER CLASS | 325 |
| TOTAL FEE PAID | 325 |

**SIGNATURE SECTION**

| SIGNATURE | /Alex McIntosh/ |
|---|---|
| SIGNATORY'S NAME | Alex McIntosh |
| SIGNATORY'S POSITION | Co-founder & CEO |
| DATE SIGNED | 01/12/2020 |
| SIGNATORY'S PHONE NUMBER | 510-841-9800 |
| PAYMENT METHOD | DA |

**FILING INFORMATION**

| SUBMIT DATE | Mon Jan 13 03:24:42 EST 2020 |
|---|---|

| | |
|---|---|
| **TEAS STAMP** | USPTO/S08N15-XXX.XXX.XX.X<br>XX-20200113032442552951-4<br>467942-70089506a637a5f11e<br>7a21c91ba36278b2c7709282c<br>bf3b6c28ddb2473a7a06856-D<br>A-24423788-20200109171007<br>823724 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 10/31/2021)

## Combined Declaration of Use and Incontestability under Sections 8 & 15
**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 4467942
**REGISTRATION DATE:** 01/14/2014

**MARK:** THRIVE

The owner, THRIVE NATURAL CARE, INC., a corporation of Delaware, having an address of
    42 DARRELL PLACE
    SAN FRANCISCO, California 94133
    United States
    XXXX (authorized)
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 003, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Non-medicated skin care preparations, namely, facial lotions, cleansers and creams, creams and oils for cosmetic use, skin moisturizers; pre-shaving preparations; after shave lotions and creams; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) pages from registrant's online store.
Specimen File1
Specimen File2

The applicant's current attorney information: Tsan Abrahamson. Tsan Abrahamson of Cobalt LLP, is located at

    Building A21
    918 Parker Street
    Berkeley, California 94710
    United States

The phone number is 510-841-9800.

The fax number is 510-295-2401.

The email address is trademarks@cobaltlaw.com

The applicants proposed attorney information: Travis Manfredi. Other appointed attorneys are Tsan Abrahamson, Jessica Tam. Travis Manfredi of Cobalt LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

    1912 Bonita Avenue
    Berkeley, California 94704
    United States
The docket/reference number is THRIVE 03.

The phone number is 510-841-9800.

The fax number is 510-295-2401.

The email address is trademarks@cobaltlaw.com

Travis Manfredi submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

The applicant's current correspondence information: Tsan Abrahamson. Tsan Abrahamson of Cobalt LLP, is located at

Building A21
918 Parker Street
Berkeley, California 94710
United States

The phone number is 510-841-9800.

The fax number is 510-295-2401.

The email address is trademarks@cobaltlaw.com

The applicants proposed correspondence information: Travis Manfredi. Travis Manfredi of Cobalt LLP, is located at

1912 Bonita Avenue
Berkeley, California 94704
United States
The docket/reference number is THRIVE 03.

The phone number is 510-841-9800.

The fax number is 510-295-2401.

The email address is trademarks@cobaltlaw.com

A fee payment in the amount of $325 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.

### Declaration

☑ Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

☑ Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

☑ The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

☑ There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

☑ There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Alex McIntosh/   Date: 01/12/2020
Signatory's Name: Alex McIntosh
Signatory's Position: Co-founder & CEO
Signatory's Phone: 510-841-9800

Mailing Address **(current):**
  Cobalt LLP
  918 Parker Street
  Berkeley, California 94710

Mailing Address **(proposed):**
  Cobalt LLP
  1912 Bonita Avenue
  Berkeley, California 94704


Serial Number: 85980517
Internet Transmission Date: Mon Jan 13 03:24:42 EST 2020
TEAS Stamp: USPTO/S08N15-XXX.XXX.XX.XXX-202001130324
42552951-4467942-70089506a637a5f11e7a21c
91ba36278b2c7709282cbf3b6c28ddb2473a7a06
856-DA-24423788-20200109171007823724





THRIVE

PRODUCTS ⌄   MISSION   POWERFUL PLANTS   SKIN HEALTH   BLOG   CONTACT

SIGN IN   🔍   🛒 0

## FACE WASH - 3.38FL.OZ.(100ML)

⭐⭐⭐⭐⭐ 158 reviews

$ 11.65

**Subscribe and Save!**

⦿ ONE-TIME PURCHASE

◯ SUBSCRIBE & SAVE 15% ($ 9.90)

**ADD TO CART**

Product Description | Our Commitments

This natural cleanser is an excellent start to your day or a great post-adventure refresh for your face. It removes dirt, SPF, oil, and sweat from your face, leaving it feeling clean, fresh, hydrated, and healthy. The plant-powered formula avoids drying the skin and keeps you looking vibrant throughout the day.

Share: 🐦 📘 📌 🔵 ✈️

## ROUTING SHEET TO POST REGISTRATION (PRU)

**Registration Number:**   4467942

**Serial Number:**   85980517

**RAM Sale Number:  4467942**

**RAM Accounting Date:  20200113**

**Total Fees:**   $325

Note:  Process in accordance with Post Registration Standard Operating Procedure (SOP)

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Number of Classes Paid | Total Fee |
|---|---|---|---|---|---|---|
| §8 affidavit | 7205 | 20200113 | $125 | 1 | 1 | $125 |
| §15 affidavit | 7208 | 20200113 | $200 | 1 | 1 | $200 |

Physical Location: 700  - INTENT TO USE SECTION

Lost Case Flag: False

In TICRS (AM-FLG-IN-TICRS): True

**Transaction Date:**   20200113



| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Saturday, March 7, 2020 11:00 PM |
| **To:** | trademarks@cobaltlaw.com |
| **Subject:** | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 4467942: THRIVE: Docket/Reference No. THRIVE 03 |

**U.S. Serial Number:** 85980517
**U.S. Registration Number:** 4467942
**U.S. Registration Date:** Jan 14, 2014
**Mark:** THRIVE
**Owner:** THRIVE NATURAL CARE, INC.

Mar 7, 2020

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065. **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
003

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date. See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=85980517&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=85980517&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

\*   **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

# TRIAL EXHIBIT NO. 119

# United States of America

## United States Patent and Trademark Office

# THRIVE

**Reg. No. 6,164,303**

**Registered Sep. 29, 2020**

**Int. Cl.: 3**

**Trademark**

**Principal Register**

Thrive Natural Care, Inc.  (DELAWARE CORPORATION)
42 Darrell Place
San Francisco, CALIFORNIA 94133

CLASS 3: Body and non-medicated soaps and skin cleansing gels; non-medicated skin care preparations, namely, facial lotions, cleansers and creams, oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; shaving creams and gels; pre-shaving preparations; after shave lotions and creams

FIRST USE 9-5-2013; IN COMMERCE 9-5-2013

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 87-021,374, FILED 05-02-2016





Director of the United States
Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# TRIAL EXHIBIT NO. 141



GAMES & QUIZZES | THESAURUS | WORD OF THE DAY | FEATURES | SHOP ⌄       LOG IN | REGISTER | 🔖 MY WORDS

Merriam-Webster · SINCE 1828

thrive                                                    ✕   🔍

**Dictionary**    **Thesaurus**



# thrive *verb*

🔖 Save Word

\ ˈthrīv 🔊 \

**thrived** *or* **throve** \ ˈthrōv 🔊 \; **thrived** *also* **thriven** \ ˈthri-vən 🔊 \; **thriving** \ ˈthrī-viŋ 🔊 \

## Definition of *thrive*

*intransitive verb*

**1**  **:** to grow vigorously **:** <u>FLOURISH</u>

**2**  **:** to gain in wealth or possessions **:** <u>PROSPER</u>

**3**  **:** to progress toward or realize a goal despite or because of circumstances — often used with *on*
   // *thrives* on conflict



**WORD OF THE DAY**

*flexuous* 🔊

<u>See Definitions and Examples</u> »

Get Word of the Day daily email!

Case 2:20-cv-09091-PA-AS   Document 174   Filed 10/26/21   Page 71 of 195   Page ID #:8407







Search Macmillan Dictionary

# thrive   DEFINITIONS AND SYNONYMS ★

VERB  INTRANSITIVE   US 🔊 /θraɪv/

**OTHER ENTRIES FOR THIS WORD**    +

**WORD FORMS**    +

**DEFINITIONS**    1

1    **to become very successful, happy, or healthy**

*Children thrive when given plenty of love and attention.*
*This type of plant thrives in cool conditions.*

**Collocations and examples**    +

**Collocations and examples**    +

**Collocations and examples**    +

**Synonyms and related words**    +

**Do Not Sell My Personal Information**

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners.

Accept Cookies

TNC03101



*Meaning of **thrive** in English*

# thrive

*verb* [ I ]

US  /θraɪv/    UK  /θraɪv/

**thrived** or US also **throve**  |  **thrived** or US also **thriven**

C1

## to grow, develop, or be successful:

• *His business thrived in the years before the war.*

• *She seems to thrive **on** stress.*

**Synonyms**

burgeon literary

prosper

– SMART Vocabulary: related words and phrases

**Succeeding, achieving and fulfilling**

A game

accomplish

**Do Not Sell My
Personal Information**

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. **Privacy and Cookies Policy**

Accept Cookies

**TNC03104**



 

**thrive** | BUSINESS ENGLISH

# thrive

*verb* [ I ]

**UK** 🔊   /θraɪv/   **US** 🔊

**thrived** | **thrived** | US also **throve** | **thriven**

➕ ☰

**to grow, develop, and become successful:**

- *Industries such as water, telecoms, and insurance have been thriving.*
- **thrive on sth** *Some employees thrive on the challenge of intense workloads.*

---

*(Definition of **thrive** from the **Cambridge Business English Dictionary** © Cambridge University Press)*

EXAMPLES of **thrive**

# thrive

In the end, the kids are thriving and the adults are more or less fine.

*From* *The Atlantic*        💬

For example, women who got divorced often thrived.

*From* *The Atlantic*        💬

**More examples**

These examples are from corpora and from sources on the web. Any opinions in the examples do not represent the opinion of the Cambridge Dictionary editors or of Cambridge University Press or its licensors.

**Do Not Sell My Personal Information**

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. **Privacy and Cookies Policy**

Accept Cookies

**TNC03106**



**DEFINITIONS** ⌄ | thrive 🔍

MEANINGS GAMES LEARN WRITING WORD OF THE DAY

**Top Definitions** **Synonyms** **Quizzes** **Related Content**

**Vocab Builder** **Examples** **British**

# thrive



Save This Word!

[ thrahyv ] **SHOW IPA** 🔊 ☆

**See synonyms for:** thrive / thrived / thrives / thriving on Thesaurus.com

*verb (used without object),* **thrived** or **throve** 🔊 [throhv], **thrived** or **thriv·en** 🔊 [**thriv**-*uh*n], **thriv·ing.**

1. to prosper; be fortunate or successful.

2. to grow or develop vigorously; flourish:
   *The children thrived in the country.*

**OTHER WORDS FOR THRIVE**

1. advance.

**See synonyms for *thrive* on Thesaurus.com**

**QUIZ**

# SPRINT TO THE FINISH WITH THIS OLYMPICS QUIZ!

**TNC03073**

# TRIAL EXHIBIT NO. 324

**From:**        Sonia Sousa  <srs0804@gmail.com>
**Sent:**        Monday, August 06, 2012 9:58 PM
**To:**          Alex McIntosh
**Subject:**     Re: Notes from Thrive brainstorming

Hi Alex,

Great notes.

On our go dos we had d=scussed the goal to talk with 10 people - 5 by the end of Aug and another = by the end of Sept.

I am working on the framework as a suggestion=for how to find and vet the companies. I will have a first draft tomorrow =or your review.

I read the report I sent you last week, it was very disappointing on th= company list - they have over 200 companies but none from Costa Rica - th=y did not list Natura in Brazil, which does not make sense.  The more=than I thought about, Cost Rica is a very interesting place as a source of=natural products - I am totally on board.

I will circle back with you tomorrow on the draft.

Cheers

On Mon, Aug 6, 2012 at 6:0= PM, Alex McIntosh <alex.mcintosh@ecomundiventures.com> wrote:

Hi Sonia=

Attached are pics of each sheet from our brainstorming=  It was a great session (even though it started a little rocky on Th=rs with the shrimp!), and I think there is a ton of opportunity here for u=.

On the last page are our To-Dos, which are a bit weak. =nbsp;Though since we were doing them at 11:15pm after 7 hours of brainstor=ing, perhaps we get a bit of slack.  In any case, *my* to-d=s were to:  a) topline the notes (see below); and b) send you copy of=the sheets (attached).

*Your* next step was to send me your suggested str=tegy for identifying our "goldilocks company" (e.g. the company =hat is neither too big/expensive/sophisticated, nor too small/risky/withou= infrastructure, so that you and I could make a short list of 4-5 prospect=ve companies asap, at least before Wednesday.  Does that sound right?=/div>

Here are topline points from our brainstorming:<=div>
1) Our vision is to create a natural care product line called &qu=t;Thrive".

2) Our brand promise is that the products =) work great/provide consumer with great use experience; b) and by their e=istence, make the environment (esp the area from where the ingredients are=sourced) and the local community(ies) (again, esp from the areas where the=ingredients are sourced) BETTER.  We don't just reduce our impact, we=make the consumers life, the environment, the community BETTER.

3) We discussed how the packaging, the channel/distribution, the "=story" would all reinforce this brand promise in innovative and appea=ing ways.

4) We discussed how "place" of sourcing was =i>key to our product.  I continue to believe that Costa Rica=offers a GREAT opportunity for brand definition and differentiation in a c=uttered marketplace, at least for first products.  Relatedly, you enc=uraged us to think about innovation in the sourcing and communication of t=at sourcing (your "foursquare" concept).  I liked that.

5) We talked a lot about making our sourcing/production process more e=ficient (e.g. the concept formerly known as "enhancing nature") =nd agreed that natural but innovative ways of extracting the ingredients a=d using the byproducts of the ingredients would be essential:  both f=r reducing our COGS, as well as in reducing our impact on the environment.=/div>

6) We agreed that we were personally and professionally most aligned a=d interested in a starting course that had us buying/investing in/becoming=controlling interests in...an existing natural care products company, and =hen building out our Thrive concept from that baseline.  The company = found in Costa Rica is a target to check out.

7) We outlined some rough next steps (see attached).  My reco is =o look these over, see if anything else comes to your mind.  Then let=s talk about sketching out a business plan and timeline to really flesh ou= our idea.


Let me know your thoughts on above before we lose you t= relationship bliss mid-week.  Take care.
Alex McIntosh
Ecomundi Ventures
<=ont face="Optima" size="4">t: 203.249.7285
e:




=br>



=-_
Sonia_R._Sousa
srs0804@gmail.com
650-384-5140


=

# TRIAL EXHIBIT NO. 95

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 85726058**
**Filing Date: 09/11/2012**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85726058 |
| **MARK INFORMATION** | |
| **\*MARK** | THRIVE |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | THRIVE |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Ecomundi Ventures, LLC |
| **\*STREET** | 42 Darrell Place |
| **\*CITY** | San Francisco |
| **\*STATE** (Required for U.S. applicants) | California |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 94133 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited liability company |
| **STATE/COUNTRY WHERE LEGALLY ORGANIZED** | Connecticut |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 003 |
| **\*IDENTIFICATION** | Personal care products for cosmetic use, namely, hair shampoos and conditioners, hair styling preparations; body and hand washes, soaps and gels; non-medicated skin care preparations, namely facial lotions, cleansers and creams, body lotions, creams and oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; lip creams and balms; antiperspirants and deodorants for personal use; shaving creams and gels; pre-shaving preparations; after shave lotions and creams; non-medicated baby care products, namely baby lotions, creams, body cleansers, shampoos, gels and washes, diaper rash creams and ointments |
| **FILING BASIS** | SECTION 1(b) |

## ATTORNEY INFORMATION

| | |
|---|---|
| NAME | John W. Crittenden |
| ATTORNEY DOCKET NUMBER | 313705-20000 |
| FIRM NAME | Cooley LLP |
| STREET | 777 6th Street NW, Suite 1100 |
| CITY | Washington |
| STATE | District of Columbia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 20001 |
| PHONE | 415 693 2090 |
| FAX | 415 693 2222 |
| EMAIL ADDRESS | trademarks@cooley.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | Janet L. Cullum, Anne H. Peck, Peter J. Willsey, Vincent J. Badolato, Todd S. Bontemps, Bryan J. Boyle, Morgan A. Champion, Susan Piascik Christoff, Heather Dunn Navarro, Angela Dunning, Kathryn Duvall, Aaron M. Fennimore, Ariana Gallisá Hiscott, Brendan J. Hughes, Carolyn V. Juarez, Nishan Kottahachchi, Katie Krajeck, Lori Mayall, Jeffrey T. Norberg, John P. Oleksiuk, Kathlyn Querubin, and Karen K. Won |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| NAME | John W. Crittenden |
| FIRM NAME | Cooley LLP |
| STREET | 777 6th Street NW, Suite 1100 |
| CITY | Washington |
| STATE | District of Columbia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 20001 |
| PHONE | 415 693 2090 |
| FAX | 415 693 2222 |
| EMAIL ADDRESS | trademarks@cooley.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| | |
|---|---|
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |

## SIGNATURE INFORMATION

| | |
|---|---|
| SIGNATURE | /Alex G. McIntosh/ |

| SIGNATORY'S NAME | Alex G. McIntosh |
| --- | --- |
| SIGNATORY'S POSITION | Chief Executive Officer |
| DATE SIGNED | 09/11/2012 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 85726058**
**Filing Date: 09/11/2012**

## To the Commissioner for Trademarks:

**MARK:** THRIVE (Standard Characters, see mark)
The literal element of the mark consists of THRIVE.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Ecomundi Ventures, LLC, a limited liability company legally organized under the laws of Connecticut, having an address of
    42 Darrell Place
    San Francisco, California 94133
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

   International Class 003:  Personal care products for cosmetic use, namely, hair shampoos and conditioners, hair styling preparations; body and hand washes, soaps and gels; non-medicated skin care preparations, namely facial lotions, cleansers and creams, body lotions, creams and oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; lip creams and balms; antiperspirants and deodorants for personal use; shaving creams and gels; pre-shaving preparations; after shave lotions and creams; non-medicated baby care products, namely baby lotions, creams, body cleansers, shampoos, gels and washes, diaper rash creams and ointments
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
   John W. Crittenden and Janet L. Cullum, Anne H. Peck, Peter J. Willsey, Vincent J. Badolato, Todd S. Bontemps, Bryan J. Boyle, Morgan A. Champion, Susan Piascik Christoff, Heather Dunn Navarro, Angela Dunning, Kathryn Duvall, Aaron M. Fennimore, Ariana Gallisá Hiscott, Brendan J. Hughes, Carolyn V. Juarez, Nishan Kottahachchi, Katie Krajeck, Lori Mayall, Jeffrey T. Norberg, John P. Oleksiuk, Kathlyn Querubin, and Karen K. Won of Cooley LLP
    777 6th Street NW, Suite 1100
    Washington, District of Columbia 20001
    United States
The attorney docket/reference number is 313705-20000.
The applicant's current Correspondence Information:
    John W. Crittenden
    Cooley LLP
    777 6th Street NW, Suite 1100
    Washington, District of Columbia 20001
    415 693 2090(phone)
    415 693 2222(fax)
    trademarks@cooley.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or

association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /Alex G. McIntosh/   Date: 09/11/2012
Signatory's Name: Alex G. McIntosh
Signatory's Position: Chief Executive Officer
RAM Sale Number: 2623
RAM Accounting Date: 09/12/2012

Serial Number: 85726058
Internet Transmission Date: Tue Sep 11 15:50:40 EDT 2012
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2012091115504035
3230-85726058-4907aa97e47411f992f4dbb30f
a268694-DA-2623-20120911143417971173

# THRIVE

# TRIAL EXHIBIT NO. 318



Alex & Andrea discuss

*A new model for personal care business*

Costa Rica

20 November 2012

Ecomundi_00005





*Can personal care products offer **high performance**, avoid unhealthy synthetic ingredients, and be sold at an attractive price?*

*Can business do more than 'extract'?  Can it also **restore** our planet?*

*Can the wisdom of indigenous communities help us live **healthier** lives?*

*Can a natural care product be **sexy**, **fun**, and **exciting**?*

**Ecomundi_00006**



Yes.

Ecomundi_00007





# thrive as the new model

Nature's axiom is that "life creates the conditions conducive to other life"

Nature's tendency is to **thrive**: to be restorative, generative, flourishing

Our generation's challenge is to reshape business from an *extractive* endeavor to one that creates conditions of **thriving**

Ecomundi_00008





# Thrive™

*Verb*:  **To grow or develop well and vigorously**

*Synonyms*:   **prosperar - medrar - desarrollarse bien - florecer**

Ecomundi_00009



Ecomundi_00010



# natural care market opportunity

**Natural Care Manufactures' Sales Growing Rapidly Around the Globe**



**Attracting Investors and New Brands**



♣ US market CAGR 11%+; will reach > $6b by 2015

♣ Favorable long-term drivers
- increased consumer demand
- demographics (aging boomers, rising incomes int'l)

♣ Fueling M&A and *many* new market entrants



**8**

# yet a consumer/retail gap remains









poor product performance

absence of compelling and unique brand personality

greenwashing & "natural pretenders"

high price

Ecomundi_00012





# Thrive vision

Ecomundi_00013



# *Thrive*™ value proposition







A high-performance, truly natural brand of personal care product born in the world's most idyllic place

Offers people a better way to
- look great
- be healthy
- have fun living bigger than the traditional "consumer" role

Operates Impact Positive
- restore the planet
- improve indigenous livelihoods
- role model for 21st century business

Ecomundi_00014



# Thrive™ strategy

**1** ID native plant w/ new functional benefit(s)



Peine de Mico

**2** Collaborate with partners to increase conservation value of target landscapes via organic and biodynamic ag; co-op equity for rural/indigenous suppliers; sustainably harvest plants



**3** Blend indigenous active ingredients with US science for new, high performance products



**4** Innovative packaging & logistics in cradle to cradle ethos




**5** Disruptive channel distribution reduces footprint, and cost while bringing products to US market

ecommerce partners





Ecomundi_00015





# why Costa Rica?

Extraordinary abundance of flora, including more than 9,000 species of higher plants

International reputation for natural beauty, spas and eco-adventure

Inspiring national initiatives have made country "the Switzerland of the Americas":  disbanded army in1950's; 25% of country set aside as protected parks; 2021 carbon neutral goal

Continually ranks #1 or #2 in citizen happiness vs rest of world

Ecomundi_00016





Ecomundi_00017

# Founding Team

## Alex McIntosh, co-founder

  
 

**Ecomundi Ventures**
Impact investment fund focused on water, launched 2010

» Raised seed capital, formed team, diligence on >840 emerging water co's

» Board Director, Clearwater Systems, Inc, (10 yr old company with 5k installations around world of its chemical-free water treatment technology)

**Nestlé Waters**
Former executive with $4B division of world's largest consumer water company

» Vision, strategic plan, hands-on leadership building Nestlé Waters' first sustainability program from ground up

» Catalyzed the corporation's 8,500 person corporate sustainability performance to assume position of recognized industry leadership

**The Nature Conservancy**

» Directed volunteer and staff efforts to help secure record $75MM in private capital for the two largest watershed conservation projects in TNC history

» Vision, strategic plan, leadership of 9-person fundraising team that increased revenue 1,250% over four years and completed most successful corporate conservation campaign in state history

**Other Environmental Leadership**

» Co-developed an ecotourism business & funding model for nation of Gabon

» Created 5-year business plan for Big Bend National Park

» *Judge*: Cleantech Group's Global 100; Global Social Venture Competition; Global Cleantech Cluster Assn, Net Impact

**Education**
Yale University, Master's degree (with honors) in environmental management
Duke University, B.A. (with honors); Trinity Scholar

## Andrea Becerra, co-founder

> you need to send me your updated pic

 

**Aromas para el Alma**
Founder and director of leading Costa Rican natural care company

» Launched seven years ago; all natural ingredients manufactured in CR

» Over 40 products now sold in major CR grocery, natural foods stores; spas; two stand alone retail stores

» Large network of suppliers, vendors; formulation expertise

» FY 2011 sales >150M colones; cash flow positive

**Universitaria y Otro Educacion**

» Bachillerato en Antropología con énfasis en antropología social, Universidad de Costa Rica

» Bach Flower Practitioner: (Programa Internacional de Educación de Flores de Bach).

» Certificación en Aromaterapia. Instituto Argentino de Terapias Naturales.

» Actualmente: Certificación en Aromaterapia Sutil

» Curso de Aromaterapia (Instituto Argentino de Terapias Naturales)

» Curso de Destilación de Aceites Esenciales (Finca Ipe)

» Curso de Cosmetología Natural (Instituto Deon)

» Curso de Agricultura Orgánica (INA)

» Curso de Plantas Medicinales y Aromáticas (INA)

» Curso de Introducción a Vitrales (INA)

» Curso de Astronomía (UCR).

» Miembro del grupo de mujeres emprendedoras Pathways to Prosperity iniciado por Hillary Clinton

» Congreso de Women Leadership and Entrepeneurship, Washington DC y Nueva Cork.

» Congreso y Feria Biofach y Vivaness de Cosméticos Orgánicos y Naturales, Alemania

» Congreso de Agroecología Biodinámica, Universidad EARTH

**Ecomundi_00018**


# operational advisors



## Art Georgalas
### Formulation & Regulatory Advisor

Art's career spans more than forty years in personal and natural care product formulation and applied research at a number of leading cosmetic manufacturers, including Revlon, Charles of the Ritz, and LaMaur/DowBrands. Art is a leading contributor to various trade journals, including Cosmetics & Toiletries magazine and has presented at many technical and trade conferences. Art earned a Masters in Pharmaceutics with a specialty in Cosmetic Science at the Arnold and Marie Schwartz College of Pharmacy and Health Sciences of Long Island University. As an adjunct professor, Art instructs classes in product development and applied colloid chemistry at Fairleigh Dickinson University.



## Jane O'Reilly
### Branding & Marketing Advisor

Jane's 25-year career in beauty and marketing includes senior positions at Conde Nast, Time Inc, and she is currently Creative Marketing Director at Travel & Leisure magazine.  Jane has created hundreds of high-impact, award-winning brand and marketing communications via ad campaigns, branded content, digital integration; collateral materials; integrated programs and video production.



## Dr. Florencia Montagnini
### Ecosystem Restoration & Costa Rican Biome Advisor

Professor Montagnini teaches courses at Yale's Environmental School in tropical forest ecology and management, soil science, agroforestry, and restoration ecology. She also holds honorary professorships at several universities in Latin America. Dr. Montagnini has written eight books on agroforestry systems and ecological restoration, including a major textbook in tropical forest ecology and management, and 200 scientific articles in international refereed journals.

Professor Montagnini's research focuses on Latin American sustainable land use systems that integrate ecological principles with economic, social, and political factors; the principles and applications of forest landscape restoration; the reforestation of degraded lands with native species; identification and quantification of ecological services provided by forest ecosystems; organic farming using indigenous resources; Payments for Environmental Services as tools to promote restoration, conservation, and rural development.  In her research, she collaborates with institutions such as CATIE (Tropical Agriculture Research and Higher Education Center, Costa Rica), as well as with universities and other academic, private and government institutions in Argentina, Brazil, Colombia, Costa Rica, Mexico, and Panama.  She is a Senior Fellow of ECPA, Energy and Climate Partners of the Americas, of the U.S. Department of State.

pls send me photos/bios for christina and carlos (assuming that you still want them working on this

Ecomundi_00019



# strategy advisors



## Kim E. Jeffery
President & CEO
Nestle Waters North America

Kim Jeffery is President and Chief Executive Officer of Nestlé Waters North America Inc. based in Stamford, Connecticut.  He oversees the largest bottled water company in North America with 8,500 employees, 27 plants, and more than 100 facilities.  Mr. Jeffery joined the Company in 1978 and assumed the Company's top position in 1992. With sales of more than $4.2 billion in 2008, the Company holds seven of the top ten U.S. water brands   Throughout his tenure, he has made environmental stewardship a priority and has been an industry leader in building green plants, reducing water use, protecting natural lands, and reducing raw material usage.  Additionally, Mr. Jeffery launched a decade-long partnership with The Nature Conservancy and as part of his personal commitment to the environment. Mr. Jeffery serves on the Executive Board of American Beverage Association and the Board of Keep America Beautiful.   He is also currently on the Board of Directors for Kendall Jackson Wine Estates and Stew Leonards Retail Food Stores.



## Roger Milliken, Jr.
President, Baskahegan Co.
Director, Milliken Enterprises, Inc.
Former Chair, Nature Conservancy

Roger Milliken, Jr. is president of the Baskahegan Company, which owns and manages 100,000 acres of forestland in eastern Maine and is known for its commitment to managing for timber while respecting the dynamics of natural systems.  Roger has served on the The Nature Conservancy's board of directors since 2000, chairing its conservation committee from 2005-2008, and was named chairman of the organization's global board of directors in October 2008.  Milliken also chairs the advisory board of the Manomet Forest Conservation Program, is an advisor to the Open Space Institute's Northern Forest Protection Fund, and served on the board of the Land for Maine's Future program for nine years.  From 1994 to 1999, Milliken co-founded and later chaired the Maine Forest Biodiversity Project, a 100+ person collaborative which later supported successful legislation to establish 100,000 acres of ecological reserve on state lands.  From 1986 to 1996, Milliken was the director of the Maine Forest Products Council. Milliken is a 1975 graduate of Harvard University, and is currently writing a book about his lifelong exploration of right relationship with land.

Ecomundi_00020



# launch to male target; expand





# launch shower/haircare; expand

1st: Body wash/gel; haircare → 2nd: Skin care (body, facial, shaving lotion) → 4th: Boomer and Baby extensions

| Product Category | Market CAGR | Market Size | Cost to Bring to Market | Level of Competition (assume USA) | Regulatory & Technical Barriers | RANKING |
|---|---|---|---|---|---|---|
| **Bodywash/body gel** | | | | | | |
| **Skin care (body lotion)** | | | | | | |
| **Skin care (facial lotion)** | | | | | | |
| **Hair care (shampoo)** | | | | | | |
| Bar soap (body & hand) | | | | | | |
| Hair care (styling prep) | | | | | | |
| Hair care (conditioner) | | | | | | |
| Medicated skin care | | | | | | |
| pre/post shave lotions & creams | | | | | | |
| Skin care (sunscreen) | | | | | | |
| Lip creams/balms | | | | | | |
| Shaving creams & gels | | | | | | |
| Medicated hair care | | | | | | |
| Antiperspirants & deodorants | | | | | | |

Ecomundi_00022





# timeline

**Completed:** founding team, plan, market/customer research, basic unit economics, recruit core advisors/partners in CR & US

**4Q 2012:** formulation profiles, target plant species, CR suppliers, research & NGO partners; priority conservation targets; contract manufacturer

**1Q2013:** seed funding, beta formulation and packaging

**2Q2013**: secure core U.S. channel partners & distribution, finalize supply chain and back office partners

**3-4Q2014:** Series A round, co-marketing, manufacturing and distribution

Ecomundi_00023





# contact:

Andrea Becerra
Aromas para el Alma
(506) 2203-1541
andrea@aromas.co.cr

Alex McIntosh
Ecomundi Ventures
203.249.7285
alex.mcintosh@ecomundiventures.com

Ecomundi_00024

# TRIAL EXHIBIT NO. 319



Thrive™

Costa Rica

prepared for Tammy E. Newmark
EcoEnterprise Fund
15 November 2012

*CONFIDENTIAL
pls do NOT distribute*

Ecomundi_00025



# summary vs EE fund criteria

🔸 **Geographic location:** Costa Rica

🔸 **Industry sector:** natural care products via sustainable ag (organic and biodynamic); NTFP; ecosystem restoration

🔸 **Company profile:** emerging for-profit enterprise; founding team with successful track record in target sectors; notable advisors backing project

🔸 **Investment**: not requesting now; seed round 1Q2013; Series A round 4Q2013

🔸 **Environmental & social impact**: improved conservation value of degraded ag landscapes; broad collaboration with rural and indigenous communities; organic/ECOCERT certifications; improved consumer health



Ecomundi_00026



# natural care market opportunity

**Natural Care Manufactures' Sales Growing Rapidly Around the Globe**



CAGR: 15%

**Attracting Investors and New Brands**



♣ Target US market CAGR 11%+; will reach > $6b by 2015

♣ Favorable long-term drivers
  • increasing consumer demand for naturals vs synthetics
  • media focus
  • demographics (aging boomers, rising incomes int'l)

♣ Fueling M&A and new market entrants

Ecomundi_00027



**4**

# yet a consumer/retail gap remains









poor product performance

absence of compelling and unique brand personality

greenwashing & "natural pretenders"

high price

Ecomundi_00028







# what motivates us

Resource depletion: in Costa Rica <15% of original forests remain while 70% of its food is imported

Human health: more than 90% of personal care products contain synthetic ingredients known to be dangerous to health and the environment

Innovation:  the modern eco-efficiency paradigm of "being less bad" won't get us to Good. Or Healthy.  Or Happy.

Entrepreneurship:  building a hugely successful business by giving our customers a better product

Ecomundi_00029





# thrive as our paradigm

Nature's axiom is that "life creates the conditions conducive to other life"

Nature's tendency is to **thrive**: to be restorative, generative, flourishing

Our generation's challenge is to reshape business from an *extractive* endeavor to a *restorative* process that creates conditions of **thriving**

Ecomundi_00030



# Thrive™ value proposition







A high-performance, truly natural brand of personal care product born in the world's most idyllic place and sold in the U.S.

Offers consumers a better way to
- look great
- be healthy
- Connect to something bigger than stuff in a plastic bottle

Operates Impact Positive
- Ecosystem restoration
- improve indigenous livelihoods
- role model for 21st century business

**Ecomundi_00031**



# Thrive™ strategy

**1** ID native plant w/ new functional benefit(s)



Peine de Mico

**2** Collaborate with partners to increase conservation value of target landscapes via organic and biodynamic ag; co-op equity for rural/indigenous suppliers; sustainably harvest plants



**3** Blend indigenous active ingredients with US science for new, high performance products



**4** Innovative packaging & logistics in cradle to cradle ethos




**5** Disruptive channel distribution reduces footprint, and cost while bringing products to US market

ecommerce partners





Ecomundi_00032



# launch and growth strategy



Ecomundi_00033





# why Costa Rica?

Extraordinary abundance of flora, including more than 9,000 species of higher plants

Strong agricultural, academic, private sector networks supportive of organic farming, bioprospecting, sustainable business models

Brand value:  int'l reputation for natural beauty, spas, eco-adventure; inspiring national initiatives (disbanded army, 25% of country set aside as protected parks; 2021 carbon neutral goal); continually ranks #1 or #2 in citizen happiness vs rest of world

Ecomundi_00034

# Founding Team

## Alex McIntosh, co-founder







**Ecomundi Ventures**
Impact investment fund focused on water, launched 2010

» Raised seed capital, formed team, diligence on >840 emerging water co's

» Board Director, Clearwater Systems, Inc, (10 yr old company with 5k installations around world of its chemical-free water treatment technology)

**Nestlé Waters**
Former executive with $4B division of world's largest consumer water company

» Vision, strategic plan, hands-on leadership building Nestlé Waters' first sustainability program from ground up

» Catalyzed the corporation's 8,500 person corporate sustainability performance to assume position of recognized industry leadership

**The Nature Conservancy**

» Directed volunteer and staff efforts to help secure record $75MM in private capital for the two largest watershed conservation projects in TNC history

» Vision, strategic plan, leadership of 9-person fundraising team that increased revenue 1,250% over four years and completed most successful corporate conservation campaign in state history

**Other Environmental Leadership**

» Co-developed an ecotourism business & funding model for nation of Gabon

» Created 5-year business plan for Big Bend National Park

» *Judge*: Cleantech Group's Global 100; Global Social Venture Competition; Global Cleantech Cluster Assn, Net Impact

**Education**
Yale University, Master's degree (with honors) in environmental management
Duke University, B.A. (with honors); Trinity Scholar

## Andrea Becerra, co-founder





**Aromas para el Alma**
Founder and director of leading Costa Rican natural care company

» Launched seven years ago; all natural ingredients manufactured in CR

» Over 40 products now sold in major CR grocery, natural foods stores; spas; two stand alone retail stores

» Large network of suppliers, vendors; formulation expertise

» FY 2011 sales >150M colones; cash flow positive

**Universitaria y Otro Educacion**

» Bachillerato en Antropología con énfasis en antropología social, Universidad de Costa Rica

» Bach Flower Practitioner: (Programa Internacional de Educación de Flores de Bach).

» Certificación en Aromaterapia. Instituto Argentino de Terapias Naturales.

» Actualmente: Certificación en Aromaterapia Sutil

» Curso de Aromaterapia (Instituto Argentino de Terapias Naturales)

» Curso de Destilación de Aceites Esenciales (Finca Ipe)

» Curso de Cosmetología Natural (Instituto Deon)

» Curso de Agricultura Orgánica (INA)

» Curso de Plantas Medicinales y Aromáticas (INA)

» Curso de Introducción a Vitrales (INA)

» Curso de Astronomía (UCR).

» Miembro del grupo de mujeres emprendedoras Pathways to Prosperity iniciado por Hillary Clinton

» Congreso de Women Leadership and Entrepeneurship, Washington DC y Nueva Cork.

» Congreso y Feria Biofach y Vivaness de Cosméticos Orgánicos y Naturales, Alemania

» Congreso de Agroecología Biodinámica, Universidad EARTH



# operational advisors



## Art Georgalas
### Formulation & Regulatory Advisor

Art's career spans more than forty years in personal and natural care product formulation and applied research at a number of leading cosmetic manufacturers, including Revlon, Charles of the Ritz, and LaMaur/DowBrands. Art is a leading contributor to various trade journals, including Cosmetics & Toiletries magazine and has presented at many technical and trade conferences. Art earned a Masters in Pharmaceutics with a specialty in Cosmetic Science at the Arnold and Marie Schwartz College of Pharmacy and Health Sciences of Long Island University. As an adjunct professor, Art instructs classes in product development and applied colloid chemistry at Fairleigh Dickinson University.



## Jane O'Reilly
### Branding & Marketing Advisor

Jane's 25-year career in beauty and marketing includes senior positions at Conde Nast, Time Inc, and she is currently Creative Marketing Director at Travel & Leisure magazine.  Jane has created hundreds of high-impact, award-winning brand and marketing communications via ad campaigns, branded content, digital integration; collateral materials; integrated programs and video production.



## Dr. Florencia Montagnini
### Ecosystem Restoration & Costa Rican Biome Advisor

Professor Montagnini teaches courses at Yale's Environmental School in tropical forest ecology and management, soil science, agroforestry, and restoration ecology. She also holds honorary professorships at several universities in Latin America. Dr. Montagnini has written eight books on agroforestry systems and ecological restoration, including a major textbook in tropical forest ecology and management, and 200 scientific articles in international refereed journals.

Professor Montagnini's research focuses on Latin American sustainable land use systems that integrate ecological principles with economic, social, and political factors; the principles and applications of forest landscape restoration; the reforestation of degraded lands with native species; identification and quantification of ecological services provided by forest ecosystems; organic farming using indigenous resources; Payments for Environmental Services as tools to promote restoration, conservation, and rural development.  In her research, she collaborates with institutions such as CATIE (Tropical Agriculture Research and Higher Education Center, Costa Rica), as well as with universities and other academic, private and government institutions in Argentina, Brazil, Colombia, Costa Rica, Mexico, and Panama.  She is a Senior Fellow of ECPA, Energy and Climate Partners of the Americas, of the U.S. Department of State.



# strategy advisors



### Kim E. Jeffery
President & CEO
Nestle Waters North America



### Roger Milliken, Jr.
President, Baskahegan Co.
Director, Milliken Enterprises, Inc.
Former Chair, Nature Conservancy

Kim Jeffery is President and Chief Executive Officer of Nestlé Waters North America Inc. based in Stamford, Connecticut.  He oversees the largest bottled water company in North America with 8,500 employees, 27 plants, and more than 100 facilities.  Mr. Jeffery joined the Company in 1978 and assumed the Company's top position in 1992. With sales of more than $4.2 billion in 2008, the Company holds seven of the top ten U.S. water brands   Throughout his tenure, he has made environmental stewardship a priority and has been an industry leader in building green plants, reducing water use, protecting natural lands, and reducing raw material usage.  Additionally, Mr. Jeffery launched a decade-long partnership with The Nature Conservancy and as part of his personal commitment to the environment. Mr. Jeffery serves on the Executive Board of American Beverage Association and the Board of Keep America Beautiful.   He is also currently on the Board of Directors for Kendall Jackson Wine Estates and Stew Leonards Retail Food Stores.

Roger Milliken, Jr. is president of the Baskahegan Company, which owns and manages 100,000 acres of forestland in eastern Maine and is known for its commitment to managing for timber while respecting the dynamics of natural systems.  Roger has served on the The Nature Conservancy's board of directors since 2000, chairing its conservation committee from 2005-2008, and was named chairman of the organization's global board of directors in October 2008.  Milliken also chairs the advisory board of the Manomet Forest Conservation Program, is an advisor to the Open Space Institute's Northern Forest Protection Fund, and served on the board of the Land for Maine's Future program for nine years.  From 1994 to 1999, Milliken co-founded and later chaired the Maine Forest Biodiversity Project, a 100+ person collaborative which later supported successful legislation to establish 100,000 acres of ecological reserve on state lands.  From 1986 to 1996, Milliken was the director of the Maine Forest Products Council. Milliken is a 1975 graduate of Harvard University, and is currently writing a book about his lifelong exploration of right relationship with land.

Ecomundi_00037





# timeline

**Completed:** founding team, plan, market/customer research, basic unit economics, recruit core advisors/partners in CR & US

**4Q 2012:** formulation profiles, target plant species, CR suppliers, research & NGO partners; priority conservation targets; contract manufacturer

**1Q2013:** seed funding, beta formulation and packaging

**2Q2013**: secure core U.S. channel partners & distribution, finalize supply chain and back office partners

**3-4Q2014:** Series A round, co-marketing, manufacturing and distribution

Ecomundi_00038





# discussion points

Feedback on our strategy and model

Recommendations for working with EcoEnterprise Fund II

Suggestions for leaders, organizations, communities to recruit to make our vision a successful reality

Ecomundi_00039





# contact:

Andrea Becerra
Aromas para el Alma
(506) 2203-1541
andrea@aromas.co.cr

Alex McIntosh
Ecomundi Ventures
203.249.7285
alex.mcintosh@ecomundiventures.com

Ecomundi_00040

# TRIAL EXHIBIT NO. 320

# Real. Sexy. Healthy.
# Inside & out.

**Thrive Natural Care RFP**

18 January 2013

Ecomundi_00052

# Wanted:  a great creative partner

To collaborate with us to **develop a brand "voice"** that **successfully launches** our innovative bodycare brand Thrive into the market by:

- **capturing the beneficial magic of Thrive's products**, the authenticity of their origin and the spirit of our company vision so as to differentiate us from the competition in a cluttered market

- *translating* **that magic and vision** into a compelling, hierarchical value proposition for Thrive's initial target (US male consumer), and for the retailers and influencers that drive sales to that consumer

Ecomundi_00053

# why must...

- ...most bodycare products be filled with harsh synthetic, even petroleum-based (yuck) ingredients, when the consumer's goal is to be clean, attractive and healthy?

- ...most *truly natural* bodycare products be so boring?  Poor performers vs cheap synthetics?  Horridly packaged?  Emanate hippy eco-righteousness?  Be eye-wateringly expensive?  Hard to find?

- ...corporations trash the planet to make their products?

- ...a globalized economy force rural and indigenous communities to trade their resources and wisdom for peanuts while over-satiated consumers long for authentic and unique products?

Ecomundi_00054

# we think great natural bodycare products can...

- ♣ ...appeal to a much bigger group of consumers by being
  - beautiful **inside** (formulation provides unique, amazing experience & functional benefit) AND
  - beautiful **outside** (sexy, cool, attractive, unique voice and packaging)

- ♣ ... help consumers look better and live healthier by using unique miracle plants and other premium natural ingredients

- ♣ ...be born and made in a beautiful, friendly, inspiring place, instead of big boring factories in anonymous industrial parks

- ♣ ...reinvent and revolutionize "traditional business" by making rural communities stronger and our planet healthier

Ecomundi_00055

# but, four big challenges...

- Tricky Market:
  - Crowded and competitive
  - Dominated by large multinationals and cluttered with hundreds of small entrants
  - Difficult to get retailers' and consumers' attention
  - Many established natural brands already make organic formulation, ethical/sustainable sourcing, sustainable packaging claims (albeit in a boring old school way)
  - Many 'green pretender" brands promise natural, don't really deliver, but can be sold cheaply since they're filled with synthetic crap
  - most consumers don't care about "green", eco, or saving the world

- We're a start up.  Which means big ambitions and a small checkbook

- Producing a truly natural, high quality product that works great *at a modest price point* is very difficult

- We will operate as a social enterprise.  Which is far cooler, better for the planet, for communities, and customers.  But is even harder to pull off.

Ecomundi_00056

# So, we want to collaborate to...

🍀 **develop a brand "voice"** that successfully launches Thrive into the market by:
- capturing the beneficial magic of Thrive's products, the authenticity of their origin and the spirit of our company vision so as to differentiate us from the competition in a cluttered market
- *translating* that magic and vision into a compelling, hierarchical value proposition for Thrive's target US male consumer, and for the retailers and influencers that drive sales to that consumer

🍀 **articulate the Thrive brand voice** via:
- a brilliantly distinctive **logo** (develop 3 concepts, execute one fully to our approval)
- design and execution oversight of **packaging labels** for 2-4 products in the same line
- conceptual design of 7-10 hugely impactful, ridiculously low-cost, but totally executable guerilla **marketing activities** that will help put Thrive on the map and create the right buzz among key influencers of our target consumers

🍀 **have fun**.  after all, we+you are aiming to change the world.  Too much seriousness isn't good for the soul.

**Ecomundi_00057**

# success means that we+you will

- ♣ create retail "pull" for an innovative new bodycare brand in a way that can be quantitatively measured among target:
  - consumers (goal: 1,000 beta customers try our products; we get feedback from >70%, quantify "willingness to buy/buy again")
  - retailers (goal:  # of beta test retail partners > 3)
  - thought leaders (goal: # of mentions by top tier bloggers, editors, experts in target market(s) > 15)

- ♣ help consumers feel more sexy and live more healthy

- ♣ leave the planet healthier than we found it

- ♣ improve the livelihoods of women, farmers and rural communities

- ♣ reinforce your reputation for creativity, cutting-edge design, and kick-ass communication

Ecomundi_00058

# the brass tacks

- due dates:
  - RFP: 1 February 2013 (emailed response to Thrive)
  - project: "voice" & logo (1 March); labels & marketing (22 March)

- our objectives:
  - translate our innovative ingredients, business model & values, into a brand identity hugely appealing to our target consumer and retailers
  - create great logo, label graphics, and guerrilla marketing executions to facilitate a successful beta launch of Thrive brand

- things we'd like to know about you and your team (see following page)

- budget:  funding approved & ready; for discussion with you during RFP process

- decision process:
  - 21-31 January:  Thrive distribute RFP, respond to questions by agencies
  - By 5 Feb: Thrive team evaluates proposals, notifies winning agency

Ecomundi_00059

# things we'd like to know about you

*(Please limit responses to < 250 words per question)*

1. How is your team's background and expertise relevant to branding and marketing innovative bodycare products in competitive markets?

   a. Please share samples of your work, illustrating #1 above (ideally inclu info re: the strategic challenge, consumer target, and final creative execution)

   b. Please attach short bio(s) for each person from your agency who might work on this project

   c. Please provide 1-2 references for your recent work, including contact info.

2. Why are you uniquely able to help us *translate* our vision/model/products into something exciting, relevant, and compelling to our target US consumer, retailers and influencers?

3. If your team was paired with branding/marketing experts in the other market/culture, how would you ensure that the resulting work was accretive and not dilutive?

4. Share with us *how* you think our target customer finds/tries new bodycare products, and *what criteria* (conscious and/or subconscious) he uses to decide if he will buy and then repurchase a bodycare product.  (FYI:  this isn't a research question.  We're interested in your instincts)

5. How would you approach this project from a project management standpoint, to ensure great executions, alignment, and meeting time/budget constraints?  Do you have the bandwidth to lead this project successfully amid your other work?

6. What existing US bodycare brands do you admire?  Despise?  Why?

7. We're committed to making people and the planet healthier.  And seek partners who are aligned.  Please tell us briefly about your commitment to social and/or environmental responsibility.

8. What do you expect from us in order to work as an effective partner and to do your best work?

**Ecomundi_00060**

# a little about Thrive

Ecomundi_00061

# Founding Team

## Alex McIntosh, co-founder & CEO

  
 

**Ecomundi Ventures**
Founded impact investment fund focused on sustainability and water

» Raised seed capital, formed team, diligence on >840 emerging water co's

» Board Director, Clearwater Systems, Inc, (10yr old company with 5k global installations of its chemical-free water treatment technology)

**Nestlé Waters**
Former executive with $4B division of world's largest consumer water company

» Vision, strategic plan, hands-on leadership building Nestlé Waters' first sustainability program from ground up

» Catalyzed the corporation's 8,500 person corporate sustainability performance to assume position of recognized industry leadership

**The Nature Conservancy**

» Directed volunteer and staff efforts to help secure record $75MM in private capital for the two largest watershed conservation projects in TNC history

» Vision, strategic plan, leadership of 9-person fundraising team that increased revenue 1,250% over four years and completed most successful corporate conservation campaign in state history

**Education**
Yale University, Master's degree (with honors) in environmental management
Duke University, B.A. with honors; Trinity Scholar (4-yr academic merit scholarship)

**Other Environmental Leadership**

» Author, *The Birds of Duke Gardens* (1990)
» Co-developed an ecotourism business & funding model for nation of Gabon
» Created 5-year business plan for Big Bend National Park
» Previous board directorships: Cape Elizabeth Land Trust, Falmouth Conservation Trust, Stamford Land Conservation Trust
» *Judge*: Cleantech Group's Global 100; Global Social Venture Competition; Global Cleantech Cluster Assn, Net Impact

## Andrea Becerra Kriebel, co-founder & Chief Creative Officer

  

**Aromas para el Alma**
Founder and director of a leading Costa Rican natural care company

» Launched eight years ago; cash flow positive

» All natural, biodegradable ingredient products manufactured in Aromas' proprietary facilities in CR

» Over 40 products now sold in major CR grocery, natural foods stores; spas, hotels, and two stand-alone retail stores

» Large network of suppliers, vendors; formulation expertise

**Education**

» Degree in Social Anthropology, University of Costa Rica
» Degree in Foreign Commerce, ICOEX
» Holistic Therapies Practitioner, Gaia Center of Integral Balance
» Bach Flower Practitioner, International Program on Bach Flower Remedies
» Aromatherapy Certification, Institute of Natural Therapies, Argentina
» Subtle Aromatherapy Certification (in process)
» Essential oil Destillation Course, Ipe Farm
» Natural Cosmetology Course, Deon Institute
» Organic Agriculture Course, INA
» Medicinal and Aromatic Plants Course, INA

**Recognitions & Activities**

» Member of the Group of Women Entrepreneurs, Pathways to Prosperity, founded by Hillary Clinton
» Congress on Women Leadership and Entrepenuncy, NYC/DC
» Vital Voices Congress, Guatemala
» Biofach y Vivaness Congress and Trade Show on Organic and Natural Cosmetics, Germany
» Latinamerican Congress on Agroecological Biodynamics, EARTH University

Ecomundi_00062

# strategic advisors



## Kim E. Jeffery
President & CEO
Nestle Waters North America

Kim Jeffery is President and Chief Executive Officer of Nestlé Waters North America Inc. based in Stamford, Connecticut.  He oversees the largest bottled water company in North America with 8,500 employees, 27 plants, and more than 100 facilities.  Mr. Jeffery joined the Company in 1978 and assumed the Company's top position in 1992. With sales of more than $4.2 billion in 2008, the Company holds seven of the top ten U.S. water brands

Throughout his tenure, he has made environmental stewardship a priority and has been an industry leader in building green plants, reducing water use, protecting natural lands, and reducing raw material usage. Additionally, Mr. Jeffery launched a decade-long partnership with The Nature Conservancy and as part of his personal commitment to the environment.  Mr. Jeffery serves on the Executive Board of American Beverage Association and the Board of Keep America Beautiful.   He is also currently on the Board of Directors for Kendall Jackson Wine Estates and Stew Leonards Retail Food Stores.



## Walter Kissling Jiménez
Chairman & CEO
NAVSAT

Walter has been involved in finance related activities for the last 22 years and real estate activities for the last 10.  As part of Banex, Costa Rica's largest private financial group at the time (now owned by HSBC) he organized, started and managed Banex Valores, a stock exchange operation, the Cuenta Maestra, and Fiduciaria de Ahorro Banex, the first private money management operation for second and third tier retirement money.

The retirement money management operation launched the private pension industry in Costa Rica, which today manages billions in assets and covers millions of workers. He also started a private equity Central American fund, co-founder and shareholder of Genesis Investment Group which is one of Costa Ricas's largest real estate developers.

In July 2006 Walter started NAVSAT, a company using GPS technology to offer navigation, geo-localization, geo-tracking and other location based services.

Walter serves on the boards of Casual Food, Genesis, Sotheby's Realty Mexico, ILG Logistics, Mercado de Valores de Costa Rica, and Importadora Monge

**Ecomundi_00063**

# strategic advisors



## Roger Milliken, Jr.
President, Baskahegan Co.
Director, Milliken Enterprises, Inc.
Former Chair, Nature Conservancy

Roger Milliken, Jr. is president of the Baskahegan Company, which owns and manages 100,000 acres of forestland in eastern Maine and is known for its commitment to managing for timber while respecting the dynamics of natural systems.  Roger has served on the The Nature Conservancy's board of directors since 2000, chairing its conservation committee from 2005-2008, and was named chairman of the organization's global board of directors in October 2008.

Milliken also chairs the advisory board of the Manomet Forest Conservation Program, is an advisor to the Open Space Institute's Northern Forest Protection Fund, and served on the board of the Land for Maine's Future program for nine years.  From 1994 to 1999, Milliken co-founded and later chaired the Maine Forest Biodiversity Project, a 100+ person collaborative which later supported successful legislation to establish 100,000 acres of ecological reserve on state lands.  From 1986 to 1996, Milliken was the director of the Maine Forest Products Council. Milliken is a 1975 graduate of Harvard University, and is currently writing a book about his lifelong exploration of right relationship with land.



## Lisa Nitze
Managing Director
Mission Measurement

Lisa has spent the last 25 years working with leading corporations, foundations and government organizations to develop triple-bottom-line strategies for leveraged investments. As the Managing Director of Mission Measurement's Washington, DC office, Lisa oversees client engagements with a portfolio of international aid, federal and state government offices and agencies, national nonprofits and corporations.

Throughout her career, Lisa has worked with an array of stakeholders across the public and private sectors, including: The White House Office on Social Innovation; Inter-America Development Bank; U.S. Department of State;The Clinton Global Initiative; Goodwill Industries International and Goldman Sachs Foundation.

Most recently, Lisa served as the President and CEO of the largest membership network of social enterprises in North America—the Social Enterprise Alliance. Prior to that, she served as Vice-President of the Global Engagement Team at Ashoka, where she worked with a global team of employees to develop products and services to engage corporations, foundations, and philanthropists in supporting leading social entrepreneurs.

Lisa is currently a trustee for The American University of Cairo and for United Hands for Health Colombia. She is a Speaker Specialist on social entrepreneurship for the U.S. State Department Office of International Information, having done speaking tours in India, Africa and Latin America, and is a mentor in the U.S. Department of State's Pathways for Progress Program for women business entrepreneurs. Lisa holds an M.B.A. from Stanford University, a B.A. from Harvard University and is a graduate of the Leadership New Jersey Program.

Leonardi_00064

# technical advisors



## Jane O'Reilly
Branding & Marketing Advisor

Jane's successful career in beauty and marketing spans more than two decades and includes senior positions at Condé Nast, News Corporation, Time Inc., and American Express Publishing.  Jane is currently Creative Marketing Director at *Travel + Leisure*.  Over her career, Jane has created hundreds of exciting and effective brand and marketing communications via ad campaigns, branded content, digital integration, video production, and integrated programs.



## Art Georgalas
Formulation & Regulatory Advisor

Art's career spans more than forty years in personal and natural care product formulation and applied research at a number of leading cosmetic manufacturers, including Revlon, Charles of the Ritz, and LaMaur/DowBrands. Art is a leading contributor to various trade journals, including Cosmetics & Toiletries magazine and has presented at many technical and trade conferences. Art earned a Masters in Pharmaceutics with a specialty in Cosmetic Science at the Arnold and Marie Schwartz College of Pharmacy and Health Sciences of Long Island University. As an adjunct professor, Art instructs classes in product development and applied colloid chemistry at Fairleigh Dickinson University.



## Dr. Florencia Montagnini
Ecosystem Restoration & Costa Rican Biome Advisor

Professor Montagnini teaches courses at Yale's Environmental School in tropical forest ecology and management, soil science, agroforestry, and restoration ecology. She also holds honorary professorships at several universities in Latin America.  Dr. Montagnini has written eight books on agroforestry systems and ecological restoration, including a major textbook in tropical forest ecology and management, and 200 scientific articles in international refereed journals.

Professor Montagnini's research focuses on Latin American sustainable land use systems that integrate ecological principles with economic, social, and political factors; the principles and applications of forest landscape restoration; the reforestation of degraded lands with native species; identification and quantification of ecological services provided by forest ecosystems; organic farming using indigenous resources; Payments for Environmental Services as tools to promote restoration, conservation, and rural development.  In her research, she collaborates with institutions such as CATIE (Tropical Agriculture Research and Higher Education Center, Costa Rica), as well as with universities and other academic, private and government institutions in Argentina, Brazil, Colombia, Costa Rica, Mexico, and Panama.  She is a Senior Fellow of ECPA, Energy and Climate Partners of the Americas, of the U.S. Department of State.

**Ecomundi_00065**

# technical advisors



## Carlos Víquez Arias
### Agroecological Field Coordinator

Carlos' work has centered on the implementation of sustainable, organic and biodynamic production systems, conservation of natural resources and business administration.

Today he is co-owner and manager of a farm located in San Carlos, north of Costa Rica, which specializes in the production of free-range beef cattle, reforestation of exotic and native trees, and production of organic vegetables, fruits and herbs.

He also worked as an Assistant Manager and Consultant in Sunnyside Farms, certified organic farms in Washington and Virginia. His work included  the production of short cycle vegetables, perennial crops, broilers and eggs, as well as their distribution into the markets of Virginia, Washington DC and Maryland.  Carlos was also Harvest Manager in PYF - Costa Rica - NASCAFLOR - Miami, FL-USA, focusing in the harvest of different flowers such as lilies, callas, gerberas, tulips, lisianthus, agapanthus and iris for their distribution to USA and Europe.



## Cristina Venegas
### Ethnobotanical Specialist & Chemist

Cristina's professional expertise is implementation of sustainable development systems for agricultural production and rural development. She has done research on phytochemistry, agrotechnology of medical herbs, ethnobotany and natural resources management.

Currently, Cristina is coordinator and manager of a project of support and monitoring of natural raw material production and coordinator of the Laboratory of Phytochemical Analysis, within the Department of Research and development of natural products, Lisanatura, subdivision of Laboratory Lisan of Costa Rica.

She is also a consultant and trainer on agrotechnology of medicinal plants, medicinal ethnobotany and naturopathic medicine as support to different independent projects, as part of ACOFIT ( Phytomedicine Costarican Association), and is collaborating with different activities related with natural and integrative medicine and congresses.  She is member of the Quality Control Department in natural products and performance tests applied to allopathic medicine, which develops chemical analysis at laboratory Lisan of Costa Rica.

Cristina is also assistant professor in the Chemistry Laboratory, General Chemistry I and General Chemistry II of the University of Costa Rica. She has worked in a Research project on "Environmental assessment, restoration and social projection of the water reservoir and recreation center developed by the University of Costa Rica.

**Ecomundi_00066**

# natural care market opportunity

**Natural Care Manufactures' Sales Growing Rapidly Around the Globe**



CAGR: 15%

**Attracting Investors & Acquirers**



- ♣ Big market, growing fast (CAGR 11%+; will reach > $6b by 2015)

- ♣ Good growth prospects
  - increasing consumer demand for naturals vs synthetics
  - media focus on health
  - demographics (aging boomers, rising incomes)
  - international: emerging middle classes

- ♣ Fueling lots of mergers & acquisitions

**Ecomundi_00067**

# The natural care market challenge



- Crowded and competitive

- Dominated by large multinationals with big budgets

- Hundreds of small new market entrants annually

- Difficult to get retailers' and consumers' attention

- Many established brands already make organic formulation, ethical/sustainable sourcing, sustainable packaging claims (selling the "mission")

Ecomundi_00068

# yet a consumer/retail gap remains









poor product performance

bland packaging, boring brand stories

greenwashing & "natural pretenders"

high price

Ecomundi_00069

# The market gap for Thrive

Thrive "baseline"

Thrive advantage

| Brand | Works great/ special ingred. | Truly natural formulation | Strong enviro/ social mission | Unique "place story" | Sexy, hip, fun identity |
|---|---|---|---|---|---|
| Aubrey Organics | (✔) | ✔ | | | |
| Burt's Bees | | ✔ | | (✔) | |
| Jason | | ✔ | | | |
| Kiehl's | ✔ | | | | |
| Kiss My Face | | | | | |
| L'Occitane | ✔ | | | (✔) | ✔ |
| Method | ✔ | ✔ | ✔ | | ✔ |
| Natura (Brazil) | ✔ | ✔ | ✔ | ✔ | |
| Dr. Houschka | ✔ | ✔ | ✔ | | |
| Own | ✔ | ✔ | | | |
| Ursa Major Natural Skin Care | ✔ | ✔ | | | ✔ |
| Thrive™ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Tom's of Maine | | ✔ | ✔ | (✔) | |
| Waleda | ✔ | ✔ | ✔ | | |
| Yes To | | (✔) | | | ✔ |

Ecomundi_00071

**Thrive Natural Care**

**20**

# Thríve beta test targets

## Consumer
- American Male
- 24 yrs – 65 yrs
- athletic; LOHAS affinity

## Products
- Shampoo/bodywash
- After shave facial lotion

## Channel
- 1-2 natural grocer retail stores
- leading male e-commerce site/direct sales
- other?



# *Thrive*™ value proposition







A sexy, fun personal care brand, hand-made in the world's most idyllic place, that works great and is truly natural

Offers consumers a better way to
- look their best
- be healthy
- feel great/connect to something more than product

Unique/inspiring biz model
- Ecosystem restoration
- improve rural livelihoods
- role model for 21st century business

**Ecomundi_00072**



# why Costa Rica?

International reputation for natural beauty, spas, eco-adventure, friendly/healthy/long-lived people

Extraordinary abundance of flora, including more than 9,000 species of higher plants

Inspiring national initiatives have made country "the Switzerland of the Americas":  disbanded army in1950's; 25% of country set aside as protected parks; 2021 carbon neutral goal

Continually ranks #1 or #2 in citizen happiness vs rest of world;

**Ecomundi_00073**

# channel distribution strategy



**U.S. Natural Care Product Sales
By Channel--2011**

Health and natural food stores and supermarkets, 39.1%

All other, 3.2%

Department stores, 5.6%

Direct sales, 6.7%

Specialty stores, 7.8%

Mass market, 37.6%

**Total: $3.9 billion**

♣ Beta-test product & value proposition 2-3Q2013

♣ Initially distribute via e-commerce, targeted natural foods grocery, speciality venues (e.g. gym, hotels), TBD Costa Rican venues

♣ Get traction, build compelling demand story to take to larger distribution channels

♣ Later distribution:  broader natural food grocery (Sprout, Whole Foods, etc), drug stores, supermarkets

Ecomundi_00074

# TRIAL EXHIBIT NO. 252

**Thrive Natural Care**

# Memo

To:     Laura and Team Laita

From:   Alex McIntosh (alex.mcintosh@ecomundiventures.com)

Date:    May 5, 2013

Re:     Proyecto "Hacer Magia" specifications

---

Bienvenidos al Proyecto "Hacer Magia". We are excited to work with you on what will be a challenging, creative and rewarding project.

Below are the creative specifications for our project. The specs will provide high-level guidance and real-world constraints, but will not give you a "recipe" for making the formulations. Instead, I'd like to challenge you to use your creativity, passion, and knowledge to bring to life something new and beautiful. "Magic plant" and new benchmark product info is now included, highlighted in *yellow*.

1. **Objective**

   The goal of the project is for you and Thrive to collaborate over the next eight weeks to produce superior prototype formulations for three (3) new men's products.

   *The **best formulations** will*:

   > • work great
   > • be truly natural and healthy
   > • meet Thrive's cost targets
   > • contribute to a great story (giving consumers an innovative flavor of the best of Costa Rica, and supporting the strong environmental and social vision of Thrive).

   At the end of the project, if the products you create are determined to be the best fit for Thrive, Thrive would like to enter with you into a formulation design partnership, to create and sell these and other natural cosmetic products in some of the world's most exciting markets.

2. **Mutually-beneficial Project**

   As part of this collaboration, Thrive is interested in supporting your creative efforts and learning. To this end, Thrive will contribute: professional time, funding to cover 50% of the R&D expenses, information and insight regarding the new active ingredients and US market research, and a small supply of essential oil and extract from two of the "magic plants" to use in your formulation design.

3. **Your Challenge**

   Your challenge is to work within the constraints of this project to "make magic"; to utilize your creativity, knowledge, network and passion to create the best, most effective natural formulations that will exceed the expectations of Thrive's target consumers while meeting cost goals.

TNC01638

# Thrive Natural Care

4. **Consumer Target:**

The target <u>consumer</u> (product user) for the three formulations:



- American male
- 25-54 years old
- Attentive to health and fitness; athletic
- Well educated (college degree+); income above US average
- Currently uses face and bodycare products that are made with some/many synthetic or even petroleum-derived ingredients. Has little understanding of the disadvantages of those ingredients.
- Has been exposed to information about the health benefits of "natural" or "organic" bodycare, but suspects those products won't work as well or will be more expensive
- Willing to buy and use natural products that are slightly more expensive than standard products *if* the natural products provide same or better performance, have an attractive scent, are appealingly packaged, and are sold at a decent price.
- Is typically introduced to new face/bodycare products by a female (wife, girlfriend, mother, etc) in his life



The person who often will <u>purchase</u> the products for the target male consumer is the wife, girlfriend, mother, etc. She is primarily motivated by the desire to have her husband/boyfriend/son use bodycare products that will help him to look great <u>and</u> that will be healthier for him than the synthetic-formulation products he is using now. Her perception of the benefits of natural ingredients, and of environmental, social or sustainability issues is more important for her than the average male consumer. She also pays attention to the scent of products.

Thrive plans to reach this target male consumer during product launch via two channels: natural food grocery stores and speciality e-commerce businesses.

For your formulation design, keep in mind that our research demonstrates that the qualities most important to Thrive's target consumer (and to the female who may introduce him to the products: 1) what the product promises to do for him; 2) scent; 3) price; 4) how well the product performs (does it do what it says while avoiding synthetic or harmful ingredients?).

5. **Products:**

You will lead creation of three sample formulations during this pilot project:

1. Men's face wash
2. Men's shaving oil
3. Men's facial moisturizer

*Face wash*: the two "magic plants" each have properties that make them useful in cleansing the skin, and thus as helpful active ingredients in a mens facial wash. Thrive would like to position

TNC01639

# Thrive Natural Care

this product as appropriate for daily use to remove dirt, oil, and other impurities from his skin, without overly drying or irritating his face.

We anticipate the *facial moisturizer* to become the "star" product, and plan to devote a relatively higher proportion of resources to formulation and packaging of this product.  You are encouraged to make this a focal point of your work, too.

Thrive is also very interested in innovative shaving products, and in protecting the environment by using less packaging.  For these reasons, we are very interested in selling a Thrive *shaving oil*.  High quality shaving oils, which serve as a replacement for shaving creams or gels, can provide the male consumer with a superior shave, and have the added benefit of skin moisturizing and conditioning properties despite requiring only a small amount of product per use (usually 5-8 drops of oil for a shave).

6. **Raw Material Target Price Point:**

Our target raw material price points are:

> 1. *Face wash*:  US$0.88 based on a 125ml/4.2 oz container (price includes $0.40 for the two "magic plant" essential oils/extracts; you have $0.48 to create rest of formulation)
>
> 2. *Shaving oil*:  US$0.45 based on a 15ml/0.5 oz container (price includes $0.25 for the two "magic plant" essential oils/extracts; you have $0.20 to create rest of formulation)
>
> 3. *Facial moisturizer*:  US$0.60 based on a 50ml/1.7 oz container (price includes $0.25 for the two "magic plant" essential oils/extracts; you have $0.35 to create the rest of the formulation)

- These are the "high end" price targets for each formulation, based on the 125ml, 15ml, and 50ml container sizes, and manufactured at a production volume of 3,000 units each per year
- Price should include <u>all</u> raw material ingredients for the formulation, including other essential oils/extracts
- Price should include shipping/transport, customs, taxes and other fees associated with getting the formulation ingredients to manufacturer for production.  Assume manufacturing occurs in Costa Rica.
- Price should <u>not</u> include packaging materials or cost for manufacturing
- Thrive preference will be given to natural formulation designs that offer great performance and cost <u>less</u> than the $0.88, $0.45, or $0.60 price targets.  Use your creativity; we welcome your ideas during the project on how to meet or go under these price targets!
- The written proposal you submit to Thrive mid-project should incorporate pricing guidance (doesn't have to be exact) from your potential suppliers.   And, when you submit to Thrive your final formulation prototype, we will ask you to validate that your raw materials can arrive at factory for the price you propose.  We want to make sure your magic formulation can meet our price targets.

7. **Desired Attributes of product(s):**

1. Consumer benefits & claims desired:

    a. *Face wash*:  cleans male face of dirt, oil, and impurities from the day or from exercise; naturally energizes, moisturizes, and refreshes skin without drying; strong enough to clean well and gentle enough to use every day

● Page 3

TNC01640

# Thrive Natural Care

b. *Shaving oil*:  naturally moisturizes skin and prepares facial hair for a superior shave; provides excellent lubrication to facilitate shave from start to end of the grooming regime; helps prevent cuts, irritation, razor bumps and burn; helps nourish and protect vitality of tired or stressed skin; protects sensitive skin from irritation or redness

c. *Facial moisturizer*:  a "24 hour moisturizer" designed for active men; helps naturally nourish and protect the health of facial skin; reduces inflammation and redness; helps skin retain a healthy appearance; leaves skin soft and supple

2.  Ingredient specifications:

a.  Two Costa Rican "magic plants" (see attached for more information) as primary active ingredients:

i.  *Lippia alba* (essential oil): anti-inflammatory, anti-oxidant, antiviral, antibacterial, antiseptic, astringent, antifungal, analgesic, beautiful citric scent

ii.  *Arrabidaea Chica* (pure extract):  wound healing, increases collagen content, anti-inflammatory, anti-oxidant, skin cleansing (reducing pimples and blackheads), antibacterial, astringent, ideal for problem or sensitive skin

You are encouraged to design formulations using both of the active ingredients together.  But if you decide to use only one of the magic plant ingredients in a product formulation due to your preference for performance, scent, texture or color qualities, please let me know.

b.  Guiding natural standards criteria:

i.  **Desired**: Whole Foods Premium Body Care (see LINK, and view the "400 unacceptable ingredients" pdf attached)

ii.  **Minimum** standards:  No use of:  ***Parabens*** — Synthetic preservatives that are potential endocrine disrupters; ***Sodium Lauryl Sulfate*** — Harsh cleansing agent that can potentially damage the lipid layer of your skin and cause irritation; ***Petrolatum/Mineral Oil/Paraffin*** — Non-renewable byproducts of crude oil with potentially dangerous impurities; ***Chemical Sunscreens (Avobenzone/Oxybenzone)*** — Synthetic sunscreens that get absorbed and potentially disrupt hormone balance; ***Glycols*** — Petroleum derived synthetic chemicals that can potentially draw other chemicals into the bloodstream; ***Phthalates*** — Synthetic fragrance components that are potential toxins; ***Ethoxylated ingredients like Sodium Myreth Sulfate and Sodium Laureth Sulfate, PEGs or PPGs*** — Ingredients that are made in part with the petrochemical ethylene oxide, that results in 1,4 Dioxane as a trace contaminant, classified as a possible carcinogen (35-37); ***Ethanolamines like MEA/DEA/TEA*** — Foam and viscosity boosting ingredients that can interact with other ingredients to form nitrosamines, a known carcinogen; ***Synthetic polymers (PVP/Acrylates)*** — Synthetic stabilizers that may contain residual PAHs (polycyclic aromatic hydrocarbons), a widespread organic pollutant; ***Formaldehyde Donors*** (DMDM Hydantoin/Diazolidinyl Urea) — Preservatives that work by releasing formaldehyde; ***Synthetic Fragrances*** – Fragrances that use petroleum-based solvents for extraction as well as purely synthetic additives; ***Synthetic Colors*** – unnecessary and considered carcinogenic

TNC01641

# Thrive Natural Care

   c. No ingredients or formulas tested on animals

   d. Encourage purchase, where economically feasible, of raw ingredients from suppliers who are:

      i. Certified organic or other independently verified social/environmental certification <u>where economically feasible</u>

      ii. Rural or indigenous communities, or female-led cooperatives/businesses

      iii. Costa Rica-based businesses

      iv. Known to you and dependable

   e. Raw materials should be dependably available and sustainable (e.g. no use of protected or illegal plants, no petroleum-based ingredients)

   f. Ingredients must be stable over time and temperature variations:  it will often be months from time of manufacture through transport to USA and then to customer home; conditions will vary from cold (-7C) and dry to hot (38C) and humid

3. Fragrance:

   a. The three products should share a single uniquely masculine scent; not overly powerful, but subtle.  The three products should have the same underlying scent, with the shaving oil and face wash being a bit more scented and the facial moisturizer a bit <u>less</u> scented.

   b. The over-riding fragrance notes should suggest:  sophisticated, woody, masculine, resinous, exotic/Costa Rica, fresh, botanic, verdant

   c. The scent should <u>avoid</u> typical AXE or Old Spice strong cologne-like male fragrance common in many synthetic male cosmetic products; the formulation should also avoid floral or fruity tones.  Note that Latin American bodycare products for men typically have a strong scent; for the US market we want a more subtle, complex and natural scent.

4. Form, Viscosity, Sensory:

   a. *Face wash*:

      i. A light-weight cream or gel; should definitely feel more substantial and viscous than water when applied to hands and then rubbed on the face; slight lather or foam generated upon use; could have a *very* subtle exfoliating effect, but if it does, this should be gentle enough for everyday use; should leave face feeling clean and energized without being slick or oily and without harsh drying of the skin

      ii. ==Benchmark products (*the following products provide good example of certain qualities Thrive wants to emulate. You will receive from me small samples of each. You can also learn more about the specific ingredients for these products on their websites, to help with your design*):== **Aesop Purifying Facial Cream Cleanser (Sample A) provides a gentle cleaning with a good texture and a sophisticated and pleasantly unique scent that inspires us, though it would be preferable if the cleanser generated a bit more foam during**

● Page 5

TNC01642

# Thrive Natural Care

use…also, note that this brand uses premium and sometimes synthetic ingredients (and charges a premium price); **Burt's Bees Sensitive Facial Cleanser** (Sample B) has an excellent natural formulation and works well, at a very reasonable price; **Melvita Men's Facial Cleansing Gel** (Sample C) gentle scrub has a nice consistency and slight foam, though the scent is too strong and pine-like and it uses a gentle exfoliant which isn't good for daily use.

b. *Shaving oil*:

  i. 5-8 drops of the viscous oil into the hands should provide a smooth lubricant and warm, attractive scent; after applying to his water-moistened face and neck, his face should retain lubrication sufficient for a complete shave without needing additional oil (though he will wet his shaving blade frequently); during his application to the face, the oil would ideally produce a very subtle foaming action, which consumer will appreciate as it helps guide his shave; the consumer will experience a subtle (not strong) layered aroma of scents; the oil should moisturize his face but wash off easily after he finishes shaving, leaving a healthy glow and smooth, irritation-free skin.

  ii. Target Products:  **L'Occitane Cade Shaving Oil** (Sample D) provides a very good shave, has a pleasing, unique scent.  But I would like Thrive product to provide a little more lubrication during shave and to generate a subtle foam so that the user can use to guide his shave.

c. *Facial moisturizer*:

  i. A medium-to heavy weight milky lotion, definitely <u>not</u> runny or thin. The desired sensory experience for the man would be of applying a subtly-scented, medium thick cream that soothes and refreshes his skin, particularly after shaving.  Should apply smoothly to his face without requiring a lot of rubbing or effort, and should leave skin moist and refreshed for a full day without being shiny.  Also, remember that the climate in most of USA is drier than CR, so the moisturizer should work well for dry skin.

  ii. Target products:  **L'Occitane Cade facial cream** (sample E) for its viscosity, texture, and subtle scent; **Aesop Moroccan Neroli Post-Shave Lotion** (Sample F) has a beautiful masculine scent that is good inspiration to us, applies a high quality essential oil moisturizing treatment to face that soothes after shaving, but is very expensive; **EveryMan Jack** (sample G) for its viscosity, healthy performance despite value price

5. Packaging:

a. Face wash:  TBD but likely 125ml (4.2 oz) PET plastic, opaque with disc top cap dispenser, in this shape:

TNC01643

# Thrive Natural Care



b. Shaving oil:  TBD but likely 15ml (0.5 oz) glass or PET plastic, opaque with screw on cap, in this shape:



c. Facial moisturizer:  TBD but likely 50ml (1.7 oz), PET plastic, with treatment pump dispensing 190 MCL product/stroke, in this shape:

6. Project Time-line--two months from start to end:

   1. April 26:  Receive spec document; begin project
   2. By 8 May:  <u>Company</u> receives samples of "magic plant" oil & extract, and samples of "target product" mentioned above.
   3. By 13 May:  <u>Company</u> provides to Thrive its written proposal for the three formulations, including:
      a. proposed ingredients to be used
      b. target benefits to consumers
      c. projected cost of such a formulation were it to be later manufactured at larger scale (to ensure we are testing an affordable product during the pilot)
      d. special certifications (organic, biodynamic, ECOCERT, etc) that could be listed on the label for any of the proposed formulation ingredients
      e. identification of any potential future difficulties in obtaining supply or maintaining quality if this formulation were to be manufactured
   4. By 16 May:  Thrive provide feedback, suggestions, etc to Company
   5. By 27 May:  <u>Company</u> send to Thrive (via FedEx, Thrive will pay costs) for personal testing the 1st version samples of the three formulas
   6. From 31 May – 21 June:  Company and Thrive test samples, refine and reformulate as needed
   7. By 26 June:  Thrive chooses best formulations and notifies Company

8. ***Important:*** *Please note for creating samples*:  though I was fortunate enough to obtain essential oil/extracts of two "magic plants" for this project, we have only a limited amount to work with.  Here is the information and my suggestion to you for using the magic plant essential oil/extracts:

   i. You will receive from me <mark>approximately 12-20ml</mark> of <u>each</u> oil/extract
   ii. Those two samples need to last through your testing and creation, and through two sampling rounds with me where you send me samples to test
   iii. For <u>each</u> of the three products (face wash, shaving oil, face lotion) please send to me two (2) 15 ml samples <u>per round</u> of testing.  I assume that we will have two (2) rounds of samples back and forth, that you will send to me.  This means you will be sending me 12 ml bottles of sample product to test over the course of this project.

● Page 7

# Thrive Natural Care

    iv.  My understanding is that the essential oil should be used in the 0.1% to 0.5% range in your formulation, with 0.2% probably ideal from a health and cost standpoint.  If my math is right, and given your experience, this should be enough to get us through the project.

    v.  I know this leaves you little room for error.  But please do the best you can given these constraints, and let me know if you have a better idea for doing this.

9. Questions?  Email or skype is encouraged during this project.  This is a collaboration and I and my team are looking forward to working with you to "create magic" with some healthy, effective, unique and exiting new bodycare products!

TNC01645

# TRIAL EXHIBIT NO. 325

# Thrive Natural Care

21 May 2013

Mr. Arthur Georgalas
19 Jones Road
Warwick, NY 10990

**Re: Thrive Natural Care —Confidentiality & materials agreement**

Dear Art:

We have appreciated your formulation advice and insights as Thrive Natural Care, Inc. has come to life.  With our first product lines now in development, we are pleased to deepen our relationship with you and discuss certain strategic items more fully.

 Thrive's vision is to provide innovative, natural body care products for consumers utilizing an inspiring model for sourcing and supply chain.  We look forward to collaborating with you to achieve the spirit and boldness of this vision.

Below is a full confidentiality agreement that Thrive's consultants and advisors have executed with us, and which we propose to execute with you.  This would replace the 22 September 2012 agreement we jointly executed.  Please review this and, unless you have questions, return to me signed and dated.  Then we can start the fun stuff.

Based on our discussions, we propose that you enter into the following agreement  ("***Agreement***") to provide formulation strategy, research, and recommendation services ("***Services***") as a formulation consultant ("***Consultant***") to Thrive Natural Care, Inc. (the "***Company***"), a Delaware corporation with its principal place of business in San Francisco, CA.

The following sections outline Thrive's proposed Agreement with you in terms of compensation, confidentiality, and ownership of materials during the time we work together.

1. <u>**Compensation.**</u>
  (a)   **Cash Compensation.**  As compensation for your Services to the Company, you shall be paid US$150/hour until the one-year anniversary of our agreement (9/25/13).  After this date, you shall be paid US$200/hour.  Consultant will invoice (on letterhead with your address & tax ID) Company for payment on net 30 days schedule.

  (b)   **Expenses**.  Company agrees to reimburse Consultant for all reasonable and documented travel and other expenses associated directly with your Services to the Company, in accordance with the Company's expense reimbursement policy.   Consultant will invoice Company for payment as noted above in 1(a).

  (c)   **Independent Contractor.**  Consultant is an independent contractor, is not an employee of the Company, and acknowledges that the <u>Company is not responsible to withhold income or employment taxes for Consultant.  Taxes shall be the sole responsibility of Consultant.</u>

1

**2.   Confidentiality.**

(a)   Consultant hereby agrees not to use any Confidential Information (as defined below) disclosed to Consultant by the Company for Advisor's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services.  Consultant agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than agents of the Company or persons to whom the Company consents to such disclosure. Upon request by the Company, any materials or documents that have been furnished by the Company to Consultant in connection with the Services shall be promptly returned by Consultant to the Company.

(b)   **Definition of Confidential Information.**  "Confidential Information" means any information, technical data or know-how (whether disclosed before or after the date of this Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business forecasts, sales and merchandising, human resources, patents, patent applications, formulations and ingredients, research, inventions, processes, designs, drawings, engineering, marketing or finance to be confidential or proprietary or which information would, under the circumstances, appear to a reasonable person to be confidential or proprietary. Confidential Information will not include any information that: (i) was in the possession of the Consultant  at the time of the disclosure;( ii) is or becomes part of the public domain, public knowledge, or public literature through no fault of the Consultant; (iii) was or is developed independently by the Consultant, without use of the Confidential Information as shown by prior written records; or (iii) otherwise becomes available to the Consultant  from a third party who has not violated any applicable laws or confidentiality obligations by disclosing such information.

**3.   Ownership of Rights; Work Made for Hire and Assignment.**

(a) Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Agreement grant Consultant any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.  Consultant agrees to assist the Company to obtain and enforce United States and foreign proprietary rights relating to the IP in any and all countries.  All direct expenses associated with the assistance provided by Consultant will be reimbursed to Consultant by the Company as described in sections 1 (a) & (b) above.
The Company acknowledges that Consultant has made and makes no representations or warranties concerning the patentability of the products being developed under the services provided by under this Agreement by Consultant to the Company or whether a product may or may not infringe on any patent, trademark or copyright held or allegedly held by any third party. It is agreed that the Company assumes the sole responsibility for determination of whether a product that is developed under this agreement may or may not infringe an existing patent, trademark or copyright.

(b) To the extent that Consultant jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws or other intellectual property which would be deemed to be Confidential Information of the Company (collectively, "Intellectual Property") which clearly relates to the Company's business or technology and has been created by the Consultant solely in the course of the performance of Services under this agreement such as in correspondence, e-mails, meetings or meetings relating to

Ecomundi_00002

**Thrive Natural Care**

the Company, Consultant hereby acknowledges that it is "work made for hire" for the benefit of the Company and hereby assigns all rights, titles and interest to such Intellectual Property to the Company.

**4.     Indemnification.**
The Company shall indemnify and hold harmless the Consultant against any and all liabilities, costs and expenses (including reasonable counsel fees), including any and all costs, expenses, awards and judgments to which Consultant may become subject related to any claims or proceedings under any federal or state statute, at common law or otherwise, insofar as said liabilities, costs and expenses  (1) relate to the Services and (2) do not arise out of Advisor's gross negligence, willful misconduct or willful omissions.

**5.     Governing Law; Severability.**
This Agreement shall be governed by and construed according to the laws of the State of California without regard to its conflict of laws rules.  If any provision of this Agreement is found by a court of competent jurisdiction to be unenforceable, that provision shall be severed and the remainder of this Agreement shall continue in full force and effect.

**6.     Term and Termination; Entire Agreement.**
(a)     Terms of this agreement shall remain in effect from the date hereof until the first anniversary of the date of this Agreement, and may be canceled by either party for any reason on thirty (30) days' advance written notice to the other party.  Advisor's obligations under Sections 2, 3, and 4 hereof shall survive termination and/or expiration of this Agreement. Company will be responsible for payment for all services and approved expenses  provided by Consultant under this Agreement up to the  termination date of this Agreement

(b)     This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions or arrangements between the parties with respect to the subject matter hereof.  This Agreement may not be amended, modified, or superseded except in writing signed by the parties hereto.

(c)     This Agreement incorporates and supersedes all elements of the 9/22/12 Confidentiality agreement signed by Consultant and Ecomundi Ventures.

**7.     Sustainable Enterprise.**
Thrive Natural Care's intent is to manufacture and sell body care products that help our consumers look better and live healthier, and that actively improve the natural landscapes and economic livelihoods of our partners.   As such, Thrive encourages Consultant to collaborate with us in a financially responsible manner with her/his vendors and partners to reduce and/or offset material, energy, transportation, and social impacts associated with performance of services in this agreement during the time of Project First Step.

3

**Ecomundi_00003**

**Thrive Natural Care**

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and year written below.

**Thrive Natural Care, Inc.**                              **Mr. Arthur Georgalas**

By: _____          By_____

      (Signature)                                      (Signature)

Name Printed: Alex McIntosh          Name Printed: Arthur Georgalas

Title:   Founder/CEO                          Title:    Consultant

Date:   5-21-13                                    Date:          5-23-13

4

Ecomundi_00004

# TRIAL EXHIBIT NO. 323

# THRIVE NATURAL CARE, INC.

## RESTRICTED STOCK PURCHASE AGREEMENT

THIS RESTRICTED STOCK PURCHASE AGREEMENT (the "*Agreement*") is made as of May 23, 2013, by and among Thrive Natural Care, Inc., a Delaware corporation (the "*Company*"), Alex McIntosh ("*McIntosh*") and Ecomundi Ventures, LLC, a California limited liability company ("*Purchaser*").

### RECITAL

The Company desires to issue, and Purchaser, on behalf of McIntosh, desires to acquire, stock of the Company as herein described, on the terms and conditions hereinafter set forth.

### AGREEMENT

The parties agree as follows:

**1.     PURCHASE AND SALE OF STOCK.**  Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of 5,000,000 shares of the Common Stock of the Company (the "*Stock*") at $0.00001 per share, for an aggregate purchase price of $50.00, payable as follows:

Cash ............................................................................................................................ $25.00

Transfer of intellectual property rights pursuant to the Technology Assignment Agreement attached as **Exhibit A** ............................................................................................. $25.00

The closing hereunder, including payment for and delivery of the Stock, shall occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

**2.     LIMITATIONS ON TRANSFER.**  In addition to any other limitation on transfer created by applicable securities laws, Purchaser shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Stock while the Stock is subject to the Repurchase Option.  After any Stock has been released from the Repurchase Option, Purchaser shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Stock except in compliance with the provisions herein and applicable securities laws.  Furthermore, the Stock shall be subject to any right of first refusal in favor of the Company or its assignees that may be contained in the Company's Bylaws.  **Purchaser hereby further acknowledges that Purchaser may be required to hold the Common Stock purchased hereunder indefinitely.  During the period of time during which the Purchaser holds the Common Stock, the value of the Common Stock may increase or decrease, and any risk associated with such Common Stock and such fluctuation in value shall be borne by the Purchaser.**

**3.     RESTRICTIVE LEGENDS.**  All certificates representing the Stock shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

**(a)**     "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPTION SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.   ANY TRANSFER OR ATTEMPTED

TRANSFER OF ANY SHARES SUBJECT TO SUCH OPTION IS VOID WITHOUT THE PRIOR EXPRESS WRITTEN CONSENT OF THE COMPANY."

**(b)** "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

**(c)** "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

**(d)** "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE COMPANY."

**(e)** Any legend required by appropriate blue sky officials.

**4.**  **INVESTMENT REPRESENTATIONS.**  In connection with the purchase of the Stock, Purchaser represents to the Company the following:

**(a)** Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.  Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "***Act***").

**(b)** Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

**(c)**  **Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available.**  Purchaser further acknowledges and understands that the Company is under no obligation to register the Stock.  Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend that prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

**(d)** Purchaser is familiar with the provisions of Rule 144, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

The Stock may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which may require, among other things, (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment for (within the meaning of Rule 144), the securities to be sold.

**(e)** Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then

**Ecomundi_00101**

DocuSign Envelope ID: 2F6A7572-1509-4956-9945-D782D625C80F

exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser may be precluded from selling the Stock under Rule 144 even if the minimum holding period requirement had been satisfied.

(f)     Purchaser represents that Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Act.

(g)     Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of himself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

5.     **MARKET STAND-OFF AGREEMENT.**  Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock or other securities of the Company held by Purchaser (other than those included in the registration), including the Stock (the "***Restricted Securities***"), during the 180-day period following the effective date of  the Company's first firm commitment underwritten public offering of its Common Stock (or such longer period, not to exceed 34 days after the expiration of the 180-day period, as the underwriters or the Company shall request in order to facilitate compliance with NASD Rule 2711 or NYSE Member Rule 472 or any successor or similar rule or regulation) (the "***Lock Up Period***"), *provided, however*, that nothing contained in this Section 14 shall prevent the exercise of the Repurchase Option during the Lock Up Period.  Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriters which are consistent with the foregoing or which are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Purchaser's Restricted Securities until the end of such period. The underwriters of the Company's stock are intended third party beneficiaries of this Section 14 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

6.     **REFUSAL TO TRANSFER.**  The Company shall not be required (a) to transfer on its books any shares of Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

7.     **NO EMPLOYMENT RIGHTS.**  This Agreement is not an employment or other service contract and nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company (or a parent or subsidiary of the Company) to terminate any service relationship between the Company and McIntosh or Purchaser for any reason at any time, with or without cause and with or without notice.

8.     **INTELLECTUAL PROPERTY RIGHTS.**

(a)     McIntosh and Purchaser represent and warrant that except for intellectual property rights assigned pursuant to this agreement or specifically disclosed to the Company on the appropriate schedule of McIntosh's Confidential Information and Inventions Assignment Agreement with the Company, McIntosh and Purchaser possess no intellectual property and have made no inventions related to the Company's business, as currently conducted or as proposed to be conducted.  McIntosh and Purchaser further agree that to the extent it is discovered that McIntosh or Purchaser have made inventions, patented or unpatented, or otherwise possess intellectual property rights related to the Company's business that were not properly assigned to the Company or specifically disclosed and excluded in McIntosh's

Ecomundi_00102

Confidential Information and Inventions Assignment Agreement (the "***Additional Intellectual Property***"), that the Additional Intellectual Property is hereby assigned to the Company.

(b)     McIntosh and Purchaser agree to assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign proprietary rights relating to the Additional Intellectual Property in any and all countries.  McIntosh and Purchaser agree to execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Additional Intellectual Property and the assignment thereof.

(c)     In the event the Company is unable for any reason, after reasonable effort, to secure McIntosh's or Purchaser's signature on any document needed in connection with the actions specified in the preceding paragraph, McIntosh and Purchaser hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as McIntosh's and Purchaser's agent and attorney in fact, which appointment is coupled with an interest, to act for and on behalf of McIntosh and Purchaser to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by McIntosh and Purchaser.

9.     MISCELLANEOUS.

(a)     **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, and if not during normal business hours of the recipient, then on the next business day, (iii) five calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by ten days advance written notice to the other party hereto.

(b)     **Successors and Assigns.**  This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon McIntosh, McIntosh's successors and assigns, Purchaser and Purchaser's successors and assigns.  The Repurchase Option of the Company hereunder shall be assignable by the Company at any time or from time to time, in whole or in part.

(c)     **Attorneys' Fees; Specific Performance.**  McIntosh and Purchaser shall reimburse the Company for all costs incurred by the Company if the Company seeks to enforce the performance of, or protect its rights under, any part of this Agreement and ultimately prevails in doing so, including reasonable costs of investigation and attorneys' fees.  It is the intention of the parties that the Company, upon exercise of the Repurchase Option and payment therefor, pursuant to the terms of this Agreement, shall be entitled to receive the Stock, in specie, in order to have such Stock available for future issuance without dilution of the holdings of other shareholders.  Furthermore, it is expressly agreed between the parties that money damages are inadequate to compensate the Company for the Stock and that the Company shall, upon proper exercise of the Repurchase Option, be entitled to specific enforcement of its rights to purchase and receive said Stock.

(d)     **Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to,

and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(e)  **Further Execution.**  The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

(f)  **Independent Counsel.**  Purchaser and McIntosh acknowledge that this Agreement has been prepared on behalf of the Company by Cooley LLP, counsel to the Company and that Cooley LLP does not represent, and is not acting on behalf of Purchaser or McIntosh.  Purchaser and McIntosh have been provided with an opportunity to consult with Purchaser's and McIntosh's own counsel with respect to this Agreement.

(g)  **Entire Agreement; Amendment.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

(h)  **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(i)  **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

[*Signature Page Follows*]

The parties hereto have executed this **RESTRICTED STOCK PURCHASE AGREEMENT** as of the day and year first above written.

**COMPANY:**

**THRIVE NATURAL CARE, INC.**

By: 

Alex McIntosh

Title: President and Chief Executive Officer

Address: 42 Darrell Place
San Francisco, CA 94133

**PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER MUST HOLD THE COMMON STOCK PURCHASED HEREUNDER INDEFINITELY. PURCHASER FURTHER ACKNOWLEDGES THAT ANY RISK RELATED TO THE FLUCTUATION IN THE VALUE OF THE STOCK FROM AND AFTER THE DATE HEREOF SHALL BE BORNE BY PURCHASER.**

**PURCHASER AND MCINTOSH ACKNOWLEDGE THAT PURCHASER AND MCINTOSH HAVE HAD AN OPPORTUNITY TO CONSULT PURCHASER'S AND MCINTOSH'S OWN TAX, LEGAL AND FINANCIAL ADVISORS REGARDING THE PURCHASE OF COMMON STOCK UNDER THIS AGREEMENT.**

**PURCHASER ACKNOWLEDGES AND AGREES THAT IN MAKING THE DECISION TO PURCHASE THE COMMON STOCK HEREUNDER PURCHASER HAS NOT RELIED ON ANY STATEMENT, WHETHER WRITTEN OR ORAL, REGARDING THE SUBJECT MATTER HEREOF, EXCEPT AS EXPRESSLY PROVIDED HEREIN AND IN THE ATTACHMENTS AND EXHIBITS HERETO.**

Alex McIntosh

**PURCHASER:**

**ECOMUNDI VENTURES, LLC**

By: Alex McIntosh

Its: founder/CEO

Address: 42 Darrell Place

San Francisco, CA 94133

**Ecomundi_00105**

**EXHIBIT A**

**TECHNOLOGY ASSIGNMENT AGREEMENT**

**Ecomundi_00106**

DocuSign Envelope ID: 2F9A7572-1509-4956-8945-D782DC25C80F

# TECHNOLOGY ASSIGNMENT AGREEMENT

THIS TECHNOLOGY ASSIGNMENT AGREEMENT (this "*Agreement*") is made and entered into as of May 23, 2013, by and between ECOMUNDI VENTURES (the "*Assignor*") and THRIVE NATURAL CARE, INC., a Delaware corporation (the "*Company*").  The parties hereto agree as follows:

## AGREEMENT

Assignor hereby irrevocably assigns, sells, transfers and conveys to the Company all right, title and interest, on a worldwide basis, in and to the technology described in ANNEX A attached hereto and all applicable intellectual property rights, on a worldwide basis, related thereto, including, without limitation, copyrights, trademarks, trade secrets, patents, patent applications, moral rights, contract and licensing rights (the "*Property*").  In consideration for such transfer of the Property, the Company shall grant to Assignor 2,500,000 shares of its Common Stock (the "*Payment*").  Assignor hereby acknowledges that he retains no right to use the Property and agrees not to challenge the validity of the Company's ownership of the Property.

Upon each request by the Company, without additional consideration, Assignor agrees to promptly execute documents, testify and take other acts at the Company's expense as the Company may deem necessary or desirable to procure, maintain, perfect, and enforce the full benefits, enjoyment, rights, title and interest, on a worldwide basis of the Property assigned hereunder, and render all necessary assistance in making application for and obtaining original, divisional, renewal, or reissued utility and design patents, copyrights, trademarks, trade secrets, and all other technology and intellectual property rights throughout the world related to any of the Property, in the Company's name and for its benefit.  In the event the Company is unable for any reason, after reasonable effort, to secure Assignor's signature on any document needed in connection with the actions specified herein, Assignor hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as its agent and attorney in fact, which appointment is coupled with an interest, to act for and in its behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this paragraph with the same legal force and effect as if executed by Assignor.  Assignor hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Assignor now or may hereafter have for infringement of any Property assigned hereunder.

Assignor further agrees to deliver to the Company upon execution of this Agreement any and all tangible manifestations of the Property, including, without limitation, all notes, records, files and tangible items of any sort in its possession or under its control relating to the Property.  Such delivery shall include all present and predecessor versions.  In addition, Assignor agrees to provide to the Company from and after the execution of this Agreement and at the expense of the Company competent and knowledgeable assistance to facilitate the transfer of all information, know-how, techniques, processes and the like related to such tangible manifestation and otherwise comprising the intangible aspects of the Property.

Assignor represents and warrants to the Company that (a) Assignor is the sole owner of the Property and has full and exclusive right to assign the rights assigned herein, (b) Assignor has full right and power to enter into and perform this Agreement without the consent of any third party, (c) all of the Property is free and clear of all claims, liens, encumbrances and the like of any nature whatsoever, (d) the Property is an original work of Assignor, (e) none of the Property infringes, conflicts with or violates any patent or other intellectual property right of any kind (including, without limitation, any trade secret) or similar rights of any third party, (f) Assignor was not acting within the scope of employment or other service arrangements with any third party when conceiving, creating or otherwise performing any activity with respect to the Property, (g) the execution, delivery and performance of this Agreement does not

Ecomundi_00107

conflict with, constitute a breach of, or in any way violate any arrangement, understanding or agreement to which Assignor is a party or by which Assignor is bound, and (h) Assignor has maintained the Property in confidence and has not granted, directly or indirectly, any rights or interest whatsoever in the Property to any third party.

Assignor further represents and warrants to the Company that no claim, whether or not embodied in an action past or present, of any infringement, of any conflict with, or of any violation of any patent, trade secret or other intellectual property right or similar right, has been made or is pending or threatened against Assignor relative to the Property.  Assignor agrees to promptly inform the Company of any such claim arising or threatened in the future with respect to the Property or any part thereof.

Assignor will indemnify and hold harmless the Company, from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) which result from a breach or alleged breach of any representation or warranty of Assignor (a "*Claim*") set forth in this Agreement, provided that the Company gives Assignor written notice of any such Claim and Assignor has the right to participate in the defense of any such Claim at its expense.

This Agreement and the Exhibit attached hereto constitute the entire, complete, final and exclusive understanding and agreement of the parties hereto with respect to the subject matter hereof, and supersedes any other prior or contemporaneous oral understanding or agreement or any other prior written agreement.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the parties hereto.

This Agreement will be governed and construed in accordance with the laws of the State of Delaware as applied to transactions taking place wholly within Delaware between Delaware residents. Assignor hereby expressly consents to the personal jurisdiction of the state and federal courts located in Delaware for any lawsuit filed there against Assignor by the Company arising from or related to this Agreement.

If any provision of this Agreement is found invalid or unenforceable, in whole or in part, the remaining provisions and partially enforceable provisions will, nevertheless, be binding and enforceable.

Failure by either party to exercise any of its rights hereunder shall not constitute or be deemed a waiver or forfeiture of such rights.

The provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

*[Signature page follows]*

**Ecomundi_00108**

DocuSign Envelope ID: 2F9A7572-1509-4956-9945-D782D62FC80F

The undersigned have executed this **TECHNOLOGY ASSIGNMENT AGREEMENT** as of the date set forth above.

**COMPANY:**

**THRIVE NATURAL CARE, INC.**

By: _Alex McIntosh_
1396FC7D535D435...
_____
Alex McIntosh, President and Chief Executive Officer

**ASSIGNOR:**

**ECOMUNDI VENTURES, LLC**

_Alex McIntosh_
1396FC7D535D435...
_____
By: Alex McIntosh
Its:  founder/CEO

1300852 v3/SF

**Ecomundi_00109**

**ANNEX A**

**DESCRIPTION OF TECHNOLOGY**

All algorithms, apparatus, business plans, concepts, confidential information, data, databases and data collections, designs, diagrams, documentation, drawings, flow charts, indexes, ideas and inventions (whether or not patentable or reduced to practice), know-how, materials, marketing and development plans, marks (including brand names, product names, logos, and slogans) and associated goodwill, methods, models, procedures, processes, schematics, specifications, subroutines, techniques, tools, works of authorship, and other forms of technology comprising or related to software, products and services that in any case relate in any way to or are useful to the Company's business as currently planned.

For the avoidance of doubt, all of Assignor's interests in the Thrive trademark and the domain names listed below shall be Property for purposes of this Agreement.

- Thrivenaturalcare.com
- Thrive-natural.com

1300852 v3/SF

**Ecomundi_00110**



## Certificate of Completion

Envelope Number: 2F6A75721E1948569945D782DC2FC80F                                    Status: Completed
Subject: Please DocuSign this document: SF-#1300852-v3-Thrive_-_RSPA__Ecomundi_.pdf
Client Number: 319453
Matter Number: 100
Source Envelope:
Document Pages: 11                       Signatures: 5                    Envelope Originator:
Certificate Pages: 4                     Initials: 0                     Robert E. Jones
AutoNav: Enabled                                                         101 California Street
EnvelopeId Stamping: Enabled                                            San Francisco, CA  94111
                                                                        rejones@cooley.com
                                                                        IP Address: 173.227.174.10

## Record Tracking

Status: Original                         Holder: Robert E. Jones         Location: DocuSign
    5/23/2013 2:46:45 PM PT                  rejones@cooley.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Alex McIntosh<br>alex.mcintosh@ecomundiventures.com<br>Security Level: Email, Account Authentication (None)<br>Consumer Disclosure:<br>  Accepted: 5/23/2013 3:06:13 PM PT<br>  ID: 3219369c-f7cc-4da0-8a30-349738124e05 | DocuSigned by:<br>*Alex McIntosh*<br>1396FC7D535D435...<br><br>Using IP Address: 66.162.40.226 | Sent: 5/23/2013 2:50:22 PM PT<br>Viewed: 5/23/2013 3:06:13 PM PT<br>Signed: 5/23/2013 3:09:58 PM PT |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/23/2013 2:50:22 PM PT |
| Certified Delivered | Security Checked | 5/23/2013 3:06:13 PM PT |
| Signing Complete | Security Checked | 5/23/2013 3:09:58 PM PT |
| Completed | Security Checked | 5/23/2013 3:09:58 PM PT |

## Consumer Disclosure

## CONSUMER DISCLOSURE

From time to time, Cooley LLP (we, us or Company) may be required by law to provide to you
certain written notices or disclosures. Described below are the terms and conditions for providing
to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign)
electronic signing system. Please read the information below carefully and thoroughly, and if
you can access this information electronically to your satisfaction and agree to these terms and
conditions, please confirm your agreement by clicking the â€˜I agreeâ€™ button at the bottom of
this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available
electronically to you by us. You will have the ability to download and print documents we send
to you through the DocuSign system during and immediately after signing session and, if you
elect to create a DocuSign signer account, you may access them for a limited period of time
(usually 30 days) after such documents are first sent to you. After such time, if you wish for us to
send you paper copies of any such documents from our office to you, you will be charged a
$0.00 per-page fee. You may request delivery of such paper copies from us by following the
procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time
change your mind and tell us that thereafter you want to receive required notices and disclosures
only in paper format. How you must inform us of your decision to receive future notices and
disclosure in paper format and withdraw your consent to receive notices and disclosures
electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the
speed at which we can complete certain steps in transactions with you and delivering services to
you because we will need first to send the required notices or disclosures to you in paper format,
and then wait until we receive back from you your acknowledgment of your receipt of such
paper notices or disclosures. To indicate to us that you are changing your mind, you must
withdraw your consent using the DocuSign â€˜Withdraw Consentâ€™ form on the signing page
of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn
your consent to receive required notices and disclosures electronically from us and you will no
longer be able to use the DocuSign system to receive required notices and consents electronically
from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide
electronically to you through the DocuSign system all required notices, disclosures,
authorizations, acknowledgements, and other documents that are required to be provided or made
available to you during the course of our relationship with you. To reduce the chance of you
inadvertently not receiving any notice or disclosure, we prefer to provide all of the required
notices and disclosures to you by the same method and to the same address that you have given
us. Thus, you can receive all the disclosures and notices electronically or in paper format through
the paper mail delivery system. If you do not agree with this process, please let us know as
described below. Please also see the paragraph immediately above that describes the
consequences of your electing not to receive delivery of the notices and disclosures
electronically from us.

**How to contact Cooley LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: pwerner@cooley.com

**To advise Cooley LLP of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at pwerner@cooley.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Cooley LLP**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to pwerner@cooley.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Cooley LLP**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

    i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

    ii. send us an e-mail to pwerner@cooley.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | WindowsÂ® 2000, WindowsÂ® XP, Windows VistaÂ®; Mac OSÂ® X |
|---|---|
| Browsers: | Final release versions of Internet ExplorerÂ® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safariâ„¢ 3.0 or above (Mac only) |
| PDF Reader: | AcrobatÂ® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

Ecomundi_00113

| Enabled Security Settings: | Allow per session cookies |
|---|---|

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the â€˜I agreeâ€™ button below.

By checking the â€˜I agreeâ€™ box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Cooley LLP as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Cooley LLP during the course of my relationship with you.

**Ecomundi_00114**

# TRIAL EXHIBIT NO. 275

**From:** **Rachelle Lynch** rachelle@spur.is  📎
**Subject:** WFM Round 1 Category Review Submission
**Date:** August 21, 2013 at 2:39 PM
**To:** Alex McIntosh  alex.mcintosh@ecomundiventures.com
**Cc:** LeeAnn Stevens  leeann@spur.is

RL

Ok, here you go!

Please print (ONE) copy of each page, insert into a box with the product samples and ship to:

Whole Foods Market
ATTN: Joanne Brenner
5980 Horton Street #200
Emeryville, CA  94608

Near the shipping label, make sure to write in big letters "ROUND 1 SAMPLES" so that she knows there are samples inside.

If you decide to write a note or put your business card inside, please include a comment that I'm on your team and will be submitting docs to her electronically by 8/23.

Go us!



THRIVE FY14
Nor Ca...ide.ppt

TNC01022



**From:** **Alex McIntosh** alex.mcintosh@ecomundiventures.com
**Subject:** Re: WFM Round 1 Category Review Submission
**Date:** August 22, 2013 at 2:58 PM
**To:** Rachelle Lynch rachelle@spur.is
**Cc:** LeeAnn Stevens leeann@spur.is

Hi. So our friend Joanne brenner will get three great bottles of thrive, plus printed ppt, plus a little note from thrive founder, tomorrow by 10:30am.

Ill send you photo of my note FYI.

Great work.

What's next to make the sale with WFM? ;)

Alex McIntosh

On Aug 21, 2013, at 2:39 PM, Rachelle Lynch <rachelle@spur.is> wrote:

Ok, here you go!

Please print (ONE) copy of each page, insert into a box with the product samples and ship to:

Whole Foods Market
ATTN: Joanne Brenner
5980 Horton Street #200
Emeryville, CA  94608

Near the shipping label, make sure to write in big letters "ROUND 1 SAMPLES" so that she knows there are samples inside.

If you decide to write a note or put your business card inside, please include a comment that I'm on your team and will be submitting docs to her electronically by 8/23.

Go us!
<THRIVE FY14 Nor Cal WB New Item Submission Slide.ppt>

TNC01023

**From:** **Rachelle Lynch** rachelle@spur.is
**Subject:** Re: Alex letter to Joanne/WFM
**Date:** August 22, 2013 at 9:24 PM
**To:** Alex McIntosh  agmcintosh@gmail.com

RL

Very nice!!!!  I'm thrilled to submit this over to her and see what happens.  WHOO HOO!

On Thu, Aug 22, 2013 at 8:33 PM, Alex McIntosh <agmcintosh@gmail.com> wrote:
| FYI

TNC01024



COSTA RICA • SAN FRANCISCO

**THRIVE**

A BETTER WAY TO GROOM



**FACE BALM**
*Protects and energizes skin while reducing irritation.*
WFM Cost (Delivered) per unit = $7.50
MSRP per unit = $14.99
GM **50%**
Size: 2 fl oz.
UPC 8-52200-00501-5

**FACE WASH**
*Cleanses, energizes and refreshes skin.*
WFM Cost (Delivered) per unit = $5.00
MSRP per unit = $9.99
GM **50%**
Size: 3.38 fl oz.
UPC 8-52200-00500-8

**SHAVE OIL**
*Conditions skin for a smoother, irritation-free shave.*
WFM Cost (Delivered) per unit = $5.00
MSRP per unit = $9.99
GM **50%**
Size: 1 fl oz.
UPC 8-52200-00502-2

- BRAND NEW LINE – MEN'S FACIAL CARE – (3) SKUs
- Born in Costa Rica, and brought to your consumers via an innovative social enterprise model - talented female entrepreneurs involved in product design, partnership with rural farmers and the country's leading biodynamically certified farm to supply the active botanical plants
- Beyond Sustainability: with 85% of Costa Rica's original forests cut down, Thrive is partnering with others to regenerate degraded landscapes so that the places that supply our plants become healthier & more productive over time.
- Products feature two potent and very special active botanicals:
  - Approved for use in EU and US.
  - *A. chica* – a natural antioxidant used for 100+ years by indigenous people to treat inflammation and heal skin infections. This glorious vine is prized by locals – Thrive is working with partners to re-establish it in Costa Rica.
  - *L. alba* – a natural antioxidant, loaded with antiseptic and antifungal properties, known for it's ability to reduce skin infection and irritation. Mother Nature blessed this plant with an intoxicating aroma of mint + citrus – a natural fragrance indeed!
- Shatterproof and highly recyclable PET bottles.
- Absolutely NO synthetic preservatives or formaldehyde donors, synthetic detergents, parabens, phthalates, synthetic fragrances or synthetic colors.
- Premium Body Care: **YES - All SKUs meet Premium Body Care standards**
- Exclusive: NO
- Channel Strategy: Natural, Specialty
- Promotional Support: **Quarterly TPRs with 30% OI**
- **Monthly Demo Support + Testers + Samples**
- In Store Launch: January/2014
- Distribution: Direct (open to UNFI, if accepted into all doors)

Rachelle Lynch rachelle@spur.is (480) 544-3383



**TNC01025**



**FACE BALM** Aqua/water, Glycerin*, Aloe Barbadensis Leaf Extract***, Caprilic/Capric Triglyceride, Glyceryl Stearate**, Cetearyl Alcohol**, Sodium Stearoyl Lactylate**, Macadamia Ternifolia (Macadamia nut) Seed Oil***, Butyrospermum Parkii (Shea) Butter, Olea Europea (Olive) Fruit Oil***, Argania Spinosa Kernel Oil, Xanthan Gum, Lippia Alba Oil, Arrabidacea Chica Extract, Helianthus Annuus (Sunflower) Seed Oil, Rosemarinus Officinalis (Rosemary) Leaf Extract***, natural fragrance** (Grapefruit Oil, Lemon Oil, Orange Oil, Vetiver Oil, Star Anise Oil), Dehydroacetic Acid**, Benzyl Alcohol**, Lactic Acid**



**FACE WASH** Aqua/water, Glycerin*, Coco-Glucoside**, Lauryl Glucoside**, Xanthan Gum,  Polyglyceryl-4 Laurate/Sebacate and Polyglyceryl-6 Caprylate/Caprate**, Argania Spinosa Kernel oil, Lippia Alba Oil, Arrabidacea Chica Extract, natural Fragrance** (Grapefruit Oil, Lemon Oil, Orange Oil, Vetiver Oil, Star Anise Oil), Dehydroacetic Acid**, Benzyl Alcohol**, Lactic Acid**



**SHAVE OIL** Caprilic/Capric Triglyceride*, Olea Europea (Olive) Fruit oil***,  Sodium Caproyl Lactylate**, Sodium Lauroyl Lactylate**, Argania Spinosa Kernel oil,  Polyglyceryl-4 Laurate/Sebacate and Polyglyceryl-6 Caprylate/Caprate**, Helianthus Annuus (Sunflower) Seed Oil, Rosemarinus officinalis (Rosemary) Leaf Extract***, Lippia Alba Oil, Arrabidacea Chica Extract, Mentha Piperita Oil, Eucalyptus Globulus (Eucalyptus) Leaf Oil, natural fragrance** (Grapefruit Oil, Lemon Oil, Orange Oil, Vetiver Oil, Star Anise Oil)

**\*VEGETABLE-ORIGIN  |  \*\*ECOCERT or NATRUE CERTIFIED  |  \*\*\*ORGANIC**

TNC01026

August 2013

Dear Joanne & Team —

Our thanks to you for considering Thrive for your region. We think our economics will work well for you, and add something original + compelling to your customer's in-store experience. We also think Thrive is the future of business models; and we'd be thrilled to partner with you to realize the full vision.

Rachelle Lynch* (adour team) look forward to your feedback.      Best Regards, Alex McIntosh
Thrive Founder & CEO

*(Docs submitted electronically)

TNC01027

# TRIAL EXHIBIT NO. 298

**Jim Geikie**                                      September 5, 2013 at 5:36 PM

JG

Shave Oil

To: Alex McIntosh

I have been putting a couple drops of shaving oil on the back of my hand so that
I have the pleasure of smelling it all day (or at least several hours until it flashes
off).  I know you are getting mixed response on it.  Add me to the "aye" side.
 Also the lather, the skin conditioning, and the rinse-off are better than the
creams I had been using.  It's a very good line, Alex.  I'll plan to write down
feedback this weekend, but I wanted to use the a few times.

Jim

**TNC01423**

# TRIAL EXHIBIT NO. 299

**From: JoAnne Brenner (NC NCC)** Joanne.Brenner@wholefoods.com
**Subject:** RE: hello and surprise en route
**Date:** November 4, 2013 at 6:05 PM
**To:** Alex McIntosh amcintosh@thrivenaturalcare.com



Thanks for the samples and the buffalo.  Would you mind completing the attached for further review?

JoAnne Brenner | Nor Cal Regional Buyer | Bodycare & Lifestyle
desk: 510-428-7433 | efax: 512-404-1781 | JoAnne.Brenner@Wholefoods.com
5980 Horton St. Suite# 200 | Emeryville, CA 94608

BE GOOD TO YOUR WHOLE BODY

This email contains proprietary and confidential material for the sole use of the intended recipient.  Any review, use, distribution or disclosure by others without the permission of the sender is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of the message.

**From:** Alex McIntosh [mailto:amcintosh@thrivenaturalcare.com]
**Sent:** Wednesday, October 30, 2013 5:12 PM
**To:** JoAnne Brenner (NC NCC)
**Subject:** hello and surprise en route

Hola Joanne,

Rachelle Lynch submitted to your team back in August for Thrive Natural Care's line of three SF-based men's skin care products.  And she has handed off to me for follow up (see below).

So, **first**: Hello!  Nice to e-meet you.

Thrive makes great men's care products and is a home grown SF business just coming to market.
We offer your NorCal stores great economics (50% retailer GM + retail support)
and 'affordable premium' pricing to drive purchase & deliver more consumer value.
Two really unique plants with great skin protecting properties from Costa Rica fuel our natural formulas (Whole Foods Premium standard).
And these plants are a symbol of Thrive's mission:  to leave the planet and our communities better than we found them, starting in Costa Rica.
Our brand promise and aesthetic is unlike <u>anything</u> you have on your shelves for consumers today.  I think that's how we can add value to your 2014 line up.


**Second**, since you're likely swimming in products, evaluations, and planning for 2014, I don't want to bug you on first contact.  Could you let me know two things so that I can best align with your needs:
1) do you need anything from Thrive (samples, info etc) to get to know our brand proposition for your region while you're making your 2014 plan?
2) would you have a little time to meet with me (founder/ceo) to look at ways the Thrive brand and promotional support could support your NorCal goals for 2014?  I don't have

TNC01424

rabies and haven't bitten anyone for at least 8 months...

**Third**, be on the lookout for a fun surprise to arrive at your office tomorrow, harkening back to your roots, that I picked up during a recent trip slightly east of us...

Saludos,
Alex McIntosh
**Thrive Natural Care**
San Francisco, CA
t: 203.249.7285
e: amcintosh@thrivenaturalcare.com

Begin forwarded message:

**From:** Rachelle Lynch <rachelle@juicebeauty.com>
**Date:** October 26, 2013 3:40:25 PM PDT
**To:** "JoAnne Brenner (NC NCC)" <Joanne.Brenner@wholefoods.com>
**Subject: Thank you + THRIVE**

Hi JoAnne,

Thanks so much for your time this week.  It was great to speak with you and begin planning for 2014.

I wanted to shoot you a quick note to introduce you to my friend, Alex McIntosh.  I'm so obsessed with his new line of men's grooming products – I hope that you'll take a look at them and consider them for your stores.  I originally submitted these to you for Round 1 review.

While I'm not "officially" working with Alex on this project, I feel compelled to send along this note of endorsement for him, his company and his fantastic products.  Alex & the company are based in San Francisco and he's looking to fully support a launch – high levels of consumer/staff education, demos, promotional support, etc.  His goal is to start in your region, prove himself and the products and grow the business from there.  My husband and his friends are absolutely hooked on these products!

I'm sure Alex would be happy to send along some additional samples for store-level team members to enjoy.

Anyhow, if you're interested in learning more about what's going on with Thrive – feel free to reach out to Alex directly at amcintosh@thrivenaturalcare.com.

Hope you're enjoying the weekend!

TNC01425

Rachelle



**rachelle lynch**
business development

711 Grand Avenue, Suite 290
San Rafael, CA 94901

t  415.457.4600
c  480.544.3383

juicebeauty.com | facebook.com/juicebeauty



WB Nor Cal
Vendor...4.docx

TNC01426

# TRIAL EXHIBIT NO. 289

From: **Jaime Mruz** jmruz@pharmaca.com 
Subject: RE: on shelf?
Date: February 17, 2014 at 7:58 AM
To: Alex McIntosh amcintosh@thrivenaturalcare.com

---

Hello Alex—

Yes, I am feeling like a human being again. Much better, thanks.

All stores have received the product into inventory and have placed on the shelves. I checked this morning and the products are also now online and ready for ordering.

Hope you had a nice weekend



Jaime Mruz | Merchandising Support Administrator
4940 Pearl East Circle, Suite 301 | Boulder, CO 80301
303.867.3134 | Fax 303.867.4134
PHARMACA.COM™

**From:** Alex McIntosh [mailto:amcintosh@thrivenaturalcare.com]
**Sent:** Friday, February 14, 2014 3:43 PM
**To:** Jaime Mruz
**Subject:** on shelf?

Hi Jaime,

Hope you're feeling better now.

What day do you expect that the Thrive products will go on shelf in Pharmaca stores?  The planned arrival date of product was 2/17-2/20, but we were able to ship a bit earlier.  Wanted to be sure our web directed people at the right time.

Let me know when you have a chance and have a good weekend.

Alex McIntosh
**Thrive Natural Care**
San Francisco, CA

**t:** 203.249.7285
**e:** amcintosh@thrivenaturalcare.com



**TNC01385**

TNC01386

# TRIAL EXHIBIT NO. 322

## NUNC PRO TUNC TRADEMARK ASSIGNMENT

This Trademark Assignment ("Assignment") is effective as of May 23, 2013 by and between Ecomundi Ventures, LLC (the "Assignor"), a Connecticut limited liability company having an address of 42 Darrell Place San Francisco, California 94133 and Thrive Natural Care, Inc. (the "Assignee"), a Delaware corporation having an address of 42 Darrell Place San Francisco, California 94133 (collectively the "Parties").

WHEREAS, Assignor has adopted, used, and/or intends to use, and is the owner of the trademark THRIVE for the goods and services identified in Schedule A hereto (the "Trademark") and the corresponding United States trademark applications identified on Schedule A hereto.

WHEREAS, Assignor had a bona fide intent to use the Trademark in U.S. commerce at the time of filing of the Applications with the U.S. Patent and Trademark Office and has maintained a bona fide intent to use the Trademark since that time for the corresponding goods and services;

WHEREAS, Assignee is the successor to the business of the Assignor to which the Trademark pertains and the Parties have entered into the TECHNOLOGY ASSIGNMENT AGREEMENT dated May 23, 2013, regarding the transfer of all rights to the THRIVE trademark, which is incorporated herein by reference and made part of this agreement; and

WHEREAS, for the avoidance of doubt, Assignor and Assignee wish to enter into an agreement regarding the rights to the THRIVE trademark in the United States;

NOW, THEREFORE, in consideration of the foregoing promises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby assign, transfer, and convey to Assignee as the successor to the business of Assignor as set forth above, all right, title, and interest in the United States in and to the Trademark and the Applications, together with the good will associated therewith, that portion of the Assignor's ongoing and existing business to which the Trademarks pertain, and all rights and causes of action accrued, accruing, and to accrue under and by virtue hereof, including the right to sue and recover for past infringement, and to receive all damages, payments and costs and fees associated therewith.

.                                    Assignor:       ECOMUNDI VENTURES, LLC, by its
                                                     authorized representative:


                                                     Signature: _____

                                                     Name:  Alex McIntosh, CEO_____

                                                     Date: September 27, 2013_____

**Ecomundi_00078**

**SCHEDULE A**

| Mark | U.S. Serial No. | Filed | Class | Goods |
|------|-----------------|-------|-------|-------|
| THRIVE | 85726058 | September 11, 2012 | 03 | Personal care products for cosmetic use, namely, hair shampoos and conditioners, hair styling preparations; body and hand washes, soaps and gels; non-medicated skin care preparations, namely facial lotions, cleansers and creams, body lotions, creams and oils for cosmetic use, skin moisturizers; cosmetic sun care preparations and sunscreens; lip creams and balms; antiperspirants and deodorants for personal use; shaving creams and gels; pre-shaving preparations; after shave lotions and creams; non-medicated baby care products, namely baby lotions, creams, body cleansers, shampoos, gels and washes, diaper rash creams and ointments |
| THRIVE | 85726062 | September 11, 2012 | 05 | Medicated skin care products, namely, creams, lotions and oils; medicated hair care, namely, shampoos and creams; medicated facial cleansers, hand and body washes; medicated sunscreens and sunburn lotions; medicated lip creams and balms |

**Ecomundi_00079**